CHARLES R. GIBBS (*pro hac vice* admission pending)
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

DAVID P. SIMONDS (*pro hac vice* admission pending)
ARUN KURICHETY (*pro hac vice* admission pending)
AKIN GUMP STRAUSS HAUER & FELD LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (310) 229-1000
Facsimile: (310) 229-1001

– and –

JARED G. PARKER (SBN: 6428)
PARKER SCHWARTZ, PLLC
7310 N. 16th St., Suite 330
Phoenix, Arizona 85020
Telephone: (602) 282-0476
Facsimile: (602) 282-0478

[Proposed] Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>ELECTRIC TRANSPORTATION ENGINEERING CORPORATION (d/b/a ECOTALITY NORTH AMERICA), *et al.*, [1]<br><br>Debtors.<br><br>――――――――――――――――――<br><br>This filing applies to:<br><br>■ All Debtors<br><br>☐ Specified Debtors | Case No. 2:13-BK-16126 (RJH)<br><br>Chapter 11<br><br>Jointly Administered<br><br>**MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (B) PRESCRIBING THE FORM AND MANNER OF NOTICE AND SCHEDULING A FINAL HEARING, AND (C) GRANTING CERTAIN RELATED RELIEF**<br><br>Hearing Date: _____, 2013<br>Time: _____ |

―――――――――――――

[1] The Debtors in these jointly administered chapter 11 cases and the last four digits of their respective Employer Identification Numbers are: (i) ECOtality, Inc. (5422); (ii) Electric Transportation Engineering Corporation (4755); (iii) ECOtality Stores, Inc. (2643); (iv) ETEC North, LLC (n/a); (v) The Clarity Group, Inc. (8832); and (vi) G.H.V. Refrigeration, Inc. (4512). The Debtors' service address at ECOtality, Inc.'s corporate headquarters is Post Montgomery Center, One Montgomery Street, Suite 2525, San Francisco, California 94104.

The above-captioned debtors and debtors in possession (collectively, the "***Debtors***") hereby submit this motion (the "***Motion***") seeking (i) entry of an interim order, substantially in the form attached hereto as **<u>Exhibit A</u>** (the "***Interim Order***"),[2] (a) authorizing the Debtors to incur postpetition financing on an interim basis, (b) proscribing the form and manner of notice and scheduling a final hearing, and (c) granting certain related relief, and (ii) entry of a final order (a) authorizing the Debtors to incur postpetition financing on a final basis, and (b) granting certain related relief.  In support of the Motion, the Debtors also submit the First Day Declaration and respectfully state as follows:

I.

<u>**JURISDICTION AND VENUE**</u>

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

The bases for the relief requested herein are sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(e), and 507 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 4001-4 of the Local Rules of Bankruptcy Procedure for the District of Arizona (the "***Local Rules***").

II.

<u>**BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-4 DISCLOSURES**</u>

In accordance with the disclosure requirements of Bankruptcy Rules 4001(b)-(d) and Local Rule 4001-4, the material terms of that certain *Credit and Security Agreement*, dated as of September 16, 2013 (the "***DIP Credit Agreement***"), are set forth below.  To satisfy the requirements of Local Rule 4001-4, the description of the material terms set forth below includes a description of the nonconsensual priming of the Materialmen (as defined below) and the treatment of any official

---

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Declaration of H. Ravi Brar in Support of First Day Pleadings* (the "***First Day Declaration***"), the DIP Credit Agreement (as defined herein) or the Interim Order, as applicable.

committee of unsecured creditors (the "***Creditors' Committee***") appointed in these chapter 11 cases under the Carve-Out (as defined below):[3]

| | |
|---|---|
| **Borrowers** | ECOtality, Inc. ("***ECOtality***") and Electric Transportation Engineering Corporation (together with ECOtality, the "***Borrowers***" and each, individually, a "***Borrower***") |
| **Guarantors** | ECOtality Stores Inc. ("***Stores***"), ETEC North LLC ("***North***"), The Clarity Group, Inc. ("***Clarity***"), G.H.V. Refrigeration, Inc., ("***GHV***" and, together Stores, North, Clarity, and GHV, the "***Guarantors***" and, together with the Borrowers, each a "***Credit Party***" and, collectively, the "***Credit Parties***") |
| **Lender** | Nissan North America, Inc. (the "***DIP Lender***") |
| **DIP Financing** | A senior secured credit facility comprised of a $1,250,000 delayed draw term loan (the "***DIP Financing***" and, together with all other loan documents related thereto, the "***DIP Documents***"), which shall be made available to the Debtors in the following amounts (each an "***Advance***") by 10:00 a.m. (Pacific Daylight Time) on the following dates (each an "***Advance Date***"): <br><br> <table><tr><th>Advance Date</th><th>Advance</th></tr><tr><td>Closing Date</td><td>$500,000</td></tr><tr><td>September 25, 2013</td><td>$250,000</td></tr><tr><td>September 30, 2013</td><td>$250,000</td></tr><tr><td>October 7, 2013</td><td>$250,000</td></tr></table> |
| **DIP Financing Maturity Date** | All amounts outstanding and other Obligations shall be due and payable in full on the date (the "***Maturity Date***") that is the earliest of (i) any date on which Lender accelerates the maturity of the DIP Financing pursuant to Section 8.1 of the DIP Credit Agreement, (ii) the date upon which the Interim Order expires if the Final Order has not been entered prior to such date, (iii) the closing of the Sale, and (iv) October 28, 2013. |
| **Limits on Use of the DIP Financing** | The proceeds of the DIP Financing may be used by Borrowers as set forth in the proposed budget (the "***Budget***"), a copy of which is attached to the Interim Order as **Annex B**, as follows:  (i) to fund Borrowers' working capital requirements, operating expenses, costs of administration of these chapter 11 cases (including professional fees), (ii) to fund the payment of interest accrued on the DIP Financing, (iii) to pay compensation to, or reimburse or advance ordinary course expenses incurred or to be incurred by, the executives and employees of the Borrowers, (iv) to provide to the Operating Subsidiaries (as defined in the DIP Credit Agreement) no more than $27,000 in excess of the receivables and cash owned by the Operating Subsidiaries but included in the cash balance stated in the Budget (the "***Operating Subsidiary Funds***"), and (v) to provide an aggregate amount of no more than $5,000 to the Guarantors (other than the Operating Subsidiaries), which shall be used solely for costs and expenses directly related to paying the administrative costs necessary to maintain the corporate existence of such Guarantors' business operations  (the "***Administrative Funds***"). |
| **Use of Cash Collateral** | The Debtors are not seeking authority to use cash collateral pursuant to the Motion. |

---

[3] This following information is intended only for summary purposes and is qualified in its entirety by the provisions of the DIP Credit Agreement, a copy of which is attached to the Interim Order as **Annex A**.

| | |
|---|---|
| **Interest Rate** | Interest shall accrue on the outstanding principal balance of the DIP Financing at a per annum rate equal to five percent (5%) (the "***Interest Rate***"). All interest shall be due and payable on the Maturity Date. Upon the occurrence and during the continuation of an Event of Default, the Interest Rate in effect at such time with respect to the Obligations shall be increased by two percent (2%) per annum. |
| **Fees** | The Debtors shall, upon demand on or after the Maturity Date, pay all reasonable, out-of-pocket, third-party costs and expenses incurred by DIP Lender and/or its Affiliates, including, without limitation, documentation and diligence fees and expenses, all search, audit, appraisal, recording, professional and filing fees and expenses and all other out-of-pocket charges and expenses (including, without limitation, UCC and judgment and tax lien searches and UCC filings and fees for post-Closing UCC and judgment and tax lien searches and wire transfer fees and audit expenses), and reasonable attorneys' fees and expenses incurred, (i) in any effort to enforce, protect or collect payment of any DIP Obligation or to enforce any DIP Document or any related agreement, document or instrument, (ii) in connection with these chapter 11 cases or entering into, negotiating, preparing, reviewing and executing the DIP Documents and/or any related agreements, documents or instruments, (iii) in connection with instituting, maintaining, preserving, enforcing and/or foreclosing on DIP Lender's liens in any of the DIP Collateral, whether through judicial proceedings or otherwise, (iv) in defending or prosecuting any actions, claims or proceedings arising out of or relating to DIP Lender's transactions with the Debtors, (v) in seeking, obtaining or receiving any advice with respect to its rights and obligations under any DIP Document and any related agreement, document or instrument, and/or (vi) in connection with any modification, restatement, supplement, amendment, waiver or extension of any DIP Document and/or any related agreement, document or instrument. |
| **Milestone Requirements** | The DIP Financing includes certain milestone requirements, including (a) entry by the Bankruptcy Court of the Sale Procedures Order, in a form acceptable to the DIP Lender, on or before September 20, 2013; (b) entry by the Bankruptcy Court of the Sale Approval Order, in a form acceptable to the DIP Lender, on or before October 11, 2013; and (c) closing of the Sale on or before October 28, 2013. |
| **Covenants** | The DIP Credit Agreement contains certain affirmative and negative covenants customarily found in loan agreements for similar debtor-in-possession financings and other affirmative covenants deemed by the DIP Lender to be appropriate to the specific transaction |
| **Liens and Priorities** | **Liens:** Pursuant to Bankruptcy Code sections 361, 362, 364(c)(2), 364(c)(3), and 364(d), and subject to the Carve-Out in all respects, the DIP Lender as security and collateral for the DIP Financing, will be granted continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected: (a) first priority security interests in and liens on, and pledges of all now existing and hereafter acquired assets of the Debtors, including any residual interest in favor of the Debtors' estates on account of any prepetition retainers provided to the Debtors' professionals (but, for the avoidance of doubt, not any amount attributable to fees and expenses allowed or to be allowed by the Court, except the Prepetition Collateral, and all proceeds and products of the foregoing; and (b) second priority security interests in and liens on, and pledges of, the Prepetition Collateral, and all proceeds and products of the foregoing ((a)-(b) collectively the "***DIP Collateral***" and the "***DIP Liens***" as applicable).[4] Notwithstanding anything contrary herein or in the DIP Documents, the DIP Collateral shall exclude any claims under chapter 5 of the Bankruptcy Code, including any and all proceeds thereof. |

---

[4] All defined terms in the description of DIP Collateral shall have the meanings ascribed thereto in the DIP Documents. All terms not specifically defined in the DIP Documents shall have the meanings ascribed to such terms in Article 8 or 9 of the Uniform Commercial Code.

Notwithstanding anything further to the contrary herein or Section 2.5 of the DIP Credit Agreement, such grant of a security interest shall not extend to, and the DIP Collateral shall not include the Government Funded Property (as defined in the DIP Credit Agreement), except as follows: (a) the Credit Parties grant a first priority lien in their interest in the proceeds of any sale of Government Funded Property; and (b) the Credit Parties grant a first priority lien in Debtors' interest in the Government Funded Property which shall attach and become enforceable only if and when the DOE approves of said lien at the time that (i) there are no third party qualified bids after the expiration of the bid deadline at any 363 sale or foreclosure sale; and (ii) the DIP Lender exercises its statutory right to credit bid in the amount or a portion of the Loan at any 363 sale or foreclosure sale. Notwithstanding the existence of any lien on Government Funded Property, any interests of the DOE under federal law, including without limitation any rights under 10 C.F.R. § 600.321, remain on the Government Funded Property

**Priority of Liens:** Except with respect to the Prepetition Collateral and the Government Funded Property, and subject to the Carve-Out, the DIP Liens shall be senior to any and all security interests in or liens on the DIP Collateral. With respect to the Prepetition Collateral, the DIP Liens shall only be junior to the Prepetition Lien of the Prepetition Lender. Other than as set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the chapter 11 cases or any Successor Cases. The DIP Liens shall be valid and enforceable against any trustee or other estate representative appointed in these chapter 11 cases or any Successor Cases, upon the conversion of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Cases), and/or upon the dismissal of these chapter 11 cases or any Successor Cases. The DIP Liens shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the DIP Liens.

**Superpriority:** The DIP Lender will granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in these chapter 11 cases and any Successor Cases (the "***DIP Superpriority Claim***") for all DIP Obligations. Subject to the Carve-Out, the DIP Superpriority Claim shall have priority over any and all administrative expenses and unsecured claims against the Debtors or their estates in these chapter 11 cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, except as set forth herein, and (b) at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative, to the extent permitted by law. The DIP Superpriority Claim shall not extend to any avoidance actions or claims arising under chapter 5 of the Bankruptcy Code, or any of the proceeds thereof, except that the DIP Superpriority Claim shall extend to any avoidance actions or claims in each case (i) relating to the proceeds of Government Funded Property, or (ii) arising under section 549 of the Bankruptcy Code and the proceeds thereof.

**Priming:** The Materialman Liens will be primed pursuant to Bankruptcy Code section 364(d). The priming of the Materialman Liens is necessary to obtain the DIP Financing and will enable the Debtors to continue to operate their business for the benefit of their estates and creditors. In exchange for the priming of the Materialman Liens set forth below, the Materialmen shall be entitled to receive adequate protection, as set forth below.

| | |
|---|---|
| **Carve-Out** | For purposes of the Interim Order and the Final Order, the term "***Carve-Out***" shall mean the sum provided in the Budget of (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (ii) fees and expenses of up to $10,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) fees and expenses of the Creditors' Committee subject to a cap of $30,000. The DIP Lender shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any professionals retained by the Debtors incurred in connection with these chapter 11 cases or any Successor Cases. |
| **Adequate Protection for Materialmen** | In exchange for the priming of the Materialman Liens, the Materialmen shall be entitled to receive adequate protection on account of their respective interests in the Debtors' assets pursuant to Bankruptcy Code sections 361, 362, and 364 to the extent of any Diminution in Value of their respective interests in the Debtors' assets. Pursuant to sections 361, 364 and 507(b), but only to the extent that any allowed claims of Materialmen remain outstanding, and only to the extent Materialmen hold valid and perfected liens on and security interests in the Debtors' assets, and only to the extent of any Diminution in Value of their respective interests in the Debtors' assets, the Materialmen will receive as adequate protection: (a) automatically perfected, subordinated replacement liens on the DIP Collateral (the "Adequate Protection Liens"); and (b) a superpriority administrative expense claim, as provided in sections 503(b) and 507(b) of the Bankruptcy Code, against the Debtors, which super-priority claim shall have priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, or any kind or nature whatsoever; provided, however, that any such superpriority claim shall be junior to the claims of the DIP Lender; provided further, that such superpriority claim shall only apply to the extent that the Adequate Protection Liens fail to protect the Materialmen against any Diminution in Value. Effective immediately upon approval of the Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the Materialmen are hereby granted the Adequate Protection Liens on the DIP Collateral, which Adequate Protection liens shall at all times be subordinate to the DIP Liens and other claims of the DIP Lender. The Adequate Protection Liens shall be deemed a Permitted Lien within the meaning of the DIP Credit Agreement. |
| **Events of Default** | The DIP Credit Agreement contains events of default customarily found in loan agreements for similar debtor-in-possession financings and other events of default deemed by the DIP Lender to be appropriate to the specific transaction. |
| **Default Remedies** | Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Lender, as provided in the DIP Documents, may declare: (a) all DIP Obligations owing under the DIP Documents to be immediately due and payable; (b) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains; and/or (c) the termination of the DIP Credit Agreement and any other DIP Document as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Liens or the DIP Obligations (any such declaration by the DIP Lender shall be referred to herein as a "***Termination Declaration***"). The Termination Declaration shall be given by email (or other electronic means) to counsel to the Debtors, counsel to any Creditors' Committee appointed by this Court (or if no Creditors' Committee is appointed, to the Debtors' twenty (20) largest creditors), and the U.S. Trustee (the earliest date any such Termination Declaration is made shall be referred to herein as the "Termination Declaration Date"). The DIP Obligations shall be due and payable, without notice or demand, on the Termination Declaration Date. |

| | |
|---|---|
| **Waiver or Modification of the Automatic Stay** | Subject to the terms of Paragraph 23 of the Interim Order, the automatic stay imposed under section 362(a) of the Bankruptcy Code shall be modified as necessary to effectuate all of the terms and provisions of the Interim Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, and DIP Superpriority Claim, if permitted; (b) permit the Debtors to incur all liabilities and obligations under the DIP Documents, the DIP Financing and the Interim Order; (c) permit the Debtors to perform such other acts as are necessary to effectuate the terms of the Interim Order; and (d) authorize the Debtors to pay, and the DIP Lender to retain and apply, payments made in accordance with the terms of the Interim Order. |
| **Waivers/Modification Regarding Perfection or Enforcement of a Lien** | The Interim Order and the Final Order will be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and Adequate Protection Liens without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable nonbankruptcy law) the DIP Liens and Adequate Protection Liens, or to entitle the DIP Lender to the priorities granted in the DIP Documents, the Interim Order, or the Final Order. |
| **Indemnification** | The Debtors will indemnify the DIP Lender, its Affiliates, and its and their respective shareholders, subsidiaries, managers, members, officers, directors, employees, Affiliates, agents, representatives, successors, assigns, accountants, attorneys, and advisors (collectively, the "***Indemnified Persons***") from and against any and all liabilities, claims, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, reasonable attorneys' fees and expenses) which may be imposed on, incurred by or asserted against any Indemnified Person with respect to any breach of any representation or warranty contained herein or in any DIP Document, or arising out of, or in any litigation, proceeding or investigation instituted or conducted by any Person with respect to any aspect of, or any transaction contemplated by or referred to in, or any matter related to, any DIP Document or any agreement, document or transaction contemplated thereby, whether or not such Indemnified Person is a party thereto other than from the Indemnified Parties' gross and willful misconduct (as determined by a court of competent jurisdiction in a final, non-appealable order). |
| **Conditions to Closing and Advances** | The DIP Credit Agreement contains conditions precedent to the Closing and each Advance. |

# III.

# FACTUAL BACKGROUND

## A.  General Background

On the date hereof (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108, and have sought procedural consolidation and joint administration of these chapter 11 cases.  No official committee of unsecured creditors, nor any trustee or examiner, has been appointed in these cases.

A description of the Debtors' businesses and the reasons for filing these chapter 11 cases is set forth in the First Day Declaration, which was filed contemporaneously herewith and is incorporated by reference as if fully set forth herein.

## B.    Specific Background

### 1.    Need for Postpetition Financing

As of the Petition Date, and as described more fully in the First Day Declaration, the Debtors had cash on hand of less than $500,000 and do not currently generate sufficient cash to fund their operating expenses. As a result, the Debtors have, with the assistance of their financial advisor FTI Consulting, Inc. ("*FTI*"), analyzed their cash needs in an effort to determine what is necessary to maintain their businesses in chapter 11 while working toward a sale of substantially all of their assets pursuant to Bankruptcy Code section 363. In undertaking this analysis, the Debtors and their advisors have considered the impact of the current economic outlook on the Debtors' near-term projected financial performance, as well as the costs associated with conducting an orderly sale process.

