CHARLES R. GIBBS (*pro hac vice* admission pending)
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

DAVID P. SIMONDS (*pro hac vice* admission pending)
ARUN KURICHETY (*pro hac vice* admission pending)
AKIN GUMP STRAUSS HAUER & FELD LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (310) 229-1000
Facsimile: (310) 229-1001

– and –

JARED G. PARKER (SBN: 6428)
PARKER SCHWARTZ, PLLC
7310 N. 16th St., Suite 330
Phoenix, Arizona 85020
Telephone: (602) 282-0476
Facsimile: (602) 282-0478

[Proposed] Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>ELECTRIC TRANSPORTATION ENGINEERING CORPORATION (d/b/a ECOTALITY NORTH AMERICA), *et al.*,[1]<br><br>    Debtors.<br><br>---<br><br>This filing applies to:<br><br>   ■ All Debtors<br><br>   ☐ Specified Debtors | Case No. 2:13-BK-16126 (RJH)<br><br>Chapter 11<br><br>(Joint Administration Requested)<br><br>**DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) SCHEDULING SALE HEARING, (C) APPROVING THE FORM AND MANNER OF THE SALE, AUCTION, AND SALE HEARING, AND (D) GRANTING RELATED RELIEF, AND (II) AN ORDER APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS**<br><br>Hearing Date: _____, 2013<br>Time: _____ |

---

[1] The Debtors in these jointly administered chapter 11 cases and the last four digits of their respective Employer Identification Numbers are: (i) ECOtality, Inc. (5422); (ii) Electric Transportation Engineering Corporation (4755); (iii) ECOtality Stores, Inc. (2643); (iv) ETEC North, LLC (n/a); (v) The Clarity Group, Inc. (8832); and (vi) G.H.V. Refrigeration, Inc. (4512). The Debtors' service address at ECOtality, Inc.'s corporate headquarters is Post Montgomery Center, One Montgomery Street, Suite 2525, San Francisco, California 94104.

The above-captioned debtors and debtors in possession (collectively, the "***Debtors***")[2] hereby submit this motion (the "***Motion***") seeking entry of (I) an order, substantially in the form attached hereto as **Exhibit A**, (a) approving Bidding Procedures in connection with the sale of substantially all of the Debtors' Assets, (b) scheduling Sale Hearing, (e) approving the form and manner of the Sale, Auction, and Sale Hearing, and (d) granting related relief, and (II) an order approving the sale of substantially all of the Debtors' Assets.[3] In support of the Motion, the Debtors respectfully state as follows:

I.

**JURISDICTION**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

The bases for the relief requested herein are sections 105, 363, and 365 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 2002, 6004, 6006, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rules 2084-25 and 6004-1 of the Local Rules of Bankruptcy Procedure for the District of Arizona (the "***Local Rules***").

II.

**BACKGROUND**

A.     **General Background**

On the date hereof (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108, and have sought procedural consolidation and joint administration of these chapter 11 cases. No official committee of unsecured creditors, nor any trustee or examiner, has been appointed in these cases.

---

[2] All capitalized terms used but not defined herein shall have the meaning ascribed to them in the *Declaration of H. Ravi Brar in Support of First Day Pleadings* (the "***First Day Declaration***").

[3] As set forth herein, the Debtors will file a proposed Sale Order on or before September 30, 2013.

A description of the Debtors' businesses and the reasons for filing these chapter 11 cases is set forth in the First Day Declaration filed contemporaneously herewith and incorporated by reference as if fully set forth herein.

## B.     Marketing Process

Beginning in August 2013, the Debtors embarked on a comprehensive restructuring effort, including exploring various strategic alternatives, such as a transaction involving a sale of all or a portion of the Debtors' assets.  The Debtors, together with their advisors, in connection with these restructuring efforts, initiated a sale process, which included actively marketing their assets in an effort to maximize value for all of their creditors.  This marketing process included contacting various financial and strategic parties that the Debtors and their advisors believed may have an interest in potentially purchasing some or all of the Debtors' assets (the "*Assets*") and discussing such possibilities with them.  Specifically, the Debtors or their advisors:  (i) contacted thirty-four (34) potential purchasers, (ii) received preliminary indications of interest from twenty-three (23) parties, and (iii) entered into confidentiality agreements (each, a "*Confidentiality Agreement*") with eleven (11) parties.  Of those eleven (11) parties, eight (8) parties expressed interest in purchasing the Debtors' Assets.  Given the Debtors' significant liquidity constraints and the difficulty of obtaining long-term financing to support the Debtors in a reorganization, the Debtors believe that a sale of their Assets in the manner described herein is necessary to maximize value for the Debtors' estates and their creditors.

As noted above, as a result of these efforts, the Debtors received several preliminary indications of interest from potential purchasers.  Ultimately, however, the Debtors were unable to negotiate a stalking horse agreement prior to the commencement of these chapter 11 cases, in significant part, because of their liquidity needs.  Rather than delay the filing of these cases, the Debtors have determined that it is in the best interests of their estates and creditors to file these cases without a stalking horse bidder and to open the sale to all interested parties.

Based on the foregoing, the Debtors believe that the Bidding Procedures (as defined below) and an auction (the "*Auction*") will afford the Debtors the best opportunity to market their Assets and maximize value while continuing to operate their businesses, which will avoid a fire-sale liquidation

process that would result in severely depleted reserves for the Debtors' estates, their creditors, and other stakeholders.

### III.

### RELIEF REQUESTED

By this Motion, the Debtors request entry of orders, pursuant to Bankruptcy Code sections 105, 363, and 365, Bankruptcy Rules 2002, 6004, 6006, 9008, and 9014 and Local Rules 2084-25 and 6004-1 (I) (a) approving Bidding Procedures in connection with the sale of substantially all of the Debtors' Assets, (b) authorizing, but not requiring, entry into Stalking Horse Agreements, (c) approving procedures related to the assumption and assignment of Assigned Contracts and Assigned Leases, (d) scheduling the Auction and Sale Hearing, (e) approving the form and manner of the Sale Notice, and (e) granting related relief; and (II) approving the sale of substantially all of the Debtors' Assets.

In accordance with Rule 9013-1 of the Local Rules of Bankruptcy Procedure for the District of Arizona, the bases for the relief requested are set forth herein and in the First Day Declaration.

### A.    Bidding Procedures Order

The Debtors request entry of an order, substantially in the form attached to the Motion as **Exhibit A** (the "*Bidding Procedures Order*"):

> (i)    approving procedures (the "*Bidding Procedures*"),[4] the form of which is attached to the Bidding Procedures Order as **Exhibit 1**, for (a) submitting bids for the purchase of some or all or substantially all of the Assets, and (b) conducting an Auction for the Assets in the event that the Debtors receive two or more Qualified Bids (as defined below) for the Assets or some subset thereof;

> (ii)    authorizing, but not requiring, the Debtors to (a) enter into a "stalking horse" agreement (a "*Stalking Horse Agreement*"), on or before September 30, 2013, with one or more bidders (the "*Stalking Horse Bidder(s)*") for the purpose of establishing a minimum acceptable bid(s) for the Assets (the "*Stalking Horse Bid(s)*"), (b) provide any Stalking Horse Bidder(s) with a break-up fee of up to two percent (2%) of the guaranteed cash purchase price proposed in the Stalking Horse Bid, and (c) reimburse any Stalking Horse Bidder(s) for all reasonable and actual costs and expenses up to an amount equal to $25,000 incurred by such Stalking Horse Bidder(s) in connection with its bid;

---

[4] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures.

(iii)  approving procedures (the "***Assumption and Assignment Procedures***") for the assumption and assignment of certain executory contracts (the "***Assigned Contracts***") and unexpired leases (the "***Assigned Leases***") in connection with the sale of the Assets, or any subset thereof, and resolution of any objections or requests for adequate assurance of future performance related thereto;

(iv)  scheduling (a) a deadline to submit bids for the Assets of **October 7, 2013**, (b) the date of the Auction for **October 9, 2013**, (c) the date of the hearing to consider approval of the proposed sale of Assets (the "***Sale Hearing***") for **October 10, 2013**, and (d) a deadline to consummate the sale of some, all, or substantially all of the Assets of **October 11, 2013**;

(v)  approving the form and manner of notice of the deadline to submit bids for the Assets, the date and time of the Auction, and the date and time of the Sale Hearing; and

(vi)  granting certain related relief.

**B.  Sale Order**

Second, upon conclusion of the Sale Hearing, the Debtors request entry of an order (the "***Sale Order***") (i) authorizing and approving the sale of Assets to the Successful Bidder(s) (as defined below), (ii) authorizing the assumption and assignment of certain Assigned Contracts and Assigned Leases to be assumed and assigned in connection with the proposed sale of Assets to the Successful Bidder(s), and (iii) granting certain related relief.

*1.  Bidding Procedures*

To obtain the highest and otherwise best bid(s) for the Assets the Debtors intend to implement the Bidding Procedures attached to the Bidding Procedures Order as **Exhibit 1**.  The Bidding Procedures set forth, among other things, the availability of due diligence for Potential Bidders, the deadline and requirements for submitting a "Qualified Bid," the procedures for conducting the Auction, and the criteria for determining the highest and otherwise best Qualified Bid(s) for the Assets (the "***Successful Bid(s)***").  The following summary highlights the material terms of the Bidding Procedures and all parties in interest are referred to the text of the Bidding Procedures for additional information regarding the proposed procedures.[5]

---

[5] This summary of the Bidding Procedures is qualified in all respects by reference to the Bidding Procedures and, to the extent of any inconsistency between this summary and the Bidding Procedures, the Bidding Procedures shall govern.

4

(i)     Assets to be Sold

The Debtors seek to sell substantially all of their Assets, including all equipment, machinery, inventory, supplies, real property, software, intellectual property, cash, and accounts receivable. Except as otherwise provided in definitive documentation with respect to any sale of the Assets, all of the Debtors' right, title, and interest in and to the Assets shall be sold free and clear of all liens, claims, encumbrances, rights, remedies, restrictions, pledges, interests, liabilities, charges, options, and contractual commitments of any kind or nature whatsoever, whether arising before or after the Petition Date, whether at law or in equity, in accordance with Bankruptcy Code section 363.

(ii)     Due Diligence

Upon request, the Debtors will provide any interested party with a copy of the Bidding Procedures, together with a copy of the Stalking Horse Agreement(s) (or the Form APA (as defined below), if no Stalking Horse Bidder(s) is selected).  Should any interested party desire additional or further information, such interested party will be required to execute a Confidentiality Agreement in form and substance satisfactory to the Debtors, and on terms that are not more favorable to such interested party than the Confidentiality Agreement executed by the Stalking Horse Bidder(s), if any. Upon execution of such Confidentiality Agreement, the respective interested party will be deemed a "***Potential Bidder***" and will thereafter be afforded the opportunity to conduct a due diligence investigation with respect to the Assets in the manner determined by the Debtors, in their business judgment, to be reasonable and appropriate.

Potential Bidders will be given access (through a virtual data room, site inspections, or otherwise) to various financial data and other relevant and confidential information.  The Debtors will designate an employee or other representative to coordinate all requests for additional information or access from Potential Bidders.  The Debtors may, in their business judgment, coordinate due diligence investigations such that multiple Potential Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections.  The Debtors shall not be obligated to furnish access to any such information to any entity that does not execute a Confidentiality Agreement in form and substance satisfactory to the Debtors in their business

judgment. The Debtors shall not be obligated to furnish access to any information of any kind whatsoever regarding the Assets after the Bid Deadline (as defined below).

In addition, to facilitate the preparation and submission of bids for the Assets, the Debtors will file any Stalking Horse Agreement(s) (or the Form APA, if no Stalking Horse Bidder is selected), and a form Sale Order, with the Court on or before **September 30, 2013**. Upon request, the Debtors will provide copies of such documents to any Potential Bidder. The use of uniform agreements will enable the Debtors and other parties in interest to easily compare and contrast the differing terms of any bids that may be received. The Debtors have the right not to consider any bid that does not conform to the form agreements. The Debtors shall provide an opportunity, on an expedited basis, for a dialogue between Potential Bidders and the United States Department of Energy (the "***DOE***") to the extent that either the Debtors, the DIP Lender (as defined in the First Day Declaration), or the Potential Bidder(s) at issue determine that such dialogue is beneficial.[6]

(iii)   <u>Bid Deadline</u>

Any Potential Bidder wanting to participate in the Auction must become a Qualified Bidder (as defined below) by submitting a Qualified Bid (as defined below) in writing **so as to be <u>actually received</u> by the Debtors on or before October 7, 2013 at 5:00 p.m. (Pacific Time)** (the "***Bid Deadline***"), which deadline may be extended by the Debtors in consultation with any statutory committee of unsecured creditors (the "***Creditors' Committee***") appointed in these chapter 11 cases, if any.[7] No bids submitted after the Bid Deadline shall be considered by the Debtors, unless the Debtors, in their business judgment and in consultation with the Creditors' Committee, if appointed, determine that consideration of such a bid is appropriate under the circumstances.

---

[6] Prior to the Petition Date, the Debtors and the DOE engaged in discussions regarding the relief requested herein. As a result of these discussions, the Debtors and the DOE have agreed to include certain language in the Bidding Procedures Order setting forth the DOE's position with respect to certain matters with regard to the sale contemplated hereby and associated matters, as well as certain additions reflected in the Bidding Procedures Order.

[7] Until there is a Qualified Bid (as defined below) for the Assets that is greater than $2.5 million, Nissan North America, Inc. (the "***DIP Lender***") shall have the same consultation rights granted to the Creditors' Committee herein.

(iv)    <u>Bid Requirements</u>

Only bids for the Assets that constitute "Qualified Bids" will be considered by the Debtors. A "*__Qualified Bid__*" is an offer to purchase the Assets that, prior to the Bid Deadline:

(a)    identifies in writing the Assets to be purchased and the consideration to be paid for such Assets;

(b)    identifies in writing any proposed revisions to the Stalking Horse Agreement(s), if any, or to the form of asset purchase agreement provided by the Debtors (the "*__Form APA__*") and attached to the Motion as __Exhibit E__;

(c)    identifies in writing the Potential Bidder and the officer(s) or authorized agent(s) who will appear on behalf of such Potential Bidder at the Auction, if any;

(d)    provides written and other evidence, satisfactory to the Debtors, in their business judgment, in consultation with the Creditors' Committee, if appointed, of the Potential Bidder's financial wherewithal and operational ability to consummate the proposed transaction by no later than **October 11, 2013**;

(e)    provides in writing that such offer is not subject to any due diligence or financing contingency or further board or similar approval;

(f)    is accompanied by a good faith deposit (a "*__Good Faith Deposit__*") submitted to the Debtors on or before the Bid Deadline in a cash amount equal to not less than five percent (5%) of the proposed purchase price;

(g)    identifies in writing any Assigned Contracts or Assigned Leases to be assumed and assigned in connection with the proposed purchase of the Assets, and provides evidence of the Potential Bidder's ability to provide adequate assurance of future performance (as provided for under Bankruptcy Code section 365) under such Assigned Contracts and Assigned Leases;

(h)    provides in writing that each offer is irrevocable until the later of (a) consummation of a transaction involving any other Potential Bidder for the same Assets, and (b) the first business day that is thirty (30) days after the conclusion of the Sale Hearing;

(i)    includes a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to submit an offer to purchase the Assets specified on the terms proposed by such Potential Bidder;

(j)    complies with all requirements of the Novation Requirements section in the Bid Procedures Order; and

(k)    contains the form of Sale Order approving the proposed transaction that the Potential Bidder would request the Debtors to submit to the Court.

As soon as practicable after a Potential Bidder submits a bid, the Debtors, in consultation with the Creditors' Committee, if appointed, will determine whether such bid is a Qualified Bid and will notify such Potential Bidder of such determination. The Debtors may, in their business judgment,

communicate with any Potential Bidder and may request any additional information reasonably required in connection with the evaluation of such Potential Bidder or bid submitted by such Potential Bidder. To the extent that the Debtors determine that a bid submitted by a Potential Bidder is a Qualified Bid, such Potential Bidder shall then be deemed a "***Qualified Bidder***" and be allowed to participate in the Auction in all respects. The Debtors reserve the right, in their business judgment, to consider bids for the Assets that do not conform to one or more of the aforementioned requirements, and, in consultation with the Creditors' Committee, if appointed, may deem such bids to be Qualified Bids notwithstanding such requirements. The Debtors also may consider bids that call for the purchase of the Assets on a piecemeal basis, as well as bids for substantially all of the Assets, if the Debtors, in their business judgment and in consultation with the Creditors' Committee, if appointed, believe that such bids will result in a value maximizing transaction. As promptly as practical under the circumstances following a determination that a Qualified Bidder has submitted a Qualified Bid, the Debtors shall forward any such Qualified Bid to the DOE, or in the event that there are no Qualified Bids, inform the DOE that there are no Qualified Bids.

(v)    <u>Stalking Horse Bid</u>

If the Debtors receive one or more Qualified Bids on or before **September 30, 2013 at 5:00 p.m. (Pacific Time)**, the Debtors, in consultation with the Creditors' Committee, if appointed, may, but shall not be required to, enter into a Stalking Horse Agreement(s) with one or more Stalking Horse Bidders for the purpose of establishing Stalking Horse Bid(s). The Stalking Horse Agreement(s) shall be in such form and contain terms and provisions as the Debtors deem appropriate in their business judgment, subject to the limitations set forth in the Bidding Procedures regarding the Stalking Horse Protections (as defined below). Any Stalking Horse Bid shall be deemed a Qualified Bid for purposes of the Bidding Procedures. In the event that the Debtors enter into a Stalking Horse Agreement, the Debtors shall (a) promptly file a notice with the Court that includes a copy of any such agreement, and (b) provide a copy of such agreement to any Potential Bidder upon request.

(vi)    <u>Stalking Horse Protections</u>

The Debtors may, in their business judgment, provide the Stalking Horse Bidder(s) with a fee of up to two percent (2%) of the guaranteed cash purchase price proposed in the Stalking Horse Bid

(the "**Break-Up Fee**") and an expense reimbursement of up to an amount equal to $25,000 (the "**Expense Reimbursement**" and, together with the Break-Up Fee, the "**Stalking Horse Protections**"); _provided_, that such Stalking Horse Bidder is not in breach under the Stalking Horse Agreement or has not previously terminated such agreement. The Break-Up Fee will be payable to a Stalking Horse Bidder only if the Debtors, at the Auction, select as the Successful Bid(s) a Qualified Bid by a Qualified Bidder that is not the Stalking Horse Bidder for the sale of Assets that are substantially all of the Assets subject of the Stalking Horse Agreement and consummate the sale to such Successful Bidder(s) following approval by the Court at the Sale Hearing. The Expense Reimbursement will be payable to a Stalking Horse Bidder (i) only if the Debtors, at the Auction, select as the Successful Bid(s) a Qualified Bid by a Qualified Bidder that is not the Stalking Horse Bidder for the sale of Assets that are substantially all of the Assets subject of the Stalking Horse Agreement and consummate the sale to such Successful Bidder(s) following approval by the Court at the Sale Hearing, or (ii) if the Debtors are unable to consummate the sale of the Assets pursuant to the Stalking Horse Agreement for any reason other than breach or termination by the Stalking Horse Bidder. Further, the Break-Up Fee and the Expense Reimbursement shall be payable solely from the proceeds of a consummated sale, and only after all outstanding obligations under the Debtors' debtor in possession financing facility (the "**DIP Loan**") have been paid in full by the Debtors.

(vii)    Credit Bid

The DIP Lender shall be deemed a Potential Bidder in all respects, and shall have the option to submit a credit bid for some or all of the Assets to the fullest extent permitted under Bankruptcy Code section 363(k) (the "**Credit Bid**"). In the event that the DIP Lender chooses to submit a Credit Bid as permitted by the Bidding Procedures, it shall be considered a Qualified Bidder in all respects and afforded all rights associated therewith. Notwithstanding the Bid Deadline, the DIP Lender, as well as any transferee of the DIP Loan, shall have the option to submit a Credit Bid at any time prior to the conclusion of the Auction.

(viii)    Auction

If two or more Qualified Bids are received on or before the Bid Deadline, the Debtors shall conduct the Auction on **October 9, 2013 at 10:00 a.m. (Pacific Time)**, at the offices of Akin Gump

Strauss Hauer & Feld LLP, 2029 Century Park East, Suite 2400, Los Angeles, California 90067, or such other location as the Debtors may advise any parties entitled to attend the Auction upon two (2) business days' notice, to determine the Successful Bid(s). The Auction may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Auction. The Debtors reserve the right to cancel the Auction if two or more Qualified Bids are not received as of the Bid Deadline.

(ix)   <u>Auction Procedures</u>

Only an entity that has submitted a Qualified Bid (a "***Qualified Bidder***"), the DOE, the Office of the United States Trustee for the District of Arizona (the "***U.S. Trustee***"), the Creditors' Committee, if appointed, and each such entity's respective advisors are eligible to participate in the Auction. All participants shall appear in person or through a duly authorized representative. Prior to the Auction, the Debtors, in consultation with the Creditors' Committee, if appointed, shall select the Qualified Bid that, in their business judgment, reflects the highest or otherwise best bid for the Assets as the starting bid (the "***Starting Auction Bid***"), and shall advise all participants in the Auction of the terms of the Starting Auction Bid. In the event that the only bids received by the Debtors are for certain of the Assets, the Debtors reserve the right, in consultation with the Creditors' Committee, if appointed, to designate any such Qualified Bids as the Starting Auction Bids. Qualified Bidders may then submit bids that are better and higher than the Starting Auction Bid in an initial increment amount equal to the amount of any Stalking Horse Protections plus $250,000 and subsequent increments of at least $100,000 (collectively, the "***Overbid Increments***").

