1   CHARLES R. GIBBS (*pro hac vice* admission pending)    DAVID P. SIMONDS (*pro hac vice* admission pending)
    AKIN GUMP STRAUSS HAUER & FELD LLP      ARUN KURICHETY (*pro hac vice* admission pending)

2   1700 Pacific Avenue        AKIN GUMP STRAUSS HAUER & FELD LLP
    Dallas, Texas 75201        2029 Century Park East, Suite 2400

3   Telephone: (214) 969-2800        Los Angeles, California 90067
    Facsimile: (214) 969-4343        Telephone: (310) 229-1000

4                      Facsimile: (310) 229-1001

5   – and –

6   JARED G. PARKER (SBN: 6428)
    PARKER SCHWARTZ, PLLC

7   7310 N. 16th St., Suite 330
    Phoenix, Arizona 85020

8   Telephone: (602) 282-0476
    Facsimile: (602) 282-0478

9

10   [Proposed] Attorneys for Debtors
    and Debtors in Possession

11

12 <div align="center">

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA
</div>

| | |
|---|---|
| 13 In re: | Case No. 2:13-BK-16126 (RJH) |
| 14 ELECTRIC TRANSPORTATION ENGINEERING CORPORATION (d/b/a | Chapter 11 |
| 15 ECOTALITY NORTH AMERICA), *et al.*,[1] | (Joint Administration Requested) |
| 16     Debtors. | **DECLARATION OF H. RAVI BRAR IN SUPPORT OF FIRST DAY PLEADINGS** |
| 17 | |
| 18 | Hearing Date: September 19, 2013 Time: 10:30 a.m. (MST) |
| 19 This filing applies to: | |
| 20   ■ All Debtors | |
| 21   ☐ Specified Debtors | |

22

23

24

25

---

26       [1] The Debtors in these jointly administered chapter 11 cases and the last four digits of their respective Employer

27 Identification Numbers are: (i) ECOtality, Inc. (5422); (ii) Electric Transportation Engineering Corporation (4755); (iii) ECOtality Stores, Inc. (2643); (iv) ETEC North, LLC (n/a); (v) The Clarity Group, Inc. (8832); and (vi) G.H.V. Refrigeration, Inc. (4512). The Debtors' service address at ECOtality, Inc.'s corporate headquarters is Post Montgomery

28 Center, One Montgomery Street, Suite 2525, San Francisco, California 94104.

I, H. Ravi Brar, declare as follows under penalty of perjury:

1.     I am the President and Chief Executive Officer of each of the above-captioned debtors and debtors in possession (collectively, the "***Debtors***").[2]  I have been employed by the Debtors in these roles since September 2012.  From November 2010 to September 2012, I served as Chief Financial Officer of Debtor ECOtality, Inc. ("***ECO***").  Accordingly, I am familiar with the Debtors' day-to-day operations, businesses and financial affairs.

2.     On the date hereof (the "***Petition Date***"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").  To minimize the adverse effects of the commencement of these chapter 11 cases on the Debtors' businesses, the Debtors have requested a variety of relief in "first day" motions and applications (collectively, the "***First Day Pleadings***"), filed concurrently herewith.  I am familiar with the contents of each of the First Day Pleadings, and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.  Indeed, I believe that the Debtors' estates would suffer immediate and irreparable harm absent the immediate ability to obtain the relief requested in the First Day Pleadings.  In my opinion, approval of the relief requested in the First Day Pleadings will minimize disruptions to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors and their estates and assisting the Debtors in achieving a successful conclusion to these chapter 11 cases.

3.     In support of the First Day Pleadings, I submit this declaration (the "***Declaration***") to assist the Court and other parties in interest in understanding the circumstances that led to the commencement of these chapter 11 cases.  Except as otherwise indicated, all facts set forth herein are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion based upon my experience, knowledge and information concerning the Debtors' operations and financial affairs.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

---

[2] A chart detailing the corporate structure of the Debtors is attached hereto as **Exhibit A**.

4. This Declaration is divided into four parts. Section I of this Declaration provides an overview of the Debtors' business operations, the EV Project (as defined below), and the Debtors' prepetition debts and other significant liabilities. Section II describes the events giving rise to these chapter 11 cases. Section III presents the Debtors' intended goals, objectives and proposed course for these chapter 11 cases. Last, Section IV summarizes, and provides the basis for, the relief requested in the First Day Pleadings.

**I.
DESCRIPTION OF THE DEBTORS' OPERATIONS, THE EV PROJECT,
AND PREPETITION DEBT**

A. **The Debtors' Business Operations**

    *i.*      *Overview*

5. Originally formed in 1999 as a marketing enterprise for biodegradable products, the Debtors rebranded themselves in November 2006 to reflect their businesses' renewable energy strategy. Collectively, the Debtors are a leader in advanced electric vehicle ("*EV*") charging and energy storage systems, with over twenty years of experience in designing, manufacturing, testing and commercializing such technologies. As an industry leader and innovator in these fields, the Debtors primarily operate three complementary business segments: Blink; Minit-Charger; and eTec Labs. In addition to their complementary business segments and as a result of the Debtors' extensive history in the EV supply equipment industry, they have been successful in winning bids for public and private funding to support and manage EV charging infrastructure research and deployment programs, including, most notably, a $100.2 million cost-share grant (the "*DOE EV Project Contract*") from the United States Department of Energy (the "*DOE*") to lead, support and manage the largest deployment of EVs and charging infrastructure in United States history (the "*EV Project*").[3] The Debtors also received an $8.0 million grant from the California Energy Commission with respect to deploying charging infrastructure and EVs in the San Diego, California region.

---

[3] The Debtors were also awarded a $26.4 million contract in 2012 under the DOE's AVTA (as defined below) program.

*ii.* ***The Debtors' Businesses***

5.     As noted above, the Debtors mainly operate three distinct, yet complementary, business

segments: (a) Blink; (b) Minit-Charger; and (c) eTec Labs.  Under the Blink brand, the Debtors offer

electric vehicle charging stations and a turnkey network operating system for EV drivers, commercial

businesses and utilities.  Minit-Charger manufactures and distributes fast-charging systems for material

handling and airport ground support vehicles.  The eTec Labs business segment is a trusted research

and testing resource for governments, automotive original equipment manufacturers ("***OEMs***") and

utilities.

a.  <u>Blink</u>

6.     The Debtors' flagship passenger vehicle product line consists of Blink charging

stations, which are available for both residential and commercial applications.  To date, the Debtors

have installed approximately 13,500 Blink charging stations, which consist of the following:  Level 2

wall-mount units, commonly referred to as the Blink Residential Charger (the "***Blink Residential***"); a

commercial stand-alone Level 2 charger, commonly known as the Blink Level 2 Pedestal Charger (the

"***Blink Pedestal***"); and, the Blink DC Fast Charger (the "***Blink DC***").

7.     The Blink Residential chargers, generally consumer in nature, are typically installed in

an individual's home, garage or carport, and are available in both hardwired and plug-in models.  The

Blink Pedestal charger, on the other hand, is designed for commercial applications and is installed

where drivers normally travel – movie theaters, shopping malls, coffee shops, restaurants and retailers.

Through these convenient locations, individuals can utilize chargers in the ordinary course of their

day-to-day activities, thereby extending the range of their EVs.  Both the Blink Residential and Blink

Pedestal chargers are capable of delivering a full charge to a consumer's EV in approximately two to

eight hours.  The Blink DC charger is a fast charging system that is capable of delivering a full charge

to an EV in less than 30 minutes (depending on battery size).  Major customers that have installed

Blink chargers include Cracker Barrel, Fred Meyer, IKEA, Kimpton Hotels, Kohl's, Macy's, Mapco,

McDonald's, Regency Centers, Sears and WalMart.

8.     In addition to providing physical charging locations, each of the Blink chargers is

connected through the "***Blink Network***," which is a cloud-based operating system that provides distinct

advantages to both EV drivers and the Debtors. The connection of the chargers to a central computer via cellular services and the internet creates the Blink Network. This provides for what the industry describes as smart charging services and allows the Debtors to provide device management and provisioning, location pricing customization, transaction processing, payment gateways, data collection, content management, reservation capabilities and integration with utility smart grid services and load management and demand response programs. This enables automated or cloud-based demand response and energy management services, thereby providing virtual control of, and access to data regarding, EVs in the Blink Network, charging events, and the Blink charging stations themselves. These services are widely viewed by the major industry participants to provide valuable services to vehicle drivers as demonstrated by a current customer enrollment rate of 500 new memberships a week. Smart charging also allows for the collection of fees and centralized billing services for the members. The usage data previously described is also believed to be valuable in the foreseeable future to the charger Hosts, utilities and governments for planning purposes, and should provide another revenue should the Debtors survive and industry matures.

9. With respect to EV drivers, the Blink Network allows consumers the freedom to travel wherever they choose and to charge their EVs at conveniently located commercial locations. Utilizing the Blink Network, EV drivers are able to easily identify charging stations and then pay for such charging services through a variety of methods, including smart phone applications, radio-frequency identification (RFID) cards, and other mobile phone and credit card-based options. EV drivers may further take advantage of the Blink Network by becoming a member of the Blink Network. Members of the Blink Network have access to discounted charging rates, reservation systems and enhanced Blink Network capabilities.

### b. Minit-Charger

10. The Debtors' Minit-Charger business line offers fast-charging systems for off-road industrial applications, including material handling operations and airport ground support equipment ("**GSE**"). The Minit-Charger is a patented advanced algorithm technology that provides a lighter, compact and cost-effective fast charging system for GSEs and material handling operations. The

Minit-Charger is capable of charging batteries four to six times faster than conventional chargers and enables battery life that is equal to or longer than traditional charging methods.

11.     Similar to the Blink product line, Minit-Chargers also include advanced data collection capabilities, including the patented Minit-Trak fleet and system data management system.  This system provides operators with comprehensive performance evaluation of a battery's state-of-health and state-of-charge, and automatically adjusts charging rates to increase and maximize battery life.

### c.  eTec Labs

12.     The Debtors' eTec Labs business is a trusted research and testing resource for governments, automotive OEMs and utilities.  This business segment has standing contractual relationships as a test contractor and consulting engineer for projects with the DOE, several national research laboratories, national energy storage consortiums and large electric utilities.  Through these contracts eTec Labs provides services in energy storage, monitoring, systems design and fabrication, product and vehicle testing, and product development.

13.     More specifically, since 1998, eTec Labs has been the testing partner for the DOE's Advanced Vehicle Testing Activity ("*AVTA*") program under a grant for vehicle and associated fueling infrastructure, which provides baseline vehicle performance testing and battery analysis.  In connection with AVTA, the Debtors purchase vehicles from local bidders through a bidding process (subject to reimbursement from the DOE and other conditions related to disposal of these vehicles at the end of testing), and then subject such vehicles to rigorous performance testing analysis.  To date, eTec Labs has conducted more than twelve million test miles for more than 1,250 advanced vehicles under the AVTA program.

14.     Utilizing their extensive EV experience, the Debtors' eTec Labs business line also has developed what is known as an EV Micro-Climate Planning Process (the "*Climate Process*").  The Climate Process is a detailed planning and consulting program that is designed for municipal planning organizations and utilities to provide a deployment blueprint and action plan for a comprehensive EV charging infrastructure in a given area.  The implementation of the Climate Process includes physical charge infrastructure installations at residential, commercial and public locations, as well as comprehensive review of regulatory issues, public awareness and marketing programs to support the

various value chains associated with the Climate Process. The Climate Process has been undertaken and refined in markets covered by the EV Project, as well as certain domestic and international markets not covered. In addition, the Climate Process has been implemented with respect to many major utilities which include BC Hydro in British Columbia.

