CHARLES R. GIBBS (admitted *pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
cgibbs@akingump.com

DAVID P. SIMONDS (admitted *pro hac vice*)
ARUN KURICHETY (admitted *pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (310) 229-1000
Facsimile: (310) 229-1001
dsimonds@akingump.com
akurichety@akingump.com

– and –

JARED G. PARKER (SBN: 6428)
PARKER SCHWARTZ, PLLC
7310 N. 16th St., Suite 330
Phoenix, Arizona 85020
Telephone: (602) 282-0476
Facsimile: (602) 282-0478
jparker@psazlaw.com

Attorneys for Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Case No. 2:13-BK-16126 (RJH) |
| ELECTRIC TRANSPORTATION ENGINEERING CORPORATION (d/b/a ECOTALITY NORTH AMERICA), *et al.*,[1] | Chapter 11 |
| | Jointly Administered |
| Debtors. | **DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING AND AUTHORIZING THE IMPLEMENTATION OF A KEY EMPLOYEE RETENTION AND INCENTIVE PROGRAM** |

This filing applies to:

■ All Debtors

☐ Specified Debtors

---

[1] The Debtors in these jointly administered chapter 11 cases and the last four digits of their respective Employer Identification Numbers are: (i) ECOtality, Inc. (5422); (ii) Electric Transportation Engineering Corporation (4755); (iii) ECOtality Stores, Inc. (2643); (iv) ETEC North, LLC (n/a); (v) The Clarity Group, Inc. (8832); and (vi) G.H.V. Refrigeration, Inc. (4512). The Debtors' service address at ECOtality, Inc.'s corporate headquarters is Post Montgomery Center, One Montgomery Street, Suite 2525, San Francisco, California 94104.

204027988

The above-captioned debtors and debtors in possession (collectively, the "*Debtors*") hereby submit this motion (the "*Motion*") seeking entry of an order, substantially in the form attached hereto as **Exhibit A**, authorizing the Debtors to implement a key employee retention and incentive program. In support of this Motion, the Debtors rely on (i) the *Declaration of Dewey Imhoff in Support of Debtors' Motion for Entry of an Order Authorizing the Implementation of a Key Employee Retention and Incentive Plan*, attached hereto as **Exhibit B** (the "*Imhoff Declaration*"), and (ii) the *Declaration of Susie Herrmann in Support of Debtors' Motion for Entry of an Order Authorizing the Implementation of a Key Employee Retention and Incentive Plan*, attached hereto as **Exhibit C** (the "*Herrmann Declaration*").[2] In further support of this Motion, the Debtors respectfully state as follows:

I.

**JURISDICTION**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

The bases for the relief requested herein are sections 105(a), 363(b), and 503 of chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*").

II.

**FACTUAL BACKGROUND**

A.     **General Background**

On September 16, 2013 (the "*Petition Date*"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. On September 17, 2013, the Court entered an order authorizing the joint administration and procedural consolidation of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) [Docket No. 34]. On September 24, 2013, the Office of the United States Trustee for Region 14 (the "*U.S. Trustee*") appointed a committee of

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Imhoff Declaration or the Herrmann Declaration, as applicable.

unsecured creditors (the "***Creditors' Committee***") under Bankruptcy Code section 1102. No trustee or examiner has been appointed in these cases.

A description of the Debtors' businesses and the reasons for filing these chapter 11 cases is set forth in the *Declaration of H. Ravi Brar in Support of First Day Pleadings* [Docket No. 28] (the "***First Day Declaration***"), which was filed on September 17, 2013 and is incorporated by reference as if fully set forth herein.

### B.     Specific Background

#### (i)     Need for a Retention and Incentive Plan

As the Court is aware, the Debtors commenced these chapter 11 cases with the intention of pursuing a sale of their assets through a highly expedited, court-supervised competitive bidding process (the "***Sale Process***"). The success or failure of the Sale Process is inextricably tied to the Debtors' remaining workforce. Indeed, given the highly technical and sophisticated nature of the Debtors' businesses, much of their value is directly linked to their employees, without which the Debtors and, in particular, their extensive network of electric car charging stations (the "***EV Charging Network***"), simply could not operate. The employees' particular skills, institutional knowledge, and understanding with respect to the Debtors' operations, infrastructure, customer relations, and the EV Charging Network are essential to the ongoing maintenance of the Debtors' businesses, and the value thereof, during the Sale Process.

Although the Debtors believe that the proposed path forward in these chapter 11 cases is feasible, the Debtors' chapter 11 filing and their general financial condition have, understandably, raised serious concerns among the Debtors' employees. These concerns have been significantly exacerbated by management's ongoing efforts to manage costs, which have resulted in reductions in Debtors' workforce leading up to the Petition Date.[3] While the Debtors are very hopeful that the potential purchaser(s) of the Debtors' assets would seek to hire most, if not all, of the Debtors' remaining employees, the anxiety demonstrated by employees is such that the Debtors believe that

---

[3] The Debtors reduced their workforce from one hundred and forty-eight (148) in July 2013 to fifty-four (54) as of the Petition Date. The remaining employees are those that the Debtors have determined are essential to the ongoing operations of the Debtors and their ability to operate in chapter 11.

most, if not all, of the remaining employees are actively searching for other employment, which may result in further attrition of the Debtors' workforce.[4] To the extent that the Debtors were to suffer a mass exodus of their remaining employees, the Debtors may be forced to terminate their operations prior to the completion of the Sale Process. This could dramatically reduce the value of the Debtors' assets and any potential purchase price a willing buyer may offer for such assets, to the detriment of the Debtors' estates, their creditors, and their other stakeholders.

*(ii)        Proposed Retention Program*

To avoid these potentially disastrous consequences and to properly motivate and incentivize remaining employees to stay with the Debtors through the conclusion of the Sale Process, the Debtors have worked with their professional advisors to develop an appropriate incentive and retention plan (the "***Incentive and Retention Plan***"). The proposed Incentive and Retention Plan is relatively straightforward and designed to motivate the Debtors' remaining employees, the lifeblood of the Debtors' operations, to continue working for the Debtors through the approval of any sale of their assets. The Debtors also believe that the minimal expense associated with the Incentive and Retention Plan will provide significant dividends in the form of an increased purchase price for the Debtors' assets. The proposed Incentive and Retention Plan, as more fully described below, divides the employees and associated payments through the use of two (2) tiers. "***Tier I***" consists of "management" employees (the "***Management Participants***"), who should not, but arguably could be, considered "insiders" (as that term is defined in Bankruptcy Code section 101(31)). The Debtors note that the Debtors' Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, and General Counsel, who are the Debtors' most senior employees, are specifically _not_ included in, and will not receive benefits under, the Incentive and Retention Plan. The second tier, designated as

---

[4] Four (4) employees have resigned from their position with the Debtors since the Petition Date, and the majority of those remaining have indicated to management informally that they are actively seeking out other employment.