As part of these recent financial analyses and projections, the Debtors, with the assistance of FTI, developed a rolling cash flow forecast, which takes into account anticipated cash receipts and disbursements during that time. This forecast considers a number of factors, including the impact of a bankruptcy filing, material cash disbursements, cash flows, and costs related to a sale process. Absent approval of the DIP Financing, these analyses and projections show that the Debtors' current cash on hand and the cash generated going forward will be insufficient to, among other things, preserve the Debtors' assets during the pendency of these chapter 11 cases and, more specifically, the sale process being pursued by the Debtors.

Without access to the DIP Financing, the Debtors will soon have no cash available to maintain their businesses and make the necessary expenditures that are critical to their operations and ability to conduct an orderly sale process. As such, the Debtors would be forced to curtail or most likely terminate their businesses to the material detriment of the value of their assets and all parties in interest in these chapter 11 cases.

### 2. *The Debtors' Efforts to Obtain Postpetition Financing*

When it became apparent that the Debtors were generating insufficient cash to support their operating expenses and that a chapter 11 filing may be necessary, consistent with their fiduciary duties, the Debtors and FTI canvassed the market for potential third-party financing, either through a pre-bankruptcy facility or a debtor in possession facility. In addition to traditional financial institutions and parties that specialize in distressed lending, the Debtors and FTI contacted a number the Debtors' prepetition strategic partners, including those parties that rely on the Debtors' goods, services, and/or ongoing operations in some way, to gauge interest in a potential financing transaction.

Of the thirty-four (34) potential funding sources contacted by the Debtors and FTI, the DIP Lender was one of twenty-three (23) parties that gave a preliminary indication of interest. Of the twenty-three (23) parties that provided a preliminary indication of interest, three (3) executed confidentiality agreements. However, the DIP Lender was the only party that ultimately indicated a willingness to extend debtor-in-possession financing to the Debtors on favorable terms. Importantly, the Debtors manufacture and manage the network of electric vehicle chargers that is relied upon by certain of the DIP Lender's customers. The Debtors believe that this prepetition relationship with the DIP Lender allowed them to secure a proposal for the DIP Financing on a much quicker schedule and on more favorable terms than would have otherwise been possible.

Nevertheless, prior to and during negotiations with the DIP Lender, the Debtors and their advisors analyzed and marketed various debtor in possession financing structures, and evaluated the Debtors' need for financing (*i.e.*, amount, type, etc.). In addition, the Debtors and their advisors carefully weighed the effect that the Debtors' prepetition relationship with the DOE would have on their ability to attain debtor in possession financing and ultimately sell substantially all of their assets in a chapter 11 proceeding.

In light of the above, and after thoroughly considering all other options, the Debtors determined that the proposal by the DIP Lender was in the best interests of their estates and all of their stakeholders. Specifically, the Debtors concluded that the proposal embodied in the DIP Credit Agreement is desirable because it provides the financing necessary to continue their businesses while pursuing a sale of substantially all of their assets. Absent approval of the DIP Financing, the Debtors

will exhaust their available cash within weeks and likely be forced to terminate their operations to the substantial detriment of the value of their assets to potential purchasers. Moreover, the financing offered by the DIP Lender is especially attractive because it allows the Debtors to avoid a costly and uncertain priming fight with the DOE. Specifically, as set forth in the DIP Credit Agreement, the Debtors, the DIP Lender, and the DOE have agreed that the security interests provided to the DIP Lender do not extend to, and the DIP Collateral does not extend to, the Government Funded Property (as defined in the DIP Credit Agreement), except as specified in section 2.5(c) of the DIP Credit Agreement. Based on these factors, and in light of the fair and thorough negotiation process undertaken by the Debtors, the DIP Financing is the only feasible postpetition financing option for the Debtors and is in the best interests of the Debtors' estates.

### 3.     Implementation of the DIP Financing

The DIP Financing will allow the Debtors to draw on a $1,250,000 commitment from the DIP Lender. This commitment should allow the Debtors to meet all of their obligations during these chapter 11 cases while pursuing an orderly disposition of substantially all of their assets. The Debtors and the DIP Lender have agreed upon the Budget for the four (4) week period from the Closing Date. The Debtors believe that the Budget is achievable and will allow the Debtors to operate without the accrual of unpaid administrative expenses.

## IV.

## <u>RELIEF REQUESTED</u>

By this Motion, the Debtors request entry of an interim order, pursuant to Bankruptcy Code sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(e) and 507, Bankruptcy Rules 2002, 4001 and 9014, and Local Rule 4001-4, (a) authorizing the Debtors to incur postpetition financing on an interim and final basis in an aggregate amount not to exceed $1,250,000, (b) authorizing the Debtors to execute and deliver the DIP Documents, (c) authorizing the Debtors' use of the proceeds of the DIP Loans, (d) granting the DIP Lender first priority security interests on all assets owned by the Debtors that are otherwise unencumbered by liens held by the DOE, (e) granting the DIP Lender junior security interests on all assets owned by the Debtors that are encumbered by liens held by the DOE, (f) authorizing the Debtors to pay the principal, interest and other amounts payable under the DIP

Documents as they become due, (g) vacating and modifying the automatic stay to the extent necessary to implement the DIP Documents, and (h) granting certain related relief.

In accordance with Local Rule 9013-1, the bases for the relief requested are set forth herein and in the First Day Declaration.

**V.**

**BASIS FOR RELIEF**

As set forth in detail above, the DIP Financing is the best financing available to the Debtors at this time. The Debtors have been unable to procure sufficient financing: (i) in the form of unsecured credit allowable under Bankruptcy Code section 503(b)(l); (ii) solely as an administrative expense under Bankruptcy Code sections 364(a) and (b); or (iii) in exchange solely for the grant of a superpriority administrative expense claim pursuant to Bankruptcy Code section 364(c). Thus, based on the foregoing and for the reasons set forth below, the Debtors submit that they have satisfied the requirements to access postpetition financing on a superpriority, secured basis pursuant to Bankruptcy Code section 364.

**A.      The Debtors Should Be Authorized to Obtain Postpetition Financing Under Bankruptcy Code Section 364**

Pursuant to Bankruptcy Code section 364(c), a court may authorize a debtor to incur debt that is (a) entitled to a superpriority administrative expense status; (b) secured by a lien on otherwise unencumbered property; or (c) secured by a junior lien on encumbered property if the debtor cannot obtain postpetition credit on an unsecured basis, on an administrative expense priority, or secured solely by junior liens on the debtor's assets. *See* 11 U.S.C. § 364(c);[5] *In re Barbara K. Enters, Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *8 (Bankr. S.D.N.Y. June 16, 2008) (in order for a debtor

---

[5] Specifically, Bankruptcy Code section 364(c) provides, in pertinent part, that:

> If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt – (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2) secured by a junior lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

to obtain postpetition secured credit under section 364, the debtor must prove that it was unable to reasonably obtain secure credit elsewhere); *Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).

Courts have fashioned guidelines in applying these statutory requirements.  Generally, courts advocate using a "holistic approach" to evaluate postpetition financing agreements, which focuses on the transaction as a whole.  As one court has noted:

> Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and . . . the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.

*In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *see also In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 442 (Bankr. S.D.N.Y. 2010).

More specifically, in evaluating a debtor's proposed postpetition financing, courts consider whether the postpetition financing:  (a) is necessary to preserve the assets of the estate and is necessary, essential, and appropriate for continued operation of the debtor's business; (b) is in the best interests of the debtor's creditors and estates; (c) is an exercise of the debtor's sound and reasonable business judgment; (d) was negotiated in good faith and at arm's length between the debtor, on the one hand, and the lender on the other; and (e) contains terms that are fair, reasonable, and adequate, given the circumstances of the debtor and the proposed postpetition lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) *cited in* Tr. of Rec. at 733:3-6; *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009); *see also In re Barbara K. Enters., Inc.*, 2008 WL 2439649 at *10; *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

Here, the Debtors propose to obtain the financing in the form provided for in the DIP Credit Agreement by providing, among other things, superpriority claims, security interests, and liens pursuant to Bankruptcy Code sections 364(c)(1)-(3) and 364(d).  For the reasons set forth below, the Debtors submit that entry into the DIP Financing satisfies these factors.

1.     *The DIP Financing was Negotiated in Good Faith, and Entry into the DIP Financing is in the Best Interests of the Debtors' Creditors and Estates, is Necessary to Preserve Estate Assets, and is an Exercise of the Debtors' Sound and Reasonable Business Judgment*

A debtor's decision to enter into a postpetition lending facility under Bankruptcy Code section 364 is governed by the business judgment standard. *See Barbara K. Enters.*, 2008 WL 2439649, at *14 (explaining that courts defer to a debtor's business judgment); *Ames Dep't Stores*, 115 B.R. at 38 (noting that financing decisions under Bankruptcy Code section 364 must reflect a debtor's business judgment). Courts grant a debtor considerable deference in acting in accordance with its sound business judgment. *See, e.g.*, *Barbara K. Enters.*, 2008 WL 2439649, at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *Trans World Airlines, Inc. v. Travelers Int'l AG* (*In re Trans World Airlines, Inc.*), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("[D]iscretion to act with regard to business planning activities is at the heart of the debtor's power.") (citations omitted).

Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del, Aug. 15, 2007) (quoting *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006)); *In re Brooklyn Hosp. Ctr. and Caledonian Health Ctr., Inc.*, 341 B.R. 405, 410 (Bankr. E.D.N.Y. 2006) (the business judgment rule "is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company") *quoting Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in

good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.") (citation omitted).

Furthermore, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Financing, the Court should consider the economic terms of the DIP Financing in light of current market conditions. *See, e.g.,* Tr. of Rec., 734-35:24, *In re Lyondell Chem. Co.,* Case No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) (recognizing "the terms that are now available for DIP financings in the current economic environment aren't as desirable" as in the past). Moreover, it is appropriate for the Court to consider noneconomic benefits to the Debtors offered by a proposed postpetition financing facility. For example, in *In re ION Media Networks, Inc.,* the Bankruptcy Court for the Southern District of New York held that:

> Although all parties . . . are naturally motivated to obtain financing on the best possible terms, the business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic factors. . . . This is particularly true in a bankruptcy setting where cooperation and established alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable plan of reorganization. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

Case No. 09-13125 (Bankr. S.D.N.Y. July 6, 2009).

The Debtors' decision to enter into the proposed DIP Financing is an exercise of their sound business judgment that warrants approval by the Court. As described in more detail above, the Debtors' decision to enter into the DIP Financing is the culmination of an exhaustive process targeted at procuring the best available financing under the circumstances. The Debtors negotiated the DIP Financing with the DIP Lender in good faith, at arm's length, and with the assistance of outside advisors to obtain the required postpetition financing on the most favorable terms possible to the Debtors.

Upon consultation with the Debtors' advisors, and through the Debtors' own analysis, the Debtors have determined, in their sound business judgment, that the DIP Financing provides for financing on more favorable terms than any other reasonably available alternative. As noted above, a number of the DIP Lender's customers are dependent on the Debtors' network of electric vehicle

chargers.  The Debtors firmly believe that this reliance encouraged the DIP Lender to offer the DIP Financing on substantially better terms than would have otherwise been possible.

Moreover, entry into the DIP Financing is absolutely necessary to the preservation of estate assets and is in the best interest of the Debtors' creditors and all parties in interest.  Specifically, entry into the DIP Financing is part of a comprehensive strategy that will enable the Debtors to preserve the value of their assets while pursuing a sale process pursuant to Bankruptcy Code section 363.  Given the Debtors' significantly constrained liquidity, the DIP Financing is of critical importance to preserving the Debtors' going concern value and maximizing value received through a Bankruptcy Code section 363 sale.  As discussed above, without access to the DIP Financing, the Debtors would likely deplete available cash within weeks and likely be forced to cease their day-to-day operations.  Such a result would have a devastating effect on the value of the Debtors' assets and substantially harm all parties in interest.

Additionally, the Debtors' access to the DIP Financing will ensure that the value of their assets is preserved, thereby providing a greater recovery to the Debtors' creditors than would be realized if the Debtors were forced to engage in a fire-sale liquidation of their assets under chapter 7 of the Bankruptcy Code.  Accordingly, the Debtors submit that the availability of credit under the DIP Financing is necessary to preserve and enhance the value of their estates for the benefit of all stakeholders in these chapter 11 cases.

For these reasons, the Debtors submit that the terms of the DIP Financing were negotiated in good faith, and that entry into the DIP Financing is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets, and is an exercise of the Debtors' sound and reasonable business judgment.

> 2. *The Terms of the DIP Financing Are Fair, Reasonable, and Appropriate in Light of the Debtors' Needs and the Current Market Environment*

It is well recognized that the appropriateness of a proposed postpetition financing facility must be considered in light of current market conditions.  *See, e.g.,* Tr. of Rec. at 734-35:24, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009); *Bray v. Shenandoah Fed. Savs. & Loan Assoc. (In re Snowshoe Co. Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (noting that a debtor is not

required to seek credit from every possible lender before determining such credit is unavailable). Indeed, courts often recognize that, where there are few lenders likely able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [a debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989); *see also In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (the Bankruptcy Code "does not require the debtor to seek alternate financing from every possible lender"). This is especially true when time is of the essence. *See In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). Rather, a debtor must demonstrate that it made a reasonable effort to seek credit from other sources available under Bankruptcy Code sections 364(a) and (b). *See Snowshoe*, 789 F.2d at 1088; *see also In re Utah 7000, L.L.C.*, No. 08-21869, 2008 WL 2654919, at *2 (Bankr. D. Utah July 3, 2008); *Shaw Indus.*, *Inc v. First Nat'l Bank of PA (In re Shaw Indus., Inc.)*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) (where debtor made efforts by contacting "numerous" lenders and was unable to obtain credit without a priming lien, it had met its burden under Bankruptcy Code section 364(d)); *In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 899-900 (Bankr. N.D. Ohio 1992).

Though the current market for financing may be improving, it is still strained as the global economy struggles to recover from the credit crisis that began in 2008. Simply put, because of current economic conditions, there is a limited market for financing, including debtor in possession financing or otherwise, and provisions once considered "extraordinary" in debtor in possession financing arrangements have, for the time being, become standard. *See, e.g.*, Tr. of Rec., *Lyondell*, at 740:4-6 & 752-53:22 ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now."); Tr. of Rec. 123:17-25, 123:1, *Chemtura*, No. 09-11233 (S.D.N.Y. Mar. 20, 2009) (J. Gonzalez noting support for finding that DIP with roll-up provision was the only funding available to meet the debtors' needs at that time).

Nevertheless, the Debtors believe that the terms that they have negotiated in the DIP Documents are favorable, fair, and appropriate. As explained above, in addition to a superpriority administrative expense claim, the DIP Lender, the Debtors, and the DOE have agreed that the security

interests provided to the DIP Lender do not extend to, and the DIP Collateral does not extend to, the Government Funded Property, except as specified in section 2.5(c) of the DIP Credit Agreement. This will allow the Debtors to avoid a costly and uncertain priming fight with the DOE regarding the nature and extent of, and the Debtors' ability to prime, the DOE's alleged interests. Finally, as explained above, the terms offered by the DIP Lender are substantially better than any other financing reasonably available due to the DIP Lenders' electric vehicle customers relying on the Debtors' goods and services on a daily basis. The Debtors believe that this prepetition reliance caused the DIP Lender to provide the DIP Financing on substantially better terms than are otherwise possible. Accordingly, the Debtors submit that the terms of the DIP Financing are reasonable, fair, and appropriate.

**B.      Priming the Materialman Liens Under Bankruptcy Code Section 364(d) is Appropriate**

Bankruptcy Code section 364(d)(1) provides that a court may grant a priming lien if (a) debtor-in-possession financing cannot be obtained otherwise, and (b) there is adequate protection of the interest of the holder of such lien. *See* 11 U.S.C. §364(d)(1). As explained above, the Debtors are unable to otherwise obtain financing from an alternative source without priming the Materialman Liens. Further, the Debtors submit that the interests of the Materialmen are adequately protected. Specifically, as set forth above and in the Interim Order, the Materialmen are to receive adequate protection in the form of (i) the Adequate Protection Liens, and (ii) superpriority administrative claims that are junior only to the claims of the DIP Lender. Therefore, the Debtors submit that priming the Materialman Liens is appropriate.

**C.      The Payment of Fees to the DIP Lender is Appropriate**

The various fees and charges to be paid to the DIP Lender, as described in the overview of the proposed DIP Financing, are reasonable and appropriate under the circumstances. Courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in Bankruptcy Code section 364. *See Resolution Trust Corp. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 319 (B.A.P. 9th Cir. 1992) (approving financing facility pursuant to Bankruptcy Code section 364 that included a lender "enhancement fee"). More specifically, the

Debtors believe that the proposed Interest Rate and other fees to be paid to the DIP Lender under the DIP Documents are fair, reasonable, and appropriate in light of the circumstances of these cases.

### D. The DIP Financing Was Negotiated in Good Faith and Should be Afforded the Protection of Bankruptcy Code Section 364(e)

Bankruptcy Code section 364(e) protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, Bankruptcy Code section 364(e) provides that any "reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under Bankruptcy Code section 364 shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith." 11 U.S.C. § 364(e).

Courts generally hold that "good faith" in the context of postpetition financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction concerned. *See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)). Additionally, good faith is measured with respect to the good faith of the lender as contrasted to that of the borrower. Tr. of Rec. at 736:24-25, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009). Moreover, a lender's desire to ensure that it is repaid, to make money on interest and fees, and to protect prepetition positions are understandable and acceptable motivations for a post-petition lender in negotiating a deal. *Id.* at 737:10-14.

As explained in detail herein, the terms of the DIP Financing were negotiated in good faith and at arm's length between the Debtors and the DIP Lender, and all of the DIP Loan obligations will be extended by the DIP Lender in good faith (as such term is used in Bankruptcy Code section 364(e)). No consideration is being provided to any party to the Obligations arising under the DIP Financing, other than as set forth herein. Moreover, the DIP Financing has been extended in express reliance upon the protections offered by Bankruptcy Code section 364(e), and the DIP Lender should be entitled to the full protection of Bankruptcy Code section 364(e) in the event that either of the orders granting the Motion (or any provision thereof) are vacated, reversed, modified on appeal, or otherwise.