(x)   <u>Determination of Successful Bid</u>

On or before October 10, 2013, the Debtors, in consultation with the Creditors' Committee, if any, shall review each Qualified Bid that has been submitted and determine, in the Debtors' business judgment and in consultation with the Creditors' Committee, if appointed, which Qualified Bid(s) is the highest and best and, therefore, the Successful Bid(s). In making such determination, the Debtors, in consultation with the Creditors' Committee, if appointed, shall consider any factor that they deem relevant, including the purchase price, the payment of any Break-Up Fee or Expense Reimbursement, any benefit to the Debtors' estates from any proposal to assume liabilities of the Debtors, and those

factors affecting the speed and certainty of consummating the sale of the Assets. The presentation of the Successful Bid(s) to the Court for approval does not constitute the Debtors' acceptance of such bid(s). The Debtors will be deemed to have accepted the Successful Bid(s) only when such bid(s) has been approved by the Court pursuant to a Sale Order and the sale of the Assets proposed in such bid has been consummated.

As soon as practicable following the determination of the Successful Bid(s), but no later than **October 10, 2013**, the Debtors shall file a notice with the Court identifying the Qualified Bidder(s) that submitted the Successful Bid(s) (the "***Successful Bidder(s)***") and serve such notice by telecopy, electronic mail transmission, overnight delivery, or other means reasonably calculated to provide notice, upon the following entities: (i) the U.S. Trustee; (ii) the DOE; (iii) the United States Department of Labor (the "***DOL***"); (iv) counsel to the Creditors' Committee, if appointed; (v) the parties listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims; (vi) all Qualified Bidders that have submitted a Qualified Bid; (vii) all non-Debtor counterparties to the Assigned Contracts and Assigned Leases proposed to be assumed and assigned under the Successful Bid(s); and (viii) any party that has requested notice pursuant to Bankruptcy Rule 2002.

The Debtors may adjourn, continue, re-open, or terminate the Auction, subject to any required approval of the Court, and reserve the right to adopt other and further rules and procedures for the Auction that, in their business judgment and in consultation with the Creditors' Committee, if appointed, will better promote the goal of maximizing the value of the Assets through the Auction process.

(xi) <u>Back-Up Bid</u>

The Successful Bidder(s) shall be required to consummate the purchase of the Assets by **11:59 p.m. (Mountain Standard Time) on October 11, 2013**, subject to extension by the Debtors in their business judgment. If the Successful Bidder(s) fails to timely consummate the purchase of the Assets, or any part thereof, then the next highest or otherwise best Qualified Bid (if any) (the "***Back-up Bid***") may be designated by the Debtors, in consultation with the Creditors' Committee, if appointed, as the Successful Bid, and the Debtors shall be authorized, but not required, to consummate the sale of the Assets to the Qualified Bidder that submitted the Back-Up Bid pursuant to the terms of such Back-Up

Bid as soon as is commercially reasonable. If the Successful Bidder(s) fails to consummate the purchase of the Assets because of a breach, default or failure to perform on the part of such Successful Bidder(s), the Debtors reserve the right to seek all available damages from such Successful Bidder(s).

(xii)    <u>Reservation of Rights</u>

The Debtors reserve the right to (i) determine in their business judgment, in consultation with the Creditors' Committee, if appointed, whether any Qualified Bid is a Successful Bid, and (ii) reject, at any time prior to entry of the Sale Order by the Court, without liability, any bid that the Debtors, in their business judgment and in consultation with the Creditors' Committee, if appointed, determine to be (a) inadequate or insufficient, (b) not in conformity with the Bidding Procedures, the Bankruptcy Code, or the Bankruptcy Rules, or (c) contrary to the best interests of the Debtors and their estates. At or before the Sale Hearing, the Debtors may impose such other terms and conditions on the sale of the Assets as the Debtors may determine to be in the best interests of the Debtors and their estates.

The Debtors further reserve the right, in consultation with the Creditors' Committee, if appointed, to modify the Bidding Procedures without the need for any further order of the Bankruptcy Court, including by (i) extending the deadlines set forth in the Bidding Procedures, (ii) adjourning the Auction and the Sale Hearing, and (iii) withdrawing any Assets from the sale process at any time prior to or during the Auction.

(xiii)    <u>Disposition of Good Faith Deposits</u>

All Good Faith Deposits shall be held in a separate non-interest-bearing escrow account for the benefit of the Debtors. As soon as practicable following the consummation of the sale of the Assets, any Good Faith Deposit received from a Qualified Bidder who is not determined to be the Successful Bidder shall be released from escrow and returned to such Qualified Bidder. If the Successful Bidder fails to consummate the purchase of the Assets, or any part thereof, because of a breach, default, or failure to perform on the part of such Successful Bidder, the Debtors will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become property of the Debtors without affecting or reducing any of the Debtors' other rights or claims against such Successful Bidder. If a Successful Bidder fails to consummate the purchase of the Assets, or any part thereof, because of a breach, default, or failure to perform on the

part of the Debtors, the Good Faith Deposit deposited by such Successful Bidder shall be returned to such Successful Bidder. If a Successful Bidder consummates the purchase of the Assets, the Good Faith Deposit deposited by such Successful Bidder shall be applied as a credit toward the purchase price paid by such Successful Bidder.

(xiv)    <u>As Is, Where Is</u>

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their estates, or their agents or representatives. Except as otherwise expressly provided in these Bidding Procedures, any applicable Stalking Horse Agreement, or any applicable Form APA (as modified), by submitting a bid, each Potential Bidder that submits a bid shall be deemed to acknowledge and represent that it (i) has had an opportunity to conduct any and all reasonable due diligence regarding the Assets prior to making its bid, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith.

(xv)    <u>Sale Hearing</u>

The sale of the Assets and the Stalking Horse Agreement (or a modified Form APA related to the Successful Bid(s)) shall be presented for authorization and approval by the Court at the Sale Hearing, which the Debtors propose be held on **October 10, 2013 at 10:00 a.m. (Mountain Standard Time)**, subject to the availability of the Court. The Sale Hearing may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.

2.    *Notice Procedures*

The Debtors also request approval of the proposed form and manner of notice of the Bid Deadline, the Auction, and the Sale Hearing. Specifically, within one (1) business day of entry of the Bidding Procedures Order, the Debtors will serve notice of the Bid Deadline, the Auction, and the Sale Hearing, substantially in the form attached to the Motion as **<u>Exhibit B</u>** (the "*Sale Notice*"), by first class mail on:

| | | |
|---|---|---|
| (a) | the United States Trustee; |
| (b) | counsel for the Creditors' Committee, if any; |
| (c) | all known creditors of the Debtors; |
| (d) | any entity known or reasonably believed to have asserted a security interest in or lien against any of the Assets; |
| (e) | all counterparties to Assigned Contracts and Assigned Leases; |
| (f) | any entity that has expressed a <u>bona fide</u> interest in acquiring the Assets; |
| (g) | all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; |
| (h) | the Securities and Exchange Commission; |
| (i) | the DOE; |
| (j) | the DOL; |
| (k) | the United States Department of Justice; |
| (l) | the United States Attorney's Office for the District of Arizona; |
| (m) | the Attorneys General in the States where the Assets are located; and |
| (n) | any party that has requested notice pursuant to Bankruptcy Rule 2002. |

Within three (3) business days of the entry of the Bidding Procedures Order, the Debtors will publish a notice, in a form to be submitted to the Court (the "***Publication Notice***"), in the *USA Today* or such other publication(s) as the Debtors and their advisors deem appropriate.

Additionally, as soon as practicable following the determination of the Successful Bid(s), the Debtors shall file a notice with the Court identifying the Successful Bidder(s) and serve such notice by telecopy, electronic mail transmission, overnight delivery, or other means reasonably calculated to provide notice, upon the following entities: (i) the U.S. Trustee; (ii) the DOE; (iii) the DOL; (iv) counsel to the Creditors' Committee; if appointed, (v) the parties listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims; (vi) all Qualified Bidders that have submitted a Qualified Bid; (vii) all non-Debtor counterparties to the Assigned Contracts and Assigned Leases proposed to be assumed and assigned under the Successful Bid(s); and (viii) any party that has requested notice pursuant to Bankruptcy Rule 2002.

### 3. Assumption and Assignment Procedures

To facilitate and consummate the sale of the Assets, the Debtors seek authority to assume and assign certain Assigned Contracts and Assigned Leases to the Successful Bidder(s). Due to the nature of the bidding process, it is impossible for the Debtors to currently identify which Assigned Contracts and Assigned Leases will require assumption and assignment to the Successful Bidder(s). As such, the Debtors further seek authority to establish the following Assumption and Assignment Procedures:

### (xvi) Cure Schedule

By no later than **September 27, 2013**, the Debtors will file with the Court a schedule, substantially in the form attached to the Motion as **Exhibit C**, (the "*Cure Schedule*") of each of the executory contracts and unexpired leases that may be assumed and assigned to the Successful Bidder(s) (the "*Potentially Assigned Contracts and Leases*"). The Cure Schedule, which will be served via overnight delivery on the non-Debtor counterparties to each of the Potentially Assigned Contracts and Leases, will indicate whether the Debtors' books and records show any amounts due under each of the Potentially Assigned Contracts and Leases that must be cured in accordance with Bankruptcy Code sections 365(b) and (f)(2) (the "*Cure Amount*") prior to the assumption and assignment of such Potentially Assigned Contracts and Leases. To the extent that any non-Debtor counterparty to any of the Potentially Assigned Contracts and Leases wishes to object or request adequate assurance of future performance, such party should do so in accordance with the procedures set forth below.[8]

As soon as practicable after selecting the Successful Bidder(s), such Successful Bidder(s) shall submit a schedule of the Potentially Assumed Contracts and Leases that it wishes to be Assigned Contracts and Assigned Leases. However, by no later than **October 10, 2013**, the Debtors will file a notice, substantially in the form attached to the Motion as **Exhibit D** (the "*Contract Assignment*

---

[8] For the avoidance of doubt, each of the Potentially Assigned Contracts and Leases set forth on the Cure Schedule is included solely for purposes of providing notice that such Potentially Assigned Contracts and Leases may be assumed and assigned to the Successful Bidder(s). Inclusion of the Potentially Assigned Contracts and Leases on the Cure Schedule shall in no way bind the Debtors or the Successful Bidder(s) and all rights to reject any of the Potentially Assigned Contracts and Leases are expressly reserved.

*Notice*"), with the Court and serve such Contract Assignment Notice via overnight delivery on the non-Debtor counterparties to such Assigned Contracts and Assigned Leases.

The Contract Assignment Notice will include (i) the title of the Assigned Contract or Assigned Lease to be assumed and assigned, (ii) the name of the non-Debtor counterparty to such Assigned Contract or Assigned Lease, (iii) Cure Amounts, if any, (iv) the proposed effective date of the assignment, and (v) the identity of the Successful Bidder and a statement as to such Successful Bidder's ability to perform the Debtors' obligations under such Assigned Contract or Assigned Lease.

(xvii) <u>Objection to Assumption and Assignment of Assigned Contracts and Assigned Leases</u>

Any objection to the assumption and assignment of any Assigned Contract or Assigned Lease identified on the Cure Schedule, including any objection to the Cure Amount set forth on the Cure Schedule or to the ability of the Successful Bidder to provide adequate assurance of future performance under such Assigned Contract or Assigned Lease, must (i) be in writing, (ii) set forth the basis for the objection as well as any cure amount that the objector asserts to be due (in all cases with appropriate documentation in support thereof), and (iii) be filed with the Clerk of the Court, United States Bankruptcy Court for the District of Arizona, 230 North First Avenue, Suite 101, Phoenix, Arizona 85003 and be served on proposed counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, Century Park East, Suite 2400, Los Angeles, California 90067 (Attn: David P. Simonds and Arun Kurichety), and Parker Schwartz, PLLC, 7310 N. 16th St., Suite 330, Phoenix, Arizona 85020 (Attn: Jared G. Parker), so as to be actually received no later than **October 7, 2013 at 5:00 p.m. (Pacific Time)** (the "*Assignment and Cure Objection Deadline*").

(xviii) <u>Requests for Adequate Assurance</u>

Any request for adequate assurance information regarding the Successful Bidder(s) (a "*Request for Adequate Assurance*") must be in writing and be served on proposed counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, Century Park East, Suite 2400, Los Angeles, California 90067 (Attn: David P. Simonds and Arun Kurichety), and Parker Schwartz, PLLC, 7310 N. 16th St., Suite 330, Phoenix, Arizona 85020 (Attn: Jared G. Parker), so as to be actually received no later than the Assignment and Cure Objection Deadline. Requests for Adequate Assurance must include an email

address, postal address, and/or facsimile number to which a response to such request will be sent. Upon receiving a Request for Adequate Assurance, the Debtors shall promptly after such request, but in no event later than one (1) business day after the Debtors' selection of the Successful Bid(s), provide such party with any non-confidential information reasonably related to adequate assurance by email, facsimile, or overnight delivery.

(xix)   <u>Resolution of Objections</u>

If no objection to the proposed assumption and assignment of an Assigned Contract or Assigned Lease is timely received by the Assignment and Cure Objection Deadline, then the assumption and assignment is authorized and the respective Cure Amount set forth in the Cure Schedule shall be binding upon the counterparty to the Assigned Contract or Assigned Lease for all purposes and will constitute a final determination of the total Cure Amount required to be paid by the Debtors in connection with such assumption and assignment to the Successful Bidder.

To the extent that any entity does not timely object as set forth above, such entity shall be (i) forever barred from objecting to assumption and assignment of the Assigned Contracts and Assigned Leases identified on the Cure Schedule, including asserting any additional cure payments or requesting additional adequate assurance of future performance, (ii) deemed to have consented to the applicable Cure Amount, if any, and to the assumption and assignment of the applicable Assigned Contract or Assigned Lease, (iii) bound to such corresponding Cure Amount, if any, (iv) deemed to have agreed that the Successful Bidder has provided adequate assurance of future performance within the meaning of Bankruptcy Code section 365(b)(1)(C), (v) deemed to have agreed that all defaults under the applicable Assigned Contract or Assigned Lease arising or continuing prior to the effective date of the assignment have been cured as a result or precondition of the assignment, such that the Successful Bidder or the Debtors shall have no liability or obligation with respect to any default occurring or continuing prior to the assignment, and from and after the date of the assignment the applicable Assigned Contract or Assigned Lease shall remain in full force and effect for the benefit of the Successful Bidder and such entity in accordance with its terms, (vi) deemed to have waived any right to terminate the applicable Assigned Contract or Assigned Lease or designate an early termination date under the applicable Assigned Contract or Assigned Lease as a result of any default

that occurred and/or was continuing prior to the assignment date, and (vii) deemed to have agreed that the terms of the Sale Order shall apply to the assumption and assignment of the applicable Assigned Contract or Assigned Lease.

If no objection to the proposed assumption and assignment of an Assigned Contract or Assigned Lease is received by the Assignment and Cure Objection Deadline, counsel for the Debtors may submit to the Court a certificate of no objection and a form of order (a "***Certificate of No Objection***") granting such assumption and assignment, and serve such Certificate of No Objection on the counterparty to such Assigned Contract or Assigned Lease or seek such determination pursuant to the Sale Order.

If an objection is timely received and such objection cannot otherwise be resolved by the parties, the Court may hear such objection at the Sale Hearing or any later date set by the Court.[9] The pendency of a dispute relating to the Cure Amount will not prevent or delay the assumption and assignment of any Assigned Contract or Assigned Lease. If an objection is filed only with respect to the cure amount listed on the Cure Schedule, the Debtors may file a Certificate of No Objection as to assumption and assignment only and the dispute with respect to the cure amount will be resolved consensually, if possible, or, if the parties are unable to resolve their dispute, before the Court. The Debtors intend to cooperate with the counterparties to the Assigned Contracts and Assigned Leases to be assumed and assigned by the Debtors to attempt to reconcile any difference in a particular Cure Amount.

(xx) <u>Anti-Assignment Provisions in Assigned Contracts or Assigned Leases</u>

The Debtors further request that the Court find that any anti-assignment provisions included in, or otherwise purporting to affect, any Assigned Contracts and Assigned Leases to be assumed and assigned by the Debtors are unenforceable under Bankruptcy Code section 365(f).

---

[9] To the extent that any non-Debtor counterparty objects to the assumption and assignment of an Assigned Contract or Assigned Lease, the Debtors reserve all rights, in consultation with the Successful Bidder(s), to reject such Assigned Contract or Assigned Lease, regardless of its prior designation as an Assigned Contract or Assigned Lease.

# IV.

## BASIS FOR RELIEF

**A.      The Bidding Procedures Order Should be Entered on the Terms Proposed**

*1.      The Bidding Procedures are Fair, Appropriate, and Should be Approved*

Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or public auction.  The Debtors respectfully submit that the sale of the Assets, pursuant to the Bidding Procedures and by public auction, will ensure that the bidding process with respect to the Assets is fair, reasonable, and will yield the maximum value for their estates and creditors.

Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales.  *See In re Montgomery Ward Holding Corp.*, Case No. 97-1409 (PJW) (Bankr. D. Del. Aug. 6, 1997) [Docket No. 377]; *In re Fruehauf Trailer Corp.*, Case No. 96-01563 (PJW) (Bankr. D. Del. Jan. 31, 1997) [Docket No. 439]; *see also In re Integrated Res.*, 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets"); *In re Financial News Network, Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) (as amended) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for an [sic] fair and efficient resolution of bankrupt estates").

The Bidding Procedures, as proposed herein, contemplate an expedited schedule for conducting the Auction and the Sale Hearing.  This expedited schedule is a direct result of the Debtors' current liquidity crisis, which threatens their ability to operate as a going concern.  The Debtors sought to obtain additional debtor in possession financing that would have allowed for a longer sale process.  However, the DIP Lender, as well as all other potential lenders contacted by the Debtors, was unwilling to extend financing on terms that would allow for a longer sale process.  To the extent that the Debtors are unable to adhere to the timeline proposed herein, they likely would deplete their cash reserves within weeks and would be forced to shut down operations.  This result would irreparably damage the value of the Debtors' assets and businesses to the detriment of the Debtors, their estates,

and their creditors. Thus, an expedited sale process is necessary under the circumstances and provides the best mechanism to maximize value for the Debtors and their estates.

In addition, similar procedures have been previously approved by this Court and others. *See In re Eurofresh, Inc.*, Case No. 13-01125 (EWH) (Bankr. D. Ariz. March 4, 2013) [Docket No. 170]; *In re Dewey Ranch Hockey, LLC*, Case No. 09-09488 (RTB) (Bankr. D. Ariz. June 4, 2009) [Docket No. 260]; *In re Humboldt Creamery, LLC*, Case No. 09-11078 (Bankr. N.D. Cal. July 28, 2009); *In re Asyst Techs., Inc.*, Case No. 09-43246 (Bankr. N.D. Cal. June 8, 2009); *In re Nortel Networks, Inc.*, Case No. 09-10138 (KG) (Bankr. D. Del. June 30, 2009) [Docket No. 1012]; *In re Tweeter Home Entm't Group, Inc.*, Case No. 07-10787 (PJW) (Bankr. D. Del. June 26, 2007) [Docket No. 211]; *In re Radnor Holdings Corp.*, Case No. 06-10894 (PJW) (Bankr. D. Del. Sept. 22, 2006) [Docket No. 277]. Moreover, this Court and others have approved expedited sale processes comparable to the process requested herein. *See In re 5712 N.67th Ave., L.L.C.*, Case No. 12-17606 (Bankr. D. Ariz. Nov. 2, 2012) [Docket No. 70] (approving sale process of 31 days); *In re Digital Domain Media Group, Inc.*, Case No. 12-12568 (Bankr. D. Del. Sept. 12, 2012) [Docket No. 56] (approving sale process of 13 days); *In re Humboldt Creamery, LLC*, Case No. 09-11078 (Bankr. N.D. Cal. July 28, 2009) [Docket No. 177] (approving sale process of 37 days); *In re Asyst Techs., Inc.*, Case No. 09-43246 (Bankr. N.D. Cal. June 8, 2009) [Docket No. 181] (approving sale process of 45 days).

Accordingly, the Debtors request that the Court approve the Bidding Procedures, including the timetable for the sale process set forth therein.

### 2. The Stalking Horse Protections Have Sound Business Purpose and Should be Approved

Approval of the Stalking Horse Protections is governed by general administrative expense jurisprudence under Bankruptcy Code section 503(b). *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2009); *Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999). In *O'Brien*, the Third Circuit concluded that the determination as to whether to approve break-up fees or expense reimbursements "depends upon the requesting party's ability to show that the fees [or expenses] were actually necessary to preserve the value of the estate." *O'Brien*, 181 F.3d at 535.

The *O'Brien* court identified at least two instances in which bidding incentives may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

In addition, courts in the Ninth Circuit have held that, in considering whether to approve a break-up fee, the court must determine whether transaction will "further the diverse interests of the debtors, creditors and equity holders, alike," *In re America West Airlines, Inc.*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) *quoting In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983), and "be carefully scrutinized to insure that the debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected." *Id., citing In re Hupp Indus., Inc.*, 140 B.R. 191, 196 (Bankr. N.D. Ohio 1992).

Here, the proposed Stalking Horse Protections and Overbid Increments should be approved because they will provide a clear benefit to the Debtors' estates and are actually necessary to preserve the value of the Debtors' estates. The ability to grant a Break-Up Fee and Expense Reimbursement will enable the Debtors to potentially secure an adequate floor and, thus, insist that competing bids be materially higher or otherwise better than any agreement that might be entered into with the Stalking Horse Bidder. Thus, the Debtors' ability to offer Potential Bidders the Break-Up Fee and Expense Reimbursement enables them to ensure the sale of the Assets to a contractually-committed bidder at a price they believe to be fair while, at the same time, providing the Debtors with the ability to generate a higher purchase price to benefit their estates.