### d. Miscellaneous Business Lines

15. In addition to their core business lines, the Debtors and certain affiliated non-Debtor entities operate several smaller businesses. Debtor ECOtality Stores, Inc. ("**ECOtality Stores**"), which does business as Fuel Cell Store, operates a virtual store selling hydrogen fuel cell equipment for educational and recreational purposes. ECOtality Stores has an online presence only and does not have any employees or physical operations. In addition, non-Debtor affiliate Portable Energy de Mexico, S.A. Dec. V. ("**Portable Energy**"), a company organized under the laws of Mexico, provides manufacturing and assembly services or a type of battery required for certain supercomputers. Portable Energy has operations in Tijuana, Mexico and has six (6) employees. Debtor ECO is Portable Energy's sole customer.

### iii. The EV Project

16. On September 30, 2009, Debtor Electric Transportation Engineering Corporation ("**ETEC**") entered into the DOE EV Project Contract, which is a cost-reimbursable contract with the DOE to support, manage and lead the EV Project. The EV Project, which is the largest deployment of EV charging infrastructure in United States history, seeks to collect data on the use of such infrastructure through the placement of residential and commercial Blink charging stations throughout approximately twenty-one (21) major metropolitan areas in the United States, including Phoenix, Arizona, Los Angeles, California, San Francisco, California, Dallas, Texas, Chicago, Illinois, Philadelphia, Pennsylvania, Atlanta, Georgia and Washington, DC. The EV Project, initially projected to cost approximately $218.7 million, commenced in October 2009, and was previously scheduled to conclude in April 2013. Given the Debtors' liquidity situation and other factors described herein, the EV Project, to date, has not concluded.

17. Under the DOE EV Project Contract, ETEC was awarded a cost-share grant of approximately $99.8 million, of which $13.4 million was sub-funded to two (2) state and federal

research and development centers. The DOE EV Project Contract was subsequently extended to award ETEC an additional $15 million in cost-share money. Under the terms of the DOE EV Project Contract, the DOE agreed to reimburse 45.8% of total EV Project costs incurred by ETEC, up to a total amount equal to $100.2 million.[4] As of December 31, 2012, ETEC had received $84.8 million in reimbursements from the DOE.

### iv. Prepetition Debts and Other Significant Liabilities

18. Notably, the Debtors have no significant secured debt obligations and no liens on cash collateral.[5] Instead, the Debtors' significant prepetition liabilities are composed of an unsecured convertible note, certain capital lease obligations and other long-term secured debt. Each of these liabilities is summarized below:

### a. Convertible Note

19. On March 13, 2012, the Debtors received $5 million in cash in exchange for a convertible note (the "**Convertible Note**") payable to ABB Technology Ventures Ltd ("**ABBTV**").[6] In connection with the issuance of the Convertible Note, Debtor ECO decreased the exercise price of certain previously existing warrants held by ABBTV. The Convertible Note bears interest at a rate of 5.05% per annum, which is payable quarterly in arrears, and matures on March 13, 2015. The Convertible Note also is convertible into 3,937,007 shares of ECO's common stock at a per share conversion price equal to $1.27 per share.

### b. Capital Lease Obligations and Other Long Term Debt

21. In addition to the Convertible Note, the Debtors have certain capital lease obligations and other long-term secured debt. The amount and nature of these obligations is as follows:

- **Building Note**: On January 16, 2007, ECO purchased an office building in Arizona for an aggregate price of $575,500. One-half of the aggregate price, or $288,000, was paid in cash and the remaining balance of $287,500 was structured as an interest-only loan (the "**Building Note**"). The loan carried an annual interest rate of 6.75%, with monthly interest-

---

[4] The DOE EV Project Contract was amended in August 2012 to reduce the total estimated costs under the EV Project from $218.7 million to $210.7 million.

[5] Although the Debtors do not have any significant secured debt obligations, the DOE may assert interests in, or with respect to, certain of the Debtors' assets. The Debtors reserve their rights regarding the character, validity, extent, avoidability and enforceability of any such interests.

[6] ABBTV is a subsidiary of ABB, a global leader in power and automation technologies. The Debtors and ABB have numerous strategic relationships pursuant to various license and collaboration agreements.

only payments due beginning on February 16, 2007. On January 20, 2012, ECO entered into an agreement to modify the terms of the Building Note. In connection with the terms of the loan modification, ECO paid $100,000 as a principal reduction of the Building Note. The remaining balance of $187,500 was structured as an interest-only loan, bearing interest at 7.0% per annum, with monthly payments in the amount of $1,100, beginning on February 16, 2012. The entire outstanding $187,500 principal balance is due on January 16, 2014 (the "*Interim Maturity Date*"); provided, however, if ECO does not default on any interest payments due in the period up to the Interim Maturity Date, then the Interim Maturity Date shall automatically extend until January 16, 2016. ECO has the right to pay the principal balance early without penalty, and the Building Note is secured by a deed of trust on the office building.

- **Cisco Equipment Lease**: ECO also entered into a Master Lease Agreement with Cisco Capital (the "*Cisco Equipment Lease*") for equipment with an original retail price of $314,000. The terms of Cisco Equipment Lease provide for monthly payments, beginning on December 1, 2011, of principal and interest at a rate of 5.4% per annum.

- **Operating Leases**: ECO leases certain other equipment and facilities from various third parties. These leases are all set to expire before October 2014; however, certain of these leases may be extended by the Debtors on a month–to–month basis. Through the first three months of 2013, the Debtors estimate that facilities-related lease payments totaled approximately $277,000.

## II.
## EVENTS LEADING UP TO THESE CHAPTER 11 CASES

22.     The Debtors' chapter 11 cases are not the result of an "overleveraged" balance sheet, a single adverse event or a long-term decline in revenues. Rather, the Debtors' entry into chapter 11 can best be described as the result of a confluence of several adverse events occurring during the first and second quarters of 2013, which significantly impacted the Debtors' liquidity situation. The Debtors likely could have sustained operations in the face of these events individually, at least for some time, but, as described herein, the combined effect, and relative timing, of these events effectively left them with no choice but to file these chapter 11 cases at this time.

23.     Among other things, six factors precipitated the Debtors' decision to file these chapter 11 cases. These factors include: (i) the Debtors' failure to attain sales volumes of their commercial Electric Vehicle Service Equipment ("*EVSE*") sufficient to support their operations; (ii) the Debtors' inability to release a scheduled new product offering in their Minit-Charger industrial line; (iii) the Debtors' inability to obtain additional financing that would allow them to finance their operations; (iv) the DOE's suspension of payments to the Debtors in connection with the EV Project; (v) the significant expenses and liquidated damages incurred by the Debtors in connection with a

settlement with the United States Department of Labor ("**DOL**"); and (vi) uncertainty regarding the resolution of a phenomenon occurring in some of the Debtors' previously installed EVSEs.

### B. Failure to Meet Sales Projections

24. The Debtors failed to attain sales volumes of their commercial EVSEs sufficient to support the Debtors' operations in the second half of 2013. As cash flows from the EV Project declined, it was essential that the Debtors transition from subsidized installations of EVSEs under the EV Project to regular commercial sales and installations. To this end, the Debtors reorganized their sales organization to support such efforts. In addition to selling their products directly through their sales force, the Debtors formed commercial relationships with independent dealers for the purpose of distribution of their EVSEs and related products in the first half of 2013 with the expectation of selling substantial volumes of EVSE products in the second half of 2013. At this time, neither the Debtors' direct sales force nor the independent dealers have generated sales volumes of their commercial EVSE products sufficient, in combination with other sources of revenue, to support the Debtors' operations in the second half of 2013.

### C. Failure to Release a New Minit-Charger Product

25. The Debtors were unable to release a scheduled new product offering in their Minit-Charger industrial line. Their industrial product line expansion with the Minit Charger 12 product, which was scheduled to launch later this year, was critical to the Debtors' growth. However, because the Minit Charger 12 product exhibited unacceptable performance shortfalls during prototype verification testing, such product will not be introduced in 2013. Accordingly, there will be no revenues from the product in 2013.

### D. Inability to Obtain Sufficient Prepetition Capital

26. The Debtors have been unable to obtain additional financing. Net working capital is an important measure of the Debtors' ability to finance their operations. As the Debtors focused on their business plan for strong growth of their commercial businesses, they were cognizant that fully executing on their plan would require the Debtors to raise additional capital to supplement their cash flows from operations. Management actively pursued a number of options to secure additional capital.

However, the Debtors learned on August 8, 2013 that financing that was being pursued from an existing investor would not be forthcoming.

### E. Suspension of Funds from the DOE

27.     In an abundance of caution on August 8, 2013, the Debtors notified the DOE that, even though the Debtors continued to aggressively pursue certain options for additional financing and was exploring other alternatives, in the event additional financing was not obtained, the Debtors may not be able to fulfill their operational obligations, including under the EV Project. In response, the DOE sent a letter to the Debtors stating that it was suspending all payments under the EV Project while it investigates the situation and determines whether the award should continue. This suspension has had a significant impact on receivables that were anticipated to be collected from the DOE, in addition to remaining amounts anticipated to be invoiced and collected under the EV Project.

28.     In the August 8, 2013 letter, the DOE also notified the Debtors that the Debtors were not authorized to incur any new cost or obligation under the award and that the DOE would not reimburse the Debtors for such costs during the suspension. Further, the DOE instructed the Debtors to provide notices to their vendors and subcontractors of the suspension.

### F. DOL Settlement

29.     In addition to the foregoing, the Debtors also incurred significant expenses and liquidated damages in connection with the previously disclosed (in public filings) Department of Labor ("**DOL**") investigation (the "**DOL Investigation**") under the Fair Labor Standards Act and the Davis-Bacon Act. The Debtors have agreed to pay certain employees and contractors identified by the Debtors and the DOL back wages and liquidated damages in an aggregate total amount of approximately $855,000 in consideration for a release of the Debtors by such employees and contractors of any and all liability with respect to any wage related matters. Accordingly, the Debtors revised its March 31, 2013 accrual of $597,000 to reflect the approximately $855,000 expected to be paid, in addition to approximately $89,000 in estimated payroll taxes, for a total accrual of $943,000 as of June 30, 2013, resulting in an additional approximately $346,000 charge to general and administrative expenses in the second quarter of 2013.

### G.  Uncertainty Regarding Existing Products

30.    The Debtors also face some uncertainty regarding the resolution of a phenomenon occurring in some of the Debtors' previously installed EVSEs, which causes overheating, and in certain rare cases melting, of the connector plug that connects the EVSE to the electric vehicle when charging.  The Debtors, along with certain automotive OEMs and equipment suppliers, have been actively evaluating the issue in an attempt to determine the cause and to address the problem.  Even though a root cause for the observed phenomenon has yet to be definitively verified, in the interim, on August 9, 2013, the Debtors commenced the reduction of the maximum power delivered by certain of the EVSEs, which reduction has been shown in limited laboratory test to reduce the temperature rise in the connector plug to acceptable levels.  The Debtors continue to discuss with the parts supplier of the connector plug a plan of action which would require the parts supplier to pay to replace either all the connector plugs in their existing EVSE units or those connector plugs identified to be problematic.  At this time, the Debtors are unsure whether the negotiations will result in the parts supplier agreeing to incur the cost of such remediation.  Accordingly, the Debtors may have to incur such costs and expenses in the future.  In addition, some OEMs have notified the Debtors that they are considering communicating to their customers and other parties to advise them not to use the Debtors' EVSEs because of the connector plug issue if the Debtors do not replace all connector plugs on their approximately 12,000 existing EVSEs in the market.  The Debtors believe such a communication may have a material adverse impact on the near term cash flow and prospects.