204027988

"*Tier II*," consists of critical, but clearly non-insider, rank and file employees (the "***Rank and File Participants***" and, together with the Management Participants, the "***Plan Participants***").[5]

(1)    <u>Tier I</u>

Tier I consists of five (5) employees who hold titles including, among others, "Vice President," "Chief Technical Officer," and "Controller," and includes aggregate payments of not more $91,075, with no more than $25,625 to be paid to any individual Management Participant. Importantly, all payments to be made to the Management Participants under the Incentive and Retention Plan are conditioned upon the approval of a sale of assets in accordance with the deadlines and procedures established by the *Order (A) Approving Bidding Procedures in Connection with Substantially all of the Debtors' Assets, (B) Scheduling a Sale Hearing, (C) Approving the Form and Manner of the Sale, Auction, and Sale Hearing, and (D) Granting Related Relief* [Docket No. 56] (the "***Bid Procedures Order***"). Specifically, upon the entry of an order by the Court approving one or more sales of assets through the Sale Process in accordance with the Bid Procedures Order, each Management Participant will receive, as determined by the Debtors, either (i) a payment equal to one and a half (1.5) times his or her monthly salary, or (ii) a fixed amount of $1,700.[6] If no such sale is approved, the Management Participants will not receive any payment under the Incentive and Retention Plan.

Each of the Management Participants included in Tier I (i) is critical to the Debtors' ongoing operations or completion of the sale and subsequent wind down and (ii) is a potential asset themselves who will be attractive to interested purchasers as potential employees. Again, the Debtors' most senior executives, including the Chief Executive Officer, the Chief Operating Officer, the Chief Financial Officer, and the General Counsel are not among the employees included in Tier I and, for the avoidance of doubt, will not be eligible for any payments under the Incentive and Retention Plan.

---

[5] For privacy reasons, a list of Plan Participants and proposed payments is not attached to this Motion as an exhibit. Instead, the Debtors will provide the Court, the U.S. Trustee, counsel to Nissan North America, Inc. (the "***DIP Lender***"), counsel to the Creditors' Committee, and any appropriate interested party who executes an appropriate confidentiality agreement, in form and substance reasonably acceptable to the Debtors, with the names of the Plan Participants and details regarding the amount to be paid to each Plan Participant under the proposed Incentive and Retention Plan.

[6] For the avoidance of doubt, if a Management Participant resigns, is otherwise terminated, or ceases discharging his or her duties prior to the entry of an order approving a sale in accordance with the Bid Procedures Order, such Management Participant will not be entitled to receive any payment under the Incentive and Retention Plan.

204027988

4

(2)    Tier II

Tier II consists of thirty-eight (38) Rank and File Participants and provides for payments of no more than $137,628 in the aggregate,[7] for all such Rank and File Participants, and no more than $15,417 for any individual Rank and File Participant. Pursuant to the Incentive and Retention Plan, each Rank and File Participant will receive a retention bonus equal to one of the following, as determined by the Debtors: (i) a fixed bonus of $1,700, (ii) a factor of one (1) times his or her monthly salary, or (iii) a factor of one and a half (1.5) times his or her monthly salary. The Debtors, with the assistance of their advisors and in their business judgment, determined the amount proposed to be paid to each individual Rank and File Participant primarily based on the particular nature of the applicable Rank and File Participant's contributions to the chapter 11 cases and the Sale Process. Notably, payments to the Rank and File Participants are backloaded – *i.e.*, payments will not be made until the close of business on the later of (i) October 10, 2013, and (ii) the day after the conclusion of the sale hearing held by the Court under the Bid Procedures Order (or if such hearing is cancelled, one business day after such cancellation), and will be paid only to those Rank and File Participants who remain employed by the Debtors and otherwise continue discharging their respective duties until such date. Although October 10, 2013 closely coincides with the consummation of any successful sale of the Debtors' Assets, payments to the Rank and File Participants will not be dependent upon the completion of a court-approved sale.

Each of the Rank and File Participants is critical to the Debtors' ongoing operations and the completion of a successful sale. As explained above, these employees possess particular skills, knowledge, and understanding with respect to the Debtors' operations, infrastructure, customer relations, and EV Charging Network, and are essential to the ongoing maintenance of the Debtors' businesses during the Sale Process. None of the employees included in Tier II is an insider or perform executive duties, nor could such employees be described as having control over any of the Debtors.[8]

---

[7] The aggregate amount of potential awards payable to the Plan Participants of approximately $230,000 is less than the $260,000 provided for in the budget relating the Debtors' debtor-in-possession financing facility.

[8] Certain of the Rank and File Participants in Tier II may have the title of "Vice President," "Controller," or "Manager." However, notwithstanding their respective official titles, the Debtors submit that these Rank and File Participants are not insiders because they are not in control of the Debtors, do not set corporate policy, and do not perform executive duties. *See Infra*, p. 8-9. Further detail regarding these Rank and File Participants is set forth in the Herrmann Declaration.

# III.

## RELIEF REQUESTED

By this Motion, the Debtors request entry of an order, pursuant to Bankruptcy Code sections 105(a), 363(b), and 503(c), authorizing the Debtors to establish the Incentive and Retention Program and make payments to the Plan Participants consistent with the terms thereof.

In accordance with Rule 9013-1 of the Local Rules of Bankruptcy Procedure for the District of Arizona, the bases for the relief requested are set forth herein.

# IV.

## BASIS FOR RELIEF

### A. The Incentive and Retention Plan is a Valid Exercise of the Debtors' Business Judgment and Approval is Warranted Under Bankruptcy Code Section 363(b)

Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The use, sale, or lease of property of the estate, other than in the ordinary course of business, is authorized when a "sound business purpose" justifies such action. *See, e.g., In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (explaining that the "sound business purpose" test should be used to evaluate motions brought under section 363(b)); *see also In re Continental Air Lines*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Quality Beverage Co.*, 181 B.R. 887, 895 (Bankr. S.D. Tex. 1995); *In re San Jacinto Glass Indus.*, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988).

Once a debtor articulates a valid business justification for a particular form of relief, the Court reviews the debtor's request under the "business judgment rule." The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (D. Del. 1985)).

The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing. *See id.*; *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 395 (3d Cir.

1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under Bankruptcy Code section 363(b) when there is a legitimate business justification); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (affirming bankruptcy court approval of key employee retention program, stating that "in determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtors to show that a sound business purpose justifies such actions").