**E.**     **Modification of the Automatic Stay Under Bankruptcy Code Section 362 is Appropriate Under the Circumstances**

Paragraph 16 of the Interim Order requires that the automatic stay imposed under Bankruptcy Code section be modified as necessary to effectuate all of the terms and provisions of the DIP Documents, including, without limitation, to:  (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, and DIP Superpriority Claim, if permitted; (b) permit the Debtors to incur all liabilities and obligations under the DIP Documents, the DIP Financing, and the Interim Order; (c) permit the Debtors to perform such other acts as are necessary to effectuate the terms of the Interim Order; and (d) authorize the Debtor to pay, and the DIP Lender to retain and apply, payments made in accordance with the terms of the Interim Order and the Final Order.

Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  *See, e.g., In re Innkeepers USA Trust*, Case No. 10-13800, at 14 (Bankr. S.D.N.Y. Sept. 2, 2010); *Tronox Inc.,* Case No. 09-10156, at 33, 41-43 (Bankr. S.D.N.Y. Jan. 15, 2010); *In re Gen. Growth Props. Inc.*, Case No. 09-1197, at 27, 30 (Bankr. S.D.N.Y. May 14, 2009); *In re Chemtura Corp.*, Case No. 09-11233, at 16-17 (Bankr. S.D.N.Y. Apr. 29, 2009).  Accordingly, the Court should modify the automatic stay to the extent contemplated by the Debtors and the DIP Lender.

**F.**     **Waiver of Bankruptcy Rule 6004 (a) and 6004 (h)**

The Debtors further seek a waiver of any stay of the effectiveness of the Interim Order and Final Order approving the Motion.  Pursuant to Bankruptcy Rule 6004(h), "a[n] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."  As set forth above, the DIP Financing is essential to prevent irreparable damage to the Debtors' business, value, and ability to conduct an orderly sale process.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## VI.

## <u>DEBTORS' RESERVATION OF RIGHTS</u>

Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under Bankruptcy Code section 365. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently. In addition, the Debtors reserve the right to seek additional relief from this Court as relates to any of the relief requested pursuant to the Motion.

## VII.

## <u>NOTICE</u>

No trustee, examiner or statutory committee has been appointed in the Debtors' chapter 11 cases. The Debtors have provided notice of this Motion to: (i) the Office of the United States Trustee for the District of Arizona; (ii) the parties listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (iii) the United States Department of Energy; (iv) the United States Department of Labor; (v) the Securities and Exchange Commission; (vi) the Internal Revenue Service; (vii) the United States Attorney's Office for the District of Arizona; (viii) all parties known by the Debtors claiming to have Liens on or security interests in any of the Debtors' property and (ix) any party that has requested notice pursuant to Bankruptcy Rule 2002. In the event that the Court grants the relief requested by the Motion, the Debtors shall provide notice of the entry of the order granting such relief upon each of the foregoing parties and any other parties in interest as the Court directs. The Debtors respectfully submit that such notice is sufficient and that no further notice need be given.

# VIII.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (a) enter an order granting the relief requested in the Motion, and (b) grant such other and further relief as the Court may deem just, proper, and equitable.

Dated: September 16, 2013

PARKER SCHWARTZ, PLLC

By: _____ /s/ Jared G. Parker _____
Jared G. Parker

– and –

AKIN GUMP STRAUSS HAUER & FELD LLP

Charles R. Gibbs (*pro hac vice* admission pending)
David P. Simonds (*pro hac vice* admission pending)
Arun Kurichety (*pro hac vice* admission pending)

[Proposed] Attorneys for the Debtors
and Debtors in Possession

**Exhibit A**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA

In re:

ELECTRIC TRANSPORTATION
ENGINEERING CORPORATION (d/b/a
ECOTALITY NORTH AMERICA), *et al.*,[1]

    Debtors.

Case No. 2:13-BK-16126 (RJH)

Chapter 11

**INTERIM ORDER: (I) AUTHORIZING
DEBTORS TO OBTAIN POST-PETITION
FINANCING PURSUANT TO 11 U.S.C.
§§ 105, 361, 362, 363, AND 364
(II) GRANTING ADEQUATE
PROTECTION TO MATERIALMEN
PURSUANT TO 11 U.S.C. §§ 361, 362, 363
AND 364; AND (III) SCHEDULING A
FINAL HEARING PURSUANT TO
BANKRUPTCY RULES 4001(B) AND
4001(C)**

Upon consideration of the motion dated September 16, 2013 (the "***Motion***")[2] filed by the

above-captioned debtors (the "***Debtors***") pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1),

364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code (the "***Bankruptcy***

***Code***"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy***

---

[1] The Debtors in these jointly administered chapter 11 cases and the last four digits of their respective Employer Identification Numbers are: (i) ECOtality, Inc. (5422); (ii) Electric Transportation Engineering Corporation (4755); (iii) ECOtality Stores, Inc. (2643); (iv) ETEC North, LLC (n/a); (v) The Clarity Group, Inc. (8832); and (vi) G.H.V. Refrigeration, Inc. (4512). The Debtors' service address at ECOtality, Inc.'s corporate headquarters is Post Montgomery Center, One Montgomery Street, Suite 2525, San Francisco, California 94104.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Documents (as defined below), as applicable.

**_Rules_**"), and Rules 2002-1 and 4001-4 of the Local Rules of Bankruptcy Procedure for the District of Arizona (the "**_Local Rules_**") seeking:

(a)    Authorization under sections 364(c) and 364(d) of the Bankruptcy Code and Rule 4001(c) of the Bankruptcy Rules for the Debtors (the "**_Borrowers_**") to obtain secured, superpriority postpetition financing consisting of a term loan in the maximum principal amount of One Million Two Hundred Fifty Thousand Dollars ($1,250,000) (the "**_DIP Financing_**") as set forth in that certain Credit and Security Agreement, dated as of September 15, 2013, by and between, ECOtality, Inc., a Nevada corporation ("**_ECOtality_**"), and Electric Transportation Engineering Corporation, an Arizona corporation (together with ECOtality, "**_Borrowers_**" and each, individually, a "**_Borrower_**"), and ECOtality Stores Inc., a Nevada corporation ("**_Stores_**"), ETEC North, LLC, a Delaware limited liability company ("**_North_**"), The Clarity Group, Inc., a Arizona corporation ("**_Clarity_**"), G.H.V. Refrigeration, Inc., a California corporation ("**_GHV_**", together with Stores, North, and Clarity, the "**_Guarantors_**", and together with Borrowers, each a "Credit Party" and collectively, the "**_Credit Parties_**") and Nissan North America, Inc., a California corporation (the "**_DIP Lender_**"), a true and correct copy of which is attached to this Interim Order as **Annex A** (the "**_DIP Credit Agreement_**");

(b)    Authorization under section 363 of the Bankruptcy Code and Rules 4001(b) and 6004 of the Bankruptcy Rules for the Debtors to use the proceeds from the DIP Financing to (i) fund Borrowers' operations until the Sale, (ii) to fund $27,000 for the operations of the Operating Subsidiaries and (iii) to pay certain administrative costs necessary to maintain the corporate existence of the Guarantors' operations, in each case, in accordance with the terms of the Debtors' proposed budget (the "**_Budget_**"), a copy of which is annexed hereto as **Annex B**;

(c)    authorization for the Debtors to grant security interests, liens, superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the

Bankruptcy Code), and related protections to the DIP Lender to secure all DIP Obligations (as defined herein), in accordance with the provisions of this order (the "***Interim Order***") and as set forth in DIP Credit Agreement;

(d) authorization for the Debtors to execute and deliver the DIP Credit Agreement and all other loan documents related thereto (collectively, the "***DIP Documents***") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents and pursuant to the provisions of this Interim Order;

(e) authorization for the Debtors to grant the DIP Lender an allowed, superpriority administrative expense claims in the Bankruptcy Cases and any Successor Cases (as defined herein) for the DIP Financing and all "Obligations" as described in the DIP Documents, the ("***DIP Obligations***"), as more fully set forth in this Interim Order;

(f) authorization for the Debtors to grant the DIP Lender automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), which liens shall be subject to the priorities set forth in Paragraphs 7 and 8 below;

(g) authorization for the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as they become due, all to the extent provided by and in accordance with the terms of the respective DIP Documents;

(h) authorization for the Debtors to use the proceeds of the DIP Financing in the Bankruptcy Cases only in accordance with the Budget and as otherwise provided in the DIP Documents;

(i) to vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Documents and this Interim Order; and

(j) to waive any applicable stay as provided in the Bankruptcy Rules and provide for the immediate effectiveness of this Interim Order.

The Debtors having requested in the Motion that pending a final hearing on the Motion (the "***Final Hearing***"), a hearing be scheduled on an expedited basis (the "***Interim Hearing***") to consider the entry of this Interim Order approving the DIP Financing on an interim basis; and upon finding that

3

Case 2:13-bk-16126-RJH Doc 4 Filed 09/17/13 Entered 09/17/13 01:45:43 Desc
Main Document Page 25 of 73

notice of the Interim Hearing was given, where possible, to: (i) the Office of the United States Trustee for the District of Arizona; (ii) the parties listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (iii) the United States Department of Energy (the "*DOE*"); (iv) the United States Department of Labor (the "*DOL*"); (v) the Securities and Exchange Commission; (vi) the Internal Revenue Service; (vii) the United States Attorney's Office for the District of Arizona; (viii) all parties known by the Debtors claiming to have liens on or security interests in any of the Debtors' property; and (ix) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "*Notice Parties*"), in accordance with Rules 2002, 4001(b), (c) and (d), and 9014 of the Bankruptcy Rules; and upon finding that this Court has jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334; and upon finding that venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the Interim Hearing to consider the Motion on an interim basis having been held and concluded; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the relief is fair and reasonable and in the best interest of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and good and sufficient cause appearing therefor, it is hereby found:

1.      *Petition Date*.  On September 16, 2013 (the "*Petition Date*"), the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Arizona (the "*Court*"), thereby commencing the Bankruptcy Cases.

2.      *Debtors in Possession*.  The Debtors are continuing in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code, and no trustee or examiner has been appointed in these Bankruptcy Cases.  The Debtors, among other things, operate a network of charging stations for electric vehicles.

3.      *Jurisdiction*.  This Court has core jurisdiction over the Bankruptcy Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.

4.      *Notice*.  Notice of the Motion, the relief requested in the Motion, and the Interim Hearing was served by the Debtors on the Notice Parties.  The interim relief granted herein is

necessary to avoid immediate and irreparable harm to the Debtors and their estate pending the Final Hearing. Under the circumstances, the notice given by the Debtors of the Motion and the Interim Hearing: (i) was, in the Debtors' good faith belief, the best available under the circumstances; (ii) constitutes due and sufficient notice thereof; and (iii) complies with Rules 4001(b) and 4001(c) of the Bankruptcy Rules. No further notice of the relief sought at the Interim Hearing is necessary or required.

5. _Prepetition Debt_. Prior to the Petition Date, the Debtors borrowed certain funds from C. Timothy Caldwell (the "**Prepetition Lender**") in the amount of $187,500 (the "**Prepetition Loan**"). The Prepetition Loan is secured by a security interest in and lien on (the "**Prepetition Lien**") that certain real property located in Arizona (the "**Prepetition Collateral**").

6. _Materialman Liens_. Certain of the Debtors' vendors (the "**Materialman**") may assert certain claims secured by statutory liens (the "**Materialman Liens**") arising from the provision of services or other materials in connection with the Debtors' businesses.

7. _Findings Regarding the DIP Financing_.

i. *Good Cause*. Good cause has been shown for the entry of this Interim Order.

ii. *Immediate Need*. The Debtors have an immediate need to obtain the DIP Financing in order, in accordance with the terms of the Budget, (i) to fund Borrowers' working capital requirements, operating expenses, costs of administration of the Bankruptcy Cases (including professional fees), (ii) to fund the payment of interest accrued on the Term Loan, (iii) to pay compensation to, or reimburse or advance ordinary course expenses incurred or to be incurred by, the executives and employees of Borrower, (iv) to provide to the Operating Subsidiaries no more than $27,000 in excess of the receivables and cash owned by the Operating Subsidiaries but included in the Budget (the "**Operating Subsidiary Funds**"), and (v) to provide an aggregate amount of no more than $5,000 to the Guarantors (other than the Operating Subsidiaries), which shall be used solely for costs and expenses directly related to pay the administrative costs necessary to maintain the corporate existence of such Guarantors' business operations (the "**Administrative Funds**"). The access of the Debtors (x) to sufficient working capital and liquidity through the incurrence of the DIP Financing and concomitant financial accommodations and (y) to fund the Operating Subsidiary Funds and the

Administrative Funds as allowed in the DIP Credit Agreement is vital to the preservation and maintenance of the going concern value of the Debtors, the Guarantors and the Operating Subsidiaries. Absent the DIP Financing, the Debtors will not have sufficient sources of working capital to continue as a going concern and maintain the value of their assets. The ability of the Debtors to pay their employees, maintain business relationships with vendors and suppliers, and otherwise finance their operations is essential to the Debtors' continued viability and the ultimate process of selling the Debtors' assets on a going concern basis to a stronger financial entity. Without the DIP Financing, serious and irreparable harm would result to the Debtors' operations, thereby significantly reducing recovery for creditors of the Debtors' estate.

iii. *No Credit Available on More Favorable Terms.* Given the Debtors' current financial condition, financing arrangements, capital structure, and other factors described in the Motion, the Debtors are unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Financing. The Debtors have been unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code or solely in exchange for the grant of a special administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code. The Debtors have also been unable to obtain credit: (a) having priority over that of administrative expenses of the kind specified in sections 502(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien pursuant to section 364(c)(2) of the Bankruptcy Code; or (c) secured solely by a junior lien on property of the Debtors and their estate that is subject to a lien pursuant to section 364(c)(3) of the Bankruptcy Code. Within the timeframe required, financing on a postpetition basis is not otherwise available without granting the DIP Lender: (i) perfected security interest in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth in Paragraph 8 hereof; (ii) superpriority claims with the priorities set forth in Paragraph 9 hereof; and (iii) the other protections, terms and conditions set forth in this Interim Order.

iv. *Fair and Reasonable Terms.* The terms of the DIP Financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

v.    *Business Judgment and Good Faith Pursuant to Section 364(e)*.  The terms and conditions of the DIP Financing and the DIP Documents, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.  The DIP Financing was negotiated in good faith and at arms' length among the Debtors and the DIP Lender.  Credit to be extended under the DIP Financing shall be deemed to have been so allowed, advanced, made, used or extended in good faith and for valid business purposes and uses within the meaning of section 364(e) of the Bankruptcy Code.  Accordingly, the DIP Lender is entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this Interim Order or any other order.

vi.    *Priming of Liens and Other Security Interests*.  The priming of the Materialman Liens set forth below pursuant to section 364(d) of the Bankruptcy Code is necessary to obtain the DIP Financing and will enable the Debtors to continue to operate their business for the benefit of their estates and creditors.  In exchange for the priming of the Materialman Liens set forth below, the Materialmen shall be entitled to receive adequate protection, as set forth in this Interim Order, pursuant to sections 361, 363 and 364 of the Bankruptcy Code for any diminution in the value of their respective interests in the assets of the Debtors resulting from, among other things, the subordination to the DIP Liens (as defined herein), the Debtors' use, sale or lease of the Debtors' assets, and the imposition of the automatic stay from and after the Petition Date (collectively, and solely to the extent of such diminution in value, the "***Diminution in Value***").

vii.    *Use of Proceeds of the DIP Financing*.  As a condition to the entry into the DIP Documents and the extension of credit under the DIP Credit Agreement, the DIP Lender requires, and the Debtors have agreed, that the proceeds of the DIP Financing shall be used in a manner consistent with the terms and conditions of the DIP Documents, including any covenant contained therein pertaining to compliance with the Budget and any additions or modifications made thereto from time to time, in each case, approved by the DIP Lender (the "***Budget Compliance Covenant***").

viii.    *Application of Proceeds of Collateral*.  As a condition to the entry into the DIP Documents and the extension of credit under the DIP Facility, the Debtors have agreed that as of and commencing on the date of entry of the Order, the Debtors shall apply the proceeds of DIP Collateral as set forth in the DIP Documents.

ix.    *Irreparable Harm*.    The Debtors have requested entry of this Interim Order pursuant to Rules 4001(b)(2) and Rule 4001(c)(2) of the Bankruptcy Rules.  Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Financing in accordance with the provisions of this Interim Order and the DIP Documents is therefore in the best interests of the Debtors' estates.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED that**:

1.    *DIP Financing Approved*.  The Motion is granted as set forth herein, the DIP Financing and the incurrence of the DIP Obligations is authorized and approved on an interim basis, subject to the terms and conditions set forth in this Interim Order.

2.    *Objections Overruled*.  All objections to the DIP Financing are hereby overruled to the extent they have not otherwise been resolved or withdrawn.

3.    *Authorization of the DIP Financing and DIP Documents*.  The DIP Documents are hereby approved for the DIP Financing.  The Debtors are expressly and immediately authorized, empowered and directed to execute and deliver the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments and documents which may be required or necessary for performance by the Debtors of their obligations in respect of the DIP Financing and the creation and perfection of the DIP Liens (as defined below) described in and provided for by this Interim Order and the DIP Documents.  The Debtors are hereby authorized and directed to pay the principal, interest, fees, expenses and other amounts described in the DIP Documents after such become due and without need to obtain further Court approval, all to the extent, and at the times, provided in the DIP Documents.  Upon payment, such amounts shall be deemed fully earned, indefeasibly paid, and non-

refundable. All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents. Prior to the remittance to the DIP Lender of any proceeds of the DIP Collateral, the Debtors shall be deemed to hold such proceeds for the benefit of the DIP Lender. Upon execution and delivery, the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against the Debtors and their estates in accordance with their terms.

4. *Authorization to Borrow*. Until the earlier of (a) the Maturity Date (as defined in the DIP Credit Agreement) and (b) the termination of obligations under the DIP Documents by the DIP Lender upon the occurrence and during the continuation of an Event of Default (as defined below) (such earlier date, the "***Termination Date***"), and subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Documents and this Interim Order, the Debtors are hereby authorized to request, and DIP Lender shall provide to the Debtors, extensions of credit under the DIP Financing (in the form of loans) of up to an aggregate principal amount not to exceed One Million Two Hundred Fifty Thousand Dollars ($1,250,000) at any one time outstanding.

5. *DIP Obligations*. The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations, which DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto, including without limitation, any trustee or other estate representative appointed in the Bankruptcy Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of the Bankruptcy Cases, or in any other proceedings superseding or related to any of the foregoing (each, a "***Successor Cases***"). Upon entry of this Interim Order, the DIP Obligations will include all amounts owed pursuant to the DIP Documents. The DIP Obligations shall be due and payable, without notice or demand, on the Termination Declaration Date (as defined herein). The full amount of the DIP Obligations may be credit bid by the DIP Lender (or any of their successors or assigns) in any sale of the Debtors' assets, whether in whole or in part, pursuant to section 363 of the Bankruptcy Code or any other similar provision.