The maximum amount of the Break-Up Fee, Expense Reimbursement, and Overbid Increments, as requested herein, is reasonable and appropriate in light of the size and nature of the contemplated transaction and the efforts that been and will be expended by any Stalking Horse Bidder

that the Debtors choose.  Moreover, should the Debtors determine that providing an Expense Reimbursement is necessary, only documented, reasonable costs and expenses will be reimbursed.

Finally, authority to pay a Break-Up Fee and Expense Reimbursement will not diminish the Debtors' estates.  The Debtors do not intend to terminate a Stalking Horse Agreement, if entered, if doing so would incur an obligation to pay a Break-Up Fee and Expense Reimbursement, unless the Debtors determine, in their business judgment, that accepting an alternative bid will result in consideration in an amount greater than the aggregate amount of the Stalking Horse Bid together with the Stalking Horse Protections.  Therefore, even if a Stalking Horse Bidder is ultimately not determined to be the Successful Bidder, the Debtors will still have benefited from the higher floor established by the improved bid.

As a result, the Debtors submit that the Stalking Horse Protections and Overbid Increments will not chill bidding on the Assets and will clearly benefit the Debtors' estates.  Accordingly, the Debtors request that the Court approve and authorize the Stalking Horse Protections and Overbid Increments.

**B.      The Notice Procedures are Reasonable and Appropriate**

Pursuant to Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Assets, including a disclosure of the time and place of the Auction, the terms and conditions of the proposed sale, and the deadline for filing objections.  The Debtors submit that the notice procedures described above fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the proposed sale of the Assets, the Bidding Procedures, the Auction, the Cure Amount, and the Sale Hearing to the Debtors' creditors and all other parities in interest that are entitled to notice, as well all those parties that have expressed a bona fide interest in acquiring the Assets.  Based upon the foregoing, the Debtors respectfully request that the Court approve the notice procedure proposed above, including the form and manner of service of the Sale Notice.

**C.      The Sale of Substantially All of the Debtors' Assets Should be Approved**

*1.      The Sale of Assets Under Bankruptcy Code Section 363 is Warranted*

Ample justification exists for approval of the proposed sale of the Assets.  Bankruptcy Code section 363 provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the

ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Bankruptcy Code section 105(a) provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

The decision to sell assets outside of the ordinary course of business is based upon the sound business judgment of the debtor. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Trans World Airlines, Inc.*, 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001).

Courts typically consider the following factors in determining whether to approve a sale under Bankruptcy Code section 363: (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was given to interested parties; (iii) whether the sale will produce a fair and reasonable price for the property; and (iv) whether the parties have acted in good faith. *See In re Delaware & Hudson Ry.*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); *In re United Healthcare Sys., Inc.*, No. 97-1159, 1997 WL 176574, at *4 and n.2 (D.N.J. Mar. 26, 1997).

A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors, or interest holders. *See, e.g., In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983). In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (*quoting In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections

to the debtor's conduct." *Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res.*, 147 B.R. at 656 (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1). Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions. *See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.*), 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

The Debtors submit that the proposed sale of the Assets is within their sound business judgment. The Debtors have considered all alternatives, with the assistance of their advisors, and determined that the sale of their Assets through a 363 sale process governed by the Bidding Procedures will maximize the value of the Debtors' estates and is in the best interests of their estates and creditors. As set forth above and in the First Day Declaration, the Debtors' present financial condition warrants an expedited, but thorough, marketing and sale process as the Debtors lack the income or financing to fund protracted chapter 11 cases. The Debtors do not have sufficient working capital or access to financing to rebuild and rehabilitate their assets and operations during the chapter 11 cases. Thus, the expedited sale provides the best mechanism to maximize value under the circumstances and is a valid exercise of the Debtors' business judgment. Accordingly, the Debtors respectfully request that the sale of the Assets to the Successful Bidder be approved.

> 2. *The Sale of Assets Should be Free and Clear of all Liens, Claims, Interests, and Encumbrances*

In the interest of attracting the best bids for the Assets, the Debtors submit that the sale of the Assets should be free and clear of any and all liens, claims, interests, and encumbrances in accordance with Bankruptcy Code section 363(f), with any such liens, claims, interests, and encumbrances attaching to the proceeds of a sale.

Pursuant to Bankruptcy Code section 363(f), a debtor may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

> (1)  applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)  such entity consents;
>
> (3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)  such interest is in bona fide dispute; or
>
> (5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1) – (5).

This provision is supplemented by Bankruptcy Code section 105(a), which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

Because Bankruptcy Code section 363(f) is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the assets "free and clear" of liens and interests. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions is met, the debtor has the authority to conduct the sale free and clear of all liens.") (*citing Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988)); *In re Dundee Equity Corp.*, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. March 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *see also Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

The Debtors submit that one or more of the conditions set forth in Bankruptcy Code section 363(f) will be satisfied with respect to the sale of the Assets. In particular, section 363(f)(2) will be met in connection with the transactions proposed because each of the parties holding liens, claims or

encumbrances on the Assets will consent, or, absent any objection to the Motion, will be deemed to have consented to the sale. Further, any such lien, claim, or encumbrance will be adequately protected by attachment to the net proceeds of the sale, subject to any claims and defenses the Debtors may possess with respect thereto. Accordingly, the Debtors request that the Assets be sold and transferred to the Successful Bidder free and clear of all liens, claims, interests, and encumbrances pursuant to Bankruptcy Code section 363(f).[10]

      3.      *The Successful Bidder Should be Afforded All Protections Under Bankruptcy Code Section 363(m) as a Good Faith Purchaser*

Bankruptcy Code Section 363(m) protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U. S.C. § 363(m).

The Debtors submit, and will present evidence at the Sale Hearing, if necessary, that the selection of the Successful Bidder shall be the product of arm's-length, good-faith negotiations in an anticipated competitive sale process. Accordingly, the Debtors request that the Court make a finding at the Sale Hearing and in the Sale Order that the Successful Bidder has purchased the Assets in good faith and is entitled to the full protections of Bankruptcy Code section 363(m).

---

[10] Although the Debtors do not have any significant secured debt obligations, the DOE may assert interests in, or with respect to, certain of the Debtors' assets. The Debtors reserve their rights regarding the character, validity, extent, avoidability, and enforceability of any such interests.

**D.** **Assumption and Assignment of Executory Contracts and Unexpired Leases Should be Approved**

*1. Assumption and Assignment Based on Debtors' Business Judgment*

As stated above, in order to facilitate and effectuate the sale of their Assets, the Debtors also seek authority to assume and assign certain Assigned Contracts and Assigned Leases to the Successful Bidder(s). Bankruptcy Code sections 365(a) and (b) authorize debtors in possession to assume executory contracts or unexpired leases subject to the Court's approval, and requires such debtors in possession to satisfy certain requirements at the time of assumption. Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing in relevant part that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> > (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
> >
> > (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

A debtor's decision to assume an executory contract or unexpired lease must be an exercise of its sound business judgment for the Court to approve the assumption under Bankruptcy Code section 365(a). *See Sharon Steel Corp. v. National Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.),* 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1099 (2d Cir. 1993) *see also NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113); *In re III Enter., Inc. V,* 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) (citations omitted), *aff'd,* 169 B.R. 551 (E.D. Pa. 1994).

27

It is well established that the court should approve a debtor's motion to assume or reject an executory contract if the debtor's decision is based on its "business judgment." *See In re Decora Indus., Inc.*, 2002 WL 32332749, at *8 (D. Del. 2002); *Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.)*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"). *See also Phar Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted).[11]

To determine if the business judgment test is met, the court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. at 239 ("This is not a difficult standard to satisfy and requires only a showing that rejection will benefit the estate."). Specifically, a court should find that the assumption or rejection is elected on "an informed basis, in good faith, and with the honest belief that the assumption . . . [is] in the best interests of [the debtor] and the estate." *In re Network Access Solutions Corp.*, 330 B.R. at 75. Under this standard, a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion. *See Computer Sales Int'l, Inc. v. Federal Mogul (In re Federal Mogul Global, Inc.)*, 293 B.R. 124, 126 (D. Del. 2003); *Lubrizol Enters. v. Richmond Metal Finishers*, 756 F.2d 1043, 1047 (4th Cir. 1985).

In the present case, the Debtors' assumption and assignment of certain Assigned Contracts and Assigned Leases to the Successful Bidder(s) meets the business judgment standard and satisfies the requirements of Bankruptcy Code section 365. The assumption and assignment of the Assigned Contracts and Assigned Leases are necessary for any Successful Bidder(s) to conduct business going forward, and since no purchaser would take the Assets without certain Assigned Contracts and

---

[11] Further, "[n]othing in the Code suggests that the debtor may not modify its contracts when all parties to the contract consent." *In re Network Access Solutions, Corp.*, 330 B.R. at 74 (citation omitted). While "[s]ection 363 of the Bankruptcy Code allows a debtor to . . . modify contracts . . . [t]o the extent they are outside the ordinary course of business, court approval is necessary." *Id.* Regardless, "[t]here is . . . no discernible difference in the notice requirements or standard for approval under section 363 and 365." *Id.*

Assigned Leases, the assumption and assignment of such Assigned Contracts and Assigned Leases is essential to inducing the highest and best offer for the Assets. Further, upon consummation of the proposed sale of the Assets, the Debtors will likely no longer continue to operate their businesses and will therefore have no use for any of the Assigned Contracts and Assigned Leases utilized in their businesses. Lastly, the proposed Assumption and Assignment Procedures ensure that all counterparties to Assigned Contracts and Assigned Leases to be assumed and assigned by the Debtors will have ample notice of such relief and an opportunity to contest any asserted Cure Amount, as well as the ability of the Successful Bidder(s) to provide adequate assurance of future performance.

Consequently, the Debtors submit that the Assumption and Assignment Procedures are fair and reasonable, and respectfully request that the Court approve the Assumption and Assignment Procedures and authorize the Debtors to assume and assign any Assigned Contracts and Assigned Leases to the Successful Bidder(s).

2. *Adequate Assurance of Future Performance*

A debtor in possession may assign an executory contract or unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. 11 U.S.C. § 365(f)(2).

The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992); *In re Rachels Indus., Inc.*, 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); *see also In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance").

Adequate assurance of future performance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned. *See*, *e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that

adequate assurance of future performance is present when the prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

Pursuant to the Bidding Procedures, in order to submit a "Qualified Bid" for the Assets, all Potential Bidders must provide evidence of such Potential Bidder's ability to provide adequate assurance of future performance under the Assigned Contracts and Assigned Leases to be assumed and assigned. *See* Bidding Procedures, Section D. Moreover, the Assumption and Assignment Procedures permit the non-Debtor counterparties to such Assigned Contracts and Assigned Leases to request adequate assurance information regarding the Successful Bidder(s), and afford such counterparties the opportunity to evaluate the ability of the Successful Bidder(s) to provide adequate assurance of future performance under such Assigned Contracts and Assigned Leases. Accordingly, in this regard, the Assumption and Assignment Procedures are reasonable and appropriate and support approval of the assumption and assignment of Assigned Contracts and Assigned Leases to the Successful Bidder(s).

### 3. *Anti-Assignment Provisions Should be Deemed Unenforceable*

To facilitate the assumption and assignment of Assigned Contracts and Assigned Leases, the Debtors also request that the Court enter an order providing that any anti-assignment provisions included in, or otherwise purporting to affect, the Assigned Contracts and Assigned Leases to be assumed and assigned shall not restrict, limit, or prohibit the assumption, assignment, and sale of such Assumed Contracts and Assumed Leases, and that such provisions are deemed and found to be unenforceable anti-assignment provisions within the meaning of Bankruptcy Code section 365(f).[12]

Section 365(f)(l), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. *See*, *e.g.*, *Coleman Oil Co., Inc. v. Circle K Corp. (In re Circle K Corp.)*, 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"), *cert denied*, 522 U.S.

---

[12] As set forth in the First Day Declaration, the Debtors are party to a (a) $100.2 million and (b) $26.4 million cost-share grant, respectively, with the DOE. The Debtors reserve their rights regarding their ability to assume and assign such cost-share grants.

1148 (1998). Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. *See*, *e.g., In re Jamesway Corp.*, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced. *See In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 356(f) [sic], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in *In re Mr. Grocer, Inc.*, the court noted that:

> [the] case law interpreting § 365(f)(l) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987).

Accordingly, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment, and sale of any Assumed Contracts or Assumed Leases to the Successful Bidder(s) and be deemed and found to be unenforceable anti-assignment provisions within the meaning of Bankruptcy Code section 365(f).

### E. Relief Under Bankruptcy Rule 6004(h) and 6004(d) is Appropriate

Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."

The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Bankruptcy Rules 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day period, the leading treatise on bankruptcy suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy, ¶ 6004.10 at 6004-18 (L. King., 15th rev. ed. 2008). The treatise further provides that if an objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

As described above, time is clearly of the essence. The Debtors lack the working capital or access to further financing to rehabilitate their operations and, absent adherence to the procedures set forth herein, will likely deplete cash reserves in the near term and be forced to shut down operations. Such a result would irreparably harm the value of the Assets and, by extension, their creditors. Therefore, to maximize the value received for the Assets and minimize accruing liabilities, the Debtors seek to consummate the sale of the Assets to the Successful Bidder(s) as soon as possible following the Sale Hearing. Accordingly, the Debtors request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the proposed sale of the Assets is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

Given the nature of the relief requested herein, the Debtors respectfully request a waiver of (i) the notice requirements under Bankruptcy Rule 6004(a), and (ii) the 14-day stay under Bankruptcy Rule 6004(h), to the extent that either rule is applicable.

## V.

## NOTICE

No trustee, examiner or statutory committee has been appointed in the Debtors' chapter 11 cases. The Debtors have provided notice of this Motion to: (i) the Office of the United States Trustee for the District of Arizona; (ii) the parties listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (iii) the United States

Department of Energy; (iv) the United States Department of Labor; (v) the Securities and Exchange Commission; (vi) the Internal Revenue Service; (vii) the United States Attorney's Office for the District of Arizona; and (vii) any party that has requested notice pursuant to Bankruptcy Rule 2002. In the event that the Court grants the relief requested by the Motion, the Debtors shall provide notice of the entry of the order granting such relief upon each of the foregoing parties and any other parties in interest as the Court directs. The Debtors respectfully submit that such notice is sufficient and that no further notice need be given.

## VI.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (a) enter an order granting the relief requested in the Motion, and (b) grant such other and further relief as the Court may deem just, proper and equitable.

Dated: September 16, 2013

PARKER SCHWARTZ, PLLC

By: _____/s/ Jared G. Parker_____
       Jared G. Parker

– and –

AKIN GUMP STRAUSS HAUER & FELD LLP

Charles R. Gibbs (*pro hac vice* admission pending)
David P. Simonds (*pro hac vice* admission pending)
Arun Kurichety (*pro hac vice* admission pending)

[Proposed] Attorneys for the Debtors
and Debtors in Possession

**<u>Exhibit A</u>**

**Proposed Bid Procedures Order**

1
2
3
4
5
6
7
8
9                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF ARIZONA
10
   In re:                                    Case No. 2:13-BK-16126 (RJH)
11
   ELECTRIC TRANSPORTATION ENGINEERING       Chapter 11
12 CORPORATION (d/b/a ECOTALITY NORTH
   AMERICA), *et al.*,[1]                    Jointly Administered
13
              Debtors.                       **ORDER (A) APPROVING BIDDING
14                                           PROCEDURES IN CONNECTION WITH
                                             THE SALE OF SUBSTANTIALLY ALL OF
15                                           THE DEBTORS' ASSETS,
                                             (B) SCHEDULING SALE HEARING,
16 _____          (C) APPROVING THE FORM AND
                                             MANNER OF THE SALE, AUCTION, AND
17 This filing applies to:                   SALE HEARING, AND (D) GRANTING
                                             RELATED RELIEF**
18            ■ All Debtors
                                             Hearing Date: _____, 2013
19            □ Specified Debtors            Time:         _____
20 _____
21        Upon the motion (the "***Motion***") of the above-captioned debtors and debtors in possession

22 (collectively, the "***Debtors***") seeking entry of an order (this "***Order***") (i) approving procedures (the

23 "***Bidding Procedures***") for (a) submitting bids for the purchase of the Assets, and (b) conducting an

24 auction for the Assets (the "***Auction***"); (ii) authorizing, but not requiring, the Debtors to (a) enter into a

25 "stalking horse" agreement with one or more bidders (the "***Stalking Horse Bidder(s)***") for the purpose

26        [1] The Debtors in these jointly administered chapter 11 cases and the last four digits of their respective Employer
   Identification Numbers are: (i) ECOtality, Inc. (5422); (ii) Electric Transportation Engineering Corporation (4755);
27 (iii) ECOtality Stores, Inc. (2643); (iv) ETEC North, LLC (n/a); (v) The Clarity Group, Inc. (8832); and (vi) G.H.V.
   Refrigeration, Inc. (4512). The Debtors' service address at ECOtality, Inc.'s corporate headquarters is Post Montgomery
28 Center, One Montgomery Street, Suite 2525, San Francisco, California 94104.

of establishing a minimum acceptable bid(s) for the Assets (the "***Stalking Horse Bid(s)***"), (b) provide any Stalking Horse Bidder(s) with a break-up fee in the event that such Stalking Horse Bidder(s) is not the successful bidder for the Assets (the "***Successful Bidder(s)***") in an amount not to exceed two percent (2%) of the guaranteed cash purchase price proposed in the Stalking Horse Bid in accordance with the terms of the Bidding Procedures, and (c) reimburse any Stalking Horse Bidder(s) for reasonable and actual costs and expenses incurred by such Stalking Horse Bidder(s) in connection with its bid(s) in an amount not to exceed $25,000; (iii) approving procedures (the "***Assumption and Assignment Procedures***") for the assumption and assignment of certain executory contracts (the "***Assigned Contracts***") and unexpired leases (the "***Assigned Leases***") in connection with the sale of the Assets and resolution of any objections or requests for adequate assurance of future performance related thereto; (iv) scheduling (a) a deadline to submit bids for the Assets, (b) the date and time of the Auction, (c) the date and time of the hearing to consider approval of the proposed sale of the Assets to the Successful Bidder(s) (the "***Sale Hearing***"), and (d) a deadline to consummate a sale of the Assets; (v) approving the form and manner of notice of the deadline to submit bids for the Assets, the Auction and the Sale Hearing; and (vi) granting certain related relief, all as more fully set forth in the Motion;[2] and a hearing having been held to consider the relief requested in the Motion (the "***Bidding Procedures Hearing***"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein; and this Court having determined that the legal and factual bases set forth in the record establish just cause for the relief granted herein;

---

[2] All terms used but not defined herein shall have the meaning ascribed to them in the Motion, the Bidding Procedures, or the First Day Declaration, as applicable.

and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

THE COURT HEREBY FINDS THAT:[3]

1.    The Debtors have demonstrated that, under the circumstances described herein and in the Motion, there is a compelling and sound business justification for this Court to grant the relief requested in the Motion, including, without limitation, (i) approval of the Bidding Procedures, (ii) authorization to enter into a Stalking Horse Agreement(s) with a Stalking Horse Bidder(s), (iii) authorization to provide the Stalking Horse Protections, and (iv) approval of the Assignment and Assumption Procedures.

2.    The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1** and are incorporated herein by reference as if fully set forth in this Order, are fair, reasonable and appropriate and represent the best method for maximizing the value of the Debtors' estates.

3.    Entry by the Debtors, in their sole discretion, into one or more Stalking Horse Agreements is in the best interests of the Debtors' estates and creditors and will provide a clear benefit to the Debtors' estates and creditors.

4.    The Stalking Horse Protections and the Overbid Increments are fair, reasonable and appropriate and will provide a benefit to the Debtors' estates and creditors.

5.    Payment by the Debtors of any portion of the Stalking Horse Protections, under the conditions set forth in the Motion and in this Order, is (i) an actual and necessary cost of preserving the Debtors' estates, within the meaning of Bankruptcy Code section 503(b), (ii) of substantial benefit to the Debtors' estates and creditors and all parties in interest herein, (iii) a material inducement for the Stalking Horse Bidder(s) to expend considerable time and resources pursuing the purchase of the Assets, and (iv) reasonable and appropriate in view of the fact that, if the Stalking Horse Protections are triggered, the efforts of the Stalking Horse Bidder(s) will have improved the ability of the Debtors to receive the highest and otherwise best bid for the Assets.

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

6. The Sale Notice, substantially in the form attached to the Motion as **Exhibit B** and incorporated herein by reference as if fully set forth in this Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of the Assets, the Bidding Procedures, the Auction and the Sale Hearing, and no other or further notice is required.

7. The Cure Schedule, substantially in the form attached to the Motion as **Exhibit C** and incorporated herein by reference as if fully set forth in this Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the assumption and assignment of the Assigned Contracts and the Assigned Leases in connection with the sale of the Assets and the related Cure Amount (as defined below), and no other or further notice is required.