### H.    Engagement of a Restructuring Advisor

31.    In connection with the events disclosed above, the Debtors' Board of Directors (the "***Board***") retained FTI Consulting ("***FTI***"), as financial advisor, reporting directly to the Board.  FTI's primary responsibilities included:  (i) evaluating capital structure alternatives and identify additional sources of financing, (ii) executing profitability improvement alternatives, (iii) undertaking cost cutting measures, (iv) developing and execute plans to improve liquidity against existing assets, (v) identifying ongoing personnel requirements and appropriate retention or incentive plans, and (vi) facilitating the possible sale of the Debtors or their assets.

### III.
### PROPOSED COURSE OF THESE CHAPTER 11 CASES

### I.     Ongoing Negotiations with the DOE and Nissan

32.     The Debtors' management has actively pursued a number of options to secure additional capital.  As discussed in greater detail in the *Motion For Entry Of Interim And Final Orders (A) Authorizing The Debtors To Obtain Postpetition Financing, (B) Prescribing The Form And Manner Of Notice And Scheduling A Final Hearing, And (C) Granting Certain Related Relief* (the "***DIP Motion***") and the *Debtors' Motion For Entry of (I) An Order (A) Approving Bidding Procedures In Connection with the Sale Of Substantially All Of The Debtors' Assets, (B) Scheduling Sale Hearing, (C) Approving The Form And Manner Of The Sale, Auction, And Sale Hearing, And (D) Granting Related Relief, And (Ii) An Order Approving The Sale Of Substantially All Of The Debtors' Assets* (the "***Sale Motion***") filed contemporaneously herewith, after recognizing that it was highly unlikely that the Debtors could obtain prepetition financing on reasonable terms, the Debtors commenced a process through which they sought to obtain either out-of-court financing or postpetition financing in an amount sufficient to conduct a chapter 11 sale process for their assets.  The Debtors, with the assistance of their advisors, contacted (or were contacted by) approximately thirty-four (34) parties (including both financial and strategic players) who expressed an initial interest in either providing postpetition financing or purchasing the Debtors' assets.  Of these thirty-four (34) parties, the Debtors received preliminary indications of interest from twenty-three (23) parties.   Eleven (11) parties executed confidentiality agreements in order to obtain non-public financial information, balance sheet detail, performance metrics and other related due diligence information.  Of the eleven (11) parties that executed confidentiality agreements, three (3) parties expressed interest in providing postpetition financing and eight (8) expressed interest in purchasing the Debtors' assets.  Many of these parties, although interested, were unable to receive sufficient comfort regarding the status of the DOE's rights and interests in the Debtors' assets or otherwise decided not to provide financing.

33.     As of the Petition Date, only one (1) party, Nissan North America, Inc. ("***Nissan***"), has expressed continued interest with respect to providing postpetition financing within the timeframe dictated by the Debtors' liquidity crisis.  Since expressing an initial interest approximately three (3)

weeks prior to the Petition Date, Nissan and the Debtors have engaged in numerous discussions, exchanged written proposals and negotiated in good faith and at arm's length the terms of proposed postpetition financing, which would allow the Debtors to remain operational for a limited period after the Petition Date and conduct an expedited process related to the sale of the Debtors' assets.[7] Consequently, the Debtors, through the DIP Motion, seek to obtain up to $1.25 million in postpetition financing from Nissan.

### J. The Debtors Proposed Budget and Need for Expedited Sale Process

34. Based on the Debtors' four (4) week rolling cash forecast and the agreed upon budget attached to the Interim Order as **Annex 2**, the Debtors believe that, with cash on hand and the anticipated availability under the proposed postpetition financing, they will have the ability to fund an expedited process with respect to the sale of some, substantially all, or all of their assets.

35. Faced with the alternative of imminent liquidation, the Debtors believe, in their reasonable business judgment, that conducting an expedited sale process within the timeframe dictated by available cash will maximize any potential recoveries for the Debtors' creditors under the circumstances. Though the Debtors sought to obtain a larger postpetition financing facility to conduct a longer sale process, no party, including Nissan, was willing to provide sufficient financing under the circumstances.

### K. Sale Process

36. Though the Debtors have not entered into any "stalking horse" agreements, the Debtors have received preliminary indications of interest from several parties regarding the purchase of some, substantially or all of their assets. The Debtors anticipate that these parties will continue their due diligence investigations postpetition and may submit bids for the Debtors' assets pursuant to the proposed bidding procedures described in the Sale Motion. In addition, upon approval of the bidding procedures, the Debtors will continue their efforts to market their assets and also believe that the

---

[7] Nissan has developed and manufactured EVs (under the Leaf name) that operate on the Debtors' Blink Network. As a result, Nissan has agreed to provide postpetition financing with a view towards keeping the Blink Network operational during the proposed sale process.

publicity generated by these chapter 11 cases may bring other interested parties forward, thereby potentially leading to an active bidding process for the Debtors' assets.

## IV.
## SUMMARY OF FIRST DAY PLEADINGS[8]

37.     To enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases on their ongoing business operations and to promote a smooth transition to operations in chapter 11 and during the sale process, the Debtors have requested various forms of relief in their First Day Pleadings.  The First Day Pleadings seek authority to, among other things, ensure the continuation of the Company's cash management systems and business operations without interruption and provide for compensation of the Debtors' employees in the ordinary course of business.  Obtaining Court approval of the relief sought in the First Day Pleadings is essential to the Debtors' ability to work toward a successful completion of these chapter 11 cases that will benefit all of the Debtors' constituents, preserve customer relationships and maintain employee morale.

38.     I have reviewed each of the First Day Pleadings.  The facts stated therein are true and correct to the best of my information and belief, and I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully preserving the Debtors' businesses and pursuing the goals of these chapter 11 cases.

39.     Several of the First Day Pleadings request authority to pay certain prepetition claims.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedures provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, and as set forth below, the Debtors have only requested immediate authority to pay prepetition claims where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

---

[8] All capitalized terms used in this section but not otherwise defined shall have the meanings ascribed to them in the applicable First Day Pleading.

# I.    FINANCING AND SALE RELATED MOTIONS

## A.    Sale and Bid Procedures Motion

40.    Beginning in August 2013, the Debtors embarked on a comprehensive restructuring effort, including exploring various strategic alternatives, such as a transaction involving a sale of all or a portion of the Debtors' assets.  The Debtors, together with their advisors, in connection with these restructuring efforts, initiated a sale process, which included actively marketing their assets in an effort to maximize value for all of their creditors.  This marketing process included contacting various financial and strategic parties that the Debtors and their advisors believed may have an interest in potentially purchasing some or all of the Debtors' assets (the "*Assets*") and discussing such possibilities with them.  Specifically, as described above, the Debtors or their advisors:  (i) contacted thirty-four (34) potential purchasers, (ii) received preliminary indications of interest from twenty-three (23) parties, and (iii) entered into confidentiality agreements (each, a "*Confidentiality Agreement*") with eleven (11) parties.  Of those eleven (11) parties, eight (8) parties expressed interest in purchasing the Debtors' Assets.  Given the Debtors' significant liquidity constraints and the difficulty of obtaining long-term financing to support the Debtors in a reorganization, I believe that a sale of their Assets in the manner described herein is necessary to maximize value for the Debtors' estates and their creditors.

41.    As noted above, as a result of these efforts, the Debtors received several preliminary indications of interest from potential purchasers.  Ultimately, however, the Debtors were unable to negotiate a stalking horse agreement prior to the commencement of these chapter 11 cases, in significant part, because of their liquidity needs.  Rather than delay the filing of these cases, the Debtors have determined that it is in the best interests of their estates and creditors to file these cases without a stalking horse bidder and to open the sale to all interested parties (subject to indentifying a stalking horse bidder prior to September 30, 2013 in accordance with the process outlined in the Bidding Procedures).

42.    I believe that the Bidding Procedures and an Auction will afford the Debtors the best opportunity to market their Assets and maximize value while continuing to operate their businesses, which will avoid a fire-sale liquidation process that I believe would result in severely diminished recoveries for the Debtors' estates, their creditors, and other stakeholders.

Case 2:13-bk-16126-RJH    Doc 28    Filed 09/17/13    Entered 09/17/13 19:51:09    Desc
Main Document    Page 16 of 50

**B.** **DIP Financing Motion**

  *i.*   *Need for Postpetition Financing*

  33.   As of the Petition Date, and as described more fully above, the Debtors had cash on hand of less than $500,000 and do not currently generate sufficient cash to fund their operating expenses. As a result, the Debtors have, with the assistance of their financial advisor FTI, analyzed their cash needs in an effort to determine what is necessary to maintain their businesses in chapter 11 while working toward a sale of substantially all of their assets pursuant to Bankruptcy Code section 363. In undertaking this analysis, the Debtors and their advisors have considered the impact of the current economic outlook on the Debtors' near-term projected financial performance, as well as the costs associated with conducting an orderly sale process.

  34.   As part of these recent financial analyses and projections, the Debtors, with the assistance of FTI, developed a rolling cash flow forecast, which takes into account anticipated cash receipts and disbursements during that time. This forecast considers a number of factors, including the impact of a bankruptcy filing, material cash disbursements, cash flows, and costs related to a sale process. Absent approval of the DIP Financing, these analyses and projections show that the Debtors' current cash on hand and the cash generated going forward will be insufficient to, among other things, preserve the Debtors' assets during the pendency of these chapter 11 cases and, more specifically, the sale process being pursued by the Debtors.

  35.   Without access to the DIP Financing, the Debtors will soon have no cash available to maintain their businesses and make the necessary expenditures that are critical to their operations and ability to conduct an orderly sale process. As such, the Debtors would be forced to curtail or most likely terminate their businesses to the material detriment of the value of their assets and all parties in interest in these chapter 11 cases.

  *ii.*   *The Debtors' Efforts to Obtain Postpetition Financing*

  36.   When it became apparent that the Debtors were generating insufficient cash to support their operating expenses and that a chapter 11 filing may be necessary, consistent with their fiduciary duties, the Debtors and FTI canvassed the market for potential third-party financing, either through a pre-bankruptcy facility or a debtor-in-possession facility. In addition to traditional financial

17

Case 2:13-bk-16126-RJH   Doc 28   Filed 09/17/13   Entered 09/17/13 19:51:09   Desc
Main Document   Page 17 of 50

institutions and parties that specialize in distressed lending, the Debtors and FTI contacted a number the Debtors' prepetition strategic partners, including those parties that rely on the Debtors' goods, services, and ongoing operations in some way, to gauge interest in a potential financing transaction.

37. Of the thirty-four (34) potential funding sources contacted by the Debtors and FTI, the DIP Lender was one of twenty-three (23) parties that gave a preliminary indication of interest. Of the twenty-three (23) parties that provided a preliminary indication of interest, three (3) executed confidentiality agreements. However, the DIP Lender was the only party that ultimately demonstrated a willingness to extend debtor-in-possession financing to the Debtors on favorable terms within the necessary timeframe. Importantly, the Debtors manufacture and manage the network of electric vehicle chargers that is relied upon by certain of the DIP Lender's customers. The Debtors believe that this prepetition relationship with the DIP Lender allowed them to secure a proposal for the DIP Financing on a much quicker schedule and on more favorable terms than would have otherwise been possible.

38. Nevertheless, prior to and during negotiations with the DIP Lender, the Debtors and their advisors analyzed and marketed various debtor-in-possession financing structures, and evaluated the Debtors' need for financing (*i.e.*, amount, type, etc.). In addition, the Debtors and their advisors carefully weighed the effect that the Debtors' prepetition relationship with the DOE would have on their ability to attain debtor in possession financing and ultimately sell substantially all of their assets in a chapter 11 proceeding.