Courts have specifically found that a debtor's use of reasonable retention bonuses and other incentives to retain employees is a valid exercise of a debtor's business judgment. *See, e.g., In re Global Home Prods., LLC*, 2007 Bankr. LEXIS 758 at *15 (Bankr. D. Del. March 6, 2007) ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment."); *In re Gadzooks, Inc.*, 04-31486, 2005 Bankr. LEXIS 3244 *6 (Bankr. N.D. Tex. July 21, 2005) ("sound business purpose existed justifying the severance payment" under the KERP); *In re Am. West Airlines, Inc.*, 171 B.R. 674, 678 (Bankr. D. Ariz. 1994) (it is the proper use of a debtor's business judgment to propose bonuses for employees who helped propel the debtor successfully through the bankruptcy process); *In re Interco Inc.*, 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991) ("debtors' business judgment" was controlling in the approval of a "performance/retention program").

Here, implementing the Incentive and Retention Plan has a sound business purpose – that is, preserving and maximizing the value of the Debtors' estates and motivating the Plan Participants to continue performing their duties while the Debtors pursue a sale of their assets. As set forth above, the success or failure of the Debtors' Sale Process hinges on the efforts of the Plan Participants and their willingness to remain with the Debtors through the Sale Process. To the extent that the Incentive and Retention Plan is not approved, the Debtors are confident that most, if not all, of the Plan Participants will quickly seek out new employment opportunities and leave the Debtors without the staff necessary to operate in chapter 11 and consummate a sale of their assets. This untenable outcome would likely result in a shutdown of the Debtors' businesses prior to completion of the Sale Process to the detriment of the Debtors, their creditors, and all other stakeholders. Conversely, the relatively small amount to be paid pursuant to the proposed Incentive and Retention Plan will allow the Debtors to maintain their

operations, navigate the various requirements of the Bankruptcy Code, and pursue and ultimately consummate a sale of their assets through the Sale Process. Accordingly, the Debtors submit that implementation of the Incentive and Retention Plan is a sound exercise of their business judgment that should be approved.

### B. The Incentive and Retention Plan Does Not Violate Bankruptcy Code Sections 503(c)(1) or (c)(2)

Even if an incentive and retention plan, such as the one proposed by the Debtors here, complies with the provisions of Bankruptcy Code section 363, it will not be permissible under Bankruptcy Code section 503(c) if it violates the prohibition against insider retention and severance payments found in Bankruptcy Code sections 503(c)(1) and (c)(2). *See* 11 U.S.C. §§ 503(c)(1) and (c)(2). The Incentive and Retention Plan proposed by the Debtors, including the proposed payments to both the Management Participants and the Rank and File Participants, does not violate these restrictions.

> *(i)     Bankruptcy Code Sections 503(c)(1) and (c)(2) Do Not Apply to the Rank and File Participants Because They Are Not Insiders Within the Meaning of Bankruptcy Code Section 101(31)*

As noted above, Bankruptcy Code sections 503(c)(1) and (c)(2) govern retention and payments to the *insiders* of a debtor. *See* 11 U.S.C. §§ 503(c)(1) and (c)(2) (emphasis added). With respect to the Rank and File Participants, such Rank and File Participants are not "insiders" within the meaning of Bankruptcy Code section 101(31) because they do not exercise control over the Debtors, influence general corporate policy, or perform other important executive functions. *See generally 455 CPW Assocs. v. Greater N.Y. Sav. Bank (In re 455 CPW Assocs.)*, 2000 U.S. App. LEXIS 23470 (2d Cir. Sept. 13, 2000) (affirming a bankruptcy court's holding that a vice president of a limited partnership that was a limited partner of the debtor was not an insider because he was not "in control"); *NMI Sys. V. Pillard (In re NMI Sys.)*, 179 B.R. 357, 368 (Bankr. D.D.C. 1995) (concluding that a "vice president" was not an "officer" or a "person in control" within the meaning of the term Bankruptcy Code section 101(31) because the employee was not in a position to influence corporate policy). Indeed, the Rank and File Participants are just that – rank and file employees that exercise no control

204027988

over the Debtors' operations or corporate policy and do not perform any executive functions.[9] Accordingly, because the Rank and File Participants are not insiders, the Debtors respectfully submit that Bankruptcy Code sections 503(c)(1) and (c)(2) are not applicable to payments made to those individuals.

(ii)    *The Proposed Payments to the Management Participants Do Not Violate Bankruptcy Code Sections 503(c)(1) or (c)(2)*

Although the Debtors do not believe that any of the Management Participants is necessarily an insider, as that term is defined by Bankruptcy Code section 101(31), even if one or more of the Management Participants is an insider, the Incentive and Retention Plan does not implicate either Bankruptcy Code section 503(c)(1) or (c)(2).

Bankruptcy Code section 503(c)(1) applies only to retention programs, not to incentive programs that may, coincidentally, have a retentive effect. At least one court has recognized that § 503(c)(1) must be interpreted only to prohibit "a transfer made to . . . an insider of the debtor for the [primary] purpose of inducing such person to remain with the debtor's business." *In re Nellson Nutraceuticals*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) (emphasis in original); *see also In re Pliant Corp.*, Case No. 06-10001 (MFW) (Bankr. D. Del. Mar. 14, 2006) (a debtor's payment of incentive compensation to eligible employees pursuant to incentive compensation plan did not implicate Bankruptcy Code section 503(c)). This is because "any payment made to an employee, including regular wages, has at least a partial retentive effect." *In re Borders Group, Inc.*, 2011 WL 1563633, *8 (Bankr. S.D.N.Y. April 27, 2011) (citing *Nellson Nutraceuticals*).

Here, any retentive effect of the proposed payments to the Management Participants is merely incidental to the primary purpose of motivating the Management Participants to preserve and maximize the value of the Debtors' estates during the Sale Process. This is because any payments to the Management Participants are directly tied and conditioned upon achievement of the Debtors' goal

---

[9] As noted above and as more fully set forth in the Herrmann Declaration, while certain of the Rank and File Participants may have titles that are traditionally reserved for insiders (e.g., Vice President, Controller, etc.), such Rank and File Participants do not actually exercise any more control over the Debtors than the other Rank and File Participants. The superior titles held by certain Rank and File Participants are ceremonial in nature and are largely a reflection of an inflated title offered as part of negotiations when the Rank and File Participant was originally hired. *See* Herman Declaration, p. 2.