6. *Payment of Principal, Interest, Fees*. The Debtors shall pay to the DIP Lender principal and interest as provided in the DIP Documents and in accordance with the procedures set forth therein.

In consideration of the financial accommodations made by the DIP Lender under this Interim Order and the DIP Documents, the Debtors are hereby authorized, without further order of this Court and as set forth in the DIP Documents to, upon demand on or after the Maturity Date, to pay all reasonable, out-of-pocket, third-party costs and expenses incurred by DIP Lender and/or its Affiliates, including, without limitation, documentation and diligence fees and expenses, all search, audit, appraisal, recording, professional and filing fees and expenses and all other out-of-pocket charges and expenses (including, without limitation, UCC and judgment and tax lien searches and UCC filings and fees for post-Closing UCC and judgment and tax lien searches and wire transfer fees and audit expenses), and reasonable attorneys' fees and expenses incurred, (i) in any effort to enforce, protect or collect payment of any DIP Obligation or to enforce any DIP Document or any related agreement, document or instrument, (ii) in connection with the Bankruptcy Cases or entering into, negotiating, preparing, reviewing and executing the DIP Documents and/or any related agreements, documents or instruments, (iii) in connection with instituting, maintaining, preserving, enforcing and/or foreclosing on DIP Lender's liens in any of the DIP Collateral, whether through judicial proceedings or otherwise, (iv) in defending or prosecuting any actions, claims or proceedings arising out of or relating to DIP Lender's transactions with the Debtors, (v) in seeking, obtaining or receiving any advice with respect to its rights and obligations under any DIP Document and any related agreement, document or instrument, and/or (vi) in connection with any modification, restatement, supplement, amendment, waiver or extension of any DIP Document and/or any related agreement, document or instrument. In addition, the professional fees and expenses incurred by the DIP Lender are not subject to the provisions of sections 327, 328, 329, 330, or 331 of the Bankruptcy Code, and shall be paid by the Debtors pursuant to the DIP Documents without further order of the Court. Professionals for the DIP Lender shall not be required to file fee applications or comply with the U.S. Trustee fee guidelines.

7. *DIP Liens and DIP Collateral*. Effective immediately upon the execution of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, and subject to the Carve Out in all respects, the DIP Lender as security and collateral for the DIP Financing, is hereby granted continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected: (a) first priority security interests in and liens on, and pledges of all now

existing and hereafter acquired assets of the Debtors, including any residual interest in favor of the Debtors' estates on account of any prepetition retainers provided to the Debtors' professionals (but, for the avoidance of doubt, not any amount attributable to fees and expenses allowed or to be allowed by the Court), <u>except</u> the Prepetition Collateral, and all proceeds and products of the foregoing; and (b) second priority security interests in and liens on, and pledges of, the Prepetition Collateral, and all proceeds and products of the foregoing ((a)-(b) collectively the "***DIP Collateral***" and the "***DIP Liens***" as applicable).[3] Notwithstanding anything contrary herein or in the DIP Documents, the DIP Collateral shall exclude any claims under chapter 5 of the Bankruptcy Code, including any and all proceeds thereof, except to the extent that such claims relate to the proceeds of the Government Funded Property. Notwithstanding anything further to the contrary herein or Section 2.5 of the DIP Credit Agreement, such grant of a security interest shall not extend to, and the DIP Collateral shall not include, the Government Funded Property (as defined in the DIP Credit Agreement) except as follows:

a. the Credit Parties grant a first priority lien in their interest in the proceeds of any sale of Government Funded Property; and

b. the Credit Parties grant a first priority lien in the Debtors' interest in the Government Funded Property, which shall only attach and become enforceable if and when the DOE approves of said lien at the time that: (i) there are no third party qualified bids after the expiration of the bid deadline at any 363 sale or foreclosure sale; and (ii) the DIP Lender exercises its statutory right to credit bid in the amount or a portion of the Loan at any 363 sale or foreclosure sale.

Notwithstanding the existence of any lien on Government Funded Property, any interests of the DOE under federal law, including without limitation any rights under 10 C.F.R. § 600.321, remain on the Government Funded Property.

8. *<u>DIP Lien Priority</u>*. Except with respect to the Prepetition Collateral and the Government Funded Property (as described above), and subject to the Carve Out, the DIP Liens shall

---

[3] All defined terms in the description of DIP Collateral shall have the meanings ascribed thereto in the DIP Documents. All terms not specifically defined in the DIP Documents shall have the meanings ascribed to such terms in Article 8 or 9 of the Uniform Commercial Code.

11

be senior to any and all security interests in or liens on the DIP Collateral. With respect to the Prepetition Collateral, the DIP Liens shall only be junior to the Prepetition Lien of the Prepetition Lender. Other than as set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Bankruptcy Cases or any Successor Cases. The DIP Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Bankruptcy Cases or any Successor Cases, upon the conversion of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Cases), and/or upon the dismissal of the Bankruptcy Cases or any Successor Cases. The DIP Liens shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the DIP Liens.

9.      *DIP Superpriority Claims*.  Upon entry of this Interim Order, the DIP Lender is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in the Bankruptcy Cases and any Successor Cases (the "***DIP Superpriority Claim***") for all DIP Obligations.  Subject to the Carve Out, the DIP Superpriority Claim shall have priority over any and all administrative expenses and unsecured claims against the Debtors or their estates in these Bankruptcy Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, except as set forth herein, and (b) at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative, to the extent permitted by law.  The DIP Superpriority Claim shall not extend to any avoidance actions or claims arising under chapter 5 of the Bankruptcy Code, or any of the proceeds thereof, except that the DIP Superpriority Claim shall extend to any avoidance actions or claims in each case arising under section 549 of the Bankruptcy Code and the proceeds thereof.

10.      *Adequate Protection Liens*.  The Materialman are entitled to receive adequate protection on account of their respective interests in the Debtors' assets pursuant to sections 361, 362, and 364 of

the Bankruptcy Code to the extent of any Diminution in Value of their respective interests in the Debtors' assets. Pursuant to sections 361, 364, and 507(b), but only to the extent that any allowed claims of Materialmen remain outstanding, and only to the extent Materialmen hold valid and perfected liens on and security interests in the Debtors' assets, and only to the extent of any Diminution in Value of their respective interests in the Debtors' assets, the Materialmen will receive as adequate protection: (a) automatically perfected, subordinated replacement liens on the DIP Collateral (the "***Adequate Protection Liens***"); and (b) a superpriority administrative expense claim, as provided in sections 503(b) and 507(b) of the Bankruptcy Code, against the Debtors, which super-priority claim shall have priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, or any kind or nature whatsoever; <u>provided</u>, <u>however</u>, that any such superpriority claim shall be junior to the claims of the DIP Lender; <u>provided further</u>, that such superpriority claim shall only apply to the extent that the Adequate Protection Liens fail to protect the Materialmen against any Diminution in Value. Effective immediately upon approval of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the Materialmen are hereby granted the Adequate Protection Liens on the DIP Collateral, which Adequate Protection liens shall at all times be subordinate to the DIP Liens and other claims of the DIP Lender. The Adequate Protection Liens shall be deemed a Permitted Lien within the meaning of the DIP Credit Agreement.

11. *Adequate Protection Lien Priority*. The Adequate Protection Liens shall be junior in payment and priority only to the DIP Liens and the Prepetition Lien. The Adequate Protection Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Bankruptcy Cases or any Successor Cases, upon the conversion of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Cases), and/or upon the dismissal of the Bankruptcy Cases or Successor Cases. The Adequate Protection Liens shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the Adequate Protection Liens (for any lien or interest avoided other than the Prepetition Liens).

12.     _No Obligation to Extend Credit_.  The DIP Lender shall not have any obligation to make any loan or advance under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit under the applicable DIP Documents and this Interim Order have been satisfied in full or waived by the DIP Lender in its sole discretion.

13.     _Use of DIP Financing Proceeds_.  From and after the Petition Date, the Debtors shall use advances of DIP Financing only for the purposes specifically set forth in this Interim Order, the DIP Documents and in compliance with the Budget.  Notwithstanding any first-day orders entered authorizing the Debtors to pay any prepetition or other expenses, all such payments not otherwise paid before the entry of this Interim Order, shall be made in accordance with the Budget and the Budget Compliance Covenant.

14.     _Amendment of the DIP Documents_. The DIP Documents may from time to time be amended, modified or supplemented by the parties thereto without notice or a hearing if:  (a) the amendment, modification, or supplement is (i) in accordance with the DIP Documents, (ii) beneficial to the Debtors, (iii) not prejudicial in any material respect to the rights of third parties, and (iv) does not increase the amount of the DIP Financing or extend the "Maturity Date" (as defined in the DIP Credit Agreement); (b) the amendment, modification or supplement is filed with the Court; and (c) a copy (which may be provided through electronic mail or facsimile) of the substantially final amendment, modification or supplement is provided to counsel for any statutory committee of unsecured creditors appointed in these Bankruptcy Cases (the "**_Creditors' Committee_**") and the U.S. Trustee at least three (3) days (or such shorter period agreed to by any Creditors' Committee and the U.S. Trustee) prior to the effective date of such amendment, modification or supplement.  Except as otherwise provided in this paragraph, no waiver, modification, or amendment of any of the provisions of any DIP Document shall be effective unless set forth in writing, signed on behalf of the Debtors and with the necessary consents required under and executed in accordance with the DIP Documents, and approved by the Court on notice.

15.     _Budget Maintenance_.  The Budget shall be in form and substance acceptable to and approved by the DIP Lender in its sole discretion.  The Debtors may not exceed, on a rolling two (2) week basis, the Budget by more than ten percent (10%) on an aggregate basis without the prior written

consent of DIP Lender, with any Creditors' Committee and the U.S. Trustee having an opportunity to object. Notwithstanding anything herein to the contrary, to the extent that the Debtors have not expended the full disbursement amount for a category of expense for a specified time period set forth in the Budget, the Debtors may use the unexpended amount to pay items of the same type for a subsequent time period.

16.     *Modification of Automatic Stay*.  Subject to the terms of Paragraph 23, the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to:  (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, and DIP Superpriority Claim, if permitted; (b) permit the Debtors to incur all liabilities and obligations under the DIP Documents, the DIP Financing and this Interim Order; (c) permit the Debtors to perform such other acts as are necessary to effectuate the terms of this Interim Order; and (d) authorize the Debtors to pay, and the DIP Lender to retain and apply, payments made in accordance with the terms of this Interim Order.

17.     *Perfection of DIP Liens and Adequate Protection Liens*.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and Adequate Protection Liens without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable nonbankruptcy law) the DIP Liens and Adequate Protection Liens, or to entitle the DIP Lender to the priorities granted herein.  Notwithstanding the foregoing, the DIP Lender is authorized to file, as it deems necessary in its sole discretion, such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable nonbankruptcy law or to otherwise evidence the applicable DIP Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Adequate Protection Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Lender all such financing statements, mortgages, notices and other documents as

15

any of the DIP Lender may reasonably request.  The DIP Lender, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

18.     *Proceeds of Subsequent Financing*.  If the Debtors, any trustee, any examiner with enlarged powers, any responsible officer or any other estate representative subsequently appointed in these Bankruptcy Cases or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), 364(c) or 364(d) of the Bankruptcy Code in violation of the DIP Documents at any time prior to the repayment in full of all DIP Obligations and the termination of the DIP Lender's obligation to extend credit under the DIP Financing, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender to be applied as set forth in the DIP Documents.  Any surplus shall be held in escrow for the benefit of any party entitled thereto as determined by further order of the Court.

19.     *Maintenance of DIP Collateral*.   Until the payment in full in cash of all DIP Obligations, and the termination of the DIP Documents and the DIP Lender's obligations to extend credit under the DIP Financing, the Debtors shall insure the DIP Collateral as required pursuant to the terms of the DIP Credit Agreement.

20.     *Disposition of DIP Collateral; Rights of DIP Lender*.  The Debtors shall not sell, lease, transfer, assign, encumber, or otherwise dispose of any interest of the DIP Collateral, or agree to do any of the foregoing at any future time, other than as permitted in the DIP Documents without the prior written consents as required under the DIP Documents, and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Lender or an order of this Court.

21.     *DIP Termination*.  On the Termination Date, all DIP Obligations shall be immediately due and payable, and all commitments to extend credit with respect to the DIP Financing will terminate.

22.     *Events of Default*.  The occurrence of an "***Event of Default***" under the DIP Credit Agreement (subject to any extensions or waivers as permitted under the DIP Documents), shall constitute an event of default under the DIP Documents and this Interim Order, unless expressly

waived in writing by the DIP Lender in accordance with the consents required in the DIP Documents (collectively, the "***Events of Default***").

23. <u>*Rights and Remedies Upon Event of Default*</u>.  Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Lender, as provided in the DIP Documents, may declare: (a) all DIP Obligations owing under the DIP Documents to be immediately due and payable; (b) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains; and/or (c) the termination of the DIP Credit Agreement and any other DIP Document as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Liens or the DIP Obligations (any such declaration by the DIP Lender shall be referred to herein as a "***Termination Declaration***").  The Termination Declaration shall be given by email (or other electronic means) to counsel to the Debtors, counsel to any Creditors' Committee appointed by this Court (or if no Creditors' Committee is appointed, to the Debtors' twenty (20) largest creditors), and the U.S. Trustee (the earliest date any such Termination Declaration is made shall be referred to herein as the "***Termination Declaration Date***").  The DIP Obligations shall be due and payable, without notice or demand, on the Termination Declaration Date.  Any automatic stay otherwise applicable to the DIP Lender is hereby modified so that beginning on the fifth (5th) day after the Termination Declaration Date (such five day period being the "***Remedies Notice Period***"), the DIP Lender shall be entitled to exercise all rights and remedies against the DIP Collateral in accordance with the DIP Documents and this Interim Order, and shall be permitted to satisfy the DIP Obligations and DIP Superpriority Claims.  Notwithstanding anything to the contrary, during the Remedies Notice Period, the Debtors or any Creditors' Committee appointed by this Court shall be entitled to continue to use cash on hand in accordance with the Budget and shall be entitled to seek an emergency hearing with the Court for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing.  Unless the Court determines during the Remedies Notice Period that an Event of Default has not occurred and/or is not continuing, the automatic stay shall automatically be terminated at the end of the Remedies Notice Period without further notice or order, and the DIP Lender shall be permitted to exercise all remedies set forth herein, in the DIP Credit Agreement, the DIP Documents, as applicable, and as otherwise available at law against the DIP Collateral without any further order of

or application or motion to the Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest in the DIP Collateral or any other rights and remedies granted to the DIP Lender with respect thereto pursuant to the DIP Credit Agreement, DIP Documents, or this Interim Order. In addition, notwithstanding the foregoing, and without order of or application or motion to the Court, if an Event of Default exists, the DIP Lender may do any one or more of the following at any time, including during the Remedies Notice Period, and in any order: (x) restrict the amount of or refuse to make loans under the DIP Loan Documents; (y) terminate the DIP Lender's commitment to lend under the DIP Documents; or (z) declare the DIP Financing to be immediately due and payable. The DIP Lender's failure to exercise any or all of its rights under this Paragraph shall not constitute a waiver of any of its rights hereunder or under the DIP Documents.

24. _Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order_. Through the date hereof, the DIP Lender has acted in good faith in connection with negotiating the DIP Documents and extending credit under the DIP Financing, and its reliance on this Interim Order is in good faith. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified, amended or vacated by a subsequent order of this Court or any other court, the DIP Lender is entitled to the protections provided in section 364(e) of the Bankruptcy Code. Any such reversal, modification, amendment or vacatur shall not affect the validity, perfection, priority, allowability, enforceability or non-avoidability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby. Any liens or claims granted to the DIP Lender hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

25. _Indemnification of the DIP Lender_. The Debtors shall defend, indemnify and hold harmless the Indemnified Persons, to the extent and as set forth in the DIP Documents. Nothing herein shall limit the DIP Lender's exercise of its discretionary rights granted under the DIP Documents,

including an Indemnified Party's right to select its own counsel with respect to any litigation, or preparation therefor, related to the enforcement of this Order or its rights and remedies under the DIP Documents, which counsel's reasonable fees and expenses shall be promptly paid by the Debtors.

26. *Reporting Requirements*. The Debtors shall observe and comply with all of the financial reporting and performance covenants and conditions set forth in the DIP Documents.

27. *Rights of Access and Information*. Without limiting the rights of access and information afforded the DIP Lender under the DIP Documents, the Debtors shall be, and hereby is, required to afford representatives, agents and/or employees of the DIP Lender reasonable access to the Debtors' premises and their books and records in accordance with the DIP Documents, and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the Debtors authorize their independent advisors to cooperate, consult with, and provide to the DIP Lender all such information as may be reasonably requested with respect to the business, results of operations and financial condition of any Borrower. Notwithstanding anything to the contrary, any and all of the Debtors' obligations under this Paragraph shall be subject to the Debtors' and their advisors' fiduciary duties under the Bankruptcy Code, applicable privileges and reasonable and customary confidentiality agreements not entered into for purposes of protecting information pursuant to this Paragraph.

28. *No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees*. The DIP Lender shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any professionals retained by the Debtors incurred in connection with the Bankruptcy Cases or any Successor Cases. Nothing in this Interim Order or otherwise shall be construed: (i) to obligate the DIP Lender, in any way to pay compensation to, or to reimburse expenses of, any professionals retained by the Debtors or any Creditors' Committee appointed by this Court, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; (ii) as consent to the allowance of any professional fees or expenses of any professionals retained by the Debtors or any Creditors' Committee appointed by this Court; or (iii) to affect the right of the DIP Lender to object to the allowance and payment of such fees and expenses.

29.  *Carve Out*.  For purposes of this Interim Order, "***Carve Out***" shall mean the sum set for in the Budget of: (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) fees and expenses of up to $10,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; and (iii) fees and expenses of any Creditors' Committee in an amount up to, but not exceeding, $30,000 of any Creditors' Committee.