8. The Contract Assignment Notice, substantially in the form attached to the Motion as **Exhibit D** and incorporated herein by reference as if fully set forth in this Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the assumption and assignment of the Assigned Contracts and the Assigned Leases in connection with the sale of the Assets and the related Cure Amount, and no other or further notice is required

IT IS HEREBY ORDERED that:

1. The Motion is granted to the extent provided herein.

**A.    The Bidding Procedures**

2. The Bidding Procedures are approved. The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

3. As further described in the Bidding Procedures, any Potential Bidder wanting to participate in the Auction must become a Qualified Bidder by submitting a Qualified Bid in writing to Debtors, through their proposed counsel, Akin Gump Strauss Hauer & Feld LLP, Century Park East, Suite 2400, Los Angeles, California 90067 (Attn: David P. Simonds and Arun Kurichety), and Parker Schwartz, PLLC, 7310 N. 16th St., Suite 330, Phoenix, Arizona 85020 (Attn: Jared G. Parker), **so as to be <u>actually</u> <u>received</u> by the Debtors on or before October 7, 2013 at 5:00 p.m. (Pacific Time)** (the "***Bid Deadline***"), which deadline may be extended by the Debtors in consultation with the statutory

committee of unsecured creditors (the "***Creditors' Committee***") appointed in these chapter 11 cases, if any.[4]

4.     If two or more Qualified Bids are received on or before the Bid Deadline, the Debtors shall conduct the Auction on **October 9, 2013 at 10:00 a.m. (Pacific Time)**, at the offices of Akin Gump Strauss Hauer & Feld LLP, 2029 Century Park East, Suite 2400, Los Angeles, California 90067, or such other location as the Debtors may advise any parties entitled to attend the Auction upon two (2) business days' notice, to determine the Successful Bid(s).   The Auction may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Auction.   The Debtors shall have the right to cancel the Auction if two or more Qualified Bids are not received as of the Bid Deadline.

5.     The Sale Hearing shall be held on **October 10, 2013 at 10:00 a.m. (Mountain Standard Time)** at the United States Bankruptcy Court for the District of Arizona, 230 North First Avenue, [__] Floor, Courtroom [___], Phoenix, Arizona 85003, before the Honorable [_____], United States Bankruptcy Judge.   The Sale Hearing may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.

6.     The Successful Bidder(s) shall be required to consummate the purchase of the Assets by **11:59 p.m. (Mountain Standard Time) on October 11, 2013**, subject to extension by the Debtors in their discretion.

**B.     Purchase Agreement(s)**

7.     The Debtors are authorized, but not required, in consultation with the Creditors' Committee, if appointed, to enter into a Stalking Horse Agreement(s) with one or more Stalking Horse Bidders on or before September 30, 2013.   The Stalking Horse Agreement(s) shall be in such form and contain terms and provisions as the Debtors deem appropriate in their business judgment, subject to the limitations set forth in the Bidding Procedures regarding the Stalking Horse Protections.   In the event that the Debtors enter into one or more Stalking Horse Agreements, the Debtors shall (i) promptly file

---

[4] Until there is a Qualified Bid (as defined below) for the Assets that is greater than $2.5 million, Nissan North America, Inc. (the "***DIP Lender***") shall have the same consultation rights granted to the Creditors' Committee herein.

a notice with the Court that includes a copy of any such agreement, and (ii) provide a copy of such agreement to any Potential Bidder upon request.

8.      If the Debtors do not enter into one or more Stalking Horse Agreements, the Form APA, a copy of which is attached to the Motion as **Exhibit E**, is hereby approved.

### C.      Stalking Horse Protections

9.      The Break-Up Fee, the Expense Reimbursement, and the Overbid Increments are approved and the Debtors are authorized to pay the Break-Up Fee and the Expense Reimbursement pursuant to the terms of the Bidding Procedures and the applicable Stalking Horse Agreement(s).  For the avoidance of doubt, the Break-Up Fee and the Expense Reimbursement shall be payable solely from the proceeds of a consummated sale, and only after all outstanding obligations under the DIP Loan have been paid in full by the Debtors.

### D.      Credit Bid

10.     The DIP Lender is hereby deemed a Potential Bidder in all respects, and shall have the option to submit a credit bid for some or all of the Assets to the fullest extent permitted under Bankruptcy Code section 363(k) (the "*Credit Bid*").   In the event that the DIP Lender chooses to submit a Credit Bid as permitted by the Bidding Procedures, it shall be considered a Qualified Bidder in all respects and afforded all rights associated therewith.  The DIP Lender, as well as any transferee of the DIP Loan, shall have the option to submit a Credit Bid at any time prior to the conclusion of the Auction.

### E.      Sale Notice Procedures

11.     The Sale Notice is approved.  Within one (1) business day of entry of this Order, the Debtors shall serve the Sale Notice by first class mail on: (i) the U.S. Trustee; (ii) counsel for the Creditors' Committee, if any is appointed; (iii) all known creditors of the Debtors; (iv) any entity known or reasonably believed to have asserted a security interest in or lien against any of the Assets; (v) all counterparties to Assigned Contracts and Assigned Leases; (vi) any entity that has expressed a bona fide interest in acquiring the Assets; (vii) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (viii) the Securities and Exchange Commission; (ix) the DOE; (x) the DOL; (xi) the United States Department of Justice; (xii) the United States Attorney's

Office for the District of Arizona; (xiii) the Attorneys General in the States where the Assets are located; and (xiv) any party that has requested notice pursuant to Bankruptcy Rule 2002.

12.    Within three (3) business days of entry of this Order, the Debtors shall publish a notice, in a form to be submitted to the Court (the "**Publication Notice**"), in the *USA Today* or such other publication(s) as the Debtors and their advisors deem appropriate under the circumstances. Such publication notice shall be sufficient and proper notice to any other interested parties whose identities are unknown to the Debtors.

**F.    Assumption and Assignment Notice Procedures**

13.    The Assumption and Assignment Procedures, as set forth in the Motion and incorporated herein by reference as if fully set forth in this Order, are approved.

14.    The Cure Schedule is approved. By September 27, 2013, the Debtors shall file with the Court and serve the Cure Schedule via overnight delivery on the non-Debtor counterparties to each of the Potentially Assigned Contracts and Leases. The Cure Schedule shall indicate whether the Debtors' books and records show any amounts due under each of the Potentially Assigned Contracts and Leases that must be cured in accordance with Bankruptcy Code sections 365(b) and (f)(2) (the "**Cure Amount**") prior to the assumption and assignment of such Potentially Assigned Contracts and Leases. To the extent that any non-Debtor counterparty to any of the Potentially Assigned Contracts and Leases wishes to object or request adequate assurance of future performance, such party should do so in accordance with the procedures set forth below.[5]

15.    The Contract Assignment Notice is approved. No later than October 10, 2013, the Debtors shall file the Contract Assignment Notice with the Court and serve such Contract Assignment Notice via overnight delivery on the non-Debtor counterparties to such Assigned Contracts and Assigned Leases. The Contract Assignment Notice shall include (i) the title of the Assigned Contract or Assigned Lease to be assumed and assigned, (ii) the name of the non-Debtor counterparty to such

---

[5] For the avoidance of doubt, each of the Potentially Assigned Contracts and Leases included by the Debtors on the Cure Notice is included solely for purposes of providing notice that such Potentially Assigned Contracts and Leases may be assumed and assigned to the Successful Bidder(s). Inclusion of the Potentially Assigned Contracts and Leases on the Cure Notice will in no way bind the Debtors or the Successful Bidder(s) and all of the Debtors' rights to reject any of the Potentially Assigned Contracts and Leases are expressly reserved.

Assigned Contract or Assigned Lease, (iii) Cure Amounts, if any, (iv) the proposed effective date of the assignment, and (v) the identity of the Successful Bidder and a statement as to such Successful Bidder's ability to perform the Debtors' obligations under such Assigned Contract or Assigned Lease

16.     Any objection to the assumption and assignment of any Assigned Contract or Assigned Lease identified on the Cure Notice, including any objection to the Cure Amount set forth on the Cure Notice or to the ability of the Successful Bidder to provide adequate assurance of future performance under such Assigned Contract or Assigned Lease, must (i) be in writing, (ii) set forth the basis for the objection as well as any cure amount that the objector asserts to be due (in all cases with appropriate documentation in support thereof), and (iii) be filed with the Clerk of the Court, United States Bankruptcy Court for the District of Arizona, 230 North First Avenue, Suite 101, Phoenix, Arizona 85003 and be served on proposed counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, Century Park East, Suite 2400, Los Angeles, California 90067 (Attn: David P. Simonds and Arun Kurichety), and Parker Schwartz, PLLC, 7310 N. 16th St., Suite 330, Phoenix, Arizona 85020 (Attn: Jared G. Parker), **so as to be <u>actually</u> <u>received</u> no later than October 7, 2013 at 5:00 p.m. (Pacific Time)** (the "***Assignment and Cure Objection Deadline***").

17.     Any request for adequate assurance information regarding the Successful Bidder(s) (a "***Request for Adequate Assurance***") must be in writing and be served on proposed counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, Century Park East, Suite 2400, Los Angeles, California 90067 (Attn: David P. Simonds and Arun Kurichety), and Parker Schwartz, PLLC, 7310 N. 16th St., Suite 330, Phoenix, Arizona 85020 (Attn: Jared G. Parker), so as to be actually received no later than the Assignment and Cure Objection Deadline.  Requests for Adequate Assurance must include an email address, postal address and/or facsimile number to which a response to such request will be sent.  Upon receiving a Request for Adequate Assurance, the Debtors shall promptly after such request, but in no event later than one (1) business day after the Debtors' selection of the Successful Bid(s), provide such party with any non-confidential information reasonably related to adequate assurance by email, facsimile or overnight delivery.

18.     If no objection to the proposed assumption and assignment of an Assigned Contract or Assigned Lease is timely received by the Assignment and Cure Objection Deadline, then the

assumption and assignment is authorized and the respective Cure Amount set forth in the Cure Notice shall be binding upon the counterparty to the Assigned Contract or Assigned Lease for all purposes and will constitute a final determination of total Cure Amount required to be paid by the Debtors in connection with such assumption and assignment to the Successful Bidder.

19.     To the extent that any entity does not timely object as set forth above, such entity shall be (i) forever barred from objecting to assumption and assignment of the Assigned Contracts and Assigned Leases identified on the Cure Notice, including asserting any additional cure payments or requesting additional adequate assurance of future performance, (ii) deemed to have consented to the applicable Cure Amount, if any, and to the assumption and assignment of the applicable Assigned Contract or Assigned Lease, (iii) bound to such corresponding Cure Amount, if any, (iv) deemed to have agreed that the Successful Bidder has provided adequate assurance of future performance within the meaning of Bankruptcy Code section 365(b)(1)(C), (v) deemed to have agreed that all defaults under the applicable Assigned Contract or Assigned Lease arising or continuing prior to the effective date of the assignment have been cured as a result or precondition of the assignment, such that the Successful Bidder or the Debtors shall have no liability or obligation with respect to any default occurring or continuing prior to the assignment, and from and after the date of the assignment the applicable Assigned Contract or Assigned Lease shall remain in full force and effect for the benefit of the Successful Bidder and such entity in accordance with its terms, (vi) deemed to have waived any right to terminate the applicable Assigned Contract or Assigned Lease or designate an early termination date under the applicable Assigned Contract or Assigned Lease as a result of any default that occurred and/or was continuing prior to the assignment date, and (vii) deemed to have agreed that the terms of the Sale Order shall apply to the assumption and assignment of the applicable Assigned Contract or Assigned Lease.

20.     If no objection to the proposed assumption and assignment of an Assigned Contract or Assigned Lease is received by the Assignment and Cure Objection Deadline, counsel for the Debtors may submit to the Court a certificate of no objection and a form of order (a "**Certificate of No Objection**") granting such assumption and assignment, and serve such Certificate of No Objection on the counterparty to such Assigned Contract or Assigned Lease or seek such determination pursuant to

Case 2:13-bk-16126-RJH    Doc 11    Filed 09/17/13    Entered 09/17/13 02:44:22    Desc
Main Document        Page 44 of 104

the Sale Order.

21.     If an objection is timely received and such objection cannot otherwise be resolved by the parties, the Court may hear such objection at the Sale Hearing or any later date set by the Court.[6] The pendency of a dispute relating to the Cure Amount will not prevent or delay the assumption and assignment of any Assigned Contract or Assigned Lease.  If an objection is filed only with respect to the cure amount listed on the Cure Notice, the Debtors may file a Certificate of No Objection as to assumption and assignment only and the dispute with respect to the cure amount will be resolved consensually, if possible, or, if the parties are unable to resolve their dispute, before the Court.  The Debtors intend to cooperate with the counterparties to the Assigned Contracts and Assigned Leases to be assumed and assigned by the Debtors to attempt to reconcile any difference in a particular Cure Amount.

**G.     Objection Procedures**

22.     All other objections to approval of the sale of the Assets to the Successful Bidder(s) shall must (i) be in writing; (ii) state with particularity the basis for the objection; and (iii) be filed with the Clerk of the Court, United States Bankruptcy Court for the District of Arizona, 230 North First Avenue, Suite 101, Phoenix, Arizona 85003 and be served on proposed counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, Century Park East, Suite 2400, Los Angeles, California 90067 (Attn: David P. Simonds and Arun Kurichety), and Parker Schwartz, PLLC, 7310 N. 16th St., Suite 330, Phoenix, Arizona 85020 (Attn: Jared G. Parker), **so as to be <u>actually</u> <u>received</u> no later than October 7, 2013 at 5:00 p.m. (Pacific Time)** (the "*Objection Deadline*").

23.     Failure of any entity to file an objection on or before the Objection Deadline shall be deemed to constitute consent to the sale of the Assets to the Successful Bidder(s) and other relief requested in the Sale Motion, and be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Motion, the Auction, the sale of the Assets, the assumption and assignment of Assigned Contracts and Assigned Leases to the Successful Bidder(s), or the Debtors' consummation

---

[6] To the extent that any non-Debtor counterparty objects to the assumption and assignment of an Assigned Contract or Assigned Lease, the Debtors reserve all rights, in consultation with the Successful Bidder(s), to reject such Assigned Contract or Assigned Lease, regardless of its prior designation as an Assigned Contract or Assigned Lease.

and performance of the terms of the asset purchase agreement entered into with the Successful Bidder(s), if authorized by the Court.

### H. Department of Energy

24. **DOE Interests**. The provisions of this section shall apply notwithstanding any other provision of this Order and the Bidding Procedures approved therein. The Debtors are recipients or sub-recipients of certain financial assistance agreements from the United States (collectively, the "*Assistance Agreements*"), including without limitation: agreements numbered DE-EE0002194 and DE-EE0005501. Any real property, equipment or intellectual property acquired or developed by the Debtors using, in whole or in part, funds reimbursed under the Assistance Agreements (Government Funded Property) are subject to the United States' interests under federal law and regulations, including its interests as described in 10 C.F.R. §§ 600.321 and 600.325, the Bayh-Dole Act (35 U.S.C. 200 *et seq*.), and the "Patent Rights" provisions included in the Assistance Agreements pursuant to these regulatory and statutory authorities.

25. **Novation Requirements**. Any Stalking Horse Agreement(s) and Qualified Bid(s) must identify which, if any, of the Assistance Agreements for which the bidder(s) intend to seek a novation. The United States asserts that (i) if bidder(s), including the stalking horse bidder, intend to seek novation, the Purchased Assets listed must include the Debtors' interests in any Government Funded Property and any other assets or property necessary to perform the corresponding Assistance Agreement for which the bidder(s) intend to seek novation; (ii) in order to succeed to any of the Debtors' interests in continuing to perform the Assistance Agreements and thus to have potential access to any remaining funds still reimbursable under the Assistance Agreements, the proposed purchaser, upon approval of the sale by the Court, must obtain novation of the Assistance Agreements from the United States; and (iii) the United States maintains all discretion in determining whether to grant or deny a novation of any Assistance Agreement in accordance with federal law. The Debtors reserve all rights with respect to the foregoing assertions. The novation process is independent of the bidding process described in the Bidding Procedures, and will only formally commence following the Court's approval of any sale of all assets necessary to perform the project described in the Assistant Agreement(s) for which novation is sought.

26. **Consent Requirement**. The United States asserts that no Assistance Agreement, or any other agreement between any of the Debtors and the United States, may be assumed and/or assigned by the Debtors without consent of the United States. The Debtors reserve all rights with respect to the foregoing assertion.

27. **Intellectual Property Rights**. Any intellectual property developed by Debtors under other financial assistance agreements with the United States, or any intellectual property developed under other financial assistance agreements acquired by Debtors from third parties is subject to the any interest of the United States' under federal law and regulations. The "Patent Rights" provisions generally provide, among other terms, that Debtors may retain the entire right, title, and interest to each invention conceived or first actually reduced to practice in the performance of work under the corresponding Assistance Agreement but that the United States will retain a nonexclusive, nontransferable, irrevocable, paid-up license to practice or have practiced for or on behalf of the United States the subject invention.

### I. Related Relief

28. All objections to entry of this Order that have not been withdrawn, waived, or settled as announced to the Court at the Bidding Procedures Hearing or by stipulation filed with the Court, and all reservations of rights included in such objections, are overruled except as otherwise set forth herein.

29. Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6004(d) 6006(g), 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry. The Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

30. To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in these cases, the terms of this Order shall govern.

31. This Court shall retain jurisdiction with respect to all matters related to or arising from the implementation or interpretation of this Order

### ** DATED AND SIGNED ABOVE **

## <u>Exhibit 1</u>

**Bidding Procedures**

# BIDDING PROCEDURES

Set forth below are the bidding procedures (the "***Bidding Procedures***") to be employed in connection with the sale of the Assets (as defined below) of ECOtality, Inc. and certain of its affiliates that are debtors and debtors in possession (collectively, the "***Debtors***") in the jointly administered cases under title 11 of the United States Code (the "***Bankruptcy Code***") pending in the United States Bankruptcy Court for the District of Arizona (the "***Court***") (Case No. 2:13-BK-16126 (RJH)). Pursuant to the Bidding Procedures, the Debtors shall solicit bids for the purchase of the Assets, conduct an auction for the Assets (the "***Auction***") if the Debtors receive two or more Qualified Bids (as defined below), and thereafter seek entry of an order (the "***Sale Order***"), after notice and a hearing (the "***Sale Hearing***"), authorizing and approving the sale of the Assets to the Successful Bidder(s) (as defined below).

On September 15, 2013, the Debtors filed with the Court the *Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets (B) Scheduling Sale Hearing, (C) Approving the Form and Manner of the Sale, Auction, and Sale Hearing, and (D) Granting Related Relief, and (II) An Order Approving the Sale of Substantially All of the Debtors' Assets* (the "***Motion***").[1] On September [__], 2013, the Court entered an order approving the Bidding Procedures and scheduling **October 10, 2013 at 10:00 a.m. (Mountain Standard Time)** as the date and time that the Sale Hearing will be held.

---

### Important Dates

- **September 27, 2013:** Debtors to file and serve Cure Schedule

- **September 30, 2013 (5:00 p.m. Pacific Time):** Deadline to enter Stalking Horse Agreement(s)

- **October 7, 2013 (5:00 p.m. Pacific Time):** Deadline to submit a Qualified Bid

- **October 7, 2013 (5:00 p.m. Pacific Time):** Deadline to object to assignment of Assigned Contracts and Assigned Leases

- **October 7, 2013:** Deadline to file and serve objections to relief requested at the Sale Hearing

- **October 9, 2013 (10:00 a.m. Pacific Time):** Date of Auction

- **October 10, 2013:** Announcement by Debtors of Successful Bidder(s) and Back-Up Bid

- **October 10, 2013:** Deadline for Debtors to file and serve the Contract Assignment Notice

- **October 10, 2013 (10:00 a.m. Mountain Standard Time):** Date of Sale Hearing

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

- **October 11, 2013 (11:59 p.m. Mountain Standard Time):** Deadline to consummate sale to Successful Bidder(s)

## A. <u>Assets to be Sold</u>

The Debtors seek to sell substantially all of their assets, including all equipment, machinery, inventory, supplies, real property, software, intellectual property, cash, and accounts receivable (such assets, the "*Assets*"). Except as otherwise provided in definitive documentation with respect to any sale of the Assets, all of the Debtors' right, title, and interest in and to the Assets shall be sold free and clear of all liens, claims, encumbrances, rights, remedies, restrictions, pledges, interests, liabilities, charges, options, and contractual commitments of any kind or nature whatsoever, whether arising before or after the date that the Debtors commenced these chapter 11 cases, whether at law or in equity, in accordance with Bankruptcy Code section 363.[2]

## B. <u>Due Diligence</u>

Upon request, the Debtors will provide any interested party with a copy of these Bidding Procedures, together with a copy of the Stalking Horse Agreement(s) (or the Form APA (as defined below), if no Stalking Horse Bidder(s) is selected) (each, as defined below). Should any interested party desire additional or further information, such interested party will be required to execute a confidentiality agreement (each a "*Confidentiality Agreement*") in form and substance satisfactory to the Debtors in their business judgment and on terms that are not more favorable to such interested party than the Confidentiality Agreement executed by the Stalking Horse Bidder(s), if any. Upon execution of such Confidentiality Agreement, the respective interested party will be deemed a "*Potential Bidder*" and will thereafter be afforded the opportunity to conduct a due diligence investigation with respect to the Assets in the manner determined by the Debtors, in their business judgment, to be reasonable and appropriate.

Potential Bidders will be given access (through a virtual data room, site inspections or otherwise) to various financial data and other relevant and confidential information. The Debtors will designate an employee or other representative to coordinate all requests for additional information or access from Potential Bidders. The Debtors may, in their business judgment, coordinate due diligence investigations such that multiple Potential Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. The Debtors shall not be obligated to furnish access to any such information to any entity that does not execute a Confidentiality Agreement in form and substance satisfactory to the Debtors in their business judgment. The Debtors shall not be obligated to furnish access to any information of any kind whatsoever regarding the Assets after the Bid Deadline (as defined below).

---

[2] Although the Debtors do not have any significant secured debt obligations, the DOE (as defined below) may assert interests in, or with respect to, certain of the Debtors' assets. The Debtors reserve their rights regarding the character, validity, extent, avoidability, and enforceability of any such interests.