39. In light of the above, and after thoroughly considering all other options, the Debtors determined that the proposal by the DIP Lender was in the best interests of their estates and all of their stakeholders. Specifically, the Debtors concluded that the proposal embodied in the DIP Credit Agreement is desirable because it provides the financing necessary to continue their businesses while pursuing a sale of substantially all of their assets. As reflected in the Budget, absent approval of the DIP Financing, the Debtors will exhaust their available cash within weeks or even days and most likely be forced to terminate their operations to the substantial detriment of the value of their assets to potential purchasers. Moreover, the financing offered by the DIP Lender is especially attractive because it allows the Debtors to avoid a costly and uncertain priming fight with the DOE. Specifically,

as set forth in the DIP Credit Agreement, the Debtors, the DIP Lender, and the DOE have agreed that the security interests provided to the DIP Lender do not extend to, and the DIP Collateral does not extend to, the Government Funded Property, as defined in the DIP Credit Agreement, except as specified in section 2.5(c) of the DIP Credit Agreement. Based on these factors, and in light of the fair and thorough negotiation process undertaken by the Debtors, I believe the DIP Financing currently is the only feasible postpetition financing option for the Debtors and is in the best interests of the Debtors' estates.

<div align="center">

***iii.    Implementation of the DIP Financing***

</div>

40.    The DIP Financing will allow the Debtors to draw on a $1,250,000 commitment from the DIP Lender. I believe that this commitment should allow the Debtors to meet all of their obligations during these chapter 11 cases while pursuing an orderly disposition of substantially all of their assets. The Debtors and the DIP Lender have agreed upon the Budget for the four (4) week period from the Closing Date. The Debtors believe that the Budget is achievable and will allow the Debtors to operate without the accrual of unpaid administrative expenses.

## II.    <u>OPERATIONAL MOTIONS</u>

### A.    Cash Management Motion

41.    The Debtors request entry of interim and final orders (i) authorizing, but not directing, the Debtors to (a) continue using their integrated cash management system (the "***Cash Management System***"), (b) honor or satisfy certain prepetition obligations related thereto, and (c) maintain their existing Bank Accounts and Business Forms; and (ii) granting administrative priority status to postpetition Intercompany Claims.

42.    It is my understanding that the Debtors and their non-Debtor affiliates maintain a Cash Management System composed of twenty-one (21) bank accounts (the "***Bank Accounts***"), located primarily at Bank of America ("***BoA***"), that facilitates the timely and efficient collection, management and disbursement of funds used by the Debtors. In addition to BoA, the Debtors and their non-Debtor affiliates also maintain Bank Accounts with Lloyds TSB UK, Banamex, and Bank of America Merrill Lynch (together with BoA, the "***Banks***").[9] In light of the size and complexity of the Debtors'

---

[9] ECO maintains one (1) Bank Account with Lloyds TSB UK, which currently has a zero balance, and is used

operations, I believe that a smooth transition into chapter 11 cannot be achieved if the Debtors' basic cash management procedures are substantially disrupted. Therefore, I believe that it is important that the Debtors be permitted to continue to consolidate the management of their cash and transfer monies in the amounts necessary to continue the operation of the Debtors' business and in accordance with their existing cash management procedures.

### i. *BoA Operating Accounts*

43. The primary source of operating funds for the Debtors comes from the DOE under various cost-share grants (the "***DOE Contracts***"). Additional funds are obtained from the Debtors' customers related to direct sales of their various products, which include residential, commercial and industrial charger systems sold under the Blink and Minit-Charger names. The Debtors also derive funds in connection with certain hosting services related to the Debtors' Blink network of electric chargers. The Debtors also derive funds in connection with certain hosting services related to the Debtors' Blink network of electric chargers. These funds, which generally come in the form of incoming wire transfers, customer checks and credit card transactions, initially are deposited into the Operating Accounts either directly with respect to wire transfers and customer checks or indirectly through a separate account specific to credit card transactions.

44. With respect to the Operating Account held in the name of ETEC, funds obtained under the DOE Contracts or from purchasers of Blink and Minit-Chargers are deposited directly into an Operating Account called the Full Analysis Business Account (the "***ETEC Operating Account***"). With the exception of certain Disbursement Accounts described below, all operating expenses related to ETEC's operations, which include obligations related to utilities, rent, vendors, employee expense reimbursement, employee wages and other related payroll obligations, are funded from the ETEC

---

solely to fund certain fees to the Debtors' accounting and tax provider Nair & Co. ECO also maintains one (1) money market investment Bank Account with Bank of America Merrill Lynch (the "***Merrill Lynch Account***"), which currently has a balance of approximately $16,000. The Debtors are currently in the process of closing two (2) Bank Accounts: (a) the Merrill Lynch Account and (b) the BoA collateral account that is used to secure obligations under the Debtors' corporate credit card program. The Debtors expect the process to be completed within the first week of these chapter 11 cases. Accordingly, the Debtors do not seek any requested relief with respect to these two Bank Accounts but reserve all rights to seek future relief with respect to these two Bank Accounts.

Non-Debtors ECOtality Australia Pty Ltd. and Portable Energy have one (1) Bank Account with Lloyds TSB UK and two (2) Bank Accounts with Banamex, respectively. Non-Debtors ECOtality Asia Pacific Ltd. and Collaboratev, LLC each have one (1) Bank Account with BoA.

Operating Account. With respect to payroll obligations specifically, ETEC transfers funds from the ETEC Operating Account to Automatic Data Processing ("***ADP***"), a third party service provider, who administers the payment of payroll obligations for ETEC.[10]

45. To the extent ECO requires funds for its operations, ETEC's centralized accounting personnel, in conjunction with accounting personnel at ECO, analyze the cash needs at the various Debtors and then transfer, as appropriate, required amounts. Given that ETEC generates the majority of the Debtors' revenues, either through the DOE Contracts or customer purchases, funds typically are transferred from the ETEC Operating Account to an Operating Account held by ECO (the "***ECO Operating Account***"); however, in certain instances, funds may be transferred in the opposite manner, depending upon the cash needs at the respective entities.

46. The Debtors also receive funds related to the sale of the Debtors' Innergy line of products, which include electric batteries and solar energy-related products. Such funds are deposited, either through credit card transactions or incoming wire transfers and customer checks, in another Operating Account held by ECO (the "***Innergy Operating Account***"). In addition, funds obtained by Debtor ECOtality Stores through the sale of fuel cell products are deposited in an Operating Account held by ECOtality Stores (the "***Fuel Cell Stores Operating Account***"), typically through credit card transactions. Depending on the Debtors' cash needs, funds may be transferred from the Fuel Cell Stores Operating Account to the Innergy Operating Account and then potentially to the ECO Operating Account for further disbursement.

### ii. *BoA Disbursement Accounts*

47. Although operational expenses generally are paid from the Operating Accounts, in certain instances, funds from the Operating Accounts are deposited into the Disbursement Accounts. Specifically, funds from the ECO Operating Account are transferred to the Innergy Operating Account and then deposited into a Disbursement Account, which funds are used to satisfy employee payroll

---

[10] Recently, the Debtors established a new payroll account specifically to handle manual payroll payments, which is beyond the scope of services currently provided by ADP. This is particularly important given the recent reduction in the Debtors' labor force, which ensures that such severed employees receive wages in a timely manner.

obligations associated with the Debtors' Innergy division. Such funds are then transferred to ADP, which administers the payment of payroll obligations related to the Debtors' Innergy operations.

### iii.    Intercompany Transactions

48.    The Debtors and certain non-Debtor affiliates maintain business relationships with each other (the "***Intercompany Transactions***") resulting in intercompany receivables and payables in the ordinary course of business (the "***Intercompany Claims***"). In connection with the daily operation of the Cash Management System, there may be Intercompany Claims owing by one Debtor to another Debtor or between a Debtor and non-Debtor affiliate at any given time. For example, in the ordinary course of business, ECOtality, Inc. will transfer funds to non-Debtor subsidiary Portable Energy for the payment of employee wages.[11]

49.    The Debtors track all fund transfers in their respective accounting system and can ascertain, trace and account for all Intercompany Transactions. The Debtors, in coordination with their proposed financial advisor during these chapter 11 cases, have also put in place monitoring systems to track postpetition Intercompany Transactions. The Debtors track all fund transfers in their accounting system and can ascertain, trace, and account for all Intercompany Transactions previously described. The Debtors, moreover, will continue to maintain records of such Intercompany Transactions. I believe that if the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' and their estates' detriment.

50.    I believe that the Debtors' Cash Management System constitutes a customary and essential business practice and was created and implemented by the Debtors in an appropriate exercise of their business judgment. I believe the widespread use of this type of Cash Management System, moreover, is attributable to the numerous benefits it provides, including the ability to (a) control and monitor corporate funds, (b) ensure cash availability and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. Accordingly, I believe that preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with a substantial disruption

---

[11] Non-Debtor subsidiary Portable Energy currently has six (6) employees who work four (4) days a week.

of the Cash Management System, will facilitate and enhance the Debtors' efforts to preserve value throughout these chapter 11 cases for their creditors and other parties in interest.

51.     The majority of the Bank Accounts are with BoA, which, from my understanding, is an authorized depository under the U.S. Trustee Guidelines.  The Debtors maintain only one Bank Account at Lloyds TSB UK, which does not appear on the U.S. Trustee's list of authorized depositories.  This particular Bank Account, however, maintains a zero balance.  I believe that the Debtors' Banks are well-capitalized, reputable and secure financial institutions and, therefore, the Debtors can maintain all of the Bank Accounts without jeopardizing any party in interest.

52.     To minimize expense to the Debtors' estates, I believe the Debtors should be authorized to continue to use all correspondence and business forms (including letterhead, purchase orders, invoices and related forms), as well as checks without reference to their "debtor in possession" status. I believe that changing correspondence and business forms would be unnecessary and burdensome to the estates, as well as expensive and disruptive to the Debtors' business operations.

### B.     Wages and Benefits

53.     The Debtors request entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay, in their sole discretion, all payments required under or related to Employee Obligations; authorizing the Debtors to continue to satisfy or honor, in their sole discretion, the Employee Benefits Plans, and all costs incident to the foregoing, and to continue to honor their practices, programs and policies for their Employees, as those practices, programs and policies were in effect as of the Petition Date and as such practices, programs and policies may be modified, amended or supplemented from time to time in the ordinary course of the Debtors' business; and (b) authorizing, but not directing, the applicable banks and other financial institutions to receive, process and pay any and all checks drawn on the Debtors' payroll and general accounts, and automatic payroll transfers to the extent that those checks or transfers relate to any of the foregoing.

54. As of the Petition Date, the Debtors employ approximately fifty-four (54) employees across their various business lines and operations (collectively, the "***Employees***").[12] Of this number, twenty-three (23) individuals are Employees of ECO and thirty-one (31) individuals are Employees of ETEC. All of the Employees work full time.

55. I believe that, given the highly technical and sophisticated nature of the Debtors' businesses, much of the Debtors' value is inextricably tied to their Employee workforce, without which the Debtors and, in particular, their extensive network of car charging stations, simply could not operate. The Employees perform a variety of critical functions related to the Debtors' various product lines and businesses, including research and development, engineering, administrative, accounting, legal, finance, management, supervisory, personnel management and other related tasks. I believe the Employees' particular skills, knowledge and understanding with respect to the Debtors' operations, infrastructure and customer, vendor and employee relations are essential to the ongoing viability of the Debtors' businesses.