9

of having a sale of their assets approved by the Court in accordance with the Bid Procedures Order. As set forth above, the Management Participants will not receive any payments under the Incentive and Retention Plan if this goal is not achieved, regardless of how long the Management Participants remain employed by the Debtors. Thus, the payments called for under the Incentive and Retention Plan to the Management Participants simply cannot be characterized as compensation for mere continued employment, the hallmark of the retention payments prohibited by Bankruptcy Code section 503(c)(1). *See In re Global Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007).

Similarly, the payments to the Management Participants called for under the Incentive and Retention Plan do not violate Bankruptcy Code section 503(c)(2). The Incentive and Retention Plan does not provide benefits to any Management Participants upon termination of their employment with the Debtors. As set forth above, the Management Participants will receive the payments contemplated thereunder only upon the Debtors' accomplishment of a very specific chapter 11 goal, regardless of whether the Management Participant thereafter remains employed by the Debtors. Therefore, the Incentive and Retention Plan, as it applies to the Management Participants, is better characterized as a short-term incentive plan, rather than a severance plan subject to the requirements of Bankruptcy Code section 503(c)(2).

### C. The Incentive and Retention Plan Satisfies the Requirements of Bankruptcy Code Section 503(c)(3)

The Incentive and Retention Plan is permissible under Bankruptcy Code section 503(c)(3), which prohibits transfers made "outside the ordinary course of business and not justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). Courts that have analyzed the prohibition on "other transfers" have applied the same standard under that section as they do under § 363(b) – namely, whether the decision to use estate property outside of the ordinary course of business is based on a sound exercise of the debtor's business judgment. *See In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y 2006) (test for compensation program under § 503(c)(3) is the same as the "business judgment" test); *In re Nobex*, 2006 WL 4063024, at *3 (Bankr. D. Del. 2006) (§ 503(c)(3) is essentially reiteration of standard under § 363).

Indeed, the court in the *Nobex* stated:

> I read (c)(3) to be the catch-all and the standard under (c)(3) for any transfers or obligations made outside of the ordinary course of business are those that are justified by the facts and circumstances of the case... I find it quite frankly nothing more than a reiteration of the standard under 363... under which courts had previously authorized transfers outside of the ordinary course of business and that [are], based on the business judgment of the debtor...."

Transcript of January 12, 2006, hearing at 86-87, *In re Nobex Corp.*, Case No. 05-20050 (MFW) (Bankr. D. Del.) (order approving management incentive plan entered January 20, 2006).

In *In re Am. Home Mortgage Holdings*, the court considered the interim approval of an interim retention plan. In approving that plan, in part, on an interim basis, the court stated that:

> I think the Debtors have satisfied certainly the most important criteria in connection with the non-insiders. There's a reasonable relationship between the plan and the results to be obtained, the cost of the plan is reasonable, the context of the debtors' assets, liabilities, and the scope of the plan is fair and reasonable....

Transcript of August 7, 2007, Hearing at 110, *In re Am. Home Mortgage Holdings*, et al., Case No. 07-11047 (CSS) (Bankr. D. Del.) (emphasis added).

As set forth above, implementing the Incentive and Retention Plan has a sound business purpose designed to (i) to maximize value for all of the Debtors' stakeholders, and (ii) to motivate the Plan Participants by rewarding them for conducting, facilitating, and/or assisting with a successful Sale Process. Moreover, the payments to be made under the Incentive and Retention Plan bear a direct relationship to the benefit achieved for the Debtor's estate, bear a reasonable cost in the context of the Debtor's assets and liabilities, and are generally fair and reasonable.[10] Thus, the Incentive and Retention Plan is justified by the facts and circumstances of this chapter 11 case and therefore satisfies Bankruptcy Code section 503(c)(3).

**D.    The Court May Authorize Adoption of the Incentive and Retention Plan Pursuant to Bankruptcy Code Section 105(a)**

The Court also may rely on its general equitable powers, as codified in Bankruptcy Code section 105(a) to grant the relief requested in this Motion. Specifically, Bankruptcy Code section

---

[10] As set forth in more detail in the Imhoff Declaration, both the average payment and the total amount of payments called for under the Incentive and Retention Plan here are consistent with or significantly smaller than what has been approved in other cases that have sought approval of similar incentive and retention plans. *See* Imhoff Declaration, p. 7.

105(a) empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As set forth in detail above, the Incentive and Retention Plan is critical to the Debtors' efforts to maximize the value of their estates through a sale of their assets in accordance with the Bid Procedures Order. The efforts of the Plan Participants in pursuing the maximum return for the Debtors' creditors and other parties in interest are essential to the Debtors. Therefore, the costs associated with the incentive plan are reasonable, necessary and are justified by the benefits that the Debtors will realize as a result of the services of the Plan Participants.

For all of the foregoing reasons, the Debtors submit that the Incentive and Retention Plan should be approved.

### E.      Waiver of Bankruptcy Rule 6004(a) and 6004(h)

Given the nature of the relief requested herein, the Debtors respectfully request a waiver of (i) the notice requirements under Bankruptcy Rule 6004(a), and (ii) the 14-day stay under Bankruptcy Rule 6004(h), to the extent that either rule is applicable

**V.**

**<u>DEBTORS' RESERVATION OF RIGHTS</u>**

Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract or lease under Bankruptcy Code section 365. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim at a later date.

**VI.**

**<u>NOTICE</u>**

No trustee or examiner has been appointed in the Debtors' chapter 11 cases. The Debtors have provided notice of this Motion to: (i) the U.S. Trustee; (ii) counsel to the Creditors' Committee; (iii) the United States Department of Energy; (iv) the United States Department of Labor; (v) the Securities and Exchange Commission; (vi) the Internal Revenue Service; (vii) the United States

204027988

Attorney's Office for the District of Arizona; and (viii) any party that has requested notice pursuant to Bankruptcy Rule 2002. In the event that the Court grants the relief requested by the Motion, the Debtors shall provide notice of the entry of the order granting such relief upon each of the foregoing parties and any other parties in interest as the Court directs. The Debtors respectfully submit that such notice is sufficient and that no further notice need be given.

**VII.**

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court (a) enter an order granting the relief requested in this Motion and (b) grant such other and further relief as the Court may deem just, proper and equitable.

Dated: October 1, 2013

PARKER SCHWARTZ, PLLC

By: _____ */s/ Jared G. Parker* _____
        Jared G. Parker

– and –

AKIN GUMP STRAUSS HAUER & FELD LLP

Charles R. Gibbs (admitted *pro hac vice*)
David P. Simonds (admitted *pro hac vice*)
Arun Kurichety (admitted *pro hac vice*)

Attorneys for the Debtors
and Debtors in Possession

**<u>Exhibit A</u>**

**Proposed Order**

204027988

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA

In re:

ELECTRIC TRANSPORTATION ENGINEERING
CORPORATION (d/b/a ECOTALITY NORTH
AMERICA), *et al.*,[1]

      Debtors.