30.  *Limitations on the DIP Facility and DIP Collateral*.  The DIP Financing, the DIP Collateral, and proceeds thereof may not be used: (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to the DIP Lender's rights and remedies under the DIP Documents or this Interim Order, as applicable, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Creditors' Committee appointed by this Court in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the DIP Obligations, (iii) for monetary, injunctive or other affirmative relief against the DIP Lender or its collateral contrary to the DIP Documents or this Interim Order, or (iv) preventing, hindering or otherwise delaying the exercise by the DIP Lender of any rights and/or remedies under this Interim Order, the DIP Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the DIP Lender upon any of the DIP Collateral; (b) to make any distribution under a plan of reorganization in the Bankruptcy Cases while the DIP Documents remain in effect or any DIP Obligations remain outstanding; (c) to make any payment in  settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consents required under the DIP Documents; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in the Debtors without the prior written consents required under the DIP Documents; (e) to object to, contest, or interfere with in any way the DIP Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred; (f) to sell or otherwise dispose of DIP

Case 2:13-bk-16126-RJH    Doc 4    Filed 09/17/13    Entered 09/17/13 01:45:43    Desc
Main Document      Page 42 of 73

Collateral without the consents required under the DIP Documents; (g) to use or seek to use any insurance proceeds constituting DIP Collateral other than as set forth in the DIP Documents; (h) to incur Indebtedness (as defined in the DIP Agreement) outside the ordinary course of business without the prior consents required under the DIP Documents; (i) to object to or challenge in any way the claims, liens, or interests (including interests in the Prepetition Collateral or DIP Collateral) held by or on behalf of the DIP Lender; (j) to assert, commence or prosecute any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the DIP Lender; (k) to prosecute an objection to, priority, or enforceability of any of the DIP Obligations or DIP Liens or any other rights or interests of DIP Lender; or (l) to prevent (or attempt to prevent), hinder or otherwise delay the exercise by the DIP Lender of any rights and remedies granted under this Interim Order.

31.     _No Third Party Rights_.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

32.     _No Deemed Control_.   In making decisions to advance any extensions of credit under the DIP Facility, or in taking any other actions related to this Interim Order or the DIP Documents (including, without limitation, the exercise of its approval rights with respect to any budget), the DIP Lender shall have no liability to any third party and shall not be deemed to be in control of the operations of Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of the Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act as amended, or any similar federal or state statute), and the DIP Lender's relationship with the Debtors shall not constitute or be deemed to constitute a joint venture or partnership of any kind.

33.     _Section 506(c) Claims_.  No costs or expenses of administration which have been or may be incurred in the Bankruptcy Cases or any Successor Cases at any time shall be charged against the DIP Lender, or any of its claims or the DIP Collateral pursuant to sections 105 or 506(c) of the

Bankruptcy Code, or otherwise, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by such lender.

34. _No Marshaling/Applications of Proceeds_. The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral and proceeds shall be received and applied pursuant to the DIP Documents.

35. _Discharge Waiver_. The Debtors expressly stipulates, and the Court finds and adjudicates that, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been paid in full in cash on or before the effective date of a confirmed plan of reorganization. Unless otherwise agreed to by the DIP Lender, the Debtors shall not propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon: (i) the payment in full in cash, on the effective date of such plan of reorganization or sale, of all DIP Obligations; or (ii) the right of DIP Lender (or its successors and assigns) to credit bid the full amount of its claims arising out the DIP Financing and this Interim Order.

36. _Rights Preserved_. Other than as expressly set forth in this Interim Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Lender, the Debtors, and any Creditors' Committee appointed by this Court are preserved.

37. _No Waiver by Failure to Seek Relief_. The failure of the DIP Lender to seek relief or otherwise exercise its rights and remedies under this Interim Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Lender.

38. _Binding Effect of Order_. Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, DIP Lender, all other creditors of the Debtors or any Creditors' Committee appointed by this Court in the Bankruptcy Cases, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary

hereafter appointed in the Bankruptcy Cases, any Successor Cases, or upon dismissal of the Bankruptcy Cases or any Successor Cases.

39.     *No Modification of Order*.  Until and unless the DIP Obligations have been indefeasibly paid in full in cash, and all commitments to extend credit under the DIP Facility have been terminated, the Debtors irrevocably waives the right to seek and shall not seek or consent to, directly or indirectly: (a) without the prior written consents required in the DIP Documents: (i) any modification, stay, vacatur or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 507(a) or 507(b) of the Bankruptcy Code) in the Bankruptcy Cases or any Successor Cases, equal or superior to the DIP Superpriority Claim; and (b) without the prior written consents required under the DIP Documents, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens.  The Debtors irrevocably waives any right to seek any amendment, modification or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the DIP Lender, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

40.     *Order Controls*.  In the event of any inconsistency between the terms and conditions of the DIP Documents or this Interim Order, the provisions of this Interim Order shall govern and control.

41.     *Survival*.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order: (a) confirming any plan of reorganization in the Bankruptcy Cases; (b) converting the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing the Bankruptcy Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing the Bankruptcy Cases or any Successor Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Lender pursuant to this Interim Order and/or the DIP Documents, notwithstanding the entry of any such order, shall continue in the Bankruptcy Cases, in any Successor Cases, or following dismissal of the Bankruptcy Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until all DIP Obligations and Diminution in Value claims have been indefeasibly paid in full and all

commitments to extend credit under the DIP Facility are terminated. The terms and provisions concerning the indemnification of the DIP Lender shall continue in the Bankruptcy Cases, in any Successor Cases, following dismissal of the Bankruptcy Cases or any Successor Cases, following termination of the DIP Documents and/or the repayment of the DIP Obligations.

42. *Immediate Docketing and Effect of this Interim Order*. The Clerk of the Court is hereby directed to forthwith enter this Interim Order on the docket of this Court maintained in regard to the Bankruptcy Cases. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Rule 7052 of the Bankruptcy Rules and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

43. *Final Hearing; Notice of Final Hearing*. The Final Hearing shall be held on October ___, 2013 at 10:00 a.m. (Mountain Standard Time). The Debtors shall, within two (2) days of entry of this Interim Order, mail copies of a notice of the entry of this Interim Order, together with a copy of the Motion and a notice of the Final Hearing on each of the Notice Parties and to counsel for any Creditors' Committee. The notice of Final Hearing shall state that any party in interest objection to the DIP Financing shall file written objections with the Clerk of this Court no later than 4:00 p.m. (Mountain Standard Time) on September ___, 2013, and that objections shall be served so that they are received on or before such date and time by: (a) Akin Gump Strauss Hauer & Feld LLP, 2029 Century Park East, Suite 2400, Los Angeles, CA 90067-3010, Attention: David P. Simonds; (b) Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, TN 37219, Attention: Michael R. Paslay, Esq. and Robert P. Sweeter, Esq.; and (c) the Office of the United States Trustee for the District of Arizona.

44. *Retention of Jurisdiction*. The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

**\*\* DATED AND SIGNED ABOVE \*\***

**<u>Annex A</u>**

**DIP Credit Agreement**

# CREDIT AND SECURITY AGREEMENT

This CREDIT AND SECURITY AGREEMENT (the "**Agreement**"), dated as of September 16, 2013, is entered into between ECOtality, Inc., a Nevada corporation ("**ECOtality**"), and Electric Transportation Engineering Corporation, an Arizona corporation (together with ECOtality, "**Borrowers**" and each, individually, a "**Borrower**"), and ECOtality Stores Inc., a Nevada corporation ("**Stores**"), ETEC North, LLC, a Delaware limited liability company ("**North**"), The Clarity Group, Inc., a Arizona corporation ("**Clarity**"), G.H.V. Refrigeration, Inc., a California corporation ("**GHV**", together with Stores, North, and Clarity, the "**Guarantors**", and together with Borrowers, each a "**Credit Party**" and collectively, the "**Credit Parties**") and Nissan North America, Inc., a California corporation ("**Lender**").

WHEREAS, On September 16, 2013 (the "**Petition Date**"), each Credit Party filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Arizona (the "**Bankruptcy Court**") and is continuing to operate its business as a debtor in possession under sections 1107 and 1108 of the Bankruptcy Code.

WHEREAS, Borrowers have requested that Lender make available to Borrowers a delayed draw term loan in an amount of up to One Million Two Hundred Fifty Thousand Dollars ($1,250,000) (the "**Term Loan**"), the proceeds of which shall be used by Borrowers to (i) fund Borrowers' operations until the Sale (as defined below), (ii) to fund $27,000 for the operations of the Operating Subsidiaries and (iii) to pay certain administrative costs necessary to maintain the corporate existence of the Guarantors' operations, in each case in accordance with the Budget (as defined below).

WHEREAS, Lender is willing to make the Term Loan available to Borrowers upon the terms and subject to the conditions set forth herein, but will not provide any additional funding or credit of any type other than such Term Loan; and

WHEREAS, Lender has agreed to permit Borrowers to transfer the Operating Subsidiary Funds (as defined below) to Stores and Portable Energy de Mexico, S.A. de C.V. ("**Portable**", together with Stores, the "**Operating Subsidiaries**") to fund operations of the Operating Subsidiaries, and the Administrative Funds (as defined below) to the Guarantors (other than the Operating Subsidiaries) in order to fund the administrative costs necessary to maintain the corporate existence of the Guarantors' operations and, as such, Guarantors agree and acknowledge that each Guarantor will derive material financial benefit for the making of the Term Loan.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which hereby are acknowledged, Credit Parties and Lender hereby agree as follows:

## I. DEFINITIONS

### 1.1 Certain Defined Terms. The following terms have the following meanings:

"**Affiliate**" means, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person, or (iii) of any Person described in clause (a) above with respect to such Person, or (c) which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the date hereof) of five percent (5%) or more of any class of the outstanding voting stock, securities or other equity or ownership interests of such

Person. For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through ownership of securities or other interests, by contract or otherwise. "**Affiliate**" shall include any Subsidiary.

"**Bankruptcy Cases**" means each Credit Party's bankruptcy case filed in the Bankruptcy Court, as jointly administered under In re: _____, filed as Case No. _____.

"**Budget**" means the budget attached hereto as Exhibit A, depicting on a weekly basis cash revenue, receipts, expenses, disbursements and other information for the four (4) week period following the Closing Date.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized by law to close.

"**Closing Date**" means the date on which the conditions precedent set forth in Section 3.1 have been satisfied or waived by Lender in its sole discretion.

"**Default**" means any event, fact, circumstance or condition that, with the giving of applicable notice or passage of time or both, would constitute or be or result in an Event of Default.

"**Environmental Laws**" means, collectively and each individually, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Superfund Amendment and Reauthorization Act of 1986, the Resource Conservation and Recovery Act, the Toxic Substances Control Act, the Clean Air Act, the Clean Water Act, any other "Superfund" or "Superlien" law and all other federal, state and local and foreign environmental, land use, zoning, health, chemical use, safety and sanitation laws, statutes, ordinances and codes relating to the protection of the environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Materials, in each case, as amended, and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of Governmental Authorities with respect thereto.

"**Environmental Permits**" means any and all permits, licenses, approvals, registrations, notifications, exemptions and any other authorization required under any Environmental Law.

"**Financing Orders**" means the Interim Financing Order and, when applicable, the Final Financing Order.

"**Final Financing Order**" means the order of the Bankruptcy Court in the Bankruptcy Cases, in form and substance satisfactory to Lender in its sole discretion, approving on a final, non-interim basis the transactions contemplated by this Agreement and the other Loan Documents, and the Liens granted thereunder and the other transactions contemplated thereunder.

"**GAAP**" means generally accepted accounting principles in the United States of America in effect from time to time as applied by nationally recognized accounting firms.

"**Governmental Authority**" shall mean any federal, state, municipal, national, local or other governmental department, court, commission, board, bureau, agency or instrumentality or political subdivision thereof, or any entity or officer exercising executive, legislative or judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case, whether of the United States or a state, territory or possession thereof, a foreign sovereign entity or country or jurisdiction or the District of Columbia.

2

"**Government Funded Property**" means any property of Borrowers purchased or acquired with funds that were reimbursed with federal funds under assistance agreements (Assistance Agreements), including assistance agreements DE-EE0002194 and DE-EE0005501, by and between any of the Borrowers and the United States Department of Energy. For purposes of clarity, Government Funded Property includes real property, equipment, supplies and other tangible personal property acquired for the projects that was paid for, in whole or in part, with federal funding received under the Assistance Agreements. Such property includes property that were, in connection with the Assistance Agreements, either: (1) acquired with non-federal funds and counted as cost-share: or (2) contributed as cost-share. This definition also applies going forward with respect to property acquired or contributed for the projects by the Borrowers after the Petition Date.

"**Hazardous Materials**" means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives, flammable materials; radioactive materials; polychlorinated biphenyls and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence is prohibited by any Environmental Laws; toxic mold, any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," "pollutant" or other words of similar import within the meaning of any Environmental Law.

"**Indebtedness**" of any Person means, without duplication, (a) all items which, in accordance with GAAP, would be included in determining total liabilities as shown on the liability side of the balance sheet of such Person as of the date as of which Indebtedness is to be determined, including any lease which, in accordance with GAAP would constitute Indebtedness, (b) all indebtedness secured by any mortgage, pledge, security, Lien or conditional sale or other title retention agreement to which any property or asset owned or held by such Person is subject, whether or not the indebtedness secured thereby shall have been assumed, (c) all indebtedness of others which such Person has directly or indirectly guaranteed, endorsed (otherwise than for collection or deposit in the ordinary course of business), discounted or sold with recourse or agreed (contingently or otherwise) to purchase or repurchase or otherwise acquire, or in respect of which such Person has agreed to supply or advance funds (whether by way of loan, stock, equity or other ownership interest purchase, capital contribution or otherwise) or otherwise to become directly or indirectly liable.

"**Interim Financing Order**" means the order of the Bankruptcy Court in the Bankruptcy Cases, in form and substance satisfactory to Lender in its sole discretion, approving on an interim basis the transactions contemplated by this Agreement and the other Loan Documents.

"**Investment**" means any investment in any Person, whether by means of acquiring (whether for cash, property, services, securities or otherwise), making or holding Indebtedness, securities, capital contributions, loans, time deposits, advances, guarantees or otherwise.

"**Lien**" means any mortgage, pledge, security interest, encumbrance, restriction, lien or charge of any kind (including any agreement to grant any of the foregoing, any conditional sale or other title retention agreement or any lease in the nature thereof), or any other arrangement pursuant to which title to the property is retained by or vested in some other Person for security purposes.

"**Loan Documents**" means, collectively and each individually, this Agreement, the Note and all other agreements, documents, instruments and certificates heretofore or hereafter executed or delivered to Lender in connection with any of the foregoing or the Term Loan, as the same may be amended, modified or supplemented from time to time.

3

"**Material Adverse Effect**" means a material adverse change in, or a material adverse effect upon, any of (i) the condition (financial or otherwise), operations, business, properties or prospects of any Credit Party, (ii) the rights and remedies of Lender under any Loan Document or any Lien in favor of Lender, (iii) the ability of any Credit Party to perform any of its obligations under any Loan Document, or (iv) the ability of the Borrowers to consummate the Sale on or prior to October 28, 2013.

"**Note**" means that certain Term Loan Promissory Note, dated as of the Closing Date, delivered by Borrowers to Lender in the principal amount of $1,250,000.

"**Obligations**" means all present and future obligations under this Agreement, Indebtedness and liabilities of any Credit Party to Lender at any time and from time to time of every kind, nature and description, direct or indirect, secured or unsecured, joint and several, absolute or contingent, due or to become due, matured or unmatured, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, including, without limitation, all applicable fees, charges and expenses and/or all amounts paid or advanced by Lender on behalf of or for the benefit of any Credit Party for any reason at any time except for obligations incurred outside this Agreement prior to the Petition Date.

"**Permit**" means collectively, all licenses, leases, permits, powers, approvals, notifications, certifications, franchises, registrations, authorizations, exemptions, qualifications, easements, rights of way, Liens and other rights, privileges and approvals, including but not limited to (i) Environmental Permits, and (ii) any and all other licenses, leases, permits, powers, approvals, notifications, certifications, franchises, registrations, authorizations, exemptions, qualifications, easements, rights of way, Liens and other rights, privileges and approvals required under any applicable law.

"**Person**" means an individual, a partnership, a corporation, a limited liability company, a business trust, a joint stock company, a trust, an unincorporated association, a joint venture, a Governmental Authority or any other entity of whatever nature.

"**Reorganization Milestones**" means (a) entry by the Bankruptcy Court of the Sale Procedures Order on or before September 20, 2013, (b) entry by the Bankruptcy Court of the Sale Approval Order on or before October 11, 2013, and (c) closing of the Sale on or before October 28, 2013.

"**Restricted Distribution**" means as to any Person (a) any dividend or other distribution (whether in cash, securities or other property) on any equity interest in such Person; (b) any payment by such Person on account of (i) the purchase, redemption, retirement, defeasance, surrender, cancellation, termination or acquisition of any equity interests in such Person or any claim respecting the purchase or sale of any equity interest in such Person, or (ii) any option, warrant or other right to acquire any equity interests in such Person; (c) any management fees or payment of any kind to any Affiliate or any Person holding an equity interest in any Credit Party or a Subsidiary of any Credit Party, an Affiliate of any Credit Party or an Affiliate of any Subsidiary of any Credit Party (excluding any salaries or other compensation made to the Credit Parties' directors, officers and employees pursuant to the Budget); (d) any lease or rental payments to an Affiliate or Subsidiary of Borrowers; or (e) repayments of or debt service on loans or other indebtedness held by any Affiliate or any Person holding an equity interest in any Credit Party or a Subsidiary of any Credit Party, an Affiliate of any Credit Party or an Affiliate of any Subsidiary of any Credit Party.

"**Sale**" means the sale of substantially all of the Credit Parties' assets and any interest of the Department of Energy in those assets (or subject to the Department of Energy grant, as such grant may be amended, to Borrowers if it is assumed, assigned and novated in favor of a purchaser) pursuant to the Sale Documents approved by the Bankruptcy Court in the Sale Approval Order pursuant to Section 363 of the Bankruptcy Code.

"**Sale Documents**" means, collectively, the [Purchase Agreement] and any and all other agreements, documents and certificates executed and delivered in connection therewith.

"**Sale Motion**" means a motion, in form and substance satisfactory to Lender, filed in the Bankruptcy Cases seeking entry of the Sale Procedures Order and the Sale Approval Order.

"**Sale Approval Order**" means an order entered by the Bankruptcy Court in the Bankruptcy Cases, in a form and substance satisfactory to Lender, approving the Sale pursuant to the Sale Documents, including the sale of assets in which the Department of Energy may have or assert an interest (or subject to the Department of Energy grant, as such grant may be amended, to Borrowers if the grant is assumed, assigned and novated in favor of the purchaser) and the assumption and assignment of executory contracts and unexpired leases.

"**Sale Procedures Order**" means an order entered by the Bankruptcy Court in the Bankruptcy Cases, in form and substance satisfactory to Lender, approving the procedures for the Sale and the form of the primary Sale Documents.

"**Subsidiary**" means, as to any Credit Party, any Person in which more than 50% of all equity, membership, partnership or other ownership interests is owned directly or indirectly by any Credit Party or one or more of its Subsidiaries.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York from time to time.

**1.2     UCC Terms.** All capitalized terms used which are not specifically defined herein shall, to the extent applicable, have meanings provided in Article 9 of the UCC in effect on the date hereof.