In addition, in order to facilitate the preparation and submission of bids for the Assets, the Debtors will file any Stalking Horse Agreement(s) (or the Form APA, if no Stalking Horse Bidder is selected), and a form Sale Order, with the Court on or before **September 30, 2013**. Upon request, the Debtors will provide copies of such documents to any Potential Bidder. The use of uniform agreements will enable the Debtors and other parties in interest to easily compare and contrast the differing terms of any bids that may be received. The Debtors have the right not to consider any bid that does not conform to the form agreements. The Debtors shall provide an opportunity, on expedited basis, for a dialogue between Potential Bidder(s) and the DOE to the extent that either the Debtor, the DIP Lender (as defined below), or the Potential Bidder(s) at issue determines that such dialogue is beneficial.

## C.     Bid Deadline

Any Potential Bidder wanting to participate in the Auction must become a Qualified Bidder (as defined below) by submitting a Qualified Bid (as defined below) in writing to (i) Akin Gump Strauss Hauer & Feld LLP, Century Park East, Suite 2400, Los Angeles, California 90067 (Attn: David P. Simonds and Arun Kurichety), and Parker Schwartz, PLLC, 7310 N. 16th St., Suite 330, Phoenix, Arizona 85020 (Attn: Jared G. Parker), **so as to be actually received by the Debtors on or before October 7, 2013 at 5:00 p.m. (Pacific Time)** (the "*Bid Deadline*"), which deadline may be extended by the Debtors in consultation with the statutory committee of unsecured creditors (the "*Creditors' Committee*")[3] appointed in these chapter 11 cases, if any. No bids submitted after the Bid Deadline shall be considered by the Debtors, unless the Debtors, in their business judgment and in consultation with the Creditors' Committee, if appointed, determine that consideration of such a bid is appropriate under the circumstances.

## D.     Bid Requirements

Only bids for the Assets that constitute "Qualified Bids" will be considered by the Debtors. A "*Qualified Bid*" is an offer to purchase the Assets that, prior to the Bid Deadline:

(i)     identifies in writing the Assets to be purchased and the consideration to be paid for such Assets;

(ii)     identifies in writing any proposed revisions to the Stalking Horse Agreement(s), if any, or the form of asset purchase agreement provided by the Debtors (the "*Form APA*");

(iii)     identifies in writing the Potential Bidder and the officer(s) or authorized agent(s) who will appear on behalf of such Potential Bidder at the Auction, if any;

---

[3] Until there is a Qualified Bid (as defined below) for the Assets that is greater than $2.5 million, Nissan North America, Inc. (the "*DIP Lender*") shall have the same consultation rights granted to the Creditors' Committee herein.

(iv)        provides written and other evidence, satisfactory to the Debtors, in their business judgment, in consultation with the Creditors' Committee, if appointed, of the Potential Bidder's financial wherewithal and operational ability to consummate the proposed transaction by no later than October 11, 2013;

(v)         provides in writing that such offer is not subject to any due diligence or financing contingency or further board or similar approval;

(vi)        is accompanied by a good faith deposit (a "***Good Faith Deposit***") submitted to the Debtors on or before the Bid Deadline in a cash amount equal to not less than five percent (5%) of the proposed purchase price;

(vii)       identifies in writing any Assigned Contracts or Assigned Leases to be assumed and assigned in connection with the proposed purchase of the Assets, and provides evidence of the Potential Bidder's ability to provide adequate assurance of future performance (as provided for under Bankruptcy Code section 365) under such Assigned Contracts and Assigned Leases;

(viii)      provides in writing that each offer is irrevocable until the later of (a) consummation of a transaction involving any other Potential Bidder for the same Assets, and (b) the first business day that is thirty (30) days after the conclusion of the Sale Hearing;

(ix)        includes a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to submit an offer to purchase the Assets specified on the terms proposed by such Potential Bidder;

(x)         complies with all requirements of the Novation Requirements section in the Bid Procedures Order; and

(xi)        contains the form of Sale Order approving the proposed transaction that the Potential Bidder would request the Debtors to submit to the Court.

As soon as practicable after a Potential Bidder submits a bid, the Debtors, in consultation with the Creditors' Committee, if appointed, will determine whether such bid is a Qualified Bid and will notify such Potential Bidder of such determination. The Debtors may, in their business judgment, communicate with any Potential Bidder and may request any additional information reasonably required in connection with the evaluation of such Potential Bidder or bid submitted by such Potential Bidder. To the extent that the Debtors determine that a bid submitted by a Potential Bidder is a Qualified Bid, such Potential Bidder shall then be deemed a "***Qualified Bidder***" and be allowed to participate in the Auction in all respects. The Debtors reserve the right, in their business judgment, to consider bids for the Assets that do not conform to one or more of the aforementioned requirements, and, in consultation with the Creditors' Committee, if appointed, may deem such bids to be Qualified Bids notwithstanding such requirements. The Debtors also may consider bids that call for the purchase of the Assets on a piecemeal basis, as well as bids for substantially all of the Assets, if the Debtors, in their business

judgment and in consultation with the Creditors' Committee, if appointed, believe that such bids will result in a value maximizing transaction. As promptly as practical under the circumstances following a determination that a Qualified Bidder has submitted a Qualified Bid, the Debtors shall forward any such Qualified Bid to the DOE, or in the event that there are no Qualified Bids, inform the DOE that there are no Qualified Bids.

### E. Stalking Horse Bid

If the Debtors receive one or more Qualified Bids on or before **September 30, 2013 at 5:00 p.m. (Pacific Time)**, the Debtors, in consultation with the Creditors' Committee, if appointed, may, but shall not be required to, enter into a "stalking horse" agreements (the "***Stalking Horse Agreement(s)***") with one or more Qualified Bidders (the "***Stalking Horse Bidder(s)***") for the purpose of establishing a minimum acceptable bid(s) for the assets subject to the Stalking Horse Agreement(s) (the "***Stalking Horse Bid(s)***"). The Stalking Horse Agreement(s) shall be in such form and contain terms and provisions as the Debtors deem appropriate in their business judgment, subject to the limitations set forth in the Bidding Procedures regarding the Stalking Horse Protections (as defined below). Any Stalking Horse Bid shall be deemed a Qualified Bid for purposes of these Bidding Procedures. In the event that the Debtors enter into a Stalking Horse Agreement, the Debtors shall (i) promptly file a notice with the Court that includes a copy of any such agreement, and (ii) provide a copy of such agreement to any Potential Bidder upon request.

### F. Stalking Horse Protections

1.    Break-Up Fee

The Debtors may, in their business judgment, provide the Stalking Horse Bidder(s) with a fee of up to two percent (2%) of the guaranteed cash purchase price proposed in the Stalking Horse Bid (the "***Break-Up Fee***"); *provided*, that such Stalking Horse Bidder is not in breach under the Stalking Horse Agreement or has not previously terminated such agreement. The Break-Up Fee will be payable to a Stalking Horse Bidder only if the Debtors, at the Auction, select as the Successful Bid(s) a Qualified Bid by a Qualified Bidder that is not the Stalking Horse Bidder for the sale of Assets that are substantially all of the Assets subject of the Stalking Horse Agreement and consummate the sale to such Successful Bidder(s) following approval by the Court at the Sale Hearing. Further, the Break-Up Fee shall be payable solely from the proceeds of a consummated sale, and only after all outstanding obligations under the Debtors' debtor in possession financing facility (the "***DIP Loan***") have been paid in full by the Debtors.

2.    Expense Reimbursement

The Debtors may, in their business judgment, reimburse the Stalking Horse Bidder(s) for all reasonable and actual costs and expenses, in an amount up to $25,000, that were incurred by each Stalking Horse Bidder in connection with its bid (the "***Expense Reimbursement***," and together with the Break-Up Fee, the "***Stalking Horse Protections***"); *provided*, that such Stalking Horse Bidder is not in breach under the Stalking Horse Agreement or has not previously terminated such agreement. The Expense Reimbursement will be payable to a Stalking Horse Bidder (i) only if the Debtors, at the Auction, select as the Successful Bid(s) a Qualified Bid by a

Qualified Bidder that is not the Stalking Horse Bidder for the sale of Assets that are substantially all of the Assets subject of the Stalking Horse Agreement and consummate the sale to such Successful Bidder(s) following approval by the Court at the Sale Hearing, or (ii) if the Debtors are unable to consummate the sale of the Assets pursuant to the Stalking Horse Agreement for any reason other than breach or termination by the Stalking Horse Bidder. Further, the Expense Reimbursement shall be payable solely from the proceeds of a consummated sale, and only after all outstanding obligations under the Debtors' DIP Loan have been paid in full by the Debtors.

### G. Credit Bid

The DIP Lender shall be deemed a Potential Bidder in all respects, and shall have the option to submit a credit bid for some or all of the Assets to the fullest extent permitted under Bankruptcy Code section 363(k) (the "*Credit Bid*"). In the event that the DIP Lender chooses to submit a Credit Bid as permitted by these Bidding Procedures, it shall be considered a Qualified Bidder in all respects and afforded all rights associated therewith. Notwithstanding the Bid Deadline, the DIP Lender, as well as any transferee of the DIP Loan, shall have the option to submit a Credit Bid at any time prior to the conclusion of the Auction.

### H. Auction

If two or more Qualified Bids are received on or before the Bid Deadline, the Debtors shall conduct the Auction commencing on **October 9, 2013 at 10:00 a.m. (Pacific Time)**, at the offices of Akin Gump Strauss Hauer & Feld LLP, 2029 Century Park East, Suite 2400, Los Angeles, California 90067, or such other location as the Debtors may advise any parties entitled to attend the Auction upon two (2) business days' notice, to determine the highest or otherwise best bid(s) for the Assets (the "*Successful Bid(s)*"). The Auction may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Auction. The Debtors reserve the right to cancel the Auction if two or more Qualified Bids are not received as of the Bid Deadline.

### I. Auction Procedures

Only an entity that has submitted a Qualified Bid (a "*Qualified Bidder*"), the United States Department of Energy (the "*DOE*"), the Office of the United States Trustee for the District of Arizona (the "*U.S. Trustee*"), the Creditors' Committee, if appointed, and each such entity's respective preferred advisors are eligible to participate in the Auction. All participants shall appear in person or through a duly authorized representative. Prior to the Auction, the Debtors, in consultation with the Creditors' Committee, if appointed, shall select the Qualified Bid that, in their business judgment, reflects the highest or otherwise best bid for the Assets as the starting bid (the "*Starting Auction Bid*"), and shall advise all participants in the Auction of the terms of the Starting Auction Bid. In the event that the only bids received by the Debtors are for certain of the Assets, the Debtors reserve the right, in consultation with the Creditors' Committee, if appointed, to designate any such Qualified Bids as the starting Auction Bids. Qualified Bidders may then submit bids that are better and higher than the Starting Auction Bid in an initial increment amount equal to the amount of any Stalking Horse Protections plus $250,000 and subsequent increments of at least $100,000 (collectively, the "*Overbid*

*Increments*").  The Debtors shall determine whether any Qualified Bid is the Successful Bid pursuant to the "Determination of Successful Bid" section below.

### J.      Determination of Successful Bid and Notice Thereof

On or before October 10, 2013, the Debtors, in consultation with the Creditors' Committee, if appointed, shall review each Qualified Bid that has been submitted and determine, in the Debtors' business judgment and in consultation with the Creditors' Committee, if appointed, which Qualified Bid(s) is the highest and best and, therefore, the Successful Bid(s). In making such determination, the Debtors, in consultation with the Creditors' Committee, if appointed, shall consider any factor that they deem relevant, including the purchase price, the payment of any Break-Up Fee or Expense Reimbursement, any benefit to the Debtors' estates from any proposal to assume liabilities of the Debtors, and those factors affecting the speed and certainty of consummating the sale of the Assets.  The presentation of the Successful Bid(s) to the Court for approval does not constitute the Debtors' acceptance of such bid(s).  The Debtors will be deemed to have accepted the Successful Bid(s) only when such bid(s) has been approved by the Court pursuant to a Sale Order and the sale of the Assets proposed in such bid has been consummated.

As soon as practicable following the determination of the Successful Bid(s), but no later than October 10, 2013, the Debtors shall file a notice with the Court identifying the Qualified Bidder(s) that submitted the Successful Bid(s) (the "*Successful Bidder(s)*") and serve such notice by telecopy, electronic mail transmission, or overnight delivery, upon the following entities:  (i) the U.S. Trustee; (ii) the DOE; (iii) the United States Department of Labor (the "*DOL*"); (iv) counsel to the Creditors' Committee, if appointed; (v) the parties listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims; (vi) all Qualified Bidders that have submitted a Qualified Bid; (vii) all non-Debtor counterparties to the Assigned Contracts and Assigned Leases proposed to be assumed and assigned under the Successful Bid(s); and (viii) any party that has requested notice pursuant to Bankruptcy Rule 2002.

The Debtors may adjourn, continue, re-open, or terminate the Auction, subject to any required approval of the Court, and reserve the right to adopt other and further rules and procedures for the Auction that, in their business judgment and in consultation with the Creditors' Committee, if appointed, will better promote the goals of the Auction.

### K.      Back-Up Bid

The Successful Bidder(s) shall be required to consummate the purchase of the Assets by **11:59 p.m (Mountain Standard Time on October 11, 2013**, subject to extension by the Debtors in their business judgment.  If the Successful Bidder(s) fails to timely consummate the purchase of the Assets, or any part thereof, then the next highest or otherwise best Qualified Bid (if any) (the "*Back-up Bid*") may be designated by the Debtors, in consultation with the Creditors' Committee, if appointed, as the Successful Bid, and the Debtors shall be authorized, but not required, to consummate the sale of the Assets to the Qualified Bidder that submitted the Back-Up Bid pursuant to the terms of such Back-Up Bid as soon as is commercially reasonable.  If the Successful Bidder(s) fails to consummate the purchase of the Assets because of a breach, default

or failure to perform on the part of such Successful Bidder(s), the Debtors reserve the right to seek all available damages from such Successful Bidder(s).

## L.    Reservation of Rights

### 1.    Determination of Successful Bid

The Debtors reserve the right to (i) determine in their business judgment, in consultation with the Creditors' Committee, if appointed, whether any Qualified Bid is a Successful Bid, and (ii) reject, at any time prior to entry of the Sale Order by the Court, without liability, any bid that the Debtors, in their business judgment and in consultation with the Creditors' Committee, if appointed, determine to be (a) inadequate or insufficient, (b) not in conformity with the Bidding Procedures, the Bankruptcy Code, or the Federal Rules of Bankruptcy Procedure, or (c) contrary to the best interests of the Debtors and their estates.

At or before the Sale Hearing, the Debtors may impose such other terms and conditions on the sale of the Assets as the Debtors, in consultation with the Creditors' Committee, if appointed, may determine to be in the best interests of the Debtors and their estates.

### 2.    Modification of Bidding Procedures

The Debtors reserve the right to modify the Bidding Procedures, in consultation with the Creditors' Committee, if appointed, without the need for any further order of the Court, including by (i) extending the deadlines set forth in the Bidding Procedures, (ii) adjourning the Auction and the Sale Hearing, and (iii) withdrawing any Assets from the sale process at any time prior to or during the Auction.

## M.    Disposition of Good Faith Deposits

All Good Faith Deposits shall be held in a separate non-interest-bearing escrow account for the benefit of the Debtors.  As soon as practicable following the consummation of the sale of the Assets, any Good Faith Deposit received from a Qualified Bidder who is not determined to be the Successful Bidder shall be released from escrow and returned to such Qualified Bidder.  If the Successful Bidder fails to consummate the purchase of the Assets, or any part thereof, because of a breach, default, or failure to perform on the part of such Successful Bidder, the Debtors will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become property of the Debtors without affecting or reducing any of the Debtors' other rights or claims against such Successful Bidder.  If a Successful Bidder fails to consummate the purchase of the Assets, or any part thereof, because of a breach, default, or failure to perform on the part of the Debtors, the Good Faith Deposit deposited by such Successful Bidder shall be returned to such Successful Bidder.  If a Successful Bidder consummates the purchase of the Assets, the Good Faith Deposit deposited by such Successful Bidder shall be applied as a credit toward the purchase price paid by such Successful Bidder.

### N.   As Is, Where Is

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their estates, or their agents or representatives.   Except as otherwise expressly provided in these Bidding Procedures, any applicable Stalking Horse Agreement, or any applicable Asset Purchase Agreement, by submitting a bid, each Potential Bidder that submits a bid shall be deemed to acknowledge and represent that it (i) has had an opportunity to conduct any and all reasonable due diligence regarding the Assets prior to making its bid, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith.

### O.   Assigned Contracts and Assigned Leases

By September 27 2013, the Debtors will file with the Court a schedule, substantially in the form attached to the Motion as **Exhibit C**, (the "*Cure Schedule*") of each of the executory contracts and unexpired leases that may be assumed and assigned to the Successful Bidder(s) (the "*Potentially Assigned Contracts and Leases*").  The Cure Schedule, which will be served via overnight delivery on the non-Debtor counterparties to each of the Potentially Assigned Contracts and Leases, will indicate whether the Debtors' books and records show any amounts due under each of the Potentially Assigned Contracts and Leases that must be cured in accordance with Bankruptcy Code sections 365(b) and (f)(2) (the "*Cure Amount*") prior to the assumption and assignment of such Potentially Assigned Contracts and Leases.  To the extent that any non-Debtor counterparty to any of the Potentially Assigned Contracts and Leases wishes to object or request adequate assurance of future performance, such party should do so in accordance with the procedures set forth below.[4]

As soon as practicable after selecting the Successful Bidder(s), such Successful Bidder(s) shall submit a schedule of the Potentially Assumed Contracts and Leases that it wishes to be Assigned Contracts and Assigned Leases.  However, by no later than October 10, 2013, the Debtors will file a notice, substantially in the form attached to the Motion as **Exhibit D** (the "*Contract Assignment Notice*"), with the Court and serve such Contract Assignment Notice via overnight delivery on the non-Debtor counterparties to such Assigned Contracts and Assigned Leases.  The Contract Assignment Notice will include (i) the title of the Assigned Contract or Assigned Lease to be assumed and assigned, (ii) the name of the non-Debtor counterparty to such Assigned Contract or Assigned Lease, (iii) Cure Amounts, if any, (iv) the proposed effective date of the assignment, and (v) the identity of the Successful Bidder and a statement as

---

[4] For the avoidance of doubt, each of the Potentially Assigned Contracts and Leases included on the Cure Schedule are included solely for purposes of providing notice that such Potentially Assigned Contracts and Leases may be assumed and assigned to the Successful Bidder(s).  Inclusion of the Potentially Assigned Contracts and Leases on the Cure Schedule will in no way bind the Debtors or the Successful Bidder(s) and all rights to reject any of the Potentially Assigned Contracts and Leases are expressly reserved.

to such Successful Bidder's ability to perform the Debtors' obligations under such Assigned Contract or Assigned Lease.

Any objection to the assumption and assignment of any Assigned Contract or Assigned Lease identified on the Cure Schedule, including any objection to the Cure Amount set forth on the Cure Schedule or to the ability of the Successful Bidder to provide adequate assurance of future performance under such Assigned Contract or Assigned Lease, must (i) be in writing, (ii) set forth the basis for the objection as well as any cure amount that the objector asserts to be due (in all cases with appropriate documentation in support thereof), and (iii) be filed with the Clerk of the Court, United States Bankruptcy Court for the District of Arizona, 230 North First Avenue, Suite 101, Phoenix, Arizona 85003 and be served on proposed counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, Century Park East, Suite 2400, Los Angeles, California 90067 (Attn: David P. Simonds and Arun Kurichety), and Parker Schwartz, PLLC, 7310 N. 16th St., Suite 330, Phoenix, Arizona 85020 (Attn: Jared G. Parker), so as to be actually received no later than **October 7, 2013 at 5:00 p.m. (Pacific Time)** (the "***Assignment and Cure Objection Deadline***").

Any request for adequate assurance information regarding the Successful Bidder(s) (a "***Request for Adequate Assurance***") must be in writing and be served on proposed counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, Century Park East, Suite 2400, Los Angeles, California 90067 (Attn: David P. Simonds and Arun Kurichety), and Parker Schwartz, PLLC, 7310 N. 16th St., Suite 330, Phoenix, Arizona 85020 (Attn: Jared G. Parker), so as to be actually received no later than the Assignment and Cure Objection Deadline. Requests for Adequate Assurance must include an email address, postal address and/or facsimile number to which a response to such request will be sent. Upon receiving a Request for Adequate Assurance, the Debtors shall promptly after such request, but in no event later than one (1) business day after the Debtors' selection of the Successful Bid(s), provide such party with any non-confidential information reasonably related to adequate assurance by email, facsimile, or overnight delivery.

If no objection to the proposed assumption and assignment of an Assigned Contract or Assigned Lease is timely received by the Assignment and Cure Objection Deadline, then the assumption and assignment is authorized and the respective Cure Amount set forth in the Cure Schedule shall be binding upon the counterparty to the Assigned Contract or Assigned Lease for all purposes and will constitute a final determination of total Cure Amount required to be paid by the Debtors in connection with such assumption and assignment to the Successful Bidder.

To the extent that any entity does not timely object as set forth above, such entity shall be (i) forever barred from objecting to assumption and assignment of the Assigned Contracts and Assigned Leases identified on the Cure Schedule, including asserting any additional cure payments or requesting additional adequate assurance of future performance, (ii) deemed to have consented to the applicable Cure Amount, if any, and to the assumption and assignment of the applicable Assigned Contract or Assigned Lease, (iii) bound to such corresponding Cure Amount, if any, (iv) deemed to have agreed that the Successful Bidder has provided adequate assurance of future performance within the meaning of Bankruptcy Code section 365(b)(1)(C), (v) deemed to have agreed that all defaults under the applicable Assigned Contract or Assigned Lease arising or continuing prior to the effective date of the assignment have been cured as a

10

result or precondition of the assignment, such that the Successful Bidder or the Debtors shall have no liability or obligation with respect to any default occurring or continuing prior to the assignment, and from and after the date of the assignment the applicable Assigned Contract or Assigned Lease shall remain in full force and effect for the benefit of the Successful Bidder and such entity in accordance with its terms, (vi) deemed to have waived any right to terminate the applicable Assigned Contract or Assigned Lease or designate an early termination date under the applicable Assigned Contract or Assigned Lease as a result of any default that occurred and/or was continuing prior to the assignment date, and (vii) deemed to have agreed that the terms of the Sale Order shall apply to the assumption and assignment of the applicable Assigned Contract or Assigned Lease.