56. Just as the Debtors depend on the Employees to operate their businesses on a daily basis, those individuals also depend on the Debtors. Indeed, I believe that the vast majority of these individuals rely exclusively on the payments and other benefits they receive from the Debtors for their basic living necessities. As described more fully herein, it is my understanding that the Debtors' outstanding prepetition Employee Obligations total approximately $171,536.75, excluding those Employee Obligations (*e.g.*, Paid Time Off (as defined below)) that either (a) would be honored or paid over time in the ordinary course of the Debtors' businesses and/or (b) may not require cash payments.

57. Of the total amount of prepetition Employee Obligations outstanding, it is my understanding that $58,983.15 (the "**Interim Wages Amount**") may become due and owing during the

---

[12] In addition to the employees at ECO and ETEC, there are also six (6) employees who work four (4) days a week at non-Debtor Portable Energy. ECO pays the wages of these employees pursuant to the terms of that certain *Contrato De Maquila*, dated January 2, 2004, by and between Portable Energy and ECO, as successor in interest to Innergy Power Corp. (the "***Portable Contract***"). The Debtors believe that all amounts due and owing under the terms of the Portable Contract, except approximately $3,400, are current as of the Petition Date. However, out of an abundance of caution, the Debtors have requested authority to pay this amount and any other amounts that may be due and owing in the ordinary course of business.

first twenty-one (21) days of the Debtors' chapter 11 cases (the "**Interim Period**"). It is my understanding that the Debtors are only requesting authority to pay the Interim Wages Amount during the Interim Period. For the avoidance of doubt, the Debtors request authority only to pay the Interim Amount during the Interim Period. All additional amounts due and owing on account of prepetition Employee Obligations will only be paid upon entry of a final order approving this Motion. As set forth above, Debtors expect that their cash on hand and amounts under the proposed DIP financing will be sufficient to pay all of their postpetition obligations, including those related to Employee Obligations. In addition, as described more fully herein, while I believe that a limited number of the Debtors' Employees may be owed more than the $12,475 statutory cap set forth in Bankruptcy Code section 507(a)(4) for Employee Compensation, I understand that the Debtors are not, at this time, requesting authority to pay any Employee in excess of the statutory cap, but reserve all rights to do so pursuant to a separate motion.

### i. *Wages*

58. In the ordinary course of their businesses, the Debtors incur payroll obligations for wages and salaries owed to their Employees (the "***Wages***"). The Wages include hourly and salaried pay to Employees through completion of their normal duties. In the ordinary course of their businesses, the Debtors operate separate payrolls for each entity that has Employees. Eighteen (18) of ECO's twenty-three (23) Employees are paid one month in advance on the first of every month. The remaining five (5) Employees of ECO are paid one week in arrears on a bi-weekly basis. ETEC's Employees are all paid one week in arrears on a bi-weekly basis.

59. The average monthly Wages paid to the Employees in the aggregate is approximately $443,015.22. Wages paid to Employees of ETEC constitute approximately $189,704.72 of this total, while Wages paid to ECO Employees constitute the balance. Despite all of the Employees of ETEC and five (5) of the Employees of ECO traditionally being paid one week in arrears, prior to the Petition Date, I believe that the Debtors are current on their Wages through September 13, 2013. Accordingly, it is my understanding that, as of the Petition Date, such Employees were owed Wages for one (1) day, or approximately $10,474.91. This entire amount is due to be paid during the Interim Period. In addition to the amounts specified herein, upon information and belief, some Employees may be

entitled to additional compensation because (a) discrepancies may exist between the amounts paid and the amounts that should have been paid and (b) some checks issued to the Employees prior to the Petition Date may not have been presented for payment or may not have cleared the banking system and accordingly, have not been honored and paid as of the Petition Date.

60.     Employees receive Wages either by direct deposit through electronic transfer of funds directly to the respective Employee's bank account or in certain instances by check.  To effectuate these transfers or check issuances, the Debtors utilize ADP, a third party payroll service provider.  In the ordinary course of their business, the Debtors provide an advance of funds to ADP along with applicable payment schedules, and ADP makes direct deposit disbursements and issues payroll checks.  The Debtors pay approximately $8,500 per month to ADP on account of payroll processing services.  As of the Petition Date, I do not believe that any prepetition amounts are due to ADP.

### ii.     *Payroll Taxes and Withholding Obligations*

61.     During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' gross pay, including garnishments, support obligations, and similar deductions and other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums, 401(k) contributions, legally ordered deductions and miscellaneous deductions) (collectively, the "***Deductions***"), which the Debtors or ADP then forward to the appropriate recipients.  As of the Petition Date, it is my understanding that approximately $27,216.37 in Deductions have been collected, but not yet forwarded to the appropriate recipients.  It is my understanding that all Deductions that have not yet been remitted are due to be transferred during the Interim Period.

62.     In addition to the Deductions, the Debtors are required by law to withhold amounts from Employees' wages related to federal, state and local income taxes, including social security, Medicare taxes and employment insurance (collectively, the "***Payroll Taxes***") for remittance to the appropriate taxing authorities (collectively, the "***Taxing Authorities***").  As of the Petition Date, it is my understanding that approximately $3,845.87 in prepetition Payroll Taxes have been collected but not yet remitted to the relevant Taxing Authorities.  All such amounts are due to be remitted during the Interim Period.

### iii. Reimbursable Expenses

63. Before the Petition Date and in the ordinary course of their business, the Debtors reimbursed certain of their Employees for various reasonable and customary expenses incurred on behalf of the Debtors in the scope of their employment (the "***Reimbursable Expenses***"). The Reimbursable Expenses are largely composed of ordinary and necessary expenses for travel, communication and business meetings incurred in the performance of assigned duties. Employees that incur Reimbursable Expenses submit such expenses to the Debtors' accounts payable department either electronically or through paper expense reports. Once approved by the applicable manager, the amounts related to the Reimbursable Expenses are then paid back to the applicable Employee by check. The Employees incur an aggregate of approximately $25,000 per week in Reimbursable Expenses. It is my understanding that, as of the Petition Date, all Reimbursable Expenses have been paid.

64. In addition to traditional Reimbursable Expenses, certain executive level Employees of ECO are issued corporate credit cards to pay for work-related expenses (the "***Corporate Credit Card Expenses***"). The corporate credit cards are issued by BoA and have been provided to seventeen (17) ECO Employees.[13] Amounts charged to these credit cards are paid directly by ECO on a monthly basis. The Debtors estimate that ECO Employees incur an average of $50,000 per month, in the aggregate, in Corporate Credit Card Expenses. As of the Petition Date, I believe that no prepetition amounts remain unpaid.[14]

65. Reimbursable Expenses and Corporate Credit Card Expenses are not fringe benefits to be considered part of an Employees' compensation; rather, they are reimbursements for out-of-pocket expenses incurred by Employees in the performance of their duties on behalf of the Debtors and solely for the Debtors' benefit. Although the Debtors have used their best efforts to estimate the Reimbursable Expenses and Corporate Credit Card Expenses as of the Petition Date, it is possible that

---

[13] In addition, certain ETEC Employees have been issued credit cards. However, expenses charged to the credit cards held by ETEC Employees are not directly paid by the Debtors. Instead, ETEC employees holding credit cards are required to submit expense reports and request reimbursement for amounts charged to their cards. These charges are treated the same as Reimbursable Expenses as described above. The Debtors are in the process of closing these accounts.

[14] As of the Petition Date, the Debtors were in the process of closing these accounts.

certain Employees may have incurred prepetition expenses, in an amount up to $15,000, for which they have not yet submitted requests for reimbursement or that have not yet posted to the corporate credit card account. To the extent any are outstanding, all such amounts will be due during the Interim Period.

### iv. Employee Benefits

66. The Debtors offer their Employees the ability to participate in a number of insurance and benefits programs, including, among other things, health care, vision and dental plans, vacation time, sick leave and other paid leaves of absence, a 401(k) plan, flexible spending accounts, life insurance and short-term and long-term disability insurance, workers' compensation insurance and other Employee benefit plans as described below (collectively, the "***Employee Benefit Plans***"). With exception of the 401(k) plan, the Debtors' full-time Employees are eligible to participate in all of the Employee Benefit Plans on the first day of the first full month after they begin employment with the Debtors.

### a. Health and Welfare Plans

67. As part of their Employee Benefit Plans, the Debtors offer several health and welfare benefit plans (the "***Health and Welfare Plans***" and the obligations thereunder or related thereto, the "***Health and Welfare Plan Obligations***") for the benefit of their Employees. The Health and Welfare Plans include the following: medical, dental and vision, health savings accounts, flexible spending accounts, basic life insurance, optional life insurance, optional dependant life insurance, accidental death and dismemberment insurance, and short-term and long-term disability, each as more fully described below. With one exception, each of the Health and Welfare Plans is administered by United Healthcare Services, Inc. ("***United Healthcare***").[15] The Debtors do not pay any management or administration fees to United Healthcare in connection with the administration of the Health and Welfare Plans.

---

[15] As set forth in more detail below, Discovery Benefits, Inc. ("***Discovery***") administers the Employees' flexible spending accounts.

(i)    Medical, Dental and Vision Plans

68.    As noted above, the Debtors provide their Employees with the opportunity to participate in medical, dental and vision insurance plans through United Healthcare. With respect to medical coverage, the Employees have the option to participate in a high deductible plan, a PPO plan with a $500 deductible or a PPO plan with a $1,000 deductible (collectively, the "***Medical Plans***"). The premium associated with participation in the Medical Plans varies based on the Medical Plan selected and whether the Employee's spouse and dependents are also seeking coverage. Employees pay a small portion of their respective Medical Plan premium, with the Debtors paying the balance. The Debtors' pay approximately $38,079.68 per month on account of premiums associated with the Medical Plans. It is my understanding that, as of the Petition Date, the Debtors are current in the payment of all such premiums and that no prepetition amounts on account of the premiums remain outstanding.

69.    Employees also have the option to participate in dental and vision insurance plans offered by United Healthcare. United Healthcare offers the Employees two (2) PPO dental plan options (collectively, the "***Dental Plans***") and a single vision plan option (the "***Vision Plan***"). Again, the premiums associated with the Dental Plans and the Vision Plan vary based on the type of plan selected as well as whether spouses and dependants are seeking coverage. However, unlike the Medical Plans, the Debtors do not, and are not obligated to, pay any portion of the premium under either the Dental Plans or the Vision Plan.

(ii)    Life Insurance

70.    The Debtors also provide every full-time Employee with a $15,000 life insurance policy through United Healthcare (the "***Life Insurance Benefit***"). The monthly premium cost of the Life Insurance Benefit is $1.80 per Employee and is fully funded by the Debtors. Thus, given the Debtors' current workforce of approximately fifty-four (54) full-time Employees the monthly cost attributable to premiums under the Life Insurance Benefit is approximately $97.20. The Debtors remit the premium to United Healthcare on the first day of each month. As of the Petition Date, it is my understanding that there are no prepetition amounts associated with the Life Insurance Benefit that remain unpaid.

71.    In addition to the Life Insurance Benefit, the Debtors also offer every full-time Employee the opportunity to purchase, at their own cost, additional life insurance for themselves or

separate policies for their spouse and/or dependants (the "***Voluntary Life Benefit***").[16] Under the Voluntary Life Benefit, participating Employees may purchase additional coverage of up to $150,000 for themselves and $75,000 for their spouses without submitting to additional health screening. Employees are permitted to purchase coverage beyond these limits, but such additional coverage is subject to health screenings by United Healthcare or its agent. With respect to Employees' dependents, the maximum life policy that can be purchased under the Voluntary Life Benefit is $10,000.