Case No. 2:13-BK-16126 (RJH)

Chapter 11

Jointly Administered

**ORDER APPROVING AND
AUTHORIZING THE
IMPLEMENTATION OF A KEY
EMPLOYEE RETENTION AND
INCENTIVE PROGRAM**

---

This filing applies to:

■ All Debtors

☐ Specified Debtors

---

      Upon the motion (the "***Motion***") of the above-captioned debtors and debtors in possession (collectively, the "***Debtors***") seeking entry of an order (this "***Order***") authorizing the Debtors to implement the Incentive and Retention Plan, all as more fully set forth in the Motion;[2] and upon the

---

[1] The Debtors in these jointly administered chapter 11 cases and the last four digits of their respective Employer Identification Numbers are:  (i) ECOtality, Inc. (5422); (ii) Electric Transportation Engineering Corporation (4755); (iii) ECOtality Stores, Inc. (2643); (iv) ETEC North, LLC (n/a); (v) The Clarity Group, Inc. (8832); and (vi) G.H.V. Refrigeration, Inc. (4512).  The Debtors' service address at ECOtality, Inc.'s corporate headquarters is Post Montgomery Center, One Montgomery Street, Suite 2525, San Francisco, California 94104.

[2] All terms used but not defined herein shall have the meaning ascribed to them in the Motion, the Imhoff Declaration, or the Herrmann Declaration, as applicable.

Imhoff Declaration and the Herrmann Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein; and this Court having determined that the legal and factual bases set forth in the record establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1. The Motion is granted to the extent provided herein.

2. The Incentive and Retention Plan is approved.

3. The Debtors are authorized, but not directed, to make payments to the Plan Participants consistent with the Incentive and Retention Plan. Notwithstanding anything to the contrary herein or in the Motion, the total amount of payments authorized herein shall not exceed $91,075, in the aggregate, to the Management Participants and $137,628, in the aggregate, to the Rank and File Participants.

4. All payments made by the Debtors under the Incentive and Retention Plan shall be allowed administrative expenses of the Debtors' estates pursuant to Bankruptcy Code section 503(b).

5. Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained in this Order shall constitute, nor is it intended to constitute, an admission as to the validity or priority of any claim against the Debtors, the creation of an administrative priority claim on account of the assumption or adoption of any contract or agreement under Bankruptcy Code section 365.

6. The requirements of Bankruptcy Rule 6004(a) are waived.

204027988

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, this Order shall be immediately effective and enforceable upon its entry.

8.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

9.     The Court retains jurisdiction with respect to all matters arising from or related to the interpretation or implementation of this Order.

**\*\* DATED AND SIGNED ABOVE \*\***

2040027988

3

**Exhibit B**

**Imhoff Declaration**

204027988

CHARLES R. GIBBS (admitted *pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
cgibbs@akingump.com

DAVID P. SIMONDS (admitted *pro hac vice*)
ARUN KURICHETY (admitted *pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (310) 229-1000
Facsimile: (310) 229-1001
dsimonds@akingump.com
akurichety@akingump.com

– and –

JARED G. PARKER (SBN: 6428)
PARKER SCHWARTZ, PLLC
7310 N. 16th St., Suite 330
Phoenix, Arizona 85020
Telephone: (602) 282-0476
Facsimile: (602) 282-0478
jparker@psazlaw.com

Attorneys for Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Case No. 2:13-BK-16126 (RJH) |
| ELECTRIC TRANSPORTATION ENGINEERING CORPORATION (d/b/a ECOTALITY NORTH AMERICA), *et al.*,[1] | Chapter 11 |
| Debtors. | Jointly Administered |
| | **DECLARATION OF DEWEY IMHOFF IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING AND AUTHORIZING THE IMPLEMENTATION OF A KEY EMPLOYEE RETENTION AND INCENTIVE PROGRAM** |
| This filing applies to: | |
| ■ All Debtors | |
| ☐ Specified Debtors | |

---

[1] The Debtors in these jointly administered chapter 11 cases and the last four digits of their respective Employer Identification Numbers are: (i) ECOtality, Inc. (5422); (ii) Electric Transportation Engineering Corporation (4755); (iii) ECOtality Stores, Inc. (2643); (iv) ETEC North, LLC (n/a); (v) The Clarity Group, Inc. (8832); and (vi) G.H.V. Refrigeration, Inc. (4512). The Debtors' service address at ECOtality, Inc.'s corporate headquarters is Post Montgomery Center, One Montgomery Street, Suite 2525, San Francisco, California 94104.

204031553

I, Dewey Imhoff, declare under penalty of perjury as follows, pursuant to the provisions of 28 U.S.C. § 1746:

I am a Senior Managing Director of FTI Consulting, Inc. ("*FTI*"), the proposed financial advisor and crisis managers to the above-captioned debtors and debtors in possession (collectively, the "*Debtors*"). In my role as a Senior Managing Director of FTI, I have become familiar with the Debtors' day-to-day operations, business affairs, and employees. I submit this declaration (the "*Declaration*") in support of the *Debtors' Motion for Entry of an Order Authorizing the Implementation of a Key Employee Retention and Incentive Plan* (the "*Motion*").[1]

Except as otherwise indicated herein, all statements in this Declaration are based on my personal experience and knowledge, my opinion, my discussions with the Debtors' management and professionals, information provided by other FTI professionals working under my supervision, and my review of relevant documents. If called to testify, I could and would testify to each of the facts and opinions set forth herein.

## I.

## QUALIFICATIONS

As set forth above, I am a Senior Managing Director at FTI. Prior to joining FTI, I was a partner at PricewaterhouseCoopers. Prior to that, I was a senior manager at Buccino & Associates, Inc., a nationally recognized crisis management and turnaround boutique, and a vice president of the Special Assets Group at Prudential Capital.

I received my Masters of Business Administration in accounting from Rutgers University and a Bachelor of Arts from William Paterson University. I am a certified insolvency and restructuring advisor and a certified public accountant (retired). I am a member of the Association of Insolvency & Restructuring Advisors, the American Bankruptcy Institute, the New Jersey Society of Certified Public Accountants, the American Institute of Certified Public Accountants, and the Turnaround Management Association.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion.