## II.     ADVANCES, PAYMENT, INTEREST AND COLLATERAL

**2.1     Term Loan.** Subject to the provisions of this Agreement (including satisfaction of the requirements set forth in Article III), Lender agrees to loan to Borrowers the following amounts (each an "**Advance**") by 10:00 a.m. (Pacific time) on the following dates (each an "**Advance Date**"):

| Advance Date | Advance |
|---|---|
| Closing Date | $500,000 |
| September 25, 2013 | $250,000 |
| September 30, 2013 | $250,000 |
| October 7, 2013 | $250,000 |

**2.2     Maturity.** All amounts outstanding and other Obligations shall be due and payable in full on the date (the "**Maturity Date**") that is the earlier of (i) any date on which Lender accelerates the maturity of the Term Loan pursuant to Section 8.1 herein, (ii) the date upon which the Interim Financing Order expires if the Final Financing Order has not been entered prior to such date, (iii) the closing of the Sale, and (iv) October 28, 2013.

**2.3     Interest; Default Rate.** Interest shall accrue on the outstanding principal balance of the Term Loan at a per annum rate equal to five percent (5.0%) (the "**Interest Rate**"). All interest shall be due and payable on the Maturity Date. Upon the occurrence and during the continuation of an Event of Default, the Interest Rate in effect at such time with respect to the Obligations shall be increased by two percent (2.0%) per annum. All interest and fees hereunder shall be computed on the basis of a year of

5

365/366 days and for the actual number of days elapsed in each calculation period. In no event shall the interest and other charges paid or agreed to be paid to Lender hereunder exceed the maximum rate permissible under applicable law.

**2.4** **Promise to Pay; Manner of Payment.** Borrowers and, pursuant to the Guarantee (as defined below), the Guarantors absolutely and unconditionally promise to pay principal, interest and all other amounts payable hereunder, or under any other Loan Document, without any right of rescission and without any deduction whatsoever, including any deduction for any setoff, counterclaim or recoupment. All payments made by any Credit Party shall be made by wire transfer on the date when due, without offset or counterclaim, in United States Dollars, in immediately available funds to such account as may be indicated in writing by Lender to the Credit Parties from time to time. The Term Loan and any Advances may be prepaid in full or in part without penalty or premium. Any amounts paid or prepaid under the Term Loan may not be reborrowed.

**2.5** **Security Interest**

(a) To secure the prompt payment and performance in full when due, whether by lapse of time, acceleration, or otherwise, of the Obligations, each Credit Party hereby grants to Lender a continuing security interest in, a Lien upon, and a right to set off against, and pledges to Lender any and all right, title and interest in and to all assets of each Credit Party including but not limited to the following, whether now owned or existing, or hereafter acquired or arising and including any leasehold interest therein (collectively, and each individually, the "**Collateral**"), which security interest is intended to be a first priority security interest: (i) all goods, Accounts, Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, securities accounts, fixtures, letter of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; (ii) all of each Credit Party's books and records relating to any of the foregoing; and (iii) any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.

(b) Upon the execution and delivery of this Agreement, upon the entry of the Initial Financing Order, and upon the proper filing of any necessary financing statements, without any further action, Lender will have a good, valid and perfected first priority Lien and security interest in the Collateral, subject to no transfer or other restrictions or Liens of any kind in favor of any other Person except for Permitted Liens and the interests held by the Department of Energy in certain of the Credit Parties' assets. No financing statement relating to any of the Collateral is on file in any public office except those (i) on behalf of Lender, and/or (ii) in connection with Permitted Liens.

(c) Notwithstanding the foregoing provisions of this Section 2.5, such grant of a security interest shall not extend to, and the Collateral shall not include the Government Funded Property, except on the following terms and conditions. The Credit Parties grant a first priority lien in their interest in the proceeds of any sale of Government Funded Property. The Credit Parties grant a first priority lien in Debtors' interest in the Government Funded Property which shall attach and become enforceable only if and when the Department of Energy approves of said lien at the time that (i) there are no third party qualified bids after the expiration of the bid deadline at any 363 sale or foreclosure sale; and (ii) Lender exercises its statutory right to credit bid in the amount or a portion of the Loan at any 363 sale or foreclosure sale. Notwithstanding the existence of any lien on Government Funded Property, any

6

interests of the Department of Energy under federal law, including without limitation any rights under 10 C.F.R. § 600.321, remain on the Government Funded Property.

(d)     Notwithstanding anything herein to the contrary, no Credit Party shall be required to pledge more than sixty-five percent (65%) of the voting capital stock or other equity interest in any of such Credit Party's Subsidiaries not organized under the laws of any jurisdiction within the United States.

### 2.6     Collateral Administration

(a)     All of the Credit Parties' (i) vehicle chargers and vehicle charging network shall suffer no more than forty-eight (48) hours of inoperability in the aggregate prior to the Maturity Date, and (ii) vehicle chargers shall be able to charge customers regardless of their connection to the vehicle charging network, in each case except for chargers which are inoperational due to field service issues, the acts of third parties outside the control of the Borrowers or an act of God such as a natural disaster, lightning or flooding.

(b)     If requested by Lender, each Credit Party shall execute and deliver to Lender formal written assignments of all of such Credit Party's Accounts weekly or daily as Lender may request.

**2.7     Power of Attorney.** Lender is hereby irrevocably made, constituted and appointed the true and lawful attorney for each Credit Party (without requiring Lender to act as such) with full power of substitution to do the following: (i) endorse the name of any Credit Party upon any and all checks, drafts, money orders, and other instruments for the payment of money that are payable to any Credit Party and constitute collections on its Accounts; (ii) execute in the name of any Credit Party any financing statements, schedules, assignments, instruments, documents, and statements that Lender deems necessary or desirable; and (iii) do such other and further acts and deeds in the name of any Credit Party that Lender may deem necessary or desirable to enforce any Account or other Collateral or to perfect Lender's security interest or lien in any Collateral.

**2.8     Use of Proceeds.** The proceeds of the Term Loan may be used by Borrowers as set forth in the Budget as follows: (i) to fund Borrowers' working capital requirements, operating expenses, costs of administration of the Bankruptcy Cases (including professional fees), (ii) to fund the payment of interest accrued on the Term Loan, (iii) to pay compensation to, or reimburse or advance ordinary course expenses incurred or to be incurred by, the executives and employees of Borrower, (iv) to provide to the Operating Subsidiaries no more than $27,000 in excess of the receivables and cash owned by the Operating Subsidiaries but included in the Budget (the "**Operating Subsidiary Funds**"), and (v) to provide an aggregate amount of no more than $5,000 to the Guarantors (other than the Operating Subsidiaries), which shall be used solely for costs and expenses directly related to pay the administrative costs necessary to maintain the corporate existence of such Guarantors' business operations (the "**Administrative Funds**").

## III.     CONDITIONS PRECEDENT

### 3.1     Conditions to Closing

The obligations of Lender to consummate the transactions contemplated herein and to make the Advance under the Term Loan on the Closing Date (the "**Closing Date Advance**") are subject to the satisfaction, in the sole judgment of Lender, of the following:

7

(a)     the Interim Financing Order shall be in effect and shall not have been reversed, modified, amended or stayed, and no motion seeking a reversal, modification, amendment or stay shall have been filed by any Person that, in Lender's sole discretion, could result in a Material Adverse Effect;

(b)     the Sale Procedures Order shall have been entered by the Bankruptcy Court and shall not have been reversed, modified, amended or stayed, and no motion seeking a reversal, modification, amendment or stay shall have been filed by any Person that, in Lender's sole discretion, could result in a Material Adverse Effect;

(c)     the Reorganization Milestones shall have been achieved or are achievable;

(d)     each Credit Party shall have delivered to Lender, all in form and substance satisfactory to Lender, the Loan Documents, each duly executed by an authorized officer of each Credit Party and the other parties thereto;

(e)     Lender shall have received (i) each Credit Party's formation and organization documents in form and substance acceptable to Lender, and (ii) certificates of the corporate secretary of each Credit Party dated the Closing Date as to the incumbency and signature of the Persons executing the Loan Documents, in form and substance acceptable to Lender;

(f)     Lender shall have received such other documents, certificates, and information as Lender may request, all in form and substance reasonably satisfactory to Lender and its counsel; and

(g)     no Default or Event of Default shall exist on the Closing Date, after giving effect to all of the extensions of credit to be made to Borrowers on the Closing Date.

**3.2     Conditions to Each Advance**

The obligations of Lender to make any Advance (including the Closing Date Advance) are subject to the satisfaction, in the sole judgment of Lender, of the following additional conditions precedent:

(a)     each of the representations and warranties made by any Credit Party in or pursuant to this Agreement shall be accurate in all material respects, before and after giving effect to such Advance;

(b)     no Default or Event of Default shall have occurred or be continuing or would exist immediately after giving effect to the Advance;

(c)     the Interim Financing Order or, after entry of the Final Financing Order, the Final Financing Order shall be in effect and shall not have been reversed, modified, amended or stayed, and no motion seeking a reversal, modification, amendment or stay shall have been filed by any Person that, in Lender's sole discretion, could result in a Material Adverse Effect;

(d)     the Sale Procedures Order remains in effect,

(e)     the Reorganization Milestones have been achieved or remain achievable; and

(f)     all of the Loan Documents shall be and remain in full force and effect.

**IV.     REPRESENTATIONS AND WARRANTIES**

8

Each Credit Party represents and warrants as of the date hereof, as of the Closing Date and as of the date of each Advance as follows:

**4.1     Organization and Authority.** Each Credit Party is duly organized, validly existing and in good standing under the laws of its state of formation. Upon the entry of the Financing Orders, each Credit Party (i) has all requisite corporate or entity power and authority to own its properties and assets and to carry on its business as now being conducted and as contemplated in the Loan Documents, (ii) is duly qualified to do business in every jurisdiction in which failure so to qualify would reasonably be likely to have a Material Adverse Effect, and (iii) has all requisite power and authority (A) to execute, deliver and perform the Loan Documents to which it is a party, (B) to borrow hereunder, (C) to consummate the transactions contemplated under the Loan Documents, and (D) to grant the Liens with regard to the Collateral.

**4.2     Loan Documents.** Upon the entry of the Financing Orders, the execution, delivery and performance by each Credit Party of the Loan Documents, and the consummation of the transactions contemplated thereby, (i) have been duly authorized by all requisite action of each Credit Party and have been duly executed and delivered by or on behalf of Borrower; (ii) do not violate any provisions of (A) applicable law, statute, rule, regulation, ordinance or tariff, (B) any order of any Governmental Authority binding on any Credit Party or any of its properties, or (C) the certificate of incorporation or bylaws (or any other equivalent governing agreement or document) of any Credit Party, or any agreement between any Credit Party and its stockholders, members, partners or equity owners or among any such stockholders, members, partners or equity owners; (iii) are not in conflict with, and do not result in a breach or default of or constitute an event of default, or an event, fact, condition or circumstance which, with notice or passage of time, or both, would constitute or result in a conflict, breach, default or event of default under, any indenture, agreement or other instrument to which any Credit Party is a party, or by which the properties or assets of any Credit Party are bound; (iv) except as set forth therein, will not result in the creation or imposition of any Lien of any nature upon any of the properties or assets of any Credit Party, and (v) do not require the consent, approval or authorization of, or filing, registration or qualification with, any Governmental Authority or any other Person. Upon entry of the Financing Orders, when executed and delivered, each of the Loan Documents will constitute the legal, valid and binding obligation of each Credit Party, enforceable against each Credit Party in accordance with its terms, subject to the effect of any applicable bankruptcy, moratorium, insolvency, reorganization or other similar law affecting the enforceability of creditors' rights generally and to the effect of general principles of equity which may limit the availability of equitable remedies (whether in a proceeding at law or in equity).

**4.3     Subsidiaries.** No Subsidiary or Affiliate of any Credit Party (other than a Borrower) will receive any proceeds of the Term Loan except for (i) the Operating Subsidiary Funds and (ii) the Administrative Funds.

**4.4     Properties.** Each Credit Party is the sole owner and has good, valid and marketable title to, or a valid leasehold interest in, all of the Collateral, subject to no transfer restrictions or Liens of any kind except for Liens set forth on Schedule 4.4 ("**Permitted Liens**").

**4.5     Other Agreements.** Except as set forth on Schedule 4.5, no Credit Party is a party to any judgment, order or decree or any agreement, document or instrument, or subject to any restriction, which would affect its ability to execute and deliver, or perform under, any Loan Document or to pay the Obligations.

**4.6     Litigation.** Except as set forth on Schedule 4.6, there is no action, suit, proceeding or investigation pending or, to its knowledge, threatened against any Credit Party that questions or could

9

prevent the validity of any of the Loan Documents or the right of any Credit Party to enter into any Loan Document or to consummate the transactions contemplated thereby.

**4.7** **Environmental Matters.** Other than exceptions to any of the following that could not, individually or in the aggregate, be expected to have a Material Adverse Effect:

(a) Each Credit Party and its Subsidiaries: (i) are, and within the period of all applicable statutes of limitation have been, in compliance with all applicable Environmental Laws and Environmental Permits; and (ii) reasonably believes that compliance with all applicable Environmental Laws and Environmental Permits that are or are expected to become applicable to or required by any of them will be timely attained and maintained, without material expense.

(b) Hazardous Materials are not present at, on, under, in, or about any real property now or formerly owned, leased or operated by any Credit Party or at any other location which (i) could reasonably be expected to give rise to liability of any Credit Party under any applicable Environmental Law or otherwise result in costs to any Credit Party, or (ii) impair the fair saleable value of any real property owned or leased by any Credit Party.

(c) There is no judicial, administrative, or arbitral proceeding (including any notice of violation or alleged violation) under or relating to any Environmental Law or Environmental Permit to which any Credit Party is named as a party that is pending or, to the knowledge of any Credit Party, threatened.

(d) No Credit Party has received any written request for information, or been notified that it is a potentially responsible party under or relating to the federal Comprehensive Environmental Response, Compensation, and Liability Act or any similar Environmental Law, or with respect to any Hazardous Materials.

(e) No Credit Party has entered into or agreed to any consent decree, order, or settlement or other agreement, or is subject to any judgment, decree, or order or other agreement, in any judicial, administrative, arbitral, or other forum for dispute resolution, relating to compliance with or liability under any Environmental Law.

**4.8** **Potential Tax Liability; Tax Returns**

(a) No Credit Party (i) has received any oral or written communication from the Internal Revenue Service with respect to any investigation or assessment relating to such Credit Party directly, or relating to any tax return which was filed on behalf of such Credit Party, (ii) is aware of any year which remains open pending tax examination or audit by the IRS, or (iii) is aware of any information that could give rise to an IRS tax liability or assessment.

(b) Except as set forth on Schedule 4.8(b), each Credit Party (i) has filed all federal, state, foreign (if applicable) and local tax returns and other reports which are required by law to be filed by any Credit Party, (ii) has paid all taxes, assessments, fees and other governmental charges, including, without limitation, payroll and other employment related taxes, in each case that are due and payable, except only for items that such Credit Party is currently contesting in good faith with adequate reserves under GAAP.

**4.9** **Financial Statements and Reports.** All financial statements and financial information relating to any Credit Party that have been or may hereafter be delivered to Lender by any Credit Party are accurate and complete in all material respects and have been prepared in accordance with GAAP

consistently applied with prior periods (except that interim statements do not contain footnotes or year-end adjustments).

**4.10    Compliance with Law.** Except as set forth on <u>Schedule 4.10</u>, each Credit Party (i) is in compliance with all laws, statutes, rules, regulations, ordinances and tariffs of any Governmental Authority applicable to each Credit Party and/or any Credit Party's business, assets or operations, and (ii) is not in violation of any order of any Governmental Authority or other board or tribunal, except where noncompliance or violation could not reasonably be expected to have a Material Adverse Effect.

**4.12    Disclosure.** No Loan Document nor any other agreement, document, certificate, or statement furnished to Lender by or on behalf of any Credit Party in connection with the transactions contemplated by the Loan Documents, nor any representation or warranty made by any Credit Party in any Loan Document, contains any untrue statement of material fact or omits to state any fact necessary to make the statements therein not materially misleading.

**4.13    Existing Indebtedness.** No Credit Party has any outstanding Indebtedness other than Indebtedness set forth on <u>Schedule 4.13</u> ("**Permitted Indebtedness**").

**4.14    Insurance.** Each Credit Party has in full force and effect such insurance policies as are customary in its industry.

**4.15    Bankruptcy Matters.**

(a)    The Bankruptcy Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof.

(b)    Proper notice for the motion seeking approval of this Agreement, the other Loan Documents, and the Financing Orders has been given.

(c)    The Liens securing the Obligations are valid and enforceable, perfected, first-priority Liens on all of the Collateral in favor of Lender.

(d)    Upon and after entry of the Financing Orders, the Obligations will constitute allowed administrative expense claims in the Bankruptcy Cases, having priority over all administrative expense claims and unsecured claims against each Credit Party now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c) 726 (to the extent permitted by Law), 1113, 1114, or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1) of the Bankruptcy Code.

(e)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, on the Maturity Date, Lender shall be entitled to immediate payment of all Obligations and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court.

(f)    Proper notice for (i) the Sale Procedures Motion and (ii) the hearing for the approval of Sale Procedures Motion has been given. The Credit Parties have given on a timely basis all notices required to be given to all parties specified in the Sale Procedure Motion.

## V.    AFFIRMATIVE COVENANTS

Each Credit Party covenants and agrees that, until full performance and satisfaction, and indefeasible payment in full in cash, of all the Obligations and termination of this Agreement:

**5.1    Budget Comparison; Information.** Each Credit Party shall furnish to Lender (i) on the second Business Day of each week after the Closing Date (A) a reconciliation of budgeted amounts set forth in the Budget and actual amounts spent, used or transferred during the Bankruptcy Cases, and (B) a written narrative explanation if actual aggregate disbursements under the Budget during any consecutive two-week period exceed the budgeted disbursements for such two-week period by more than ten percent (10%), and (ii) as soon as available such information, documents, statements, reports and other materials as Lender may request from a credit or security perspective or otherwise from time to time.

**5.2    Notice of an Event of Default.** Each Credit Party shall promptly notify Lender in writing of any Default or Event of Default, which notice shall specify the nature and status thereof.

**5.3    Payment of Obligations.** Each Credit Party shall make full and timely indefeasible payment in cash of the principal of and interest on the Term Loan and all other Obligations.