If no objection to the proposed assumption and assignment of an Assigned Contract or Assigned Lease is received by the Assignment and Cure Objection Deadline, counsel for the Debtors may submit to the Court a certificate of no objection and a form of order (a "***Certificate of No Objection***") granting such assumption and assignment, and serve such Certificate of No Objection on the counterparty to such Assigned Contract or Assigned Lease.

If an objection is timely received and such objection cannot otherwise be resolved by the parties, the Court may hear such objection at the Sale Hearing or any later date set by the Court.[5] The pendency of a dispute relating to the Cure Amount will not prevent or delay the assumption and assignment of any Assigned Contract or Assigned Lease. If an objection is filed only with respect to the cure amount listed on the Cure Schedule, the Debtors may file a Certificate of No Objection as to assumption and assignment only and the dispute with respect to the cure amount will be resolved consensually, if possible, or, if the parties are unable to resolve their dispute, before the Court. The Debtors intend to cooperate with the counterparties to the Assigned Contracts and Assigned Leases to be assumed and assigned by the Debtors to attempt to reconcile any difference in a particular Cure Amount.

## P.    Sale Hearing

The sale of the Assets and the Stalking Horse Agreement (or a modified APA related to the Successful Bid(s)) shall be presented for authorization and approval by the Court at the Sale Hearing, which is scheduled to be held on **October 10, 2013 at 10:00 a.m. (Mountain Standard Time)** at the United States Bankruptcy Court for the District of Arizona, 230 North First Avenue, [__] Floor, Courtroom [____], Phoenix, Arizona 85003, before the Honorable [_____], United States Bankruptcy Judge. The Sale Hearing may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.

---

[5] To the extent that any non-Debtor counterparty objects to the assumption and assignment of an Assigned Contract or Assigned Lease, the Debtors reserve all rights, in consultation with the Successful Bidder(s), to reject such Assigned Contract or Assigned Lease, regardless of its prior designation as an Assigned Contract or Assigned Lease.

**Q.**     **Jurisdiction**

The Court shall retain exclusive jurisdiction over any matter or dispute relating to the sale of the Assets, the Bidding Procedures, Stalking Horse Agreement(s), if any, any applicable asset purchase agreement, and any other matter that in any way relates to the foregoing.  All entities that submit a bid for the purchase of the Assets shall be deemed to have consented to the core jurisdiction of, and venue in, the Court and to have waived any right to a jury trial in connection with any disputes relating to the sale of the Assets, the Bidding Procedures, Stalking Horse Agreements, any applicable Asset Purchase Agreement, and any other matter that in any way relates to the foregoing.

**Exhibit B**

**Sale Notice**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CHARLES R. GIBBS (*pro hac vice* admission pending)
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

DAVID P. SIMONDS (*pro hac vice* admission pending)
ARUN KURICHETY (*pro hac vice* admission pending)
AKIN GUMP STRAUSS HAUER & FELD LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (310) 229-1000
Facsimile: (310) 229-1001

– and –

JARED G. PARKER (SBN: 6428)
PARKER SCHWARTZ, PLLC
7310 N. 16th St., Suite 330
Phoenix, Arizona 85020
Telephone: (602) 282-0476
Facsimile: (602) 282-0478

[Proposed] Attorneys for Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Case No. 2:13-BK-16126 (RJH) |
| ELECTRIC TRANSPORTATION ENGINEERING CORPORATION (d/b/a ECOTALITY NORTH AMERICA), *et al.*,[1] | Chapter 11<br><br>Jointly Administered |
| Debtors. | **NOTICE OF BID DEADLINE, AUCTION, AND SALE HEARING IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES** |
| This filing applies to:<br><br>■ All Debtors<br><br>☐ Specified Debtors | Hearing Date: _____, 2013<br>Time: _____ |

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.     ECOtality, Inc. and certain of its affiliates that are debtors and debtors in possession (collectively, the "Debtors") are seeking seek to sell substantially all of their assets (the "***Assets***") free and clear of any and all liens, claims, interests, and encumbrances.[2]

---

[1] The Debtors in these jointly administered chapter 11 cases and the last four digits of their respective Employer Identification Numbers are: (i) ECOtality, Inc. (5422); (ii) Electric Transportation Engineering Corporation (4755); (iii) ECOtality Stores, Inc. (2643); (iv) ETEC North, LLC (n/a); (v) The Clarity Group, Inc. (8832); and (vi) G.H.V. Refrigeration, Inc. (4512). The Debtors' service address at ECOtality, Inc.'s corporate headquarters is Post Montgomery Center, One Montgomery Street, Suite 2525, San Francisco, California 94104.

[2] Although the Debtors do not have any significant secured debt obligations, the DOE (as defined below) may

2.     In connection therewith, on September 15, 2013, the Debtors filed a motion (the "*Sale Motion*") with the United States Bankruptcy Court for the District of Arizona (the "*Court*") seeking, among other things, entry of an order (the "*Bidding Procedures Order*"): (i) approving procedures (the "*Bidding Procedures*") for (a) submitting bids for the purchase of the Assets, and (b) conducting an auction for the Assets (the "*Auction*"); (ii) authorizing, but not requiring, the Debtors to (a) enter into a "stalking horse" agreement with one or more bidders (the "*Stalking Horse Bidder(s)*") for the purpose of establishing a minimum acceptable bid(s) for the Assets (the "*Stalking Horse Bid(s)*"), (b) provide any Stalking Horse Bidder(s) with a break-up fee in the event that such Stalking Horse Bidder(s) is not the successful bidder for the Assets (the "*Successful Bidder(s)*") in an amount not to exceed two percent (2%) of the guaranteed cash purchase price proposed in the Stalking Horse Bid in accordance with the terms of the Bidding Procedures, and (c) reimburse any Stalking Horse Bidder(s) for reasonable and actual costs and expenses incurred by such Stalking Horse Bidder(s) in connection with its bid(s) in an amount not to exceed $25,000; (iii) approving procedures (the "*Assumption and Assignment Procedures*") for the assumption and assignment of certain executory contracts (the "*Assigned Contracts*") and unexpired leases (the "*Assigned Leases*") in connection with the sale of the Assets and resolution of any objections or requests for adequate assurance of future performance related thereto; (iv) scheduling (a) a deadline to submit bids for the Assets, (b) the date and time of the Auction, (c) the date and time of the hearing to consider approval of the proposed sale of the Assets to the Successful Bidder(s) (the "*Sale Hearing*"), and (d) a deadline to consummate a sale of the Assets; (v) approving the form and manner of notice of the deadline to submit bids for the Assets, the Auction and the Sale Hearing; and (vi) granting certain related relief.

3.     On September [__], 2013, the Court entered the Bidding Procedures Order.

4.     Subject to the conditions and restrictions set forth in the Bidding Procedures and the Bidding Procedures Order, all interested parties are invited to make offers to purchase the Assets. Copies of the Bidding Procedures and Bidding Procedures Order may be obtained by (i) written request to the Debtors' proposed counsel, Akin Gump Strauss Hauer & Feld LLP, Century Park East, Suite 2400, Los Angeles, California 90067 (Attn: David P. Simonds and Arun Kurichety), and Parker Schwartz, PLLC, 7310 N. 16th St., Suite 330, Phoenix, Arizona 85020 (Attn: Jared G. Parker); (ii) accessing the Court's website at http://www.deb.uscourts.gov/ (please note that a PACER password is needed to access documents on the Court's website); (iii) viewing the docket of these cases at the Clerk of the Court, United States Bankruptcy Court for the District of Arizona, 230 North First Avenue, Suite 101, Phoenix, Arizona 85003; or (iv) Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245. **All interested parties should carefully read the Bidding Procedures.**

5.     The deadline to submit offers to purchase the Assets in accordance with the Bidding Procedures and Bidding Procedures Order is **October 7, 2013 at 5:00 p.m. (Pacific Time)** (the "*Bid Deadline*"). Pursuant to the Bidding Procedures and the Bidding Procedures Order, if two or more Qualified Bids (as defined in the Bidding Procedures) are received on or before the Bid Deadline, the Debtors shall conduct the Auction commencing on **October 9, 2013 at 10:00 a.m. (Pacific Time)**, at the offices of Akin Gump Strauss Hauer & Feld LLP, 2029 Century Park East, Suite 2400, Los Angeles, California 90067, or such other location as the Debtors may advise any parties entitled to attend the Auction upon two (2) business days' notice, to determine the highest or otherwise best bid(s) for the Assets (the "*Successful Bid(s)*"). Only an entity that has submitted a Qualified Bid (a "*Qualified Bidder*"), the United States Department of Energy (the "*DOE*"), the Office of the United States Trustee for the District of Arizona (the "*U.S. Trustee*"), the statutory committee of unsecured creditors (the "*Creditors' Committee*"), if appointed, and each such entity's respective advisors are eligible to participate in the Auction. The Auction may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Auction. The Debtors reserve the right to cancel the Auction if two or more Qualified Bids are not received as of the Bid Deadline.

assert interests in, or with respect to, certain of the Debtors' assets. The Debtors reserve their rights regarding the character, validity, extent, avoidability, and enforceability of any such interests.

6.       The sale of the Assets to the Successful Bidder(s) shall be presented for authorization and approval by the Court at the Sale Hearing, which is scheduled to be held on **October 10, 2013 at 10:00 a.m. (Mountain Standard Time)** at the United States Bankruptcy Court for the District of Arizona, 230 North First Avenue, [__] Floor, Courtroom [___], Phoenix, Arizona 85003, before the Honorable [_____], United States Bankruptcy Judge.  The Sale Hearing may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.

7.       Objections, if any, to approval of the sale of the Assets to the Successful Bidder must (i) be in writing; (ii) state with particularity the basis for the objection; and (iii) be filed with the Clerk of the Court, United States Bankruptcy Court for the District of Arizona, 230 North First Avenue, Suite 101, Phoenix, Arizona 85003 and be served on proposed counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, Century Park East, Suite 2400, Los Angeles, California 90067 (Attn: David P. Simonds and Arun Kurichety), and Parker Schwartz, PLLC, 7310 N. 16th St., Suite 330, Phoenix, Arizona 85020 (Attn: Jared G. Parker), **so as to be _actually_ _received_ no later than October 7, 2013 at 5:00 p.m. (Pacific Time)** (the "*Objection Deadline*").

8.       Failure of any entity to file an objection on or before the Objection Deadline shall be deemed to constitute consent to the sale of the Assets to the Successful Bidder(s) and other relief requested in the Sale Motion, and be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Motion, the Auction, the sale of the Assets, or the Debtors' consummation and performance of the terms of the asset purchase agreement entered into with the Successful Bidder(s), if authorized by the Court.

9.       Pursuant to the Bidding Procedures and Bidding Procedures Order, the Successful Bidder(s) shall be required to consummate the purchase of the Assets by **11:59 p.m. (Eastern Standard Time) on October 11, 2013**.  If the Successful Bidder(s) fails to timely consummate the purchase of the Assets, or any part thereof, then the next highest or otherwise best Qualified Bid (if any) (the "*Back-up Bid*") may be designated by the Debtors, in consultation with the Creditors' Committee, if appointed, as the Successful Bid, and the Debtors shall be authorized, but not required, to consummate the sale of the Assets to the Qualified Bidder that submitted the Back-Up Bid pursuant to the terms of such Back-Up Bid as soon as is commercially reasonable.

10.       This notice is subject to the full terms and conditions of the Sale Motion, the Bidding Procedures and the Bidding Procedures Order, and the Debtors encourage any interested parties to review such documents in their entirety.  To the extent that this notice is inconsistent with the Bidding Procedures Order, the terms of the Bidding Procedures Order shall govern.

[REST OF PAGE INTENTIONALLY LEFT BLANK]

Dated: _____, 2013

PARKER SCHWARTZ, PLLC


By: _____
                Jared G. Parker

– and –

AKIN GUMP STRAUSS HAUER & FELD LLP

Charles R. Gibbs (*pro hac vice* admission pending)
David P. Simonds (*pro hac vice* admission pending)
Arun Kurichety (*pro hac vice* admission pending)


[Proposed] Attorneys for the Debtors
and Debtors in Possession

**Exhibit C**

**Cure Schedule**

1   CHARLES R. GIBBS (*pro hac vice* admission pending)    DAVID P. SIMONDS (*pro hac vice* admission pending)
    AKIN GUMP STRAUSS HAUER & FELD LLP               ARUN KURICHETY (*pro hac vice* admission pending)
2   1700 Pacific Avenue                              AKIN GUMP STRAUSS HAUER & FELD LLP
    Dallas, Texas 75201                              2029 Century Park East, Suite 2400
3   Telephone:  (214) 969-2800                       Los Angeles, California 90067
    Facsimile:  (214) 969-4343                       Telephone:  (310) 229-1000
4                                                    Facsimile:  (310) 229-1001

5   – and –

6   JARED G. PARKER (SBN: 6428)
    PARKER SCHWARTZ, PLLC
7   7310 N. 16th St., Suite 330
    Phoenix, Arizona 85020
8   Telephone:     (602) 282-0476
    Facsimile:     (602) 282-0478
9
    [Proposed] Attorneys for Debtors
10  and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Case No. 2:13-BK-16126 (RJH) |
| ELECTRIC TRANSPORTATION ENGINEERING CORPORATION (d/b/a ECOTALITY NORTH AMERICA), *et al.,*[1] | Chapter 11 |
| | Jointly Administered |
|     Debtors. | **NOTICE TO COUNTERPARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES THAT MAY BE ASSUMED AND ASSIGNED TO THE SUCCESSFUL BIDDER(S)** |
| This filing applies to: | Hearing Date: _____, 2013 |
| ■ All Debtors | Time:          _____ |
| ☐ Specified Debtors | |

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      ECOtality, Inc. and certain of its affiliates that are debtors and debtors in possession (collectively, the "***Debtors***") are seeking seek to sell substantially all of their assets (the "***Assets***") free and clear of any and all liens, claims, interests, and encumbrances.

---

[1] The Debtors in these jointly administered chapter 11 cases and the last four digits of their respective Employer Identification Numbers are:   (i) ECOtality, Inc. (5422); (ii) Electric Transportation Engineering Corporation (4755); (iii) ECOtality Stores, Inc. (2643); (iv) ETEC North, LLC (n/a); (v) The Clarity Group, Inc. (8832); and (vi) G.H.V. Refrigeration, Inc. (4512).  The Debtors' service address at ECOtality, Inc.'s corporate headquarters is Post Montgomery Center, One Montgomery Street, Suite 2525, San Francisco, California 94104.

2.     In connection therewith, on September 15, 2013, the Debtors filed a motion (the "**Sale Motion**") with the United States Bankruptcy Court for the District of Arizona (the "**Court**") seeking, among other things, entry of an order (the "**Bidding Procedures Order**"): (i) approving procedures (the "**Bidding Procedures**") for (a) submitting bids for the purchase of the Assets, and (b) conducting an auction for the Assets (the "**Auction**"); (ii) authorizing, but not requiring, the Debtors to (a) enter into a "stalking horse" agreement with one or more bidders (the "**Stalking Horse Bidder(s)**") for the purpose of establishing a minimum acceptable bid(s) for the Assets (the "**Stalking Horse Bid(s)**"), (b) provide any Stalking Horse Bidder(s) with a break-up fee in the event that such Stalking Horse Bidder(s) is not the successful bidder for the Assets (the "**Successful Bidder(s)**") in an amount not to exceed two percent (2%) of the guaranteed cash purchase price proposed in the Stalking Horse Bid in accordance with the terms of the Bidding Procedures, and (c) reimburse any Stalking Horse Bidder(s) for reasonable and actual costs and expenses incurred by such Stalking Horse Bidder(s) in connection with its bid(s) in an amount not to exceed $25,000; (iii) approving procedures (the "**Assumption and Assignment Procedures**") for the assumption and assignment of certain executory contracts (the "**Assigned Contracts**") and unexpired leases (the "**Assigned Leases**") in connection with the sale of the Assets and resolution of any objections or requests for adequate assurance of future performance related thereto; (iv) scheduling (a) a deadline to submit bids for the Assets, (b) the date and time of the Auction, (c) the date and time of the hearing to consider approval of the proposed sale of the Assets to the Successful Bidder(s) (the "**Sale Hearing**"), and (d) a deadline to consummate a sale of the Assets; (v) approving the form and manner of notice of the deadline to submit bids for the Assets, the Auction and the Sale Hearing; and (vi) granting certain related relief.

3.     On September [__], 2013, the Court entered the Bidding Procedures Order.

4.     The sale of the Assets to the Successful Bidder(s) shall be presented for authorization and approval by the Court at the Sale Hearing, which is scheduled to be held on **October 10, 2013 at 10:00 a.m. (Mountain Standard Time)** at the United States Bankruptcy Court for the District of Arizona, 230 North First Avenue, [__] Floor, Courtroom [___], Phoenix, Arizona 85003, before the Honorable [_____], United States Bankruptcy Judge.  The Sale Hearing may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.

5.     Pursuant to the Bidding Procedures Order, the Debtors are required to file with the Court a schedule (the "**Cure Schedule**") of each of the executory contracts and unexpired leases that may be assumed and assigned to the Successful Bidder(s) (the "**Potentially Assigned Contracts and Leases**").  Among other things, the Cure Schedule indicates whether the Debtors' books and records show any amounts due under each of the Potentially Assigned Contracts and Leases that must be cured in accordance with Bankruptcy Code sections 365(b) and (f)(2) (the "**Cure Amount**") prior to the assumption and assignment of such Potentially Assigned Contracts and Leases.  A copy of the Cure Schedule is attached hereto as **Exhibit 1**.

6.     For the avoidance of doubt, each of the Potentially Assigned Contracts and Leases included on the Cure Schedule is included solely for purposes of providing notice that such Potentially Assigned Contracts and Leases may be assumed and assigned to the Successful Bidder(s).  Inclusion of the Potentially Assigned Contracts and Leases on the Cure Notice will in no way bind the Debtors or the Successful Bidder(s) and all rights to reject any of the Potentially Assigned Contracts and Leases are expressly reserved.  As set forth in the Bidding Procedures, the Successful Bidder will, within one (1) business day after determination of the Successful Bid(s), submit to the Debtors a schedule of the Potentially Assigned Contracts and Leases that are to be Assigned Contracts and Assigned Leases.  No later than one (1) business day later, the Debtors will file a notice (the "**Contract Assignment Notice**") with the Court and serve such Contract Assignment Notice via overnight delivery on the non-Debtor counterparties to such Assigned Contracts and Assigned Leases.

7.     However, to the extent that any non-Debtor counterparty to any of the Potentially Assigned Contracts and Leases wishes to object or request adequate assurance of future performance, such party should do so in accordance with the procedures set forth below.

8. Any objection to the assumption and assignment of any Assigned Contract or Assigned Lease identified on the Cure Schedule, including any objection to the Cure Amount set forth on the Cure Schedule or to the ability of the Successful Bidder to provide adequate assurance of future performance under such Assigned Contract or Assigned Lease, must (i) be in writing, (ii) set forth the basis for the objection as well as any cure amount that the objector asserts to be due (in all cases with appropriate documentation in support thereof), and (iii) be filed with the Clerk of the Court, United States Bankruptcy Court for the District of Arizona, 230 North First Avenue, Suite 101, Phoenix, Arizona 85003 and be served on proposed counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, Century Park East, Suite 2400, Los Angeles, California 90067 (Attn: David P. Simonds and Arun Kurichety), and Parker Schwartz, PLLC, 7310 N. 16th St., Suite 330, Phoenix, Arizona 85020 (Attn: Jared G. Parker), **so as to be __actually__ __received__ no later than October 7, 2013 at 5:00 p.m. (Pacific Time)** (the "*Assignment and Cure Objection Deadline*").

9. Any request for adequate assurance information regarding the Successful Bidder(s) (a "*Request for Adequate Assurance*") must be in writing and be served on proposed counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, Century Park East, Suite 2400, Los Angeles, California 90067 (Attn: David P. Simonds and Arun Kurichety), and Parker Schwartz, PLLC, 7310 N. 16th St., Suite 330, Phoenix, Arizona 85020 (Attn: Jared G. Parker), **so as to be __actually__ __received__ no later than the Assignment and Cure Objection Deadline**. Requests for Adequate Assurance must include an email address, postal address and/or facsimile number to which a response to such request will be sent. Upon receiving a Request for Adequate Assurance, the Debtors shall promptly after such request, but in no event later than one (1) business day after the Debtors' selection of the Successful Bid(s), provide such party with any non-confidential information reasonably related to adequate assurance by email, facsimile, or overnight delivery.

10. **IF NO OBJECTION TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF AN ASSIGNED CONTRACT OR ASSIGNED LEASE IS TIMELY RECEIVED BY THE ASSIGNMENT AND CURE OBJECTION DEADLINE, THEN THE ASSUMPTION AND ASSIGNMENT IS AUTHORIZED AND THE RESPECTIVE CURE AMOUNT SET FORTH IN THE CURE SCHEDULE SHALL BE BINDING UPON THE COUNTERPARTY TO THE ASSIGNED CONTRACT OR ASSIGNED LEASE FOR ALL PURPOSES AND WILL CONSTITUTE A FINAL DETERMINATION OF TOTAL CURE AMOUNT REQUIRED TO BE PAID BY THE DEBTORS IN CONNECTION WITH SUCH ASSUMPTION AND ASSIGNMENT TO THE SUCCESSFUL BIDDER**.