<div align="center">(iii)   <u>Accidental Death and Dismemberment Coverage</u></div>

72.    In addition to the Life Insurance Benefit, the Debtors provide every full-time Employee with a $15,000 accidental death and dismemberment insurance policy through United Healthcare (the "***AD&D Benefit***"). The AD&D Benefit is paid for by the Debtors for the benefit of their Employees at a monthly cost of $0.30 per Employee. Given the Debtors' current workforce of approximately fifty-four (54) full-time Employees, the average monthly cost of the AD&D Benefit to the Debtors is approximately $25.80. It is my understanding that, as of the Petition Date, all premiums associated with the AD&D Benefit have been paid and that no prepetition amounts remain outstanding.

<div align="center">(iv)   <u>Short and Long-Term Disability</u></div>

73.    As an additional benefit under their Health and Welfare Plans, the Debtors also offer all full-time Employees long-term disability coverage (the "***Long-Term Disability Benefit***") as well as optional short-term disability coverage (the "***Optional Short-Term Disability Benefit***") through United Healthcare. The Long-Term Disability Benefit is provided by the Debtors for the benefit of their Employees at the Debtors' sole expense. The premium associated with the Long-Term Disability Benefit is $883.15 per month and is remitted to United Healthcare by the Debtors on the first day of each month. Upon information and belief, as of the Petition Date, the Debtors are current on their obligations with respect to the Long-Term Disability Benefit.

74.    The Debtors also offer their Employees the Optional Short-Term Disability Benefit, whereby Employees are able to purchase long-term disability insurance coverage. The Debtors merely

---

[16] An Employee's ability to purchase life coverage for their spouse and dependants is contingent upon their own participation in the Voluntary Life Benefit.

offer the option to purchase such coverage to their Employees and do not, and are not obligated to, make any contribution toward the required premium.

<p align="center">(v)     <u>Health Savings and Flexible Spending Accounts</u></p>

75.     Finally, the Debtors' Employees also have the option of diverting certain of their pre-tax earnings to a health savings account ("***HSA***") or a flexible spending account ("***FSA***") to defray medical and/or dependent care expenses.

76.     Employees that elect to participate in the Debtors' high deductible Medical Plan may deposit a portion of their pre-tax earnings (up to a statutory maximum) into an HSA and then use the funds deposited therein to pay qualified medical expenses without federal tax liability or penalty. The HSAs are administered through United Healthcare and held at Optum Health Bank at no cost to the Debtors.

77.     Employees may also deposit a portion of their pre-tax earnings (up to a statutory maximum) into an FSA. The Debtors utilize two (2) types of FSAs – a qualified medical expenses FSA and a dependent care FSA. Similar to an HSA, funds deposited into an Employee's FSA can be used to pay qualified expenses. The FSAs are administered by Discovery at a total cost of $89.00 per month to the Debtors. The Debtors remit this amount to Discovery on the first of every month. It is my understanding that, as of the Petition Date, no prepetition amounts are owed to Discovery for administering the FSAs.

78.     It is my understanding that, as of the Petition Date, there are no prepetition Health and Welfare Plan Obligations that have accrued but have not been paid to or on behalf of Employees under the Health and Welfare Plans. However, I believe that the Debtors should be authorized, in their sole discretion, to (a) continue the Health and Welfare Plans in the ordinary course of business and (b) pay any Health and Welfare Plan Obligations, including such obligations that arose prepetition, in the ordinary course of business, as they come due.

<p align="center">b.     <u>Paid Time Off</u></p>

79.     As an additional component of the Employee Benefit Plans, the Debtors provide vacation time ("***Paid Vacation***") and sick time ("***Paid Sick Leave***" and, together with Paid Vacation, "***Paid Time Off***") to their Employees. Ordinarily, when an Employee elects to take Paid Time Off,

that Employee is paid his or her regular hourly or salaried rate. The Debtors' policies regarding the use and accrual of Paid Time Off vary as between Paid Vacation and Paid Sick Leave.

(i)     Paid Vacation

80.     Under the Debtors' Paid Time Off policy, the amount of Paid Vacation available to a particular Employee and the rate at which such Paid Vacation accrues is generally determined by the Employee's length of employment. More specifically, Employees who have been employed by the Debtors for two (2) years or less receive two (2) weeks of Paid Vacation, Employees employed for three (3) to five (5) years receive three (3) weeks of Paid Vacation, and Employees with six (6) to ten (10) years of service time receive four (4) weeks of Paid Vacation. Employees who have been employed by the Debtors for more than ten (10) years receive five (5) weeks of Paid Vacation.

81.     Employees are not required to use their entire yearly accrual of Paid Vacation in a given year and may carry unused days into the next year. However, although Employees are permitted to carry unused Paid Vacation forward, the maximum Paid Vacation a particular Employee may accrue is one and a half times their yearly accrual. Once this threshold is met, Employees cease accruing Paid Vacation until the Employee again drops below the maximum accrual. If an Employee ceases to be employed by the Debtors, such Employee's final paycheck includes any accrued but unused Paid Vacation.

82.     It is my understanding that an aggregate of approximately $154,000 of earned but unused Paid Vacation has accrued as of the Petition Date. Generally, this amount, with certain exceptions, is not a current cash payment obligation.

(ii)     Paid Sick Leave

83.     With respect to Paid Sick Leave, all Employees receive the same number of hours of Paid Sick Leave each year, regardless of seniority or length of employment. More specifically, each Employee receives a total of forty-eight (48) hours of Paid Sick Leave each year. These forty-eight (48) hours are accrued by the Debtors' Employees in two (2) tranches. The first twenty-four (24) hours of Paid Sick Leave are accrued on January 1 of each year and the second twenty-four (24) hours of Paid Sick Leave are accrued on July 1 of each year. Employees can only use their Paid Sick Leave during the year in which it was accrued and are not permitted to carry forward unused days to the

following year. If an Employee ceases to be employed by the Debtors, the Employee does not receive any additional payment on account of accrued but unused Paid Sick Leave.

84.    It is my understanding that an aggregate of approximately $109,018.72 of earned but unused Paid Sick Leave has accrued as of the Petition Date. Again, however, this amount is not a current cash payment obligation as Employees are not entitled to cash payment for accrued and unused Paid Sick Leave at any time.

85.    I believe that the Debtors should be authorized to continue to honor their Paid Time Off policy in the ordinary course of business and to honor and pay any prepetition amounts related thereto. Moreover, the Debtors anticipate that their Employees will utilize any accrued Paid Time Off in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

c.    401(k) Plan

86.    The Debtors maintain a retirement savings plan with ADP, for the benefit of their Employees, that is a tax qualified plan within the meaning of, and administered in accordance with, the requirements of section 401(k) and other applicable sections of the Internal Revenue Code (the "***401(k) Plan***"). ADP, as administrator of the Plan, receives a monthly fee that totals approximately $550.00. I understand that, as of the Petition Date, no prepetition amounts are owed to ADP for services rendered.

87.    The majority of the Debtors workforce – thirty-one (31) Employees – participate in the 401(k) Plan. The 401(k) Plan allows for pre-tax salary deductions of eligible compensation up to certain Internal Revenue Code limits. The Debtors contribute a 100% match to participating Employee's contributions up to 3% of the Employee's eligible compensation, and a 50% match to participating Employee's contributions of the next 2% of the Employee's eligible compensation (the "***Matching Contributions***"). The Matching Contributions vest automatically once contributed. It is my understanding that, as of the Petition Date, the Debtors owed approximately $17,216.37 in outstanding Matching Contributions and Deductions, all of which is due to be paid in full during the Interim Period.

88.    I believe that the Debtors should be authorized, in their sole discretion, to (a) continue the 401(k) Plan in the ordinary course of business and (b) pay any obligations arising under the 401(k)

Plan, including any Matching Contributions, Deductions and administrative fees, in the ordinary course of business, as they come due.

#### d. Telephone Benefit

89.    In addition to the benefits enumerated above, the Debtors also provide company issued cellular telephones to certain Employees and pay for the cellular telephone service of other Employees (together, the "***Phone Benefit***") in connection with their employment duties.  The Phone Benefit is provided to approximately forty (40) Employees through a contract with AT&T.  The approximate cost of the Phone Benefit is $80.00 per month for each participating Employee, which totals approximately $7,000 per month.  It is my understanding that the Debtors are current on their obligations to AT&T under the terms of their contract and no prepetition amounts are outstanding as of the Petition Date.  I believe that authorizing the Debtors to continue, in their discretion, the Phone Benefit is reasonable and appropriate under the circumstances.

### v.    *Independent Contractors*

90.    In addition to their Employees, the Debtors also utilize a number of independent contractors (collectively, the "***Independent Contractors***") in the ordinary course of business.  The Independent Contractors perform a wide variety of functions for the Debtors, including technical consulting, software coding, marketing, administrative functions and temporary contract employment.  Just as the Debtors' Employees are critical to the Debtors' future viability, so are the Independent Contractors.  Without the use of the Independent Contractors, I believe that the Debtors may be forced to hire full-time Employees to perform the same functions at a dramatically higher cost.  Thus, continued use of the Independent Contractors allows the Debtors to utilize their specific skill sets and expertise at a much lower cost than would otherwise be required.  The Debtors' average monthly expenditure related to Independent Contractors is approximately $70,000, in the aggregate.  As of the Petition Date, upon information and belief, the amount due to Independent Contractors on account of prepetition services rendered is $115,000, of which $2,446 is due to be paid during the Interim Period.  Accordingly, I believe that the Debtors should be authorized, in their sole discretion, (a) to continue utilizing the services of the Independent Contractors and (b) pay obligations owing to Independent Contractors, including prepetition amounts, as they come due in the ordinary course of business.

### vi. Severance Practices

91.     While the Debtors do not maintain a formal severance policy, their recent practice has been to provide two weeks of severance without regard to an Employee's length of employment, plus an additional week of severance for each year employed by the Debtors (the "***Severance Practice***").  In addition, certain current and former high level executives, including the Debtors' former chief executive officer, have negotiated severance arrangements in connection with their employment contracts (the "***Contractual Severance Obligations***").

92.     To be clear, the Debtors are not seeking authority to (i) continue their Severance Practice, (ii) make payments to former Employees who may be entitled to receive amounts pursuant to the Contractual Severance Obligations, (iii) honor any change in control agreements of current or former Employees or to pay (except as required by Bankruptcy Code section 1114) prepetition claims or obligations such as severance to former Employees arising under individual agreements or (iv) make any payments inconsistent with Bankruptcy Code section 503(c).  Instead, to the extent that the Debtors wish to institute a formal severance program in the future or make payments on account of existing Contractual Severance Obligations, the Debtors will request appropriate relief from the Court at such time.

### C.     Taxes and Licensing Fees

93.     The Debtors request entry of interim and final orders authorizing, but not directing, the Debtors to pay any and all amounts that may come due during the postpetition period on account of prepetition claims relating to the Taxes and Fees.

94.     In the ordinary course of business, the Debtors (a) incur income, property, sales and use, and other taxes (collectively, the "***Taxes***"), (b) pay fees for business registration certificates and licenses required to operate their businesses in various jurisdictions (collectively, the "***Fees***" and, together with the Taxes, the "***Taxes and Fees***"), and (c) pay or remit such Taxes and Fees to various taxing, licensing and other governmental authorities (collectively, the "***Authorities***") as required to operate the Debtors' businesses.

95.     The Debtors pay or remit, as the case may be, the Taxes and Fees as incurred on a monthly, biannual or annual basis, as applicable, to the respective Authorities, in each case as required

by applicable laws and regulations. It is my understanding that, as of the Petition Date, the Debtors estimate that, in the aggregate, approximately $639,524.46 in prepetition Taxes and Fees will become due and owing to the Authorities postpetition in the ordinary course of business. Of the total amount of prepetition Taxes and Fees outstanding, approximately $192,508.66 (the "**Interim Taxes Amount**") may become due and owing during the Interim Period. It is my understanding that the Debtors request authority to only pay the Interim Taxes Amount during the Interim Period. All other amounts due will only be paid upon entry of a final order. As set forth in the First Day Declaration, the Debtors expect that their cash on hand and amounts under the proposed DIP financing will be sufficient to pay all of their postpetition obligations, including those related to Taxes and Fees.