204031553

I have more than thirty (30) years of advisory and management experience in the financial services, retail, healthcare, manufacturing, forest products, professional sports and sporting venues, real estate, and energy sectors. I have worked in positions with responsibility for financial and statutory reporting, troubled loans, assets sales, fraud auditing, strategic planning, and administrative and operational management. I was also the co-editor of *The Credit Executive's Guide to Business Restructuring* (Dewey Imhoff and Elliot Fuhr eds., FTI Consulting 2006) and collaborated on *The Practical Guide to Corporate Restructuring* (Cooper & Lybrand L.L.P. 1997).

In addition, I have developed or consulted on more than thirty (30) employee retention plans and employee incentive plans, which has included representation of both creditors and debtors in evaluating those plans. In connection with that work, I have performed numerous comparative studies of employee retention plans and employee incentive plans similar to the comparisons described below. I previously testified as an expert witness on employee retention plans and employee incentive plans in *In re Fibermark, Inc.*, Case No. 04-10463 (Bankr. D. Vt. Mar. 30, 2004), *In re Nelson Nutraceuticals, Inc.*, Case No. 06-10072 (Bankr. D. Del. Jan. 28, 2006), and *In re Hostess Brands, Inc.*, Case No. 12-22052 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2012). I was also retained to testify as an expert witness about employee retention plans, although ultimately was not required to provide any testimony, in *In re Cornerstone Propane, L.P.*, Case No. 04-13856 (Bankr. S.D.N.Y. June 3, 2004), and was retained to testify, but never admitted as an expert witness in *In re Fleming Co., Inc.*, Case No. 03-10945 (Bankr. D. Del. Apr. 1, 2003).

I am not being compensated specifically for this Declaration other than indirectly through the payments received by FTI for my services in connection with FTI's proposed employment in these chapter 11 cases.

## II.

## THE NEED FOR A RETENTION AND INCENTIVE PLAN

As the Court is aware, the Debtors commenced these chapter 11 cases with the intention of pursuing a sale of their assets through a highly expedited, court-supervised competitive bidding process (the "**Sale Process**"). It is my understanding, based on conversations with the Debtors' management and their other professionals, that the success or failure of the Sale Process is inextricably

tied to the Debtors' remaining workforce. Indeed, given the highly technical and sophisticated nature of the Debtors' businesses, much of their value is directly linked to their employees, without which the Debtors and, in particular, their extensive network of electric car charging stations (the "*EV Charging Network*"), simply could not operate. The employees' particular skills, institutional knowledge, and understanding with respect to the Debtors' operations, infrastructure, customer relations, and the EV Charging Network are essential to the ongoing maintenance of the Debtors' businesses, and the value thereof, during the Sale Process.

Although the Debtors believe that the proposed path forward in these chapter 11 cases is feasible, I understand that the Debtors' chapter 11 filing and their general financial condition have, understandably, raised serious concerns among the Debtors' employees. These concerns have been significantly exacerbated by management's ongoing efforts to manage costs, which resulted in reductions in force leading up to the Petition Date. While the Debtors are very hopeful that the potential purchaser(s) of the Debtors' assets would seek to hire most, if not all, of the Debtors' remaining employees, the anxiety demonstrated by employees is such that I believe, based on my conversations with the Debtors' management and their advisors, that most, if not all, of the remaining employees are actively searching for other employment, which may result in further attrition of the Debtors' workforce.[2]  To the extent that the Debtors were to suffer a mass exodus of their remaining employees, I believe that the Debtors may be forced to terminate their operations prior to the completion of the Sale Process. This could dramatically reduce the value of the Debtors' assets and any potential purchase price a willing buyer may offer for such assets, to the detriment of the Debtors' estates, their creditors, and their other stakeholders.

### III.

### THE PROPOSED INCENTIVE AND RETENTION PLAN

To avoid these potentially disastrous consequences and to properly motivate and incentivize remaining employees to stay with the Debtors through the conclusion of the Sale Process, the Debtors

---

[2] I understand that four (4) employees have resigned from their position with the Debtors since the Petition Date, and the majority of those remaining have indicated to management informally that they are actively seeking out other employment.

204031553

4

have worked with their professional advisors to develop an appropriate incentive and retention plan (the "*Incentive and Retention Plan*").  I believe that the proposed Incentive and Retention Plan is relatively straightforward and designed to motivate the Debtors' remaining employees to continue working for the Debtors through the approval of any sale of their assets.  I also believe that the minimal expense associated with the Incentive and Retention Plan will provide significant dividends in the form of an increased purchase price for the Debtors' assets.

The proposed Incentive and Retention Plan, as more fully described below, divides the employees and associated payments through the use of two (2) tiers.  "*Tier I*" consists of "management" employees (the "*Management Participants*"), who I believe should not, but arguably could be, considered "insiders" (as that term is defined in Bankruptcy Code section 101(31)).  I note that the Debtors' Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, and General Counsel, who are the Debtors' most senior employees, are specifically *not* included in, and will not received benefits under, the Incentive and Retention Plan.  The second tier, designated as "*Tier II*," consists of critical, but clearly non-insider, rank and file employees (the "*Rank and File Participants*" and, together with the Management Participants, the "*Plan Participants*").

**A.    Tier I**

Tier I consists of five (5) employees who hold titles including, among others, "Vice President," "Chief Technical Officer," and "Controller," and includes aggregate payments of not more $91,075, with no more than $25,625 to be paid to any individual Management Participant.  Importantly, all payments to be made to the Management Participants under the Incentive and Retention Plan are conditioned upon the approval of a sale of their assets in accordance with the deadlines and procedures established by the *Order (A) Approving Bidding Procedures in Connection with Substantially all of the Debtors' Assets, (B) Scheduling a Sale Hearing, (C) Approving the Form and Manner of the Sale, Auction, and Sale Hearing, and (D) Granting Related Relief* [Docket No. 56] (the "*Bid Procedures Order*").  Specifically, upon the entry of an order by the Court approving one or more sales of assets through the Sale Process in accordance with the Bid Procedures Order, each Management Participant will receive, as determined by the Debtors, either (i) a payment equal to one and a half (1.5) times his

or her monthly salary, or (ii) a fixed amount of $1,700.[3] If no such sale is approved, the Management Participants will not receive any payment under the Incentive and Retention Plan.

It is my understanding that each of the Management Participants included in Tier I (i) is critical to the Debtors' ongoing operations or completion of the sale and subsequent wind down, and (ii) is a potential asset themselves that will be attractive to interested purchasers as potential employees.