**5.4    Conduct of Business; Technical Assistance.** Each Credit Party shall engage principally in the same or similar lines of business substantially as heretofore conducted, and maintain operations, including operation of all vehicle charging stations and the charging network, in all jurisdictions in which such operations are currently located in accordance with the terms of Section 2.6 (a) of this Agreement. Each Credit Party shall provide to Lender all documents, manuals, drawings, schematics, data, engineering or technical information, and any other material or work product, in tangible or electronic format, that Lender may request with respect to manufacture or operation of any Credit Party's vehicle charging stations, charging network, parts, components or any other assets owned or used by any Credit Party in its business, and shall provide Lender with access to all persons involved in the preparation of, or with knowledge regarding, any of the foregoing, in each case as Lender may request.

**5.5    Compliance with Legal and Other Obligations.** Except as set forth on Schedule 5.5, each Credit Party shall (i) comply with all laws, statutes, rules, regulations, ordinances and tariffs of all Governmental Authorities applicable to it or its business, assets or operations unless failure to comply therewith could not reasonably be likely to have a Material Adverse Effect; (ii) perform in accordance with its terms each contract, agreement or other arrangement to which it is a party or by which it or any of the Collateral is bound, except where the failure to comply, pay or perform could not reasonably be expected to have a Material Adverse Effect, and (iii) maintain and comply with all Permits necessary to conduct its business and comply with any new or additional requirements that may be imposed on it or its business.

**5.6    Insurance.** Each Credit Party shall (i) keep all of its insurable properties and assets adequately insured in all material respects against losses, damages and hazards as are customarily insured against by businesses engaging in similar activities or owning similar assets or properties and at least the minimum amount required by applicable law, and (ii) maintain general public liability insurance at all times against liability on account of damage to persons and property having such limits, deductibles, exclusions and co-insurance and other provisions as are customary for a business engaged in activities similar to those of Borrower; all of the foregoing insurance policies to (A) be satisfactory in form and substance to Lender in its reasonable discretion, and (B) name Lender as loss payee and/or additional insured thereunder, as applicable.

**5.7    Further Assurances.** At each Credit Party's cost and expense, each Credit Party shall take such further actions, obtain such consents and approvals and duly execute and deliver such further agreements, assignments, instructions or documents as Lender may request with respect to the purposes,

terms and conditions of the Loan Documents and the consummation of the transactions contemplated thereby.

**5.8    Collateral Documents; Security Interest in Collateral.** Each Credit Party shall (i) execute, obtain, deliver, file, register and/or record any and all financing statements, continuation statements, instruments and other documents, or cause the execution, filing, registration, recording or delivery of any and all of the foregoing, that are necessary or required under law or otherwise or reasonably requested by Lender to be executed, filed, registered, obtained, delivered or recorded to create, maintain, perfect, preserve, validate or otherwise protect the pledge of the Collateral to Lender and Lender's perfected first priority Lien on the Collateral (other than Permitted Liens) (and each Credit Party irrevocably grants Lender the right, at Lender's option, to file any or all of the foregoing), and (ii) defend the Collateral and Lender's perfected first priority Lien thereon against all claims and demands of all Persons (other than holders of Permitted Liens) at any time claiming the same or any interest therein adverse to Lender, and pay, upon demand on or after the Maturity Date,  all reasonable out-of-pocket, third-party costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) in connection with such defense, which shall be added to the Obligations.

**5.9    Taxes and Other Charges.** All payments and reimbursements to Lender made under any Loan Document shall be free and clear of and without deduction for all taxes, levies, imposts, deductions, assessments, charges or withholdings, and all liabilities with respect thereto of any nature whatsoever, excluding taxes to the extent imposed on Lender's net income. If any Credit Party shall be required by law to deduct any such amounts from or in respect of any sum payable under any Loan Document to Lender, then the sum payable to Lender shall be increased as may be necessary so that, after making all required deductions, Lender receives an amount equal to the sum it would have received had no such deductions been made. Notwithstanding any other provision of any Loan Document, if at any time (i) any change in any existing law, regulation, treaty or directive or in the interpretation or application thereof, (ii) any new law, regulation, treaty or directive enacted or any interpretation or application thereof, or (iii) compliance by Lender with any request or directive (whether or not having the force of law) from any Governmental Authority: (A) subjects Lender to any tax, levy, impost, deduction, assessment, charge or withholding of any kind whatsoever with respect to any Loan Document, or changes the basis of taxation of payments to Lender of any amount payable thereunder (except for net income taxes, or franchise taxes imposed in lieu of net income taxes, imposed generally by federal, state or local taxing authorities with respect to interest or commitment fees or other fees payable hereunder or changes in the rate of tax on the overall net income of Lender), or (B) imposes on Lender any other condition or increased cost in connection with the transactions contemplated thereby or participations therein; and the result of any of the foregoing is to increase the cost to Lender of making or continuing any Loan hereunder or to reduce any amount receivable hereunder, then, in any such case, such Credit Party shall promptly pay to Lender any additional amounts necessary to compensate Lender, on an after-tax basis, for such additional cost or reduced amount as determined by Lender in its reasonable discretion.

**5.10    Environmental Laws.** Each Credit Party shall comply in all material respects with all applicable Environmental Laws and Environmental Permits, and obtain, maintain and comply in all material respects with and maintain any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws.

**5.11    Inspection.** Each Credit Party will permit representatives of Lender, upon one (1) day's notice, to be present on such Credit Party's premises and inspect any of such Credit Party's operations and assets, to examine and make abstracts or copies from any of such Credit Party's books and records, to conduct a collateral audit and analysis of such Credit Party's operations and the Collateral, to verify the amount and age of any Accounts, to verify the identity and credit of the any Account Debtors, to review the billing practices of any Credit Party and to discuss such Credit Party's affairs, finances and accounts

13

with such Credit Party's officers, employees and independent public accountants until all Obligations have been paid in full in cash and this Agreement has terminated.

**5.12    Reorganization Matters.** Each Credit Party shall timely comply with the Reorganization Milestones, it being expressly understood that time is of the essence. Promptly after the sending, receiving or filing thereof, copies of all reports, motions, affidavits, statements and other documents that any Credit Party sends, receives or files in connection with the Bankruptcy Cases, including all correspondence with the Bankruptcy Court, shall be delivered to Lender.

## VI.    NEGATIVE COVENANTS

Each Credit Party covenants and agrees that, until full performance and satisfaction, and indefeasible payment in full in cash, of all of the Obligations and termination of this Agreement:

**6.1    Permitted Indebtedness.** No Credit Party shall create, incur, assume or suffer to exist any Indebtedness other than Permitted Indebtedness.

**6.2    Permitted Liens.** No Credit Party shall create, incur, assume or suffer to exist any Lien upon, in or against, or pledge of, any of the Collateral, except (i) Liens granted in the Loan Documents or otherwise arising in favor of Lender, and (ii) Permitted Liens.

**6.3    Investments.** No Credit Party, directly or indirectly, shall make any Investment except for such Investments in existence as of the date hereof on the terms and conditions in effect as of the date hereof.

**6.4    Restricted Distributions.** No Credit Party shall make any Restricted Distribution and Borrowers shall not distribute or transfer any funds to any Guarantor, Portable or any Subsidiary or Affiliate of Borrowers other than (i) the Operating Subsidiary Funds, (ii) the Administrative Funds, and (iii) other Restricted Distributions among the Borrowers in accordance with the Budget.

**6.5    Transactions with Affiliates.** After the date hereof, no Credit Party shall enter into or consummate any transaction of any kind with any of its Affiliates except as set forth in Section 2.8 of this Agreement and the Budget.

**6.6    Material Changes.** No Credit Party shall (i) amend, modify, restate or change its certificate of incorporation or formation or bylaws or similar charter documents, (ii) change its name or change its jurisdiction of organization; or (iii) amend, alter or suspend or terminate or make provisional in any material way, any Permit.

**6.7    Truth of Statements.** No Credit Party shall furnish to Lender any certificate or other document that contains any untrue statement of a material fact or that omits to state a material fact necessary to make it not misleading in light of the circumstances under which it was furnished.

**6.8    Transfer of Assets.** Except pursuant to the Sale Order or in the ordinary course of business, no Credit Party shall sell, lease, transfer, assign or otherwise dispose of any interest in any properties or assets, or agree to do any of the foregoing at any future time.

**6.9    Bankruptcy Actions.** No Credit Party shall enter into any agreement to return any of its inventory or other Collateral to any of its creditors. No Credit Party shall make (i) payments on account of claims or expenses arising under Section 503(b)(9) of the Bankruptcy Code, (ii) payments in respect of a reclamation program, or (iii) payments in accordance with the Budget under any management incentive

14

plan or on account of claims or expenses arising under Section 503(c) of the Bankruptcy Code. No Credit Party shall obtain, or seek to obtain, any stay on the exercise of the remedies of Lender hereunder under any Loan Document or the Financing Order.

## VII.    EVENTS OF DEFAULT

The occurrence of any one or more of the following shall constitute an "**Event of Default**":

(a)    Borrowers shall fail to pay any amount on the Term Loan, on any other Obligation or provided for in any Loan Document when due (whether on any payment date or at maturity), or any Guarantor shall fail to pay any amount due pursuant to the Guarantee, on any other Obligation or provided for in any Loan Document when due (whether on any payment date or at maturity);

(b)    any representation, statement or warranty made or deemed made by any Credit Party in any Loan Document or in any other certificate, document, report or opinion delivered in conjunction with any Loan Document, shall not be true and correct in all material respects or shall have been false or misleading in any material respect on the date when made or deemed to have been made;

(c)    any Credit Party shall be in violation, breach or default of, or shall fail to perform, observe or comply with any covenant, obligation or agreement set forth in, any Loan Document and, except for negative covenants set forth in Article VI, such violation, breach, default or failure is not cured within three (3) Business Days;

(d)    (i) any of the Loan Documents ceases to be in full force and effect, or (ii) any Lien created thereunder ceases to constitute a valid perfected first priority Lien on the Collateral in accordance with the terms thereof, or Lender ceases to have a valid perfected first priority security interest in any of the Collateral;

(e)    any default (other than as a result of the filing of the Bankruptcy Cases) occurs (i) in the payment of any amount with respect to any Indebtedness (other than the Obligations) of any Credit Party in excess of $100,000, (ii) in the performance, observance or fulfillment of any provision contained in any agreement, contract, document or instrument to which a Credit Party is a party or to which any of its properties or assets are subject or bound under or pursuant to which any Indebtedness in excess of $100,000 was issued, created, assumed, guaranteed or secured, or (iii) in the performance, observance or fulfillment of any provision contained in any agreement, contract, document or instrument between any Credit Party and Lender or any Affiliate of Lender (other than the Loan Documents);

(f)    if (i) any Bankruptcy Case is converted to a case under Chapter 7 of the Bankruptcy Code, or (ii) any Bankruptcy Case is dismissed;

(g)    if a Chapter 11 trustee or an examiner with enlarged powers relating to the operations of any Credit Party's business (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed pursuant to Section 1104 of the Bankruptcy Code in the Bankruptcy Case;

(h)    if any super-priority administrative expense claim or any Lien that is pari passu with or senior to those of Lender is granted to any Person, or the authorization to use cash collateral without the consent of Lender is granted to any Person other than Lender;

(i)    if any Person other than Lender is granted relief from the automatic stay provided for in any Bankruptcy Case, or such automatic stay is otherwise modified, to permit enforcement of rights by such Person with respect to any asset of Borrower that has a value in excess of $25,000;

(j)      if any Credit Party's shareholders, directors, members or managers shall authorize the liquidation of such Credit Party's business or assets pursuant to one or more Section 363 sales or otherwise, or shall file any motion under Section 363 of the Bankruptcy Code, other than pursuant to the Sale Documents;

(k)      if any Credit Party shall fail to comply with or perform any of the terms, conditions, covenants or other obligations under the Financing Order;

(l)      the failure of the Closing Date to occur within three (3) Business Days after entry of the Interim Financing Order;

(m)      if any Credit Party fails to achieve any Reorganization Milestone as and when required;

(n)      any assumption or rejection of any executory contract without the prior written consent of Lender;

(o)      the amendment, modification, reversal, revocation, issuance of a stay or order to vacate or supplement the Financing Orders, the Sale Procedures Order, the Sale Approval Order or any other order of the Bankruptcy Court affecting this Agreement, any other Loan Document, the Sale or the transactions contemplated hereby or thereby without the prior written consent of Lender;

(p)      if any Credit Party exceeds, on a rolling two (2) week basis, the Budget by an amount exceeding ten percent (10%) on an aggregate basis without the prior written consent of Lender;

then, and in any such event, notwithstanding any other provision of any Loan Document, Lender may, without notice or demand, do any of the following: (i) terminate its obligations to make Advances hereunder, whereupon the same shall immediately terminate and (ii) elect the Term Loan and/or the Note, all interest thereon and all other Obligations to be due and payable immediately, in each case without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Credit Parties.

## VIII.   RIGHTS AND REMEDIES AFTER DEFAULT

### 8.1      Rights and Remedies

(a)      In addition to the acceleration provisions set forth in <u>Article VII</u> above, upon the occurrence and continuation of an Event of Default, Lender (without any further order of, action by or notice to the Bankruptcy Court) shall have the right to exercise any and all rights, options and remedies provided for in the Loan Documents, under the UCC or at law or in equity, including, without limitation, the right to (i) apply any property of any Credit Party held by Lender to reduce the Obligations, (ii) foreclose the Liens created under the Loan Documents, (iii) realize upon, take possession of and/or sell any Collateral with or without judicial process, (iv) exercise all rights and powers with respect to the Collateral as any Credit Party might exercise, (v) collect and send notices regarding the Collateral, with or without judicial process, (vi) by its own means or with judicial assistance, enter any premises at which Collateral are located, or render any of the foregoing unusable or dispose of the Collateral on such premises without any liability for rent, storage, utilities, or other sums, and no Credit Party shall resist or interfere with such action, (vii) at each Credit Party's expense, require that all or any part of the Collateral be assembled and made available to Lender at any place designated by Lender, and/or (viii) relinquish or abandon any Collateral or securities pledged or any Lien thereon. Notwithstanding any provision of any Loan Document, Lender, in its sole discretion, shall have the right, at any time that any Credit Party fails to do so, and from time to time, without prior notice, to: (i) obtain insurance covering any of the

16

Collateral to the extent required hereunder; (ii) pay for the performance of any of Obligations; (iii) discharge taxes or Liens on any of the Collateral; and (iv) pay for the maintenance and preservation of the Collateral. Such expenses and advances shall be added to the Obligations until reimbursed to Lender and shall be secured by the Collateral, and such payments by Lender shall not be construed as a waiver by Lender of any Event of Default or any other rights or remedies of Lender.

(b)     Each Credit Party agrees that notice received by it at least ten (10) calendar days before the time of any intended public sale, or the time after which any private sale or other disposition of Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition. If permitted by applicable law, any perishable Collateral which threatens to speedily decline in value or which is sold on a recognized market may be sold immediately by Lender without prior notice to any Credit Party. At any sale or disposition of Collateral, Lender may (to the extent permitted by applicable law) purchase all or any part thereof free from any right of redemption by any Credit Party which right is hereby waived and released. Each Credit Party covenants and agrees not to, and not to permit or cause any of its Subsidiaries to, interfere with or impose any obstacle to Lender's exercise of its rights and remedies with respect to the Collateral including but not limited to the Lender's right to credit bid at any sale of the Collateral whether inside or outside the Bankruptcy Cases. Lender, in dealing with or disposing of the Collateral or any part thereof, shall not be required to give priority or preference to any item of Collateral or otherwise to marshal assets or to take possession or sell any Collateral with judicial process.

**8.2     Application of Proceeds.** In addition to any other rights, options and remedies Lender has under the Loan Documents, the UCC, at law or in equity, all dividends, interest, rents, issues, profits, fees, revenues, income and other proceeds collected or received from collecting, holding, managing, renting, selling, or otherwise disposing of all or any part of the Collateral or any proceeds thereof upon exercise of its remedies hereunder shall be applied in the following order of priority: (i) to the payment of all costs and expenses of such collection, storage, lease, holding, operation, management, sale, disposition or delivery and of conducting the Credit Parties' business and of maintenance, repairs, replacements, alterations, additions and improvements of or to the Collateral, and to the payment of all sums which Lender may be required or may elect to pay, if any, in its reasonable discretion, for taxes, assessments, insurance and other charges upon the Collateral or any part thereof, and all other payments that Lender may be required or authorized to make under any provision of this Agreement (including, without limitation, in each such case, reasonable, out-of-pocket search, audit, recording, professional and filing fees and expenses and reasonable attorneys' fees and all expenses, liabilities and advances made or incurred in connection therewith); (ii) to the payment of all Obligations as provided herein; and (iii) any surplus then remaining to the Credit Parties, unless otherwise provided by law or directed by a court of competent jurisdiction, provided that each Credit Party shall be liable for any deficiency if such proceeds are insufficient to satisfy the Obligations or any of the other items referred to in this section. Lender shall have the right in its sole discretion to determine which rights, Liens and/or remedies Lender may at any time pursue, relinquish, subordinate or modify, and such determination will not in any way modify or affect any of Lender's rights, Liens or remedies under any Loan Document, applicable law or equity. The enumeration of any rights and remedies in any Loan Document is not intended to be exhaustive, and all rights and remedies of Lender described in any Loan Document are cumulative and are not alternative to or exclusive of any other rights or remedies which Lender otherwise may have. The partial or complete exercise of any right or remedy shall not preclude any other further exercise of such or any other right or remedy.

## IX.     WAIVERS AND JUDICIAL PROCEEDINGS

**9.1     Waivers.** Each Credit Party hereby waives setoff, counterclaim, demand, presentment, protest, all defenses with respect to any and all instruments and all notices and demands of any

17

description, and the pleading of any statute of limitations as a defense to any demand under any Loan Document. Each Credit Party hereby waives any and all defenses and counterclaims it may have or could interpose in any action or procedure brought by Lender to obtain an order of court recognizing the assignment of, or Lien of Lender in and to, any Collateral. With respect to any action hereunder, Lender conclusively may rely upon, and shall incur no liability to any Credit Party in acting upon, any request or other communication that Lender reasonably believes to have been given or made by a person authorized on Borrower's behalf. In each such case, each Credit Party hereby waives the right to dispute Lender's action based upon such request or other communication.

       **9.2     Delay; No Waiver of Defaults.** Any single or partial exercise of any provision or right in any Loan Document, or delay, failure or omission on Lender's part in enforcing any such provision shall not affect the liability of any Credit Party or operate as a waiver of such provision or affect the liability of any Credit Party or preclude any other or further exercise of such provision. No waiver by any party to any Loan Document of any one or more defaults by any other party in the performance of any of the provisions of any Loan Document shall operate or be construed as a waiver of any future default, whether of a like or different nature, and each such waiver shall be limited solely to the express terms and provisions of such waiver.