11. To the extent that any entity does not timely object as set forth above, such entity shall be (i) forever barred from objecting to assumption and assignment of the Assigned Contracts and Assigned Leases identified on the Cure Schedule, including asserting any additional cure payments or requesting additional adequate assurance of future performance, (ii) deemed to have consented to the applicable Cure Amount, if any, and to the assumption and assignment of the applicable Assigned Contract or Assigned Lease, (iii) bound to such corresponding Cure Amount, if any, (iv) deemed to have agreed that the Successful Bidder has provided adequate assurance of future performance within the meaning of Bankruptcy Code section 365(b)(1)(C), (v) deemed to have agreed that all defaults under the applicable Assigned Contract or Assigned Lease arising or continuing prior to the effective date of the assignment have been cured as a result or precondition of the assignment, such that the Successful Bidder or the Debtors shall have no liability or obligation with respect to any default occurring or continuing prior to the assignment, and from and after the date of the assignment the applicable Assigned Contract or Assigned Lease shall remain in full force and effect for the benefit of the Successful Bidder and such entity in accordance with its terms, (vi) deemed to have waived any right to terminate the applicable Assigned Contract or Assigned Lease or designate an early termination date under the applicable Assigned Contract or Assigned Lease as a result of any default that occurred and/or was continuing prior to the assignment date, and (vii) deemed to have agreed that the terms of the Sale Order shall apply to the assumption and assignment of the applicable Assigned Contract or Assigned Lease.

12.    If an objection is timely received and such objection cannot otherwise be resolved by the parties, the Court may hear such objection at the Sale Hearing or any later date set by the Court.[2] The pendency of a dispute relating to the Cure Amount will not prevent or delay the assumption and assignment of any Assigned Contract or Assigned Lease. If an objection is filed only with respect to the cure amount listed on the Cure Schedule, the Debtors may file a Certificate of No Objection as to assumption and assignment only and the dispute with respect to the cure amount will be resolved consensually, if possible, or, if the parties are unable to resolve their dispute, before the Court. The Debtors intend to cooperate with the counterparties to the Assigned Contracts and Assigned Leases to be assumed and assigned by the Debtors to attempt to reconcile any difference in a particular Cure Amount.

13.    If no objection to the proposed assumption and assignment of an Assigned Contract or Assigned Lease is received by the Assignment and Cure Objection Deadline, counsel for the Debtors may submit to the Court a certificate of no objection and a form of order (a "***Certificate of No Objection***") granting such assumption and assignment, and serve such Certificate of No Objection on the counterparty to such Assigned Contract or Assigned Lease.

14.    If you do not dispute the Cure Amount listed on the Cure Schedule, and do not otherwise object to the assumption and assignment of your Assigned Contract or Assigned Lease, you need not take any further action.

15.    The Debtors reserve the right to supplement and modify the Cure Schedule at any time, provided that to the extent that the Debtors add an Assigned Contract or Assigned Lease to the Assignment Schedule or modify the Cure Amount, the affected party shall receive a separate notice and an opportunity to object to such addition or modification.

Dated: _____, 2013

PARKER SCHWARTZ, PLLC


By: _____
        Jared G. Parker

– and –

AKIN GUMP STRAUSS HAUER & FELD LLP

Charles R. Gibbs (*pro hac vice* admission pending)
David P. Simonds (*pro hac vice* admission pending)
Arun Kurichety (*pro hac vice* admission pending)


[Proposed] Attorneys for the Debtors
and Debtors in Possession

---

[2] To the extent that any non-Debtor counterparty objects to the assumption and assignment of an Assigned Contract or Assigned Lease, the Debtors reserve all rights, in consultation with the Successful Bidder(s), to reject such Assigned Contract or Assigned Lease, regardless of its prior designation as an Assigned Contract or Assigned Lease.

# Exhibit 1

**Cure Schedule**

**Exhibit D**

**Contract Assignment Notice**

CHARLES R. GIBBS (*pro hac vice* admission pending)
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

DAVID P. SIMONDS (*pro hac vice* admission pending)
ARUN KURICHETY (*pro hac vice* admission pending)
AKIN GUMP STRAUSS HAUER & FELD LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (310) 229-1000
Facsimile: (310) 229-1001

– and –

JARED G. PARKER (SBN: 6428)
PARKER SCHWARTZ, PLLC
7310 N. 16th St., Suite 330
Phoenix, Arizona 85020
Telephone: (602) 282-0476
Facsimile: (602) 282-0478

[Proposed] Attorneys for Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>ELECTRIC TRANSPORTATION ENGINEERING CORPORATION (d/b/a ECOTALITY NORTH AMERICA), *et al.*,[1]<br><br>Debtors.<br><br>―――――――――――――――――――<br>This filing applies to:<br><br>■ All Debtors<br><br>☐ Specified Debtors | Case No. 2:13-BK-16126 (RJH)<br><br>Chapter 11<br><br>Jointly Administered<br><br>**NOTICE TO COUNTERPARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES THAT ARE TO BE ASSUMED AND ASSIGNED TO THE SUCCESSFUL BIDDER(S)**<br><br>Hearing Date: _____, 2013<br>Time: _____ |

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      On September 15, 2013, ECOtality, Inc. and certain of its affiliates that are debtors and debtors in possession (collectively, the "***Debtors***") filed a motion (the "***Sale Motion***") with the United States Bankruptcy Court for the District of Arizona (the "***Court***") seeking, among other things, entry of

―――――――――――――――――

[1] The Debtors in these jointly administered chapter 11 cases and the last four digits of their respective Employer Identification Numbers are: (i) ECOtality, Inc. (5422); (ii) Electric Transportation Engineering Corporation (4755); (iii) ECOtality Stores, Inc. (2643); (iv) ETEC North, LLC (n/a); (v) The Clarity Group, Inc. (8832); and (vi) G.H.V. Refrigeration, Inc. (4512). The Debtors' service address at ECOtality, Inc's corporate headquarters is Post Montgomery Center, One Montgomery Street, Suite 2525, San Francisco, California 94104.

an order (the "***Bidding Procedures Order***"): (i) approving procedures (the "***Bidding Procedures***") for submitting bids for the purchase of substantially all of the Debtors' assets (the "***Assets***"); (ii) approving procedures (the "***Assumption and Assignment Procedures***") for the assumption and assignment of certain executory contracts (the "***Assigned Contracts***") and unexpired leases (the "***Assigned Leases***") in connection with the sale of the Assets and resolution of any objections thereto; and (iii) scheduling the date and time of the hearing (the "***Sale Hearing***") to consider approval of the proposed sale of the Assets to the successful bidder for the Assets (the "***Successful Bidder(s)***").

2.     On September [__], 2013, the Court entered the Bidding Procedures Order.

3.     Pursuant to the Bidding Procedures and the Bidding Procedures Order, the Debtors have selected [_____] as the Successful Bidder(s) and shall seek entry of an order (the "***Sale Order***") authorizing and approving the sale of the Assets to [_____] pursuant to the terms of the asset purchase agreement, dated [_____], attached hereto as **Exhibit 1**, at the Sale Hearing, which is scheduled to be held on **October 10, 2013 at 10:00 a.m. (Mountain Standard Time)** at the United States Bankruptcy Court for the District of Arizona, 230 North First Avenue, [__] Floor, Courtroom [___], Phoenix, Arizona 85003, before the Honorable [_____], United States Bankruptcy Judge. The Sale Hearing may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.

4.     Pursuant to the Bid Procedures Order, you previously received a schedule (the "***Cure Schedule***") of each of the executory contracts and unexpired leases that may be assumed and assigned to the Successful Bidder(s) (the "***Potentially Assigned Contracts and Leases***"). Among other things, the Cure Schedule indicates whether the Debtors' books and records show any amounts due under each of the Potentially Assigned Contracts and Leases in accordance with Bankruptcy Code sections 365(b) and (f)(2) (the "***Cure Amount***") prior to the assumption and assignment of such Potentially Assigned Contracts and Leases. The Cure Schedule was accompanied by a notice that provided instructions for objecting to the assumption and assignment, including the Cure Amount listed, of any of the Potentially Assigned Contracts and Leases to which you are a counterparty.

5.     You are receiving this notice because, consistent with the Bidding Procedures Order, the Successful Bidder(s) has designated one or more of the Potentially Assigned Contracts and Leases to which you are a counterparty as Potentially Assigned Contracts and Leases that it wishes to be Assigned Contracts or Assigned Leases. Accordingly, at the Sale Hearing, the Debtors shall seek to assume and assign the Assigned Contracts and Assigned Leases identified on **Exhibit 2** attached hereto (the "***Assignment Schedule***") to the Successful Bidder(s) in connection with the sale of the Assets.

6.     The Debtors reserve the right to supplement and modify the Assignment Schedule at any time, provided that to the extent that the Debtors add an Assigned Contract or Assigned Lease to the Assignment Schedule or modify the Cure Amount, the affected party shall receive a separate notice and an opportunity to object to such addition or modification.

[REST OF PAGE INTENTIONALLY LEFT BLANK]

Dated: September _____, 2013

PARKER SCHWARTZ, PLLC


By: _____
　　　　Jared G. Parker

– and –

AKIN GUMP STRAUSS HAUER & FELD LLP

Charles R. Gibbs (*pro hac vice* admission pending)
David P. Simonds (*pro hac vice* admission pending)
Arun Kurichety (*pro hac vice* admission pending)


[Proposed] Attorneys for the Debtors
and Debtors in Possession

**<u>Exhibit 1</u>**

**Asset Purchase Agreement(s)**

**Exhibit 2**

**Assignment Schedule**

**Exhibit E**

**Form APA**

# Asset Purchase Agreement

dated as of

[_____], 2013

by and among

ECOtality, Inc.

Electronic Transportation Engineering Corporation

ECOtality Stores, Inc.

ETEC North, LLC

The Clarity Group, Inc.

and

G.H.V. Refrigeration, Inc.

as the Sellers

and

**[NAME OF BUYER]**

as Buyer

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is dated as of [**_____**], 2013 (the "**Agreement**") by and among ECOtality, Inc., a Nevada corporation, Electronic Transportation Engineering Corporation, an Arizona corporation, ECOtality Stores, Inc., a Nevada corporation, ETEC North, LLC, a Delaware limited liability company, The Clarity Group, Inc., an Arizona corporation, and G.H.V. Refrigeration, Inc., a California corporation, (each, a "**Seller**" and collectively, the "**Sellers**") and **[name of Buyer]**, a [**_____**] (the "**Buyer**").

## W I T N E S S E T H :

**WHEREAS**, the Sellers own the Purchased Assets (as defined below);

**WHEREAS**, the Sellers have sought relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") by filing cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Arizona (the "**Bankruptcy Court**") on September 16, 2013; and

**WHEREAS**, Buyer desires to purchase the Purchased Assets (as defined below) and to assume the Assumed Liabilities (as defined below), upon the terms and subject to the conditions set forth herein.

**NOW, THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, the parties to this Agreement agree as follows:

## ARTICLE 1

## DEFINITIONS

SECTION 1.01    *Definitions*.

(a)    The following terms, as used herein, have the following meanings:

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person; *provided, however*, that with respect to the Sellers, "Affiliate" shall mean only the other Sellers.

"**Assumed Contracts**" means those agreements, contracts, leases, licenses, consensual obligations, promises and undertakings identified as "Assumed Contracts" on Schedule 2.01(a) hereto.

"**Assignment and Assumption Agreement**" means an assignment and assumption agreement drafted by Sellers and reasonably acceptable to Buyer.

**"Benefit Plans"** means any employee benefit plan, program, policy or arrangement currently maintained for the benefit of any current or former employee, officer or director of any Seller.

**"Bid Procedures Order"** means the order of the Bankruptcy Court entered on September **[__]**, 2013 approving the Bidding Procedures in connection with the sale of substantially all of the Sellers' assets.

**"Bill of Sale"** means a bill of sale with respect to the Purchased Assets, drafted by Sellers and reasonably acceptable to Buyer.

"**Business Day**" means a day other than Saturday, Sunday or other day on which commercial banks in Phoenix, Arizona are authorized or required by law to close.

**"Causes of Action"** means any legal, governmental or regulatory actions, suits, proceedings, investigations, arbitrations or actions.

**"Claim"** means a claim as defined in Section 101 of the Bankruptcy Code.

**"Closing Date"** means the date of the Closing.

**"Confidentiality Agreement"** means that certain non-disclosure agreement by and between **[Sellers]** and **[Buyer]** dated **[_____]**, 2013.

**"Cure Costs"** means the liabilities and obligations of the Sellers that must be paid or otherwise satisfied to cure all of the Sellers' defaults under the Assumed Contracts at the time of the assumption by and assignment to Buyer of such Assumed Contracts as provided herein.

**"Intellectual Property"** means the intellectual property of Sellers **[identified on Schedule 1.01(a) hereto]**.

**"IP Assignment and Assumption Agreement"** means an assignment and assumption agreement with respect to the Intellectual Property drafted by Sellers and reasonably acceptable to Buyer.

**"Lien"** means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest or encumbrance in respect of such property or asset.

**"Material Adverse Effect"** means (i) any material adverse effect on the Purchased Assets, taken as a whole, or (ii) any material adverse effect on the ability of the Sellers to consummate the transactions contemplated by this Agreement; *provided that* the following shall not constitute a Material Adverse Effect and shall not be taken into account in determining whether or not there has been or would reasonably be expected to be a Material Adverse Effect: (A) changes in general economic conditions or securities or financial markets in general that do not disproportionately impact the Sellers, taken as a whole: (B) general changes in the industry in which the Sellers operate and not specifically relating to, or having a disproportionate effect on, the Sellers taken as a whole (relative to the effect on other persons operating in such industry); (C) any changes in law applicable to the Sellers or any of their respective properties or assets or

2

interpretations thereof by any governmental authority which do not have a disproportionate effect on the Sellers, taken as a whole; (D) any outbreak or escalation of hostilities or war (whether declared or not declared) or any act of terrorism which do not have a disproportionate effect on the Sellers, taken as a whole; (E) any changes to the extent resulting from the announcement or the existence of, or compliance with, this Agreement and the transactions contemplated hereby (including without limitation any lawsuit related thereto or the impact on relationships with suppliers, customers, employees or others); (F) any accounting regulations or principles or changes in accounting practices or policies that the Sellers are required to adopt; (G) matters occurring in, or arising from the Chapter 11 Cases of the Sellers, including any events, occurrences, or other actions taken as a result thereof; and (H) any changes resulting from actions of the Sellers expressly agreed to or requested by the Buyer.

"**Permitted Liens**" means (i) Liens permitted by the Approval Order, (ii) Liens created pursuant to any Assumed Contracts; and (iii) Liens set forth on Schedule 1.01(b).

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision, or an agency or instrumentality thereof.

(b)     Each of the following terms is defined in the Section set forth opposite such term:

| **Term** | **Section** |
| --- | --- |
| Agreement | Preamble |
| Approval Order | Section 5.06 |
| Assumed Liabilities | Section 2.02 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Period | Section 10.05 |
| Buyer | Preamble |
| Chapter 11 Cases | Recitals |
| Closing | Section 2.07 |
| Code | Section 7.01 |
| Excluded Assets | Section 2.01 |
| Excluded Liabilities | Section 2.03 |
| Good Faith Deposit | Section 2.06(a) |
| Income Tax | Section 7.01 |
| Purchased Assets | Section 2.01 |
| Purchase Price | Section 2.05 |
| Sellers | Preamble |
| Tax | Section 7.01 |
| Taxing Authority | Section 7.01 |
| Tax Return | Section 7.01 |
| Transfer Consent | Section 2.04 |
| Transfer Taxes | Section 7.02 |

3

SECTION 1.02    *Other Definitions and Interpretative Matters*.    Unless otherwise indicated to the contrary in this Agreement by the context or use thereof:

(a)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.  Any reference in this Agreement to days (but not Business Days) means to calendar days.

(b)    Any reference in this Agreement to $ means U.S. dollars.

(c)    Unless the context otherwise requires, all capitalized terms used in the Exhibits and Schedules shall have the respective meanings assigned in this Agreement.  All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(d)    Any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa.

(e)    The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "**Section**" or "**Article**" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(f)    Words such as "**herein**," "**hereof**" and "**hereunder**" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(g)    The word "**including**" or any variation thereof means "**including, without limitation,**" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(h)    References to laws, rules and regulations shall include such laws, rules and regulations as they may from time to time be amended, modified or supplemented.

(i)    Reference to a given agreement or instrument shall be a reference to that agreement or instrument as modified, amended, supplemented or restated through the date as of which such reference is made

(j)    References to any Person shall include its permitted successors and assigns and, in the case of any Governmental Authority, any Person succeeding to its functions and capacities.

4

# ARTICLE 2

## PURCHASE AND SALE

SECTION 2.01  *Purchase and Sale*.  Except as otherwise provided below, upon the terms and subject to the conditions of this Agreement, Buyer agrees to purchase from the Sellers and each Seller agrees to sell, convey, transfer, assign and deliver, or cause to be sold, conveyed, transferred, assigned and delivered, to Buyer at the Closing, free and clear of all Liens and Claims, other than Assumed Liabilities and Permitted Liens, all of such Seller's right, title and interest in, to and under substantially all of the properties and assets of the Sellers used in the conduct of the Sellers' businesses, including without limitation, those assets listed on Schedule 2.01(a) hereto (the "**Purchased Assets**"); *provided, that* Buyer expressly understands and agrees that the assets and properties of the Sellers set forth in Schedule 2.01(b) are excluded from the Purchased Assets and shall not be transferred to Buyer under this Agreement (the "**Excluded Assets**").

SECTION 2.02  *Assumed Liabilities*.  Upon the terms and subject to the conditions of this Agreement, Buyer agrees, effective at the time of the Closing, to assume (a) all liabilities and obligations arising from and after the Closing from or relating to the Purchased Assets and the ownership and operation thereof, (b) all liabilities and obligations arising from or relating to the Assumed Contracts and all Cure Costs relating to Assumed Contracts, (c) all liabilities and obligations of Buyer under Sellers' Benefit Plans and under Section 5.04 relating to Sellers' employees, (d) all Transfer Taxes assumed by Buyer under Section 7.02, and (e) the other liabilities and obligations of the Sellers set forth in Schedule 2.02 hereto ((a) through (e) collectively, the "**Assumed Liabilities**").

SECTION 2.03  *Excluded Liabilities*.  Notwithstanding any provision in this Agreement to the contrary, Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of any Seller of whatever nature, whether presently in existence or arising hereafter.  All such other liabilities and obligations shall be retained by and remain obligations and liabilities of the Sellers (all such liabilities and obligations not being assumed being herein referred to as the "**Excluded Liabilities**").

SECTION 2.04  *Assignment of Contracts and Rights*.  Sellers shall transfer and assign all Assumed Contracts to Buyer, and Buyer shall assume all Assumed Contracts from Sellers, as of the Closing Date pursuant to the Approval Order, or other order of the Bankruptcy Court pursuant to the process set forth in the Bid Procedures Order.  In connection with such assignment and assumption, Buyer shall pay or otherwise satisfy all Cure Costs under such Assumed Contracts.  Except as to Assumed Contracts assigned pursuant to Section 365 of the Bankruptcy Code, anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Assumed Contract or other Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party or Governmental Authority (each, a "**Transfer Consent**"), would constitute a breach by any Seller in respect thereof.  If such Transfer Consent is not obtained or such assignment is not attainable pursuant to Section 365, to the extent permitted and subject to any approval of the Bankruptcy Court that may be required, the Sellers and Buyer will cooperate in a mutually agreeable

5

arrangement (at Buyer's sole cost and expense) under which Buyer would obtain the benefits and assume the obligations thereunder in accordance with this Agreement.

SECTION 2.05    *Purchase Price.*

(a)    On the terms and subject to the conditions contained herein, the purchase price (the "**Purchase Price**") for the Purchased Assets shall consist of:

(i)    cash in the amount of $**[_____]**;

(ii)    the payment or other satisfaction of all Cure Costs; and

(iii)    the assumption of the Assumed Liabilities.

(b)    At the Closing, Buyer shall pay to the Sellers the Purchase Price less the Good Faith Deposit, by wire transfer of immediately available funds to an account or accounts designated by the Sellers at least two (2) Business Days prior to the Closing Date.

SECTION 2.06    *Good Faith Deposit*.

(a)    Simultaneously with the execution of this Agreement, Buyer shall deposit with the Sellers cash in the amount of $**[5% of Purchase Price]** (the "**Good Faith Deposit**") to be held by Sellers in a non-interest bearing account pending the Closing or other disbursement pursuant to this Agreement and applied as provided in Section 2.06(b).

(b)    The Good Faith Deposit shall be retained by the Sellers in the following circumstances: (i) at the Closing as a credit against the Purchase Price and (ii) if this Agreement is terminated pursuant to Section 9.01(b).  Except as described in the previous sentence, the Good Faith Deposit shall be returned to Buyer after termination of this Agreement subject to any setoff for any claim of breach or payment due for breach by Buyer of this Agreement.

SECTION 2.07    *Closing*.  The closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder (the "**Closing**") shall take place at the offices of Akin Gump Strauss Hauer & Feld LLP, 2029 Century Park East, Suite 2400, Los Angeles, California 90067, on the first Business Day after the satisfaction (or waiver, as applicable) of the conditions to Closing set forth in Article 6 herein, including the entry of the Approval Order (unless such Approval Order is subject to a stay of Closing).  At the Closing:

(a)    Buyer shall deliver to the Sellers:

(i)    the Purchase Price less the Good Faith Deposit as described in Section 2.05(b); and

(ii)    the Assignment and Assumption Agreement and the IP Assignment and Assumption Agreement duly executed by Buyer.