96. I believe that the Debtors' failure to pay the Taxes and Fees could materially and adversely impact their business operations in several ways. Among other things, I believe the Debtors' failure to pay Taxes and Fees may lead to (a) assessments by the Authorities of immediate, irreversible penalties, which may be entitled to priority treatment under Bankruptcy Code section 507(a)(8)(G); (b) initiation by the Authorities of audits, which would unnecessarily divert the Debtors' attention, at this critical time, from more pressing matters related to the chapter 11 process; and (c) attempts by the Authorities to suspend the Debtors' operations, file liens, seek to lift the automatic stay and pursue other remedies that would be administratively burdensome to the estates and potentially damaging to the ongoing viability of the Debtors' businesses. It also is my understanding that the Debtors and their directors and officers may be subject to personal liability for the nonpayment of the Taxes and Fees in certain jurisdictions, which undoubtedly would divert the attention of those key personnel from their duties related to the restructuring and the day-to-day operations of the Debtors' businesses.

97. The Taxes and Fees incurred by the Debtors fall into the following general categories:

### i. Income Taxes

98. The Debtors incur corporate and trade income tax liabilities (collectively, the "**Income Taxes**") to the United States government, fifteen states, the District of Columbia and the City of Portland. These Income Taxes are assessed against the income of each Debtor and remitted annually to the applicable Authorities. It is my understanding that, as of the Petition Date,

approximately $8,573.85 in prepetition Income Taxes has accrued and remains unpaid, of which $6,438.93 will become due and owing during the Interim Period.

### ii. Sales and Use Taxes

99. The Debtors also collect and remit certain taxes arising from the sale, use and purchase of products, inventory, supplies or other goods in the Debtors' businesses (collectively, the "*Sales and Use Taxes*"). The Debtors incur Sales and Use Taxes in fifteen states, the District of Columbia and six localities in Washington and Arizona. The Sales and Use Taxes are filed and remitted monthly to the applicable Authority. It is my understanding that, as of the Petition Date, approximately $255,250.61 in prepetition Sales and Use Taxes has accrued and remains unpaid, of which approximately $35,069.73 is due to be paid during the Interim Period.

### iii. Property Taxes

100. The Authorities also impose Taxes on the Debtors relating to certain real and personal property owned by the Debtors ("*Property Taxes*") in a number of states and counties across the United States. The Property Taxes are due and remitted semi-annually to the applicable Authority. It is my understanding that, as of the Petition Date, approximately $375,700.00 in prepetition Property Taxes has accrued and remains unpaid, of which approximately $151,000.00 may become due and owing during the Interim Period.

### iv. Licensing Fees

101. In the ordinary course of business, the Debtors also pay fees related to business registration certificates (the "*Business Registration Fees*"), which are necessary to remain in good standing for purposes of conducting business within the applicable jurisdiction. The Debtors also incur and remit fees to maintain operating licenses and permits (the "*Operating License Fees*" and together, with the Business Registration Fees, the "*Licensing Fees*") within the applicable jurisdiction, which are required for the Debtors' day-to-day operations of their businesses. It is my understanding that the method for calculating the amounts due for the Licensing Fees and the deadlines for paying such fees vary by jurisdiction.

102. The Debtors pay on average $3,000 each year in Licensing Fees. It is my understanding that, as of the Petition Date, no prepetition amount in Licensing Fees has accrued and remains unpaid.

If the Debtors fail to pay the Licensing Fees, I believe the applicable Authorities may seek to revoke the Business Registration and Operating Licenses, suspending the Debtors' right to conduct business and effectively forcing the Debtors to shut down their operations in those jurisdictions. Upon information and belief, the lost revenue and damage to the Debtors' businesses that could result from even a temporary shutdown of the Debtors' operations greatly exceeds any Licensing Fees that might be owed as of the Petition Date.

### D. Utilities Motion

103. The Debtors request entry of interim and final orders (a) determining that the Debtors' Utility Providers are adequately assured of future payment; (b) approving the Debtors' proposed procedures governing requests for additional or different forms of adequate assurance; and (c) prohibiting the Debtors' utility providers from altering, refusing or discontinuing services to the Debtors on account of prepetition amounts outstanding, if any, and on account of any perceived inadequacy of the Debtors' proposed adequate assurance of payment.

104. In the ordinary course of their businesses, the Debtors incur expenses for electricity, gas, water, waste and telecommunications, which services are provided by approximately twenty-six (26) Utility Providers. On average, the Debtors spend approximately $248,000 each month on utility costs. It is my understanding that, as of the Petition Date, that approximately $322,000 in utility costs is outstanding.

105. The Utility Providers service the Debtors' corporate headquarters, regional offices, warehouses, charging stations and other sites integral to the Debtors' manufacturing, testing and commercialization of technologies related to electric vehicle charging. I firmly believe that any interruption of utility services, even for a brief period of time, would negatively impact the Debtors' operations and customer relationships, thereby seriously jeopardizing the Debtors' efforts during these chapter 11 cases. Accordingly, I believe that providing the Utility Providers with assurance of future performance and payment will be necessary to ensure that such Utility Providers do not seek to discontinue providing service or taking any other related action that could jeopardize the Debtors' ability to conduct their operations.

### i.    Proposed Adequate Assurance Deposit

106.    The Debtors intend to pay postpetition obligations owed to the Utility Providers in the ordinary course.  The Debtors expect that their cash flows from operations and cash on hand will be sufficient to pay all of their postpetition obligations, including those related to their utility services.

107.    Nevertheless, to the extent that a Utility Provider does not already hold a deposit equal to or greater than two weeks' worth of service provided by such Utility Provider (such Utility Providers, the "***Affected Utility Providers***"), I understand that the Debtors propose to maintain in a special segregated account an aggregate amount of $124,000, which amount is equal to the estimated aggregate cost for two weeks of utility service, calculated as a historical average over the past 12 months, for the collective benefit of such Affected Utility Providers as adequate assurance of future payment (the "***Adequate Assurance Deposit***").  The Adequate Assurance Deposit may be adjusted by the Debtors to account for the termination of services provided by the Affected Utility Providers or for other arrangements with respect to adequate assurance of payment reached with individual Affected Utility Providers in accordance with the procedures set forth herein.

108.    The Debtors propose to place the Adequate Assurance Deposit into a newly created, interest-bearing, segregated account (the "***Adequate Assurance Deposit Account***") within twenty (20) calendar days of the Petition Date for the benefit of all Affected Utility Providers during these chapter 11 cases.  With respect to those Utility Providers that are already holding a deposit that is equal to or greater than two weeks of utility services, the Debtors submit that any request for additional assurance of payment for future services beyond the Adequate Assurance Deposit shall be resolved pursuant to the Adequate Assurance Procedures (as defined below).

109.    I believe that the Adequate Assurance Deposit and the Debtors' demonstrated ability to pay for future utility services in the ordinary course of their businesses (together, the "***Proposed Adequate Assurance***") constitute sufficient adequate assurance to the Utility Providers.  If any Utility Provider believes that additional assurance is required, however, the Debtors propose that such Utility Provider may request such assurance (each, an "***Additional Assurance Request***") pursuant to the procedures set forth in the Utilities Motion.  I believe that it is appropriate that all Utility Providers who do not timely file an objection to final approval of the relief requested in the Utilities Motion or

make an Additional Assurance Request pursuant to the Adequate Assurance Procedures be deemed to consent to the Proposed Adequate Assurance and be bound by any order(s) entered by this Court in respect of the Utilities Motion.

110.    I believe that the Debtors have made an extensive and good faith effort to identify the Utility Providers and to include them on the Utility Providers List.  To the extent that the Debtors later identify additional Utility Providers (each, an "***Additional Utility Provider***"), I believe the Debtors should be authorized to amend the Utility Providers List to add or remove any Utility Provider.  The Debtors propose that any order(s) entered by this Court granting the Utilities Motion apply to any Additional Utility Provider, regardless of when such Additional Utility Provider is added to the Utility Providers List.  The Debtors will serve a copy of the Utilities Motion and any applicable order(s), if entered, on such Additional Utility Provider to provide appropriate notice.

111.    Absent the relief requested, I believe that the Debtors could be forced to address numerous requests by their Utility Providers located in multiple jurisdictions at a critical point in the early stages of these chapter 11 cases.  It is my understanding that the Debtors could be blindsided by a Utility Provider unilaterally deciding that it is not adequately protected and then discontinuing service or making an exorbitant demand for payment to continue service.   I strongly believe that discontinuation of utility service at any point in the Debtors' research and development, manufacturing or maintenance of its electric energy products could jeopardize the Debtors' operations and the success of these chapter 11 cases.

E.    **Insurance Motion**

112.    The Debtors request entry of orders, authorizing, but not directing, the Debtors: (i) on an interim basis, to pay or honor obligations owed on account of the prepetition Policies (as defined below) in an amount not to exceed $40,000, and (ii) on a final basis, (a) to continue to maintain and administer their Policies and revise, extend, renew, supplement or replace such Policies, as needed, through the use of the Broker, (b) to pay or honor prepetition obligations outstanding on account of the Policies related thereto, if any, and (c) to revise, extend, renew, supplement or replace the Financing Agreement, as needed, in the ordinary course of business and consistent with past practice.

### i.    The Debtors' Insurance Policies

113.    In the ordinary course of the Debtors' electric energy supply solutions business, the Debtors maintain a number of insurance policies that provide coverage for, among other things, commercial liability, automobile and cargo liability, directors and officers liability, and workers compensation (collectively, the "*Policies*").[17]  Installment payments owed on certain of the Debtors' insurance premiums for the Policies (the "*Premiums*") will become due and owing in the coming months, in accordance with previously agreed upon premium payment schedules.  The Premiums over the 2013-2014 policy period total approximately $812,000.  As of the Petition Date, it is my understanding that there is approximately $130,000 outstanding in Premiums owed for the policy period, of which approximately $30,100 will become due and owing within the Interim Period.

114.    Additionally, certain of the Policies will be due for renewal in the coming months.  Although I believe that the Debtors are not obligated to renew such Policies, the Policies nevertheless are essential to the preservation of the value of the Debtors' business, property and assets.  Moreover, it is my understanding that in many cases, the coverage provided under the Policies is required by various laws and contracts that govern the Debtors' commercial activities and, as such, are necessary to the continuation and preservation of the Debtors' business operations.

### ii.    Insurance Brokers

115.    The Debtors historically have employed third parties to assist them with certain insurance services, including procurement and negotiation of the Policies as well as administration and management related to certain insurance claims.  The Debtors historically have employed Lockton Global and Crest Insurance Group (the "*Brokers*") to provide risk management advice and assist with the procurement, placement and negotiation of the Policies and insurance premium financing arrangements.  I believe that, by leveraging the expertise and experience of the Brokers, the Debtors are able to obtain insurance coverage necessary to operate their business in a reasonable and prudent manner and to realize savings in the procurement of the Policies and the financing thereof.

---

[17] The Policies provide coverage to the Debtors and certain of their non-Debtor subsidiaries.  In addition to the Policies discussed herein, the Debtors maintain numerous insurance programs with respect to employee health, medical and life insurance benefits, programs, which are addressed by separate motion filed contemporaneously herewith.

Commissions earned by the Brokers for their services related to the Policies are factored into the amounts owed on the Premiums.