**B.    Tier II**

Tier II consists of thirty-eight (38) Rank and File Participants and provides for payments of no more than $137,628, in the aggregate, for all such Rank and File Participants and no more than $15,417 for any individual Rank and File Participant. Pursuant to the Incentive and Retention Plan, each Rank and File Participant will receive a retention bonus equal to one of the following, as determined by the Debtors: (i) a fixed bonus of $1,700, (ii) a factor of one (1) times his or her monthly salary, or (iii) a factor of one and a half (1.5) times his or her monthly salary. The Debtors, with the assistance of their advisors and in their business judgment, determined the amount proposed to be paid to each individual Rank and File Participant primarily based on the particular nature of the applicable Rank and File Participant's contributions to the chapter 11 cases and the Sale Process. Notably, payments to the Rank and File Participants are backloaded – *i.e.*, payments will not be made until the close of business on the later of (i) October 10, 2013, and (ii) the day after the conclusion of the sale hearing held by the Court under the Bid Procedures Order (or if such hearing is cancelled, one business day after such cancellation), and will be paid only to those Rank and File Participants who remain employed by the Debtors and otherwise continue discharging their respective duties until such date. Although October 10, 2013 closely coincides with the consummation of any successful sale of the Debtors' Assets, payments to the Rank and File Participants will not be dependent upon the completion of a sale.

It is my understanding that each of the Rank and File Participants is critical to the Debtors' ongoing operations and the completion of a successful sale. As explained above, these employees

---

[3] It is my understanding that, if a Management Participant resigns, is otherwise terminated, or ceases discharging their duties prior to entry of an order approving a sale in accordance with the Bid Procedures Order, such Management Participant will not be entitled to receive any payment under the Incentive and Retention Plan.

possess particular skills, knowledge, and understanding with respect to the Debtors' operations, infrastructure, customer relations, and EV Charging Network, and are essential to the ongoing maintenance of the Debtors' businesses during the Sale Process. Based on my conversations with the Debtors and their other advisors, I believe that none of the employees included in Tier II is an insider or perform executive duties, nor could such employees be described as having control over any of the Debtors.

## IV.

## PROCESS FOR DEVELOPING THE INCENTIVE AND RETENTION PLAN

The Incentive and Retention Plan was designed after careful consideration by, and numerous meetings between, the Debtors' management, FTI, and the Debtors' other restructuring professionals. In connection with developing the Incentive and Retention Plan, FTI reviewed the terms of key employee retention and incentive plans approved in six (6) other chapter 11 cases since 2008. The details of that review are reflected in the analysis attached hereto as **Exhibit 1**.

I believe that the design and structure of the Incentive and Retention Plan, including the payments to be made thereunder, is generally in line with market standards and practices. Specifically, the number of Plan Participants included the Incentive and Retention Plan closely approximates the mean in the other plans reviewed by FTI. Moreover, the maximum cost per Plan Participant and overall maximum plan cost are both consistent with market practice. Both the maximum cost per plan participant and the maximum overall plan cost actually fall below the twenty-fifth (25th) percentile of what was approved in the comparator cases.

While the payments contemplated under the Incentive and Retention Plan exceed the payments made in the comparable cases when viewed as a percentage of sales and total assets, I believe that this is justified by the nature of the Debtors' businesses. More specifically, the comparable cases that I considered primarily relied upon consumer purchases to generate sales. By contrast, the Debtors had limited prepetition sales and were primarily concerned with fulfilling the terms of the cost-share grants that they received from the United States Department of Energy and other work directly funded by the State of California. Thus, I believe that the disparity between the Incentive and Retention Plan and the comparable plans that I considered in this regard is reasonable and should be expected.

204031553

**V.**

**CONCLUSION**

Taking all of the foregoing into consideration, I believe that the Incentive and Retention Plan, as contemplated in the Motion, should provide (i) adequate incentives to the Management Participants to motivate them to achieve the required metric – *i.e.*, Court approval of one or more sales of the Debtors' assets in accordance with the Bid Procedures Order, and (ii) adequate compensation to the Rank and File Participants to induce them to remain employed by the Debtors' while their services are required during the Sale Process. In addition, I believe that the Incentive and Retention Plan has been narrowly designed to ensure that the Debtors have the staff necessary to operate in chapter 11 and successfully complete the Sale Process. Finally, I believe that the relatively modest cost of the Incentive and Retention Plan is dramatically outweighed by the potentially disastrous consequences to the Debtors and their creditors if the Plan Participants were to leave the Debtors at this critical time in their chapter 11 proceedings. Accordingly, I believe that the Incentive and Retention Plan should be approved in all respects.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

1

2   I declare under penalty of perjury that the foregoing is true and correct. Executed on this 30

3   day of September, 2013 in New York, New York.

4                                          By:

5                                          Name:      Dewey Imhoff

6                                          Tite:      Senior Managing Director

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit 1**

Median assets $408,589
Avg assets  $953,334

*($000s)*

| Petition Date | Company | Type of Plan | No. Participants | Cost Threshold | Cost Target | Cost Max | Sales | Assets | Max Cost % Sales | Max Cost % Assets | Max Cost / Participant | Outcome |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/2/2010 | Movie Gallery | KERP (Employee Incentive Plan | 31 | n/a | 485 | $485 | 1,400,000 | 533,800 | 0.03% | 0.09% | $15.6 | |
| 1/14/2009 | Gottschalk | Tier 2 KEIP | 30 | 0 | n/a | 500 | 557,000 | 283,377 | 0.09% | 0.18% | 16.7 | |
| 1/13/2009 | Goody's LLC | Retention Plan | 19 | n/a | 199 | 199 | 786,000 | 206,000 | 0.03% | 0.10% | 10.5 | |
| 4/26/2012 | Betsey Johnson | Key Employee Incentive and Retention Plan | 12 | n/a | 64 | 64 | 60,000 | 21,344 | 0.11% | 0.30% | 5.3 | |
| 11/10/2008 | Circuit City | Tier 2 (Retention bonuses) | 137 | n/a | n/a | 1,620 | 11,743,000 | 3,400,080 | 0.01% | 0.05% | 11.8 | |
| 2/16/2011 | Borders Group | Key Employee Retention Plan | 25 | n/a | 933 | 1,233 | 2,300,000 | 1,275,404 | 0.05% | 0.10% | 49.3 | |

**Comparator Group Metrics (KERP)**

| | | | No. Participants | | | Cost Max | | | Max Cost % Sales | Max Cost % Assets | Max Cost / Participant | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Min | 12 | | | 64 | | | 0.01% | 0.05% | 5.3 | |
| | | 25%ile | 21 | | | 271 | | | 0.03% | 0.09% | 10.8 | |
| | | Mean | 42 | | | 684 | | | 0.05% | 0.13% | 18.2 | |
| | | 50%ile | 28 | | | 493 | | | 0.04% | 0.10% | 13.7 | |
| | | 75%ile | 31 | | | 1,050 | | | 0.08% | 0.16% | 16.4 | |
| | | Max | 137 | | | 1,620 | | | 0.11% | 0.30% | 49.3 | |

| 1/21/2012 | ECOtality Preliminary | Employee Retention Plan | 43 | | | 228 | 49,600 | 60,800 | 0.52% | 0.43% | 5.3 | |