       **9.3     Jury Waiver. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION ARISING UNDER THE LOAN DOCUMENTS OR IN ANY WAY CONNECTED WITH OR INCIDENTAL TO THE DEALINGS OF THE PARTIES WITH RESPECT TO THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES TO THE WAIVER OF THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY.**

**X.     MISCELLANEOUS**

       **10.1     Governing Law; Jurisdiction; Service of Process; Venue.** The Loan Documents shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to its choice of law provisions. Any judicial proceeding against any Credit Party with respect to the Obligations, any Loan Document or any related agreement may be brought in the Bankruptcy Court or, if the Bankruptcy Cases are no longer pending, any federal or state court of competent jurisdiction located in New York, New York. By execution and delivery of each Loan Document to which it is a party, each Credit Party and Lender (i) accept the non-exclusive jurisdiction of the aforesaid courts and irrevocably agrees to be bound by any judgment rendered thereby, (ii) waive personal service of process, (iii) agree that service of process upon them may be made by certified or registered mail, return receipt requested, (iv) waive any objection to jurisdiction and venue of any action instituted hereunder and agrees not to assert any defense based on lack of jurisdiction, venue or convenience, and (v) agree that this loan was made in New York, that Lender has accepted in New York the Loan Documents executed by the Credit Parties and has disbursed Advances under the Loan Documents in New York. Nothing shall affect the right of any Credit Party or Lender to serve process in any manner permitted by law or shall limit the right of Lender to bring proceedings against the other party or parties in the courts of any other jurisdiction having jurisdiction. All parties acknowledge that they participated in the negotiation and drafting of this Agreement and that, accordingly, no party shall move or petition a court construing this Agreement to construe it more stringently against one party than against any other.

**10.2    Successors and Assigns; Participations; New Lenders.** The Loan Documents shall inure to the benefit of Lender, Transferees (as defined below) and all future holders of the Term Loan, the Note, the Obligations and/or any of the Collateral, and each of their respective successors and assigns. Each Loan Document shall be binding upon the Persons' other than Lender that are parties thereto and their respective successors and assigns, and no such Person may assign, delegate or transfer any Loan Document or any of its rights or obligations thereunder without the prior written consent of Lender. No rights are intended to be created under any Loan Document for the benefit of any third party donee, creditor or incidental beneficiary of any Credit Party. Nothing contained in any Loan Document shall be construed as a delegation to Lender of any other Person's duty of performance. EACH CREDIT PARTY ACKNOWLEDGES AND AGREES THAT LENDER AT ANY TIME AND FROM TIME TO TIME MAY (I) DIVIDE AND RESTATE THE NOTE, AND/OR (II) SELL, ASSIGN OR GRANT PARTICIPATING INTERESTS IN OR TRANSFER ALL OR ANY PART OF ITS RIGHTS OR OBLIGATIONS IN CONNECTION WITH THE TERM LOAN OR UNDER ANY LOAN DOCUMENT, THE NOTE, THE OBLIGATIONS AND/OR THE COLLATERAL TO OTHER PERSONS (EACH SUCH TRANSFEREE, ASSIGNEE OR PURCHASER, A "**TRANSFEREE**"). Each Transferee shall have all of the rights and benefits with respect to the Term Loan, Obligations, the Note, Collateral and/or Loan Documents held by it as fully as if the original holder thereof, and either Lender or any Transferee may be designated as the sole agent to manage the transactions and obligations contemplated therein. Notwithstanding any other provision of any Loan Document, Lender may disclose to any Transferee all information, reports, financial statements, certificates and documents obtained under any provision of any Loan Document.

**10.3    Application of Payments.** To the extent that any payment made or received with respect to the Obligations is subsequently invalidated, determined to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other Person under the Bankruptcy Code, common law, equitable cause or any other law, then the Obligations intended to be satisfied by such payment shall be revived and shall continue as if such payment had not been received by Lender. Any payments with respect to the Obligations received as a result of the foregoing provision shall be credited and applied in such manner and order as Lender shall decide in its sole discretion.

**10.4    Indemnity.** Each Credit Party shall indemnify Lender, its Affiliates and its and their respective shareholders, subsidiaries, managers, members, officers, directors, employees, Affiliates, agents, representatives, successors, assigns, accountants, attorneys and advisors (collectively, the "**Indemnified Persons**") from and against any and all liabilities, claims, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, reasonable attorneys' fees and expenses) which may be imposed on, incurred by or asserted against any Indemnified Person with respect to any breach of any representation or warranty contained herein or in any Loan Document, or arising out of, or in any litigation, proceeding or investigation instituted or conducted by any Person with respect to any aspect of, or any transaction contemplated by or referred to in, or any matter related to, any Loan Document or any agreement, document or transaction contemplated thereby, whether or not such Indemnified Person is a party thereto other than from the Indemnified Parties' gross and willful misconduct (as determined by a court of competent jurisdiction in a final, non-appealable order). Any Indemnified Person may, in its reasonable discretion, take such actions as it deems necessary and appropriate to investigate, defend or settle any event or take other remedial or corrective actions with respect thereto as may be necessary for the protection of such Indemnified Person or the Collateral. The provisions of this Section 10.4 shall survive the repayment of the Obligations and the termination of this Agreement.

**10.5    Notice.** Any notice or request under any Loan Document shall be given to any party to this Agreement at such party's address set forth beneath its signature on the signature page to this Agreement, or at such other address as such party may hereafter specify in a notice given in the manner

required under this Section 10.5. Any notice or request hereunder shall be given only by, and shall be deemed to have been received upon: (i) registered or certified mail, return receipt requested, on the date on which received as indicated in such return receipt, (ii) delivery by a nationally recognized overnight courier, one (1) Business Day after deposit with such courier, or (iii) facsimile transmission, in each case upon telephone or further electronic communication from the recipient acknowledging receipt (whether automatic or manual from recipient), as applicable.

10.6    **Severability; Captions; Counterparts; Facsimile Signatures.** If any provision of any Loan Document is adjudicated to be invalid under applicable laws or regulations, such provision shall be inapplicable to the extent of such invalidity without affecting the validity or enforceability of the remainder of the Loan Documents which shall be given effect so far as possible. The captions in the Loan Documents are intended for convenience and reference only and shall not affect the meaning or interpretation of the Loan Documents. The Loan Documents may be executed in one or more counterparts (which taken together, as applicable, shall constitute one and the same instrument) and by facsimile transmission, which facsimile signatures shall be considered original executed counterparts. Each party to this Agreement agrees that it will be bound by its own facsimile signature and that it accepts the facsimile signature of each other party.

10.7    **Expenses.** Upon demand on or after the Maturity Date, each Credit Party shall pay all reasonable, out-of-pocket, third-party costs and expenses incurred by Lender and/or its Affiliates, including, without limitation, documentation and diligence fees and expenses, all search, audit, appraisal, recording, professional and filing fees and expenses and all other out-of-pocket charges and expenses (including, without limitation, UCC and judgment and tax lien searches and UCC filings and fees for post-Closing UCC and judgment and tax lien searches and wire transfer fees and audit expenses), and reasonable attorneys' fees and expenses, (i) in any effort to enforce, protect or collect payment of any Obligation or to enforce any Loan Document or any related agreement, document or instrument, (ii) in connection with the Bankruptcy Cases or entering into, negotiating, preparing, reviewing and executing the Loan Documents and/or any related agreements, documents or instruments, (iii) in connection with instituting, maintaining, preserving, enforcing and/or foreclosing on Lender's Liens in any of the Collateral, whether through judicial proceedings or otherwise, (iv) in defending or prosecuting any actions, claims or proceedings arising out of or relating to Lender's transactions with Borrower, (v) in seeking, obtaining or receiving any advice with respect to its rights and obligations under any Loan Document and any related agreement, document or instrument, and/or (vi) in connection with any modification, restatement, supplement, amendment, waiver or extension of any Loan Document and/or any related agreement, document or instrument. All of the foregoing shall be part of the Obligations. Without limiting the foregoing, each Credit Party shall pay all taxes (other than taxes based upon or measured by Lender's income or revenues or any personal property tax), if any, in connection with the issuance of the Note and the filing and/or recording of any documents and/or financing statements.

10.8    **Entire Agreement.** This Agreement and the other Loan Documents to which Credit Parties are parties constitute the entire agreement between Credit Parties and Lender with respect to the subject matter hereof and thereof, and supersede all prior agreements and understandings, if any, relating to the subject matter hereof or thereof. Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing signed by each Credit Party and Lender. No provision of this Agreement may be changed, modified, amended, restated, waived, supplemented, discharged, canceled or terminated orally or by any course of dealing or in any other manner other than by an agreement in writing signed by Lender and each Credit Party. Each party hereto acknowledges that it has been advised by counsel in connection with the negotiation and execution of this Agreement and is not relying upon oral representations or statements inconsistent with the terms and provisions hereof.

**10.9    Release of Lender.** Notwithstanding any other provision of any Loan Document, each Credit Party voluntarily, knowingly, unconditionally and irrevocably, with specific and express intent, for and on behalf of itself, its managers, members, directors, officers, employees, stockholders, Affiliates, agents, representatives, accountants, attorneys, successors and assigns and their respective Affiliates (collectively, the "**Releasing Parties**"), hereby fully and completely releases and forever discharges the Indemnified Parties and any other Person or insurer which may be responsible or liable for the acts or omissions of any of the Indemnified Parties, or who may be liable for the injury or damage resulting therefrom (collectively, with the Indemnified Parties, the "**Released Parties**"), of and from any and all actions, causes of action, damages, claims, obligations, liabilities, costs, expenses and demands of any kind whatsoever, at law or in equity, matured or unmatured, know or unknown, vested or contingent, that any of the Releasing Parties has against any of the Released Parties as of the Closing Date other than from the Indemnified Parties' gross and willful misconduct (as determined by a court of competent jurisdiction in a final, non-appealable order). Each Credit Party acknowledges that the foregoing release is a material inducement to Lender's decision to extend to Borrowers the financial accommodations hereunder and has been relied upon by Lender in agreeing to make the Advances.

**10.10    Survival.** All obligations, covenants, agreements, representations, warranties, waivers and indemnities made by any Credit Party in any Loan Document shall survive the execution and delivery of the Loan Documents, the making of the Advances and any termination of this Agreement until all Obligations are fully performed and indefeasibly paid in full in cash.

## XI.    GUARANTEE

**11.1    Guarantee.** Each of the Guarantors hereby, jointly and severally, unconditionally and irrevocably, guarantees to Lender and its successors, endorsees, transferees and assigns, the prompt and complete payment and performance by Borrowers when due (whether at the stated maturity, by acceleration or otherwise) of all Obligations. The guarantee set forth in this Article 11 (the "**Guarantee**") shall remain in full force and effect until all Obligations shall have been satisfied by payment in full in cash and this Agreement shall have terminated. No payment made by Borrower, any Guarantor, any other guarantor or any other Person, or received or collected by Lender by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations, shall be deemed to modify, reduce, release or otherwise affect the liability of any Guarantor hereunder which shall, notwithstanding any such payment, remain liable for the Obligations until the Obligations shall have been satisfied by payment in full in cash and this Agreement shall have terminated.

**11.2    No Subrogation.** Notwithstanding any payment made by any Guarantor hereunder or any set-off or application of funds of any Guarantor by Lender, no Guarantor shall be entitled to be subrogated to any of the rights of Lender against any other Credit Party or any collateral security or guarantee or right of offset held by Lender for the payment of the Obligations, nor shall any Guarantor seek or be entitled to seek any contribution or reimbursement from any other Credit Party in respect of payments made by such Guarantor hereunder.

**11.3    Payments To Be Held In Trust.** If any amount is paid to any Guarantor on account of subrogation rights or otherwise in violation of this Agreement, such amount shall be held by such Guarantor in trust for Lender, segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be turned over to Lender in the exact form received by such Guarantor (duly indorsed by such Guarantor to Lender, if required), to be applied against the Obligations, whether matured or unmatured, in such order as Lender may determine.

**11.4    Amendments, Etc. with respect to Obligations.** Each Guarantor shall remain obligated hereunder notwithstanding that the Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by Lender, and this Agreement and the other Loan Documents and any other documents executed and delivered in connection herewith may be amended, modified, supplemented or terminated, in whole or in part, as the Lender may deem advisable from time to time, and any collateral security, guarantee or right of offset at any time held by Lender for the payment of the Obligations may be sold, exchanged, waived, surrendered or released. Lender shall not have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Obligations.

**11.5    Guarantee Absolute and Unconditional.** Each Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or proof of reliance by Lender upon this Guarantee or acceptance of this Guarantee. The Obligations shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon this Guarantee, and all dealings between any Borrower and any Guarantor, on the one hand, and Lender, on the other hand, shall be conclusively presumed to have been had or consummated in reliance upon this Guarantee. Each Guarantor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon any Borrower or any Guarantor with respect to the Obligations. Each Guarantor further waives any right of Guarantor to require that an action be brought against Borrowers prior to being brought against such Guarantor, as the same may be amended from time to time. Each Guarantor understands and agrees that this Guarantee shall be construed as a continuing, absolute and unconditional guarantee of payment (and not a guarantee of collection only) until all amounts owing to Lender by Borrowers on account of the Obligations are paid in full in case and this Agreement shall have terminated, without regard to (i) the validity or enforceability of any of the Obligations or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by Lender, (ii) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by Borrowers or any other Person against Lender, or (iii) any other circumstance whatsoever (with or without notice to or knowledge of Borrowers or such Guarantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of Borrowers for the Obligations, or of such Guarantor under this Guarantee, in bankruptcy or in any other instance. When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Guarantor, Lender may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against Borrower, any other Guarantor or any other Person or against any collateral security or guarantee for the Obligations or any right of offset with respect thereto.

**11.6    Reinstatement.** The Guarantee shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by Lender.

*[signature page follows]*

22

IN WITNESS WHEREOF, each of the parties has duly executed this Credit and Security Agreement as of the date first written above.

**BORROWER**

**ECOTALITY, INC.**

By: _____
Name:  H. Ravi Brar
Title:     President and Chief Executive Officer

**ELECTRIC TRANSPORTATION ENGINEERING CORPORATION**

By: _____
Name:  H. Ravi Brar
Title:     President and Chief Executive Officer

**GUARANTORS**

**ECOTALITY STORES, INC.**

By: _____
Name:  H. Ravi Brar
Title:     President and Chief Executive Officer

**ETEC NORTH, LLC**

By: _____
Name:  H. Ravi Brar
Title:     President and Chief Executive Officer

**THE CLARITY GROUP, INC.**

By: _____
Name:  H. Ravi Brar
Title:     President and Chief Executive Officer

**G.H.V. REFRIGERATION, INC.**

By: _____
Name:  H. Ravi Brar
Title:     President and Chief Executive Officer

**LENDER**

NISSAN NORTH AMERICA, INC

By: _Brendan Stones_
Name: _Brendan Stones_
Title: _Director EV Infrastructures_
_Nissan North America_

**<u>Annex B</u>**

**Budget**

| | Forecast 1 9/20 | Forecast 2 9/27 | Forecast 3 10/4 | Forecast 4 10/11 |
|---|---|---|---|---|
| **Week #:** **Week ending:** | | | | |
| *Ecotality North America Receipts:* | 70,000 | 52,500 | 45,000 | 202,500 |
| *Ecotality Stores Subsidiary & Innergy Division* | 25,000 | 10,000 | 2,000 | 3,000 |
| **Total Contributions & Receipts** | **95,000** | **62,500** | **47,000** | **205,500** |
| | | | | |
| *Ecotality North America Disbursements:* | | | | |
| Labor Expenses | 6,000 | 106,375 | 8,510 | 114,885 |
| Professional Fees - Acctg/Tax | 30,000 | - | 10,000 | - |
| Prop & Use Tax (payable on installed EVP chargers) | 45,000 | - | - | 151,000 |
| Leased Real Estate - Phoenix locations | - | 19,042 | - | - |
| Freeport - Warehouse and Distribution facility in AZ | 26,250 | 3,750 | 3,750 | 3,750 |
| Utilities (also includes DCFC elec, call center/hosting) & Shipping | 244,644 | 100,136 | 75,000 | 75,000 |
| Expense Reports - Employees | 5,000 | 5,000 | 5,000 | 5,000 |
| Expense Reports - Field Service Employees | 2,000 | 2,000 | 2,000 | 2,000 |
| Other Expenses | 37,500 | 37,500 | 35,500 | 32,500 |
| **Total Distributions and Payments** | **396,394** | **273,803** | **139,760** | **384,135** |
| | | | | |
| *Corporate Disbursements* | | | | |
| Labor Expenses (negative is void check run) | (95,103) | 37,614 | 102,844 | 8,227 |
| Employee Medical Insurance | - | - | 60,000 | - |
| Leased Real Estate - SanFrancisco & Scottsdale | - | 9,392 | - | - |
| Utilities (Phone, Internet) | 600 | 3,500 | 1,546 | - |
| Sale Advertising Expenses | 12,500 | 12,500 | 12,500 | 12,500 |
| Mgmt/Emp Retention | - | - | - | 260,000 |
| Professional Fees (BOD + transfer agent | 8,000 | - | 49,500 | - |
| Office, postage misc/other | 500 | 500 | 500 | 500 |
| Employee Expense Reimbursement | 10,000 | 15,000 | 5,000 | 5,000 |
| Interest (Mortgage) | - | - | - | 1,094 |
| Australia - connectivity to chargers | - | - | 600 | - |
| *Ecotality Stores Subsidiary & Innergy Division & PEP Mexico* | 6,000 | 33,000 | 8,000 | 21,000 |
| *(Payroll, leases, utilities, Acctg/tax/legal for PEP & oth exp)* | | | | |
| **Corporate Expenses** | **(57,503)** | **111,506** | **240,490** | **308,321** |
| | | | | |
| **Net Cash Flow** | **(243,891)** | **(322,809)** | **(333,250)** | **(486,956)** |
| | | | | |
| **Bankruptcy Professionals:** | | | | |
| UCC Legal/FA | - | 30,000 | - | - |
| United States Trustee Fees | - | - | - | 30,000 |
| **Total Bankruptcy Professionals** | **-** | **30,000** | **-** | **30,000** |
| | | | | |
| **Net Cash Flow (after Bankruptcy Profesionals)** | **(243,891)** | **(352,809)** | **(333,250)** | **(516,956)** |
| | | | | |
| **Beginning Balance** | **416,508** | **672,617** | **569,808** | **486,559** |
| Total Receipts | 95,000 | 62,500 | 47,000 | 205,500 |
| Total Disbursements | (338,891) | (415,309) | (380,250) | (722,456) |
| DIP funding | 500,000 | 250,000 | 250,000 | 250,000 |
| **Ending cash Balance** | **672,617** | **569,808** | **486,559** | **219,602** |

[1] Excludes $400K (net of retainer already paid) sale completion fee to be paid to FTI Consulting from sale proceeds.