(b)    Sellers shall deliver to Buyer:

6

(i)　　　　the Assignment and Assumption Agreement, the IP Assignment and Assumption Agreement and the Bill of Sale duly executed by each applicable Seller; and

(ii)　　　　a certificate of non-foreign status executed by each Seller (or, if applicable, a direct or indirect owner of a Seller) that is not a disregarded entity for U.S. federal income tax purposes, prepared in accordance with Treasury Regulation Section 1.1445-2(b).

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller represents and warrants to Buyer:

SECTION 3.01　　*Organization and Qualification*.　Each Seller has been duly organized and is validly existing and in good standing under the laws of its respective jurisdiction of incorporation, with the requisite power and authority to own its properties and conduct its business as currently conducted in all material respects.　Each Seller, as applicable, has been duly qualified as a foreign corporation or organization for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification, except to the extent that the failure to be so qualified or be in good standing has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.02　　*Authorization*.　The execution, delivery and performance by the Sellers of this Agreement and the consummation of the transactions contemplated hereby are within the Sellers' corporate or limited liability company powers, as applicable, and, subject to the Bankruptcy Court's entry of the Approval Order, have been duly authorized by all necessary corporate or limited liability company action, as applicable, on the part of each Seller.

SECTION 3.03　　*Execution and Delivery; Enforceability*.　This Agreement has been duly and validly executed and delivered by each Seller, and, subject to the Bankruptcy Court's entry of the Approval Order, will constitute the valid and binding obligation of each Seller, enforceable against each such Seller in accordance with its terms.

SECTION 3.04　　*Benefit Plans*.　Schedule 3.04 sets forth a list of all material Benefit Plans currently maintained by the Sellers.　Each such Benefit Plan has been operated in compliance with its terms and with the terms and requirements of applicable law, except to the extent that the failure to so comply has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. No Benefit Plan of the Sellers is a multiemployer plan within the meaning of Section 4001(a)(3) of the Employee Retirement Income Security Act of 1974, as amended.

7

SECTION 3.05   *Exclusivity of Representations and Warranties*.   The representations and warranties made by the Sellers in this Agreement are in lieu of and are exclusive of all other representations and warranties, including, without limitation, any implied warranties.   The Sellers hereby disclaim any such other or implied representations or warranties, notwithstanding the delivery or disclosure to the Sellers or their officers, directors, employees, agents or representatives of any documentation or other information (including any financial projections or other supplemental data not included in this Agreement).

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to each Seller that:

SECTION 4.01   *Existence and Power*.   Buyer is a [_____] duly organized, validly existing and in good standing under the laws of **[jurisdiction]** and has all requisite powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

SECTION 4.02   *Authorization*.   The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby are within the **[corporate]** powers of Buyer and have been duly authorized by all necessary **[corporate]** action on the part Buyer.

SECTION 4.03   *Execution and Delivery; Enforceability*.   This Agreement has been duly and validly executed and delivered by Buyer, and constitutes the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

SECTION 4.04   *No Conflicts*.   The execution, delivery and performance by Buyer of this Agreement and the consummation by Buyer of the transactions contemplated hereby shall not, with or without the giving of notice or lapse of time, (i) violate any provision of the organizational documents of Buyer, (ii) violate any law to which Buyer is subject, or (iii) conflict with, or result in a breach or default under, any term or condition of any other agreement or other instrument to which Buyer is a party or by which Buyer is bound.

SECTION 4.05   *Sufficiency of Funds*.   Buyer has, and will continue to have at all times prior to and at the Closing, sufficient cash or other sources of immediately available funds to enable it to make payment of the Purchase Price at Closing.

SECTION 4.06   *Adequate Assurances Regarding Assumed Contracts*.   Buyer is and will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

SECTION 4.07   *Inspections; No Other Representations*.   Buyer is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of property and assets such as the Purchased Assets as contemplated hereunder.   Buyer has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent

decision with respect to the execution, delivery and performance of this Agreement. Buyer acknowledges that the Sellers have given Buyer complete and open access to the Purchased Assets and the key employees, documents and facilities of the Sellers with respect to the Purchased Assets. Buyer agrees, warrants and represents that (a) Buyer is purchasing the Purchased Assets on an "**AS IS,**" "**WHERE IS**" and "**WITH ALL FAULTS**" basis based solely on Buyer's own investigation of the Purchased Assets and (b) except as set forth in this Agreement, neither Sellers nor any director, officer, manager, employee, agent, consultant, or representative of Sellers have made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Purchased Assets, any part of the Purchased Assets, the financial performance of the Purchased Assets, or the physical condition of the Purchased Assets. Buyer further acknowledges that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by Sellers and Buyer after good-faith arms'-length negotiation in light of Buyer's agreement to purchase the Purchased Assets "**AS IS,**" "**WHERE IS**" and "**WITH ALL FAULTS**." Buyer agrees, warrants and represents that, except as set forth in this Agreement, Buyer has relied, solely upon its own investigation of all such matters, and that Buyer assumes all risks with respect thereto. **Except as set forth in this Agreement, Sellers hereby disclaim all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any director, officer, manager, employee, agent, consultant, or representative of Sellers). Sellers make no representations or warranties to Buyer regarding the probable success, profitability or value of any of the Purchased Assets.**

ARTICLE 5

COVENANTS

SECTION 5.01    *Confidentiality*.  Buyer agrees that prior to the Closing Date and after any termination of this Agreement; the Confidentiality Agreement shall remain in full force and effect. After the Closing has occurred, the Confidentiality Agreement shall be terminated to the extent relating to the Purchased Assets and Assumed Liabilities, but shall, with respect to any of the Excluded Assets and Excluded Liabilities remain in full force and effect.

SECTION 5.02    *Reasonable Best Efforts; Further Assurances*.  Subject to the terms and conditions of this Agreement, Buyer and the Sellers will use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable laws and regulations to consummate the transactions contemplated by this Agreement.

SECTION 5.03    *Public Announcements*.  Absent the prior written consent of the other parties, such consent to not be unreasonably withheld, delayed or conditioned, neither the Sellers nor Buyer shall make any press release, public announcement, securities filing or public statement concerning this Agreement or the transactions contemplated hereby, except as and to the extent that any such party shall be required to make any such disclosure by applicable law,

and then only after giving the other party hereto an opportunity to review, if possible under the circumstances, such disclosure and consider in good faith the comments of the other party hereto. For the avoidance of doubt, nothing herein shall be construed to prohibit or restrict any disclosure or announcement which the Sellers make in connection with the Chapter 11 Cases.

SECTION 5.04    *Assurances Regarding Assumed Contracts; Payment of Cure Costs; Performance of Assumed Contracts*.    With respect to each Assumed Contract, Buyer shall provide adequate assurance of the future performance by Buyer of such Assumed Contract. Buyer shall, at or prior to the Closing, pay or otherwise satisfy all Cure Costs under the Assumed Contracts so that such Assumed Contracts may be assumed by Seller and assigned to Buyer in accordance with the provisions of section 365 of the Bankruptcy Code.  Buyer shall (i) from and after the Closing Date assume all obligations and liabilities of Seller under the Assumed Contracts that accrue from and after the Closing Date, (ii) from and after the Closing Date take all actions necessary to satisfy its obligations and liabilities under the terms and conditions of each of the Assumed Contracts, and (iii) indemnify, defend and hold Sellers harmless from and against any damages, losses, costs, expenses and other liabilities arising out of a breach of this Section 5.05 or any of Buyer's other covenants or obligations contained in this Agreement.

SECTION 5.05    *Bankruptcy Court Approval*.    Prior to the execution of this Agreement, the Sellers have filed an approval motion with the Bankruptcy Court seeking entry of an order (the "**Approval Order**") which, among other things, (i) approves this Agreement, (ii) authorizes the sale of the Purchased Assets to Buyer pursuant to Section 363 of the Bankruptcy Code, (iii) authorizes the assumption and assignment to Buyer of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code and (iv) authorizes the other transactions contemplated by this Agreement, which Approval Order shall not be inconsistent with the terms of this Agreement. Buyer agrees that it will promptly take all actions as are reasonably requested by Sellers to assist in obtaining the Bankruptcy Court's entry of the Approval Order, including, without limitation, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify before the Bankruptcy Court.

ARTICLE 6

CONDITIONS TO CLOSING

SECTION 6.01    *Conditions to the Obligations of Sellers*.    The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (unless waived in writing by Sellers) of each of the following conditions on or prior to the Closing Date:

10

(a)     The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date.

(b)     Buyer shall have performed and complied in all material respects with all covenants and obligations under this Agreement to be performed or complied with by it on or prior to the Closing Date.

(c)     No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation or non-appealable judgment, decree, injunction or other order that is in effect on the Closing Date and prohibits the consummation of the Closing.

(d)     The Bankruptcy Court shall have entered the Approval Order and such Approval Order shall not be subject to a stay pending appeal.

SECTION 6.02     *Conditions to the Obligation of Buyer.*  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction (unless waived in writing by Buyer) of each of the following conditions on or prior to the Closing Date:

(a)     The representations and warranties of the Sellers contained in this Agreement, disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct on and as of the Closing Date, except for any failure to be true and correct that, together with all other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect.

(b)     Each Seller shall have performed and complied with all covenants and obligation under this Agreement, disregarding all materiality and Material Adverse Effect qualifications contained therein, to be performed or complied with by it on or prior to the Closing Date, except for any failure to perform and comply that, together with all other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect.

(c)     No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation or non-appealable judgment, decree, injunction or other order that is in effect on the Closing Date and prohibits the consummation of the Closing.

(d)     The Bankruptcy Court shall have entered the Approval Order and such Approval Order shall not be subject to a stay pending appeal.

## ARTICLE 7

## TAX MATTERS

SECTION 7.01     *Tax Definitions.*  The following terms, as used herein, have the following meanings:

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Income Tax**" means any federal, state, local or non-U.S. tax based on or measured by reference to net income, including any interest, penalties, or additions thereto, whether disputed or not.

11

"**Tax or Taxes**" means (i) any tax, governmental fee, levy, duty, tariff, impost, custom, license, payroll, employment, excise, severance, premium, windfall profits, environmental (including taxes under Code § 59A), sales, franchise, profits, pension, social security (or similar), unemployment, capital stock, or other like assessment, charge or premium of any kind whatsoever (including, but not limited to, withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax or additional amount imposed by any governmental authority (a "**Taxing Authority**") responsible for the imposition of any such tax (federal, state, local or non-U.S.), or (ii) liability for the payment of any amounts of the type described in (i) as a result of being party to any agreement or any express or implied obligation to indemnify any other Person, or as transferee, successor, guarantor or surety.

"**Tax Return**" means any return, declaration, report, claim for return, or information return or statement relating to Taxes; including any schedule or attachment thereto, and including any amendment thereof.

SECTION 7.02    *Tax Cooperation; Allocation of Taxes.*

(a)    Buyer and the Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets (including, without limitation, access to books and records) as is reasonably necessary for the preparation and filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax.  Buyer shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least six years following the Closing Date.  At the end of such period, Buyer shall provide the Sellers with at least ten days prior written notice before destroying any such books and records, during which period the Sellers can elect to take possession, at its own expense, of such books and records.  The Sellers and Buyer shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets.  Notwithstanding any provision to the contrary in this Agreement, it is understood and agreed between Sellers and Buyer that the Sellers shall be wound up and dissolved as soon as practicable following Closing.

(b)    To the extent not exempt under Section 1146(a) of the Bankruptcy Code in connection with the Chapter 11 Cases, all excise, sales, use, value added, registration stamp, recording, documentary, conveyance, franchise, property, transfer and similar Taxes, levies, charges and fees, whether federal, state, local or non-U.S., including any interest and penalties (collectively, "**Transfer Taxes**") incurred in connection with the transactions contemplated by this Agreement shall be borne by Buyer when due, and Buyer will, at its own expense, file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes.  Buyer and the Sellers shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation.  If any Seller, as agent for any Taxing Authority, is required to collect such Transfer Taxes, Buyer shall pay the aggregate amount of such Transfer Taxes to the Sellers on demand and in such case Sellers shall remit such amount to the appropriate Taxing Authorities in accordance with applicable legislation.  Buyer and the Sellers shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation, relating to Transfer Taxes.  Buyer shall indemnify and hold the Sellers harmless from and against any Transfer Taxes, penalty, interest or other amounts which

12

may be payable by or assessed against the Sellers as a result of any incorrect statement or breach of the obligations of the Buyer and/or in connection with the Seller's failure to collect and remit any Transfer Taxes on the sale and conveyance of the Purchased Assets to the Buyer, together with all loss, costs and expenses.

(c) Transfer Taxes shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by applicable law.

SECTION 7.03 *Purchase Price Allocation*. Sellers shall prepare an allocation of the Purchase Price (and all other capitalized costs) among the Purchased Assets in accordance with Code §1060 and the Treasury regulations thereunder (and any similar provision of state, local, or non-U.S. law, as appropriate), which allocation shall be binding upon Buyer. Sellers shall deliver such allocation to Buyer within 60 days after the Closing Date. Sellers and Buyer and their Affiliates shall report, act, and file Tax Returns (including, but not limited to Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation prepared by Sellers. Buyer shall timely and properly prepare, execute, file, and deliver all such documents, forms, and other information as Sellers may reasonably request in preparing such allocation. Neither Sellers nor Buyer shall take any position (whether in audits, Tax Returns, or otherwise) that is inconsistent with such allocation unless required to do so by applicable law.

ARTICLE 8

SURVIVAL

SECTION 8.01 *Survival*. The (a) representations and warranties of the parties and (b) covenants and agreements of the parties that by their terms are to be performed before Closing, contained in this Agreement or in any certificate or other writing delivered in connection herewith shall not survive the Closing. The covenants and agreements contained herein that by their terms are to be performed after Closing shall survive the Closing indefinitely except the covenants, agreements, representations and warranties contained in Article 7 shall survive until expiration of the statute of limitations applicable to the matters covered thereby (giving effect to any waiver, mitigation or extension thereof). Notwithstanding any provision to the contrary in this Agreement, it is understood and agreed between Sellers and Buyer that the Sellers shall be wound up and dissolved as soon as practicable following Closing.

ARTICLE 9

TERMINATION

SECTION 9.01 *Grounds for Termination*. This Agreement may be terminated at any time prior to the Closing:

(a) by mutual written agreement of the Sellers and Buyer;

(b) by the Sellers, if Buyer has breached any representation or warranty of Buyer contained in this Agreement in any material respect, or if Buyer shall fail to perform or comply in all material respects with all covenants and obligations of Buyer under this Agreement to be performed or complied with by it on or prior to the Closing Date; *provided, that* Sellers are not

13

then in material breach of their representations, warranties, covenants or obligations under this Agreement;

(c)     by the Sellers, if any condition to the obligations of Sellers set forth in Section 6.01 (c) or (d) shall have become incapable of fulfillment; *provided, that* Sellers are not then in material breach of their representations, warranties, covenants or obligations under this Agreement;

(d)     by the Buyer, if any condition to the obligation of Buyer set forth in Section 6.02 shall have become incapable of fulfillment; *provided, that* Buyer is not then in material breach of its representations, warranties, covenants or obligations under this Agreement;

(e)     by either the Sellers or Buyer, if the Closing shall not have been consummated on or before the date that is two (2) Business Days after the entry of the Approval Order by the Bankruptcy Court, unless the party seeking termination is in material breach of its representations, warranties, covenants or obligations under this Agreement.

The party desiring to terminate this Agreement pursuant to this Section 9.01 (other than pursuant to Section 9.01(a)) shall give notice of such termination to the other party in accordance with Section 10.01.

SECTION 9.02   *Effect of Termination*.  If this Agreement is terminated as permitted by Section 9.01, such termination shall be without liability of any party (or any stockholder, director, officer, employee, agent, consultant or representative of such party) to the other parties to this Agreement except as provided in Sections 2.06 and 10.06, the provisions of which shall represent the sole and exclusive rights of the parties upon a termination of this Agreement under Section 9.01; *provided that* if such termination shall result from the (i) failure of Buyer to perform a covenant or obligation of this Agreement, or (ii) breach of any representation or warranty by Buyer, Buyer shall be fully liable for any and all damages, costs and expenses incurred or suffered by the Sellers as a result of such failure or breach.  The provisions of Sections 2.06, 5.01, 10.04, 10.05 and 10.06 shall survive any termination pursuant to Section 9.01.

SECTION 9.03   *Exclusive Remedies*.  Effective as of Closing, Buyer waives any rights and claims Buyer may have against the Sellers, whether in law or in equity, relating to (i) any breach of representation, warranty, covenant or obligation contained herein occurring on or prior to the Closing or (ii) the Purchased Assets or Assumed Liabilities.

MISCELLANEOUS

SECTION 10.01   *Notices*.  All notices, requests and other communications to any party hereunder shall be in writing (including facsimile or email transmission with delivery confirmation) and shall be given,

if to Buyer:

14

[_____ ]
**[ADDRESS]**
Attention: **[NAME]**
Fax: **[NUMBER]**
Email: **[EMAIL ]**

with a copy to:

[_____ ]
**[ADDRESS]**
Attention: **[NAME]**
Fax: **[NUMBER]**
Email: **[EMAIL ]**

if to the Sellers, to:

ECOtality, Inc.
430 South 2nd Avenue
Phoenix, AZ 85003
Attention: H. Ravi Brar
Fax:
Email: ravi.brar@ecotality.com

with a copy to:

Akin Gump Strauss Hauer & Feld LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
Attention:  David P. Simonds
Fax: (310) 229-1000
Email: dsimonds@akingump.com

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day at the place of receipt.

SECTION 10.02   *Amendments and Waivers*.

(a)   Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement or, in the case of a waiver, by the party against whom the waiver is to be effective.

15

(b)     No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

SECTION 10.03  *Successors and Assigns*.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; *provided that* no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the written consent of each other party hereto.

SECTION 10.04  *Governing Law*.  This Agreement shall be governed by and construed in accordance with the law of the State of [Arizona], without regard to the conflicts of law rules of such state.

SECTION 10.05  *Jurisdiction*.  The parties hereto agree that, during the period from the date hereof until the date on which Sellers' the Chapter 11 Case is closed or dismissed (the "**Bankruptcy Period**"), any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court.  The parties further agree that, following the Bankruptcy Period, any suit, action or proceeding with respect to this Agreement or the transactions contemplated hereby shall be brought against any of the parties exclusively in either the United States District Court for the District of Arizona or any state court of the State of Arizona located in such district, and each of the parties hereby irrevocably consents to the jurisdiction of such court and the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the such courts or that any such suit, action or proceeding which is brought in such courts has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court, the United States District Court for the District of Arizona]or any state court of the State of Arizona.

SECTION 10.06  *WAIVER OF JURY TRIAL*.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SECTION 10.07  *Counterparts; Third Party Beneficiaries*.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.  No provision of this Agreement is intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

SECTION 10.08  *Specific Performance*.  It is understood and agreed by Buyer that money damages would be an insufficient remedy for any breach of this Agreement by Buyer and

as a consequence thereof, after the Bankruptcy Court's entry of the Approval Order, Sellers shall be entitled to specific performance and injunctive or other equitable relief as a remedy for such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring Buyer to comply promptly with any of its obligations hereunder. Sellers shall be entitled to an injunction to enforce specifically the consummation of the transactions contemplated herein in a proceeding instituted in any court in the State of Arizona having jurisdiction over the parties and the matter.

SECTION 10.09  *Entire Agreement*.  This Agreement and the Confidentiality Agreement constitute the entire agreement between the parties with respect to the subject matter of this Agreement and supersede all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

SECTION 10.10  *Bulk Sales Laws*.  Buyer hereby waives compliance by the Sellers and the Sellers hereby waive compliance by Buyer with the provisions of the "bulk sales", "bulk transfer" or similar laws of any jurisdiction other than any laws which would exempt any of the transactions contemplated by this Agreement from any Tax liability which would be imposed but for such compliance.

SECTION 10.11  *No Strict Construction*.  Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

SECTION 10.12  *Non-Recourse*.  No past, present or future director, manager, officer, employee, incorporator, member, unitholder, partner or equityholder of any party hereto shall have any liability for any obligations or liabilities of the parties under this Agreement or any other document related to the transactions contemplated hereby, for any claim based on, in respect of, or by reason of the transactions contemplated hereby and thereby, and each party hereby covenants not to sue any past, present or future director, manager, officer, employee, incorporator, member, unitholder, partner or equityholder of any other party for any such claim.

SECTION 10.13  *Severability*.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

17

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

ECOTALITY, INC.

By:_____
Name:
Title:

ELECTRONIC TRANSPORTATION
ENGINEERING CORPORATION

By:_____
Name:
Title:

ECOTALITY STORES, INC.

By:_____
Name:
Title:

ETEC NORTH, LCC

By:_____
Name:
Title:

THE CLARITY GROUP, INC.

By:_____
Name:
Title:

G.H.V. REFRIGERATION, INC.

By:_____
Name:
Title:

**[BUYER]**


By:    _____
       Name:
       Title:

**SCHEDULE 1.01(a)**
**INTELLECTUAL PROPERTY**

**SCHEDULE 1.01(b)**
**PERMITTED LIENS**

**SCHEDULE 2.01(a)**
**PURCHASED ASSETS**

**SCHEDULE 2.01(b)**
**EXCLUDED ASSETS**

## SCHEDULE 2.02
## ASSUMED LIABILITIES

**SCHEDULE 3.04**
**MATERIAL BENEFIT PLANS**