### iii. *The Debtors' Premium Financing Arrangement*

116. It is my understanding that it is not always economically or fiscally advantageous for the Debtors to pay the Premiums on a lump-sum basis. Accordingly, in the ordinary course of the Debtors' business, the Debtors finance certain Premiums generally over a period of nine months. For example, the Debtors finance the premium payments due on certain Policies for directors and officers liability pursuant to an agreement (the "***Financing Agreement***") with First Insurance Funding Corp. ("***First Insurance***").

117. Pursuant to the Financing Agreement, the Debtors finance Premiums associated with the Policies (collectively, the "***Financed Policies***") offered by (i) Liberty Insurance Underwriters, Inc., (ii) Hudson Insurance Company, (iii) Navigators Insurance Co. and (iv) Berkeley Assurance Company. Prior to the Petition Date, the Debtors paid $66,181.80 in cash to First Insurance and financed the remaining Premium amounts of $262,227.20. Thereafter, the Debtors agreed to pay nine (9) installment payments of $30,184.16 each, including a total finance charge of $9,430.24, representing an annual interest rate of 8.55%. It is my understanding that, as of the Petition Date, there were no outstanding payments owed by the Debtors to First Insurance on account of the Financing Agreement.

118. To secure such payment obligations, the Debtors assigned to First Insurance a security interest in return premiums, dividend payments and certain loss payments with respect to the covered Policies. Specifically, under the terms of the Financing Agreement, First Insurance has a right to cancel the financed Policies if the Debtors do not make a payment when due, or are otherwise in default under the Financing Agreement. Moreover, in such an event, First Insurance could seek relief from the automatic stay to cancel the Policies and collect any unearned Premiums, which the Debtors may be compelled to defend. If relief were granted, I believe that the Debtors would then be required to obtain replacement insurance on an expedited basis and at a tremendous cost to their estates. I further believe that any cancellation or suspension of the Policies would also place the Debtors' enterprise at risk, particularly given that the Debtors' chapter 11 cases may be subject to mandatory conversion or dismissal for the failure to maintain appropriate insurance coverage. Upon information

and belief, if the Debtors were required to obtain replacement insurance and pay a lump-sum for the Policies and/or the Financing Agreement in advance, this payment may be greater than what the Debtors currently pay. I believe that, even if these insurers were not permitted to terminate their respective Policies, any interruption of payment would have a severe, adverse effect on the Debtors' ability to finance premiums for future policies.

119. The Financing Agreement is set to expire on October 11, 2013, at which time the Debtors will need to renew or replace their director and officer liability coverage under any applicable premium financing agreement. I believe that renewal or replacement of the Financing Agreement falls squarely within the Debtors ordinary course of business. To reduce the administrative burden, as well as to confirm their ability to satisfy one of their obligations of operating as debtors in possession, I believe that the Debtors should be authorized, on a final basis, to renew or replace the Financing Agreement when and as necessary in the Debtors' business judgment.

120. Accordingly, I believe that the Debtors should be authorized to continue to maintain their Policies through the use of the Brokers in the ordinary course and pay any postpetition obligations related thereto, if any.

### F.      Warranty Programs Motion

121. The Debtors request entry of an order authorizing the Debtors to (a) continue to maintain and administer their limited warranty programs (collectively, the "***Warranty Programs***") and (b) honor all prepetition obligations earned by and owing to their customers related thereto in the ordinary course of business and in a manner consistent with past practice.

122. The Debtors market their products and services to a customer base consisting of established commercial, industrial, institutional, governmental and utility sector consumers, who in turn then use the Debtors' products in commercial, residential and industrial settings as well as various OEM applications. As set forth above, the Debtors' primary product and service offerings include: (i) the Blink line of EVSEs, or "charging stations," for passenger vehicle applications, represented by certain residential and commercial chargers as well as certain fast chargers; (ii) the Minit-Charger line of advanced fast-charge systems for industrial applications, including material handling and airport ground support equipment; and (iii) testing and consulting services to utilities and government

agencies worldwide. As the adoption of EVs increases and with the expansion of the Blink line of EV smart charging stations, the Debtors' customer base is expected to continue to expand rapidly.

123.    I believe that maintaining the loyalty and goodwill of the Debtors' customers, therefore, is critical to the Debtors' operations. In addition to providing reliable electric energy technology and systems, the Debtors must continue to engender customer loyalty, ensure customer satisfaction, meet competitive pressures and generate goodwill for the Debtors' brand, thereby maximizing revenue and profitability. Accordingly, I believe that the ability to honor their obligations under the Warranty Programs in the ordinary course of business is necessary to sustain positive customer relationships and the Debtors' reputation for reliability.

124.    The Debtors' Warranty Programs arise in connection with their Blink and Minit-Charger product lines. Aside from those cases in which purchase orders may contain different warranty terms or requirements, the Debtors warrant that their Blink and Minit-Charger products will conform to specifications in all material respects (subject to certain conditions) and will be free from material defects in materials and workmanship. Generally speaking, under a customer's standard purchase terms and conditions, the Debtors remain liable for obligations under the Warranty Programs for periods ranging from one to two years, with the exception of those EVSEs that are installed through the EV Project, which have warranties through the end of the EV Project, which is anticipated to conclude at the end of 2013.

125.    Based on historical quarterly figures from 2012 and 2013, I believe that their obligations related to servicing and repair, replacements, customer returns and refunds, over the next year under the Warranty Programs will not exceed approximately $51,000 per month. The Debtors are not currently aware of any amounts that are due and payable under the Warranty Programs. However, because of the timing of the filing of these chapter 11 cases in relation to the accrual periods of individual customer contracts, it is my belief that there may be obligations that have not been invoiced to the Debtors, but may arise from prepetition business activity. Considering the potential for loss of customer loyalty, goodwill and revenue absent the relief requested, I believe that authorization to continue the Warranty Programs in the ordinary course of business and to perform and honor the

prepetition obligations thereunder, as the Debtors deem appropriate in their business judgment, is essential to the ongoing vitality of the Debtors' business.

## III.   ADMINISTRATIVE MOTIONS

### A.   Joint Administration Motion

126.   The Debtors request entry of an order authorizing the joint administration of these chapter 11 cases.  As indicated in **Exhibit A**, the Debtors consist of six (6) affiliated entities, which are affiliated with each other in the following regard:

- ECOtality, Inc. is an affiliate of <u>Electric Transportation Engineering Corporation</u> ("ETEC"), which is a Debtor in a chapter 11 case filed concurrently herewith before this Court, under the case number 2:13-BK-16126 (RJH).

- ECOtality, Inc. is an affiliate of <u>The Clarity Group, Inc.</u>, a Debtor in a chapter 11 case filed concurrently herewith before this Court, under the case number 2:13-BK-16130 (SSC).

- ECOtality, Inc. is an affiliate of <u>ETEC North, LLC</u>, a Debtor in a chapter 11 case filed concurrently herewith before this Court, under the case number 2:13-BK-16129 (GBN).

- ECOtality, Inc. is an affiliate of <u>G.H.V. Refrigeration, Inc.</u>, a Debtor in a chapter 11 case filed concurrently herewith before this Court, under the case number 2:13-BK-16131 (RJH).

- ECOtality, Inc. is an affiliate of <u>ECOtality Stores, Inc.</u>, a Debtor in a chapter 11 case filed concurrently herewith before this Court, under the case number 2:13-BK-16128 (DPC).

- Each of <u>ETEC</u> and <u>ECOtality Stores, Inc.</u> is a wholly owned subsidiary of <u>ECOtality, Inc.</u>

- Each of ETEC North, Inc., The Clarity Group, Inc., and G.H.V. Refrigeration, Inc. is a wholly owned subsidiary of ETEC.

127.   I believe that joint administration of these chapter 11 cases before the same judge will allow the Debtors to avoid repetitious preparation, filing and service of duplicative notices, applications and orders in each of their respective dockets, thereby saving the Court, the Debtors and other parties in interest substantial time and expense.  Moreover, it is my understanding that the requested relief will not adversely affect parties' rights, as the Joint Administration Motion requests only administrative, and not substantive, consolidation of the Debtors' estates.  In fact, the reduced costs that will result from the joint administration of these chapter 11 cases will inure to the benefit of all of the Debtors' stakeholders.  Therefore, I believe that joint administration and a transfer of

assignment of these chapter 11 cases to be jointly administered to be heard before the same judge is warranted and will ease the administrative burden on the Court and the parties.

**B.   Creditor Matrix Motion**

128.   The Debtors request entry of an order, authorizing the Debtors to (a) prepare and maintain a single consolidated list of creditors, in lieu of submitting a formatted mailing matrix for each Debtor, and (b) file a consolidated list of the Debtors' thirty (30) largest unsecured creditors

129.   The Debtors estimate that there are likely over 800 parties that will need to be noticed in these chapter 11 cases.   Prior to the Petition Date, the Debtors' and their agents maintained computerized records of their creditors, interest holders, and other parties in interest.   After reviewing the internal records and consulting with counsel and other advisors, I believe that preparing a single consolidated list of creditors in the format currently maintained by the Debtors in the ordinary course of their businesses will be sufficient to permit them to promptly provide notices to all applicable parties.   Indeed, with the assistance of advisors, it is my understanding that the Debtors will be prepared to provide parties in interest with a computer-readable consolidated list of creditors upon request and will be capable of undertaking all mailings required during the pendency of these chapter 11 cases. It is also my understanding that converting the Debtors' computerized information to a format compatible with the matrix requirements would be a burdensome and costly task that I believe is unjustified in the context of these chapter 11 cases.   Moreover, I believe that the manual transfer of this information would greatly increase the risk and recurrence of error with respect to information already intact on computer systems maintained by the Debtors or their agents.   Accordingly, I believe that maintaining a single consolidated list of creditors, rather than preparing a separate matrix for each Debtor, will maximize efficiency, increase accuracy and reduce costs to the benefit of the Debtors' estates.

130.   Moreover, because certain Debtors may have fewer than twenty (20) identifiable unsecured creditors, it is my understanding that the filing of six (6) separate top twenty (20) creditor lists simply would not be useful.   I believe that the exercise of compiling a separate list for each individual Debtor would be a waste of resources in the context of these chapter 11 cases and that a single consolidated list of the Debtors' thirty (30) largest unsecured, non-insider creditors will be most

informative to parties in interest, including the Office of the United States Trustee, and most representative of the unsecured creditor body in these chapter 11 cases. Accordingly, I believe that filing a consolidated list of their thirty (30) largest unsecured creditors is appropriate under the present facts and circumstances.

<div align="center">[REST OF PAGE INTENTIONALLY LEFT BLANK]</div>

Pursuant to 28 U.S.C. § 1746, I, H. Ravi Brar, declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated: September 16, 2013

_____
H. Ravi Brar
President and Chief Executive Officer

**Exhibit A**

**Organizational Structure**

Collaboratev, LLC
(Delaware Corporation)
50%
ECOtality, Inc.
(Nevada Corporation)
99%
100%
100%
ECOtality Australia Pty Ltd.
(Australia Proprietary Company)
ECOtality Asia Pacific Ltd.
(Hong Kong)
Portable Energy de Mexico, S.A. de C.V.
(Mexico Corporation)
1%
ECOtality Stores, Inc.
dba Fuel Cell Stores
dba Innergy Power
(Nevada Corporation)
Electric Transportation Engineering Corporation
dba ETEC
dba ECONA
(Arizona Corporation)
40% (in progress)
Tianjin Eco-Power Technology Co. Ltd.
(China Corporation)
ETEC North, LLC
(Delaware Corporation)
100%
The Clarity Group, Inc.
dba ETA
(Arizona Corporation)
100%
G.H.V. Refrigeration Inc.
(California Corporation)
100%
Debtor
Non-Debtor
Non-Debtor Joint Venture