**Exhibit C**

**Herrmann Declaration**

CHARLES R. GIBBS (admitted *pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
cgibbs@akingump.com

DAVID P. SIMONDS (admitted *pro hac vice*)
ARUN KURICHETY (admitted *pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (310) 229-1000
Facsimile: (310) 229-1001
dsimonds@akingump.com
akurichety@akingump.com

– and –

JARED G. PARKER (SBN: 6428)
PARKER SCHWARTZ, PLLC
7310 N. 16th St., Suite 330
Phoenix, Arizona 85020
Telephone: (602) 282-0476
Facsimile: (602) 282-0478
jparker@psazlaw.com

Attorneys for Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Case No. 2:13-BK-16126 (RJH) |
| ELECTRIC TRANSPORTATION ENGINEERING CORPORATION (d/b/a ECOTALITY NORTH AMERICA), *et al.,*[1] | Chapter 11<br><br>Jointly Administered |
| Debtors. | **DECLARATION OF SUSIE HERRMANN IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING AND AUTHORIZING THE IMPLEMENTATION OF A KEY EMPLOYEE RETENTION AND INCENTIVE PROGRAM** |
| This filing applies to:<br><br>■ All Debtors<br><br>☐ Specified Debtors | |

[1] The Debtors in these jointly administered chapter 11 cases and the last four digits of their respective Employer Identification Numbers are: (i) ECOtality, Inc. (5422); (ii) Electric Transportation Engineering Corporation (4755); (iii) ECOtality Stores, Inc. (2643); (iv) ETEC North, LLC (n/a); (v) The Clarity Group, Inc. (8832); and (vi) G.H.V. Refrigeration, Inc. (4512). The Debtors' service address at ECOtality, Inc.'s corporate headquarters is Post Montgomery Center, One Montgomery Street, Suite 2525, San Francisco, California 94104.

204032767

I, Susie Herrmann, pursuant to the provisions of 28 U.S.C. § 1746, declare under penalty of perjury as follows:

I am the Chief Financial Officer of ECOtality, Inc., Electric Transportation Engineering Corporation, and each of their affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "***Debtors***"). I have been employed by the Debtors in this role since September 2012. As a result, I am familiar with the Debtors' day-to-day operations, business affairs, and the roles and responsibilities of their employees. I submit this declaration (the "***Declaration***") in support of the *Debtors' Motion for Entry of an Order Authorizing the Implementation of a Key Employee Retention and Incentive Plan* (the "***Motion***").[1]

Except as otherwise indicated herein, all statements in this Declaration are based on my personal experience and knowledge, my opinion, my discussions with other members of the Debtors' management and advisors, information provided to by employees of the Debtors working under my supervision, and/or my review of relevant documents. If called to testify, I could and would testify to each of the facts and opinions set forth herein.

## I.

## RANK AND FILE PARTICIPANTS ARE NOT INSIDERS

As set forth in the Motion, certain of the Rank and File Participants included in Tier II of the proposed Incentive and Retention Plan have job titles that could lead parties in interest to believe that they are "insiders" (as that term is defined in Bankruptcy Code section 101(31)) of the Debtors. I understand that, based on my conversations with the Debtors' advisors, if any of these Rank and File Participants are, in fact, insiders of the Debtors, they would be ineligible to receive the retention payment that is contemplated to be paid to Rank and File Participants under the proposed Incentive and Retention Plan. However, as set forth more fully below, each of the Rank and File Participants with arguably elevated titles are not directors or officers of the Debtors, do not have any ability to exert

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion.

204032767

control over the Debtors, do not set corporate policy, and do not perform traditional executive functions.[2]

More specifically, there are approximately nine (9) Rank and File Participants included in Tier II of the Incentive and Retention Plan that arguably have elevated titles that could lead parties in interest to misconstrue their role and responsibilities. Additional detail regarding each of these nine (9) Rank and File Participants is as follows:

- Two (2) of the Rank and File Participants hold the job title of "Controller." However, I do not believe that either of these two (2) individuals can be fairly characterized has having any ability to exercise control over the Debtors or influence corporate policy, and none of them are officers or perform traditional executive-level functions. Indeed, each of these two (2) Controller-level Rank and File Participants are essentially in-house accountants and perform functions consistent with such a role, including, but not limited to, financial reporting. One of these Rank and File Participants reports directly to me and the other reports to a third-party.[3]

- One (1) Rank and File Participant included in Tier II has the word "Director" attached to his job title. This Rank and File Participant is the Director of Operational Excellence. However, this individual is not a director in the traditional corporate sense or considered an officer of the Debtors. In addition, the Director of Operational Excellence does not have (i) any significant supervisory role, (ii) the ability to set the compensation of others, or (iii) the ability to dictate (or even influence) corporate policy.

- Also included among the Rank and File Participants in Tier II is the Vice President of Software Development. This individual is a Vice President in name only and only received this title as an incentive during negotiations when he was initially hired. In addition, this individual directly reports to one of the Tier I Management Participants, and has no ability to influence or otherwise dictate corporate policy.

- The remaining five (5) Rank and File Participants with arguably elevated titles are all a "Manager" of some aspect of the Debtors' operations, including payroll, infrastructure and vehicle testing, Securities and Exchange Commission compliance, and business applications delivery. While each of these individuals are critically important to the role that they fulfill, none of them (i) have significant supervisory responsibilities, (ii) are a director or officer of the Debtors, (iii) have the ability to control the Debtors, (iv) set or influence corporate policy, or (v) perform executive functions.

Accordingly, for all of the foregoing reasons, I believe that none of the Rank and File Participants described herein can reasonably be considered insiders of the Debtors.

---

[2] For the avoidance of doubt, I believe that the remaining Tier II Rank and File Participants (*i.e.*, those that do not have an elevated job title) similarly are not insiders of the Debtors, as none of those individuals are directors or officers, have any ability to control the Debtors, or perform executive-level functions. Each of the remaining Rank and File Participants are just that – rank and file employees with no significant role in the day-to-day management of the debtors' operations.

[3] A third individual holding the title of Controller has been placed in Tier I due to the nature of that individual's responsibilities.

1    I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 1

2    day of October, 2013 in Phoenix, Arizona.

3

4    By:        _Susie Herrmann_
     Name:      Susie Herrmann
5    Title:     Chief Financial Officer

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3