| | |
|---|---|
| In re: | Chapter 11 |
| ELECTRIC TRANSPORTATION ENGINEERING CORPORATION (d/b/a ECOTALITY NORTH AMERICA), *et al.*[1] | Case No. 2:13-BK-16126 (MCW) |
| Debtors. | Jointly Administered |

This filing applies to:
- ■ All Debtors
- ☐ Specified Debtors

# DISCLOSURE STATEMENT FOR
# DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Charles R. Gibbs (admitted *pro hac vice*)
1700 Pacific Avenue
Dallas, Texas 75201
Telephone:     (214) 969-2800
Facsimile:     (214) 969-4343

-and-

David P. Simonds (admitted *pro hac vice*)
Arun Kurichety (admitted *pro hac vice*)
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone:     (310) 229-1000
Facsimile:     (310) 229-1001

**PARKER SCHWARTZ, PLLC**
Jared G. Parker
7310 N. 16th St., Suite 330
Phoenix, Arizona 85020
Telephone:     (602) 282-0476
Facsimile:     (602) 282-0478

*Co-Counsel to the Debtors and Debtors in Possession*

Dated: October 28, 2014

> **This Disclosure Statement is being submitted for approval but has not been approved by the Bankruptcy Court. This is not a solicitation of acceptance or rejection of the Plan. Acceptance or rejection may not be solicited until a disclosure statement has been approved by the Bankruptcy Court either on a preliminary or final basis. The information in the Disclosure Statement is subject to change. This Disclosure Statement is not an offer to sell any securities and is not soliciting an offer to buy any securities.**

---

[1] The Debtors in these jointly administered chapter 11 cases and the last four digits of their respective Employer Identification Numbers are: (i) ECOtality, Inc. (5422); (ii) Electric Transportation Engineering Corporation (4755); (iii) ECOtality Stores, Inc. (2643); (iv) ETEC North, LLC (n/a); (v) The Clarity Group, Inc. (8832); and (vi) G.H.V. Refrigeration, Inc. (4512). The Debtors' service address is ECOtality, Inc., P.O. Box 20336, Phoenix, AZ 85036-0336.

THIS DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS HERETO, THE "**DISCLOSURE STATEMENT**") IS BEING PROVIDED PURSUANT TO BANKRUPTCY CODE SECTION 1125(B) BY THE DEBTORS FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION (THE "**PLAN**"), WHICH HAS BEEN FILED WITH THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF ARIZONA (THE "**BANKRUPTCY COURT**").  A COPY OF THE PLAN IS ATTACHED HERETO AS **EXHIBIT A**.

ALL CAPITALIZED TERMS USED BUT NOT OTHERWISE DEFINED WITHIN THIS DISCLOSURE STATEMENT SHALL HAVE THE MEANINGS SET FORTH IN THE PLAN.

THE SUMMARIES OF THE PLAN CONTAINED HEREIN SHALL NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO MAKE A JUDGMENT WITH RESPECT TO, AND DETERMINE HOW TO VOTE ON, THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN AND DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL OF THE TERMS OF THE PLAN OR THE DOCUMENTS REFERRED TO THEREIN.  YOU SHOULD REVIEW THE PLAN AND SUCH DOCUMENTS IN THEIR ENTIRETY FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS, THEIR ESTATES AND OTHER PARTIES IN INTEREST.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016(b) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER RULES GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11.  THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON ITS ACCURACY.

NO REPRESENTATION CONCERNING THE DEBTORS OR THE VALUE OF THE DEBTORS' ASSETS HAS BEEN AUTHORIZED BY THE BANKRUPTCY COURT OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT.  THE DEBTORS AND COMMITTEE ARE NOT RESPONSIBLE FOR ANY INFORMATION, REPRESENTATION OR INDUCEMENT MADE TO OBTAIN YOUR ACCEPTANCE, WHICH IS OTHER THAN, OR INCONSISTENT WITH, INFORMATION CONTAINED HEREIN AND IN THE PLAN.

YOU ARE STRONGLY URGED TO CONSULT WITH YOUR FINANCIAL, LEGAL AND TAX ADVISORS TO UNDERSTAND FULLY THE PLAN AND DISCLOSURE STATEMENT.   THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS GIVEN AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED.  THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT, UNDER ANY CIRCUMSTANCE, IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE SUCH DATE.  THIS DISCLOSURE STATEMENT IS INTENDED, AMONG OTHER THINGS, TO SUMMARIZE THE PLAN AND MUST BE READ IN CONJUNCTION WITH THE PLAN AND ITS EXHIBITS, IF ANY.  IF ANY CONFLICTS EXIST BETWEEN THE PLAN AND DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.

**THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS <u>DECEMBER 8, 2014 AT 5:00 P.M. (ARIZONA TIME)</u> (THE "<u>VOTING DEADLINE</u>"), UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE. TO BE COUNTED, A BALLOT ("<u>BALLOT</u>") INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE <u>ACTUALLY RECEIVED</u> BY KURTZMAN CARSON CONSULTANTS LLC, THE DEBTORS' NOTICE, CLAIMS AND BALLOTING AGENT (THE "<u>CLAIMS AND NOTICING AGENT</u>"), NO LATER THAN THE VOTING DEADLINE AT THE FOLLOWING ADDRESS:**

> **ECOTALITY BALLOT PROCESSING CENTER**
> **c/o KURTZMAN CARSON CONSULTANTS LLC**
> **2335 ALASKA AVENUE**
> **EL SEGUNDO, CALIFORNIA 90245**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS (INCLUDING THOSE HOLDERS OF CLAIMS OR EQUITY INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, TO THE EXTENT APPLICABLE, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.**

**CERTAIN IMPORTANT DATES AND DEADLINES:[2]**

| DEADLINE | DATE |
| --- | --- |
| Voting Record Date | October 29, 2014 |
| Deadline for Filing Plan Supplement | December 1, 2014 |
| Voting Deadline | December 8, 2014 at 5:00 p.m. (Arizona time) |
| Final Disclosure Statement and Plan Objection Deadline | December 8, 2014 |
| Submission of Voting Report | December 16, 2014 |
| Debtors' Reply Deadline | December 16, 2014 |
| Disclosure Statement and Confirmation Hearing | December 19, 2014 |

---

[2]    Subject to the Bankruptcy Court's approval and availability.

**TABLE OF CONTENTS**

I.      EXECUTIVE SUMMARY ........................................................................................................1

II.     IMPORTANT INFORMATION ABOUT THE DISCLOSURE STATEMENT ...................1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN .....................................................................................................................................2
    A.    What is chapter 11? ..................................................................................................2
    B.    Why are the Debtors sending me this Disclosure Statement? ..................................2
    C.    Am I entitled to vote on the Plan? ............................................................................2
    D.    What will I receive from the Debtors if the Plan is consummated? ...........................3
    E.    What will holders of General Unsecured Claims receive under the Plan? .................3
    F.    How do I vote on the Plan and what is the Voting Deadline? ....................................3
    G.    What will I receive from the Debtors if I hold an Administrative Expense Claim, a Compensation Claim or a Priority Tax Claim? ..........................................................4
    H.    If the Plan provides that I get a distribution, do I receive that distribution upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date" and "Consummation?"...........................................................................4
    I.    Will there be releases granted to parties in interest as part of the Plan? ..................4
    J.    Why is the Bankruptcy Court holding a Confirmation Hearing and when is the Confirmation Hearing set to occur? .........................................................................4
    K.    What is the purpose of the Confirmation Hearing? ..................................................4
    L.    What is the effect of the Plan on the Debtors' ongoing business? ............................5
    M.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? .............................................................................................5
    N.    Do the Debtors recommend voting in favor of the Plan? .........................................5

IV.     THE DEBTORS' BACKGROUND ..........................................................................................5
    A.    The Debtors' Businesses ..........................................................................................5
    B.    Summary of the Debtors' Prepetition Debts and Other Significant Liabilities .............7

V.      EVENTS LEADING TO THE CHAPTER 11 CASES ..........................................................8
    A.    Events Leading to the Commencement of the Chapter 11 Cases .............................8

VI.     SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES .......................................10
    A.    First Day Pleadings and Other Core Matters ..........................................................10
    B.    Sale of Substantially All of the Debtors' Assets .....................................................13
    C.    Other Motions and Important Events ......................................................................14

VII.    SUMMARY OF THE PLAN ...................................................................................................15
    A.    Brief Explanation of the Plan ..................................................................................15
    B.    Treatment of Unclassified Claims ...........................................................................16
    C.    Classification and Treatment of Claims and Equity Interests ..................................17
    D.    Means for Implementation of the Plan ....................................................................18
    E.    Conditions Precedent to Effectiveness of the Plan .................................................24
    F.    Discharge, Release, Injunction and Related Provisions ..........................................24

VIII.   RISK FACTORS .....................................................................................................................27
    A.    Value of the Debtors' Assets and Distributions ......................................................27
    B.    Allowed Amount of Claims ......................................................................................27
    C.    Reorganized Stock and Tax Sharing Agreement ....................................................28
    D.    Certain Tax Implications of the Chapter 11 Cases .................................................28
    E.    The DOE's Claim ....................................................................................................29
    F.    Liquidating Trustee Fees and Expenses ................................................................29
    G.    Non-Confirmation or Non-Consummation of the Plan .............................................29

IX.     SOLICITATION AND VOTING PROCEDURES.................................................................30

A. The Solicitation Package ..................................................................................... 30
B. Voting Deadline ................................................................................................ 31
C. Voting Instructions .......................................................................................... 31
D. Voting Tabulation ............................................................................................ 32

X. CONFIRMATION OF THE PLAN ........................................................................... 32
A. Requirements for Confirmation of the Plan ................................................... 32
B. Best Interests of Creditors/Liquidation Analysis .......................................... 33
C. Feasibility ........................................................................................................ 34
D. Acceptance by Impaired Classes .................................................................... 34
E. Confirmation without Acceptance by All Impaired Classes .......................... 34

XI. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................. 35
A. Introduction ..................................................................................................... 35
B. U.S. Federal Income Tax Consequences to Debtors ...................................... 35
C. U.S. Federal Income Tax Consequences to Holders of General Unsecured Claims ...................... 37
D. Withholding and Reporting ............................................................................. 40

XII. CONCLUSION AND RECOMMENDATION ............................................................. 40

**EXHIBITS**

**Exhibit A**       Plan of Reorganization

**Exhibit B**       Biography of Carolyn Johnsen

---

**THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS
DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN**

---

## I.  EXECUTIVE SUMMARY

The Debtors submit this Disclosure Statement pursuant to Bankruptcy Code section 1125 to certain holders of Claims against the Debtors in connection with the solicitation of acceptances with respect to the Plan.  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  This Disclosure Statement describes certain aspects of the Plan, including the treatment of holders of Claims and Equity Interests, and also describes certain aspects of the Debtors' operations and other related matters.

**The Debtors and the Committee believe that the Plan is fair and equitable, maximizes the value of the Estates and provides the best recovery to holders of Claims.  At this time, the Debtors believe this is the best available alternative for completing the Chapter 11 Cases.  For these reasons and others described herein, the Debtors and the Committee strongly recommend that Creditors entitled to vote on the Plan vote to accept the Plan.**

## II.  IMPORTANT INFORMATION ABOUT THE DISCLOSURE STATEMENT

This Disclosure Statement provides information regarding the Plan.  The Debtors believe that the Plan is in the best interests of all creditors and urge all holders of Claims entitled to vote on the Plan to accept the Plan.

Unless the context requires otherwise, any references to "*we*," "*our*" and "*us*" are to the Debtors.

The confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and in the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Effective Date to occur will be satisfied (or waived).

**If you are a Creditor entitled to vote on the Plan, you are encouraged to read this Disclosure Statement in its entirety, including, without limitation, the Plan, and the section entitled "Risk Factors," before submitting your Ballot to vote on the Plan.**

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, this Disclosure Statement and the Plan Supplement, and any exhibits, schedules or amendments thereto, as applicable, and the summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents.  The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date.  Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose.  The Debtors believe that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate.  The summaries of the financial information and the documents annexed to this Disclosure Statement, including, but not limited to, the Plan, or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents.

This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission ("SEC") or any federal, state, local or foreign regulatory agency, nor has the SEC or any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly stated herein.

III.    **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN**

A.      **What is chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy commencement date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  The Bankruptcy Court's confirmation of a plan binds the debtor, any person or entity acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court, in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan provides for the treatment of the debtor's debt in accordance with the terms of the confirmed plan.

B.      **Why are the Debtors sending me this Disclosure Statement?**

The Debtors will be seeking to obtain Bankruptcy Court approval of the Plan.  In connection with soliciting acceptances of the Plan, Bankruptcy Code section 1125 requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  This Disclosure Statement has been prepared in accordance with these requirements.

The Debtors will be seeking conditional approval of the Disclosure Statement and will be seeking final approval of the Disclosure Statement at the Confirmation Hearing.  Upon conditional approval of the Disclosure Statement by the Bankruptcy Court, the Debtors intend to distribute the Disclosure Statement and the Plan in connection with the solicitation of votes on the Plan.

C.      **Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Equity Interest you hold.  Each category of holders of Claims or Equity Interests, as set forth in <u>Article II</u> of the Plan pursuant to Bankruptcy Code section 1122(a), is referred to as a "Class."  The respective voting status of each Class is set forth below.

The table below designates the Classes of Claims against, and Equity Interests in, each of the Debtors and specifies which of those Classes are Impaired or Unimpaired by the Plan.  **For a complete description of the Debtors' classification and treatment of Claims and Equity Interests, reference should be made to <u>Article II</u> of the Plan.**

1.      <u>**Summary of Classification of Claims and Equity Interests.**</u>

| <u>Class</u> | <u>Designation</u> | <u>Impairment</u> | <u>Entitled to Vote</u> |
|---|---|---|---|
| 1 | Allowed Secured Claims | Unimpaired | No (deemed to accept) |
| 2 | Allowed Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| 3 | Allowed General Unsecured Claims | Impaired | Yes |
| 4 | Intercompany Claims | Unimpaired | No (deemed to accept) |

| Class | Designation | Impairment | Entitled to Vote |
|:---:|:---:|:---:|:---:|
| 5 | Section 510(b) Claims | Impaired | No (deemed to reject) |
| 6 | Equity Interests | Impaired | No (deemed to reject) |

**D.      What will I receive from the Debtors if the Plan is consummated?**

The Liquidating Trust Agreement is premised upon the consolidation of the Estates into a single Estate.  As a result of the consolidation of the Estates, each Class of Claims and Equity Interests will be treated as a single consolidated Estate under the Liquidating Trust Agreement regardless of the separate identification of the Debtors.

The following table summarizes the anticipated recoveries for holders of Allowed Claims and Equity Interests under the Liquidating Trust Agreement.  **The expected recoveries set forth below are for illustrative purposes only and are subject to material change based on, among other things, changes in the amount of Claims that are Allowed.**

**1.      Summary of Estimated Recoveries under the Liquidating Trust Agreement.**

| Class | Designation | Impairment | Estimated Recovery |
|:---:|:---:|:---:|:---:|
| 1 | Allowed Secured Claims | Unimpaired | 100% |
| 2 | Allowed Priority Non-Tax Claims | Unimpaired | 100% |
| 3 | Allowed General Unsecured Claims | Impaired | Up to 9%[3] |
| 4 | Intercompany Claims | Unimpaired | 100% |
| 5 | Section 510(b) Claims | Impaired | 0% |
| 6 | Equity Interests | Impaired | 0% |

**E.      What will holders of General Unsecured Claims receive under the Plan?**

Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of its Allowed General Unsecured Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each holder thereof shall receive cash in an amount equal to the *pro rata* share of the Unsecured Claims Fund.

Certain holders of General Unsecured Claims, defined in the Plan as Qualified Creditor Stock Beneficiaries, may also receive additional distributions arising from the Plan, including from their allocation of stock of the Reorganized Debtor pursuant to the Plan.  These additional distributions could arise from distributions on account of the Reorganized Stock or distributions pursuant to the Tax Sharing Agreement among the Reorganized Debtors and the Stock Trust.  Creditors should refer to the Plan for complete information in these regards.

**F.      How do I vote on the Plan and what is the Voting Deadline?**

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your original Ballot must be completed, signed and submitted so that it is **actually received** by the Claims and Noticing Agent by **December 8, 2014 at**

---

[3]      Subject to material change based on, among other things, claims objections as well as the realization of Causes of Action and other assets.

**5:00 p.m. (Arizona Time)**.  See <u>Article IX</u> of the Plan for additional information on Solicitation and Voting Procedures.

      **G.**      **What will I receive from the Debtors if I hold an Administrative Expense Claim, a Compensation Claim or a Priority Tax Claim?**

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims, Compensation Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Equity Interests set forth in <u>Article II</u> of the Plan.  These Claims will be satisfied as set forth in <u>Articles 2.1, 2.2 and 2.4</u> of the Plan, respectively.

      **H.**      **If the Plan provides that I get a distribution, do I receive that distribution upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date" and "Consummation?"**

"Confirmation" of the Plan refers to the approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  In addition, the Debtors or the Liquidating Trustee, as applicable, may object to your Claim (whether it was filed with a proof of claim or scheduled by the Debtors), which may further delay distribution.  See <u>Article X</u> of the Plan for a discussion of the conditions to Confirmation and Consummation of the Plan.

Initial distributions to holders of Allowed Claims will be made on the date the Plan becomes effective, the "Effective Date," or as soon as practicable thereafter, as specified in the Plan.

      **I.**      **Will there be releases granted to parties in interest as part of the Plan?**

Yes.  See <u>Article IX</u> of the Plan, which is incorporated herein by reference.

      **J.**      **Why is the Bankruptcy Court holding a Confirmation Hearing and when is the Confirmation Hearing set to occur?**

Bankruptcy Code section 1128(a) requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

The Debtors will request that the Bankruptcy Court promptly schedule a Confirmation Hearing at the same time as the final hearing on approval of the Disclosure Statement and will provide notice of the Confirmation Hearing to all necessary parties.  The Confirmation Hearing may be adjourned or continued from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be filed and served on the Debtors and certain other parties prior to the Confirmation Hearing in accordance with the notice of the Confirmation Hearing.

The Debtors will publish the notice of the Confirmation Hearing, which will contain, among other things, the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the national edition of *The New York Times*, or a publication with similar distribution, to provide notification to those Persons or Entities who may not receive notice by mail.

      **K.**      **What is the purpose of the Confirmation Hearing?**

The confirmation of a plan by a bankruptcy court binds the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan discharges a debtor from any debt that arose before the confirmation of the plan and provides for the treatment of such debt in accordance with the terms of the confirmed plan.

L.      **What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors that is a Business Day on or after the Confirmation Date on which (i) no stay of the Confirmation Order is in effect and (ii) the conditions to the effectiveness of the Plan specified in Section 8.1 of the Plan have been satisfied or, if capable of being waived, waived. In addition, on the Effective Date, the Liquidating Trust shall be created. As of the Effective Date, all of the Liquidating Trust Assets shall be transferred to the Liquidating Trust, pursuant to the terms of the Liquidating Trust Agreement. The Liquidating Trust shall be established for the sole purpose of liquidating and distributing its assets to holders of Allowed Claims in accordance with the terms of the Plan and the Liquidating Trust Agreement.

M.      **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, you may contact the Debtors' co-counsel at the addresses and phone numbers listed on the cover page of this Disclosure Statement. Copies of the Plan and this Disclosure Statement may be obtained by contacting the Claims and Noticing Agent either by telephone, (866) 967-1788, by emailing ECOInfo@kccllc.com, or by visiting www.kccllc.net/ECOtality.

N.      **Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe that the Plan provides for a larger distribution to the Debtors' Creditors than would otherwise result from any other available alternative.

## IV.     THE DEBTORS' BACKGROUND

Originally formed in 1999 as a marketing enterprise for biodegradable products, the Debtors rebranded themselves in November 2006 to reflect their businesses' renewable energy strategy. Collectively, the Debtors were a leader in advanced electric vehicle ("EV") charging and energy storage systems, with over twenty years of experience in designing, manufacturing, testing and commercializing such technologies. As an industry leader and innovator in these fields, the Debtors primarily operated three complementary business segments: (a) Blink; (b) Minit-Charger; and (c) eTec Labs. In addition to their complementary business segments and as a result of the Debtors' extensive history in the EV supply equipment industry, the Debtors were successful in winning bids for public and private funding to support and manage EV charging infrastructure research and deployment programs, including, most notably, a $100.2 million cost-share grant (the "DOE EV Project Contract") from the DOE to lead, support and manage what at the time was the largest deployment of EVs and charging infrastructure in United States history (the "EV Project"). The Debtors also received an $8.0 million grant from the California Energy Commission with respect to deploying charging infrastructure and EVs in the San Diego, California region.

A.      **The Debtors' Businesses**

As noted above, the Debtors mainly operated three distinct, yet complementary, business segments: (a) Blink; (b) Minit-Charger; and (c) eTec Labs. Under the Blink brand, the Debtors offered electric vehicle charging stations and a turnkey network operating system for EV drivers, commercial businesses and utilities. Minit-Charger manufactured and distributed fast-charging systems for material handling and airport ground support vehicles. The eTec Labs business segment was a trusted research and testing resource for governments, automotive original equipment manufacturers ("OEMs") and utilities.

1.      **Blink**

The Debtors' flagship passenger vehicle product line consisted of Blink charging stations, which were available for both residential and commercial applications. The Debtors installed approximately 13,500 Blink charging stations, which consisted of the following: Level 2 wall-mount units, commonly referred to as the Blink Residential Charger (the "Blink Residential"); a commercial stand-alone Level 2 charger, commonly known as the Blink Level 2 Pedestal Charger (the "Blink Pedestal"); and the Blink DC Fast Charger (the "Blink DC").

The Blink Residential chargers, generally consumer in nature, were typically installed in an individual's home, garage or carport, and were available in both hardwired and plug-in models. The Blink Pedestal charger, on the other hand, was designed for commercial applications and was installed where drivers normally travel – movie theaters, shopping malls, coffee shops, restaurants and retailers. Through these convenient locations, individuals could utilize chargers in the ordinary course of their day-to-day activities, thereby extending the range of their EVs. Both the Blink Residential and Blink Pedestal chargers were capable of delivering a full charge to a consumer's EV in approximately two to eight hours. The Blink DC charger was a fast charging system that was capable of delivering a full charge to an EV in less than 30 minutes (depending on battery size). Major customers that installed Blink chargers included Cracker Barrel, Fred Meyer, IKEA, Kimpton Hotels, Kohl's, Macy's, Mapco, McDonald's, Regency Centers, Sears and WalMart.

In addition to providing physical charging locations, each of the Blink chargers was connected through the "Blink Network," which was a cloud-based operating system that provided distinct advantages to both EV drivers and the Debtors. The connection of the chargers to a central computer via cellular services and the Internet created the Blink Network. This provided for what the industry describes as smart charging services and allowed the Debtors to provide device management and provisioning, location pricing customization, transaction processing, payment gateways, data collection, content management, reservation capabilities and integration with utility smart grid services and load management and demand response programs. This enabled automated or cloud-based demand response and energy management services, thereby providing virtual control of, and access to data regarding, EVs in the Blink Network, charging events, and the Blink charging stations themselves. These services were widely viewed by the major industry participants to provide valuable services to vehicle drivers as demonstrated by a customer enrollment rate of 500 new memberships a week. Smart charging also allowed for the collection of fees and centralized billing services for the members. The usage data previously described was also believed to be valuable in the foreseeable future to the charger hosts, utilities and governments for planning purposes.

With respect to EV drivers, the Blink Network allowed consumers the freedom to travel wherever they choose and to charge their EVs at conveniently located commercial locations. Utilizing the Blink Network, EV drivers were able to easily identify charging stations and then pay for such charging services through a variety of methods, including smart phone applications, radio-frequency identification (RFID) cards, and other mobile phone and credit card-based options. EV drivers were able to further take advantage of the Blink Network by becoming a member of the Blink Network. Members of the Blink Network had access to discounted charging rates, reservation systems and enhanced Blink Network capabilities.

### 2. Minit-Charger

The Debtors' Minit-Charger business line offered fast-charging systems for off-road industrial applications, including material handling operations and airport ground support equipment ("GSE"). The Minit-Charger was a patented advanced algorithm technology that provided a lighter, compact and cost-effective fast charging system for GSEs and material handling operations. The Minit-Charger was capable of charging batteries four to six times faster than conventional chargers and enabled battery life that was equal to or longer than traditional charging methods.

Similar to the Blink product line, Minit-Chargers also included advanced data collection capabilities, including the patented Minit-Trak fleet and system data management system. This system provided operators with comprehensive performance evaluation of a battery's state-of-health and state of-charge, and automatically adjusted charging rates to increase and maximize battery life.

### 3. eTec Labs

The Debtors' eTec Labs business was a trusted research and testing resource for governments, automotive OEMs and utilities. This business segment had standing contractual relationships as a test contractor and consulting engineer for projects with the DOE, several national research laboratories, national energy storage consortiums and large electric utilities. Through these contracts eTec Labs provided services in energy storage, monitoring, systems design and fabrication, product and vehicle testing, and product development.

More specifically, since 1998, eTec Labs was the testing partner for the DOE's Advanced Vehicle Testing Activity ("AVTA") program under a grant for vehicle and associated fueling infrastructure, which provides baseline vehicle performance testing and battery analysis. In connection with AVTA, the Debtors purchased vehicles from local bidders through a bidding process (subject to reimbursement from the DOE and other conditions related to disposal of these vehicles at the end of testing), and then subjected such vehicles to rigorous performance testing analysis. Prior to the Petition Date, eTec Labs conducted more than twelve million test miles for more than 1,250 advanced vehicles under the AVTA program.

Utilizing their extensive EV experience, the Debtors' eTec Labs business line also developed what is known as an EV Micro-Climate Planning Process (the "Climate Process"). The Climate Process was a detailed planning and consulting program that was designed for municipal planning organizations and utilities to provide a deployment blueprint and action plan for a comprehensive EV charging infrastructure in a given area. The implementation of the Climate Process included physical charge infrastructure installations at residential, commercial and public locations, as well as comprehensive review of regulatory issues, public awareness and marketing programs to support the various value chains associated with the Climate Process. The Climate Process was undertaken and refined in markets covered by the EV Project, as well as certain domestic and international markets not covered. In addition, the Climate Process was implemented with respect to many major utilities, which included BC Hydro in British Columbia.

### 4. Miscellaneous Business Lines

In addition to their core business lines, the Debtors and certain affiliated non-Debtor entities operated several smaller businesses. Debtor ECOtality Stores, Inc., which did business as Fuel Cell Store, operated a virtual store selling hydrogen fuel cell equipment for educational and recreational purposes. Stores had an online presence only and did not have any employees or physical operations. In addition, non-Debtor affiliate Portable Energy de Mexico, S.A. De C.V. ("Portable Energy"), a company organized under the laws of Mexico, provided manufacturing and assembly services for a type of battery required for certain supercomputers. Portable Energy had operations in Tijuana, Mexico. Debtor ECOtality, Inc. was Portable Energy's sole customer.

### 5. The EV Project

On September 30, 2009, Debtor Electric Transportation Engineering Corp. entered into the DOE EV Project Contract, which was a cost-reimbursable contract with the DOE to support, manage and lead the EV Project. The EV Project, which, at the time, was the largest deployment of EV charging infrastructure in United States history, sought to collect data on the use of such infrastructure through the placement of residential and commercial Blink charging stations throughout approximately twenty-one (21) major metropolitan areas in the United States, including Phoenix, Arizona, Los Angeles, California, San Francisco, California, Dallas, Texas, Chicago, Illinois, Philadelphia, Pennsylvania, Atlanta, Georgia and Washington, DC. The EV Project, initially projected to cost approximately $218.7 million, commenced in October 2009, and was previously scheduled to conclude in April 2013.

Under the DOE EV Project Contract, Debtor Electric Transportation Engineering Corporation was awarded a cost-share grant of approximately $99.8 million, of which $13.4 million was sub-funded to two (2) state and federal research and development centers. The DOE EV Project Contract was subsequently extended to award Debtor Electric Transportation Engineering Corp. an additional $15 million in cost-share money. Under the terms of the DOE EV Project Contract, the DOE agreed to reimburse 45.8% of total EV Project costs incurred by Debtor Electric Transportation Engineering Corp., up to a total amount equal to $100.2 million. As of December 31, 2012, Debtor Electric Transportation Engineering Corp. had received $84.8 million in reimbursements from the DOE.

### B. Summary of the Debtors' Prepetition Debts and Other Significant Liabilities

Notably, the Debtors have no significant secured debt obligations and no liens on cash collateral. Instead, the Debtors' significant prepetition liabilities are composed of an unsecured convertible note, certain capital lease obligations and other long-term secured debt. Each of these liabilities is summarized below:

### 1.    Convertible Note

On March 13, 2012, the Debtors received $5 million in cash in exchange for a convertible note (the "<u>Convertible Note</u>") payable to ABB Technology Ventures Ltd ("<u>ABBTV</u>").  In connection with the issuance of the Convertible Note, Debtor ECOtality decreased the exercise price of certain previously existing warrants held by ABBTV.  The Convertible Note bears interest at a rate of 5.05% per annum, which is payable quarterly in arrears, and matures on March 13, 2015.  The Convertible Note also is convertible into 3,937,007 shares of ECOtality's common stock at a per share conversion price equal to $1.27 per share.

### 2.    Capital Lease Obligations and Other Long Term Debt

**Building Note**: On January 16, 2007, ECOtality purchased an office building in Arizona for an aggregate price of $575,500.  One-half of the aggregate price, or $288,000, was paid in cash and the remaining balance of $287,500 was structured as an interest-only loan (the "<u>Building Note</u>").  The loan carried an annual interest rate of 6.75%, with monthly interest-only payments due beginning on February 16, 2007.  On January 20, 2012, ECOtality entered into an agreement to modify the terms of the Building Note.   In connection with the terms of the loan modification, ECOtality paid $100,000 as a principal reduction of the Building Note.   The remaining balance of $187,500 was structured as an interest-only loan, bearing interest at 7.0% per annum, with monthly payments in the amount of $1,100, beginning on February 16, 2012.  The entire outstanding $187,500 principal balance was due on January 16, 2014 (the "<u>Interim Maturity Date</u>"); <u>provided</u>, <u>however</u>, if ECOtality did not default on any interest payments due in the period up to the Interim Maturity Date, then the Interim Maturity Date shall automatically extend until January 16, 2016.  ECOtality has the right to pay the principal balance early without penalty, and the Building Note is secured by a deed of trust on the office building.  Ownership of this office building is subject to dispute between the Debtors and Blink Acquisition, LLC ("<u>Blink Acquisition</u>").

**Cisco Equipment Lease**:  ECOtality also entered into a Master Lease Agreement with Cisco Systems Capital Corporation (the "<u>Cisco Equipment Lease</u>") for equipment with an original retail price of $314,000.  The terms of the Cisco Equipment Lease provided for monthly payments, beginning on December 1, 2011, of principal and interest at a rate of 5.4% per annum.  The Debtors have rejected the Cisco Equipment Lease.

**Operating Leases**:  ECOtality leased certain other equipment and facilities from various third parties (the "<u>Operating Leases</u>").  These leases are all set to expire before October 2014; however, certain of these leases may be extended by the Debtors on a month-to–month basis.  Through the first three months of 2013, the Debtors estimate that facilities-related lease payments totaled approximately $277,000.  The Debtors have rejected the Operating Leases.

## V.    EVENTS LEADING TO THE CHAPTER 11 CASES

### A.    Events Leading to the Commencement of the Chapter 11 Cases

The Chapter 11 Cases were not the result of an "overleveraged" balance sheet, a single adverse event or a long-term decline in revenues.  Rather, the Debtors' entry into chapter 11 can best be described as the result of a confluence of several adverse events occurring during the first and second quarters of 2013, which significantly impacted the Debtors' liquidity situation.  The Debtors likely could have sustained operations in the face of these events individually, at least for some time, but, as described herein, the combined effect, and relative timing, of these events effectively left them with no choice but to file these Chapter 11 Cases and seek to sell their assets pursuant to Bankruptcy Court-approved procedures.

Among other things, six factors precipitated the Debtors' decision to file these Chapter 11 Cases.  These factors included:  (i) the Debtors' failure to attain sales volumes of their commercial Electric Vehicle Service Equipment ("<u>EVSE</u>") sufficient to support their operations; (ii) the Debtors' inability to release a scheduled new product offering in their Minit-Charger industrial line; (iii) the Debtors' inability to obtain additional financing that would allow them to finance their operations; (iv) the DOE's suspension of payments to the Debtors in connection with the EV Project; (v) the significant expenses and liquidated damages incurred by the Debtors in connection with a settlement with the United States Department of Labor ("<u>DOL</u>"); and (vi) uncertainty regarding the resolution of a phenomenon occurring in some of the Debtors' previously installed EVSEs.

1. **Failure to Meet Sales Projections**

The Debtors failed to attain sales volumes of their commercial EVSEs sufficient to support the Debtors' operations in the second half of 2013. As cash flows from the EV Project declined, it was essential that the Debtors transition from subsidized installations of EVSEs under the EV Project to regular commercial sales and installations. To this end, the Debtors reorganized their sales organization to support such efforts. In addition to selling their products directly through their sales force, the Debtors formed commercial relationships with independent dealers for the purpose of distribution of their EVSEs and related products in the first half of 2013 with the expectation of selling substantial volumes of EVSE products in the second half of 2013. Neither the Debtors' direct sales force nor the independent dealers generated sales volumes of their commercial EVSE products sufficient, in combination with other sources of revenue, to support the Debtors' operations in the second half of 2013.

2. **Failure to Release a New Minit-Charger Product**

The Debtors were unable to release a scheduled new product offering in their MinitCharger industrial line. Their industrial product line expansion with the Minit Charger 12 product, which was scheduled to launch at the end of 2013, was critical to the Debtors' growth. However, because the Minit Charger 12 product exhibited unacceptable performance shortfalls during prototype verification testing, such product was not introduced in 2013. Accordingly, there were no revenues from the product in 2013.

3. **Inability to Obtain Sufficient Prepetition Capital**

The Debtors were unable to obtain additional financing. Net working capital is an important measure of the Debtors' ability to finance their operations. As the Debtors focused on their business plan for strong growth of their commercial businesses, they were cognizant that fully executing on their plan would require the Debtors to raise additional capital to supplement their cash flows from operations. Management actively pursued a number of options to secure additional capital. However, the Debtors learned on August 8, 2013, that financing that was being pursued from an existing investor would not be forthcoming.

4. **Suspension of Funds from the DOE**

In an abundance of caution on August 8, 2013, the Debtors notified the DOE that, even though the Debtors continued to aggressively pursue certain options for additional financing and was exploring other alternatives, in the event additional financing was not obtained, the Debtors may not be able to fulfill their operational obligations, including under the EV Project. In response, the DOE sent a letter to the Debtors stating that it was suspending all payments under the EV Project while it investigated the situation and determined whether the award should continue. This suspension had a significant impact on receivables that were anticipated to be collected from the DOE, in addition to remaining amounts anticipated to be invoiced and collected under the EV Project.

In the August 8, 2013 letter, the DOE also notified the Debtors that the Debtors were not authorized to incur any new cost or obligation under the award and that the DOE would not reimburse the Debtors for such costs during the suspension. Further, the DOE instructed the Debtors to provide notices to their vendors and subcontractors of the suspension.

5. **DOL Settlement**

In addition to the foregoing, the Debtors also incurred significant expenses and liquidated damages in connection with the previously disclosed (in public filings) DOL investigation (the "DOL Investigation") under the Fair Labor Standards Act and the Davis Bacon Act. The Debtors agreed to pay certain employees and contractors identified by the Debtors and the DOL back wages and liquidated damages in an aggregate amount of approximately $855,000 in consideration for a release of the Debtors by such employees and contractors of any and all liability with respect to any wage related matters. Accordingly, the Debtors revised its March 31, 2013 accrual of $597,000 to reflect the approximately $855,000 expected to be paid, in addition to approximately $89,000 in estimated payroll taxes, for a total accrual of $943,000 as of June 30, 2013, resulting in an additional approximately $346,000 charge to general and administrative expenses in the second quarter of 2013.

6. **Uncertainty Regarding Existing Products**

The Debtors also faced some uncertainty regarding the resolution of a phenomenon occurring in some of the Debtors' previously installed EVSEs, which caused overheating, and in certain rare cases melting, of the connector plug that connects the EVSE to the EV when charging. The Debtors, along with certain automotive OEMs and equipment suppliers, actively evaluated the issue in an attempt to determine the cause and to address the problem.

7. **Engagement of a Restructuring Advisor**

In connection with the events disclosed above, the Debtors' Board of Directors (the "Board") retained FTI Consulting, Inc. ("FTI"), as financial advisor, reporting directly to the Board. FTI's primary responsibilities included: (a) evaluating capital structure alternatives and identify additional sources of financing; (b) executing profitability improvement alternatives; (c) undertaking cost cutting measures; (d) developing and executing plans to improve liquidity against existing assets; (e) identifying ongoing personnel requirements and appropriate retention or incentive plans; and (f) facilitating the sale of the Debtors or their assets.

## VI. SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES

### A. First Day Pleadings and Other Core Matters[4]

#### 1. First and Second Day Pleadings

To facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations and sale process, the Debtors filed certain motions and applications with the Bankruptcy Court on September 16, 2013 (the "Petition Date"), or shortly thereafter, seeking certain relief summarized below. The relief sought in the "first day" and "second day" pleadings facilitated the Debtors' seamless transition into chapter 11 and aided in the preservation of the value of the Debtors' assets as they sought to sell substantially all of their assets pursuant to Bankruptcy Court-approved procedures. Orders granting the relief requested in the first and second day pleadings included the following:

(a)     Post-Petition Financing

On September 19, 2013, the Bankruptcy Court entered an interim order [Docket No. 53] authorizing the Debtors to obtain secured, superpriority postpetition financing (the "DIP Financing") from Nissan North America, Inc. ("Nissan") in a maximum principal amount of $1,250,000. Under the terms of this interim order and the associated credit agreement, the funds were released to the Debtors at predetermined intervals in predetermined amounts, with $500,000 being released on the closing date and $250,000 being released on each of September 25, 2013, September 30, 2013, and October 7, 2013. Consistent with the terms of the underlying credit agreement, the funds were used to (i) fund the Debtors' operations until a sale of substantially all of their assets could be completed, (ii) fund certain of the Debtors' operating subsidiaries, and (iii) pay administrative costs necessary to maintain the corporate existence of the guarantors of the financing. Importantly, the interim financing order also resolved the DOE's purported interests in the Debtors' assets. On October 3, 2013, the Bankruptcy Court entered a final order [Docket No. 128] approving the DIP Financing on a final basis. The DIP Financing was repaid to Nissan with a portion of the proceeds of the Sales (as defined below) and cash on hand as of the time of the entry of the Sale Orders (as defined below).

(b)     Cash Management

On September 19, 2013, the Bankruptcy Court entered an interim order [Docket No. 68] authorizing, but not directing, the Debtors to continue using their existing cash management system, existing bank accounts, and existing business forms. In addition, this interim order authorized the Debtors to continue intercompany transactions in the ordinary course of business and accorded all such transactions administrative expense status under Bankruptcy

---

[4]     The descriptions of the various motions, applications and other pleadings provided herein is for informational purposes only and qualified in their entirety by reference to the various motions, applications and other pleadings filed in the Chapter 11 Cases.

Code section 503(b). On October 3, 2013, the Bankruptcy Court entered a final order [Docket No. 129] granting all such relief on a final basis.

<blockquote>(c)      Employee Wages and Benefits</blockquote>

On September 19, 2013, the Bankruptcy Court entered an interim order [Docket No. 70] (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, and other compensation and benefits and (ii) continue employee benefit programs in the ordinary course including, among others, medical, dental and 401(k) benefits; and (b) authorizing and directing applicable banks and financial institutions to honor and process related checks and transfers. Payments made pursuant to this interim order were not to exceed $62,000 during the first twenty-one (21) days of the Chapter 11 Cases. On October 3, 2013, the Bankruptcy Court entered a final order [Docket No. 132] granting the relief on a final basis, but directing that payments to individual employees shall not exceed the statutory cap of $12,425 per employee.

<blockquote>(d)      Taxes and Fees</blockquote>

On September 19, 2013, the Bankruptcy Court entered an interim order [Docket No. 72] authorizing, but not directing, the Debtors to pay certain prepetition sales, use, property, and other taxes and fees in the ordinary course of business. Payments made pursuant to this interim order during the first twenty-one (21) days of the Chapter 11 Cases were not to exceed $200,000. On October 3, 2013, the Bankruptcy Court entered a final order [Docket No. 131] granting the relief on a final basis.

<blockquote>(e)      Insurance</blockquote>

On September 19, 2013, the Bankruptcy Court entered an interim order [Docket No. 73] authorizing, but not directing, the Debtors to pay or honor obligations owed on account of their prepetition insurance policies in the ordinary course of business, as and when due, without regard to whether such obligations accrued or arose before the Petition Date. This interim order provided further that payments made thereunder on account of prepetition amounts due during the first twenty-one (21) days of the Chapter 11 Cases were not to exceed $40,000. On October 3, 2013, the Bankruptcy Court entered a final order [Docket No. 130] approving the relief requested in the underlying motion and otherwise authorizing the Debtors to (i) continue to maintain and perform under their prepetition insurance policies and premium financing agreements, (ii) pay or honor prepetition amounts due, (iii) revise, extend, renew or supplement prepetition insurance coverage and premium financing agreements as necessary, and (iv) continue using the services of an insurance broker.[5]

<blockquote>(f)      Utilities</blockquote>

On September 19, 2013, the Bankruptcy Court entered an interim order [Docket No. 71] (i) determining adequate assurance of future payment for utility services, and (ii) establishing procedures by which utility providers may seek additional adequate assurance of payment. Pursuant to this interim order, the Debtors deposited $124,000 in a segregated account as adequate assurance to utility providers that did not already hold a deposit equal to or greater than the most recent two (2) week average of service costs. On October 10, 2013, the Bankruptcy Court entered a final order [Docket No. 209] granting the relief on a final basis.

<blockquote>(g)      Warranty Programs</blockquote>

On September 19, 2013, the Bankruptcy Court entered a final order [Docket No. 69] authorizing the Debtors, in their discretion, to continue, renew, replace, implement, modify and/or terminate certain warranty programs applicable to certain EV chargers they sold in the ordinary course of business. This order further authorized, but did not direct, the Debtors to honor all prepetition and postpetition obligations relating to these warranty programs.

---

[5]    By separate motion, the Debtors also requested and received authority to purchase replacement directors' and officers' liability and employment practices liability insurance coverage [Docket No. 207]. The Bankruptcy Court also entered an order authorizing the Debtors' insurers to continue performing under the applicable directors' and officers' liability policies [Docket No. 362].

### 2. Procedural and Administrative Motions

To facilitate the efficient administration of the Chapter 11 Cases and to reduce the administrative burden associated therewith, the Debtors also sought and received approval of procedural and administrative motions that:

- authorized the joint administration of the Chapter 11 Cases [Docket No. 27];

- allowed the Debtors to prepare a single list of Creditors in lieu of submitting a formatted mailing matrix for each of the Debtors and to file a consolidated list of the Debtors' thirty (30) largest Creditors [Docket No. 74];

- allowed the Debtors to retain and compensate certain professionals utilized in the ordinary course of business [Docket Nos. 106 and 231]; and

- approved the procedures for interim compensation and reimbursement of retain professionals in the Chapter 11 Cases [Docket No. 337].

### 3. Retention of Professionals

The Debtors also filed several applications and obtained authority to retain various Professionals to assist the Debtors in carrying out their duties during the Chapter 11 Cases. These Professionals include: (a) Akin Gump Strauss Hauer & Feld LLP, as lead counsel to the Debtors [Docket No. 95]; (b) Parker Schwartz, PLLC, as co-counsel to the Debtors [Docket No. 36]; (c) FTI Consulting, Inc., as crisis manager and financial advisor to the Debtors [Docket No. 205]; and (d) Kurtzman Carson Consultants LLC as claims, noticing and solicitation agent for the Debtors [Docket No. 75].

### 4. Appointment of Committee

On September 24, 2013, Ilene J. Lashinsky, the United States Trustee appointed a statutory committee of unsecured Creditors pursuant to Bankruptcy Code section 1102. The United States Trustee appointed the Board of Regents of the University of Nebraska, Saturn Electric Inc., Hannah Solar, LLC, Kortman Electric Inc., and GMA Manufacturing LLC to the Committee [Docket No. 86]. On October 8, 2013, by order of the Bankruptcy Court, the Committee was authorized to retain Jennings, Strouss & Salmon P.L.C. as counsel to the Committee, *nunc pro tunc* to September 26, 2013. Effective June 4, 2014, by order of the Bankruptcy Court, the Committee retained and employed Dickinson Wright PLLC to represent it as counsel in the Chapter 11 Cases [Docket No. 598].

### 5. Schedules and Statements

On or about October 1, 2013, each of the Debtors filed their respective Schedules with the Bankruptcy Court pursuant to Bankruptcy Code section 521. The Schedules were filed within the fourteen (14) day period proscribed by Bankruptcy Rule 1007. Notably, the Debtors did not seek an extension of that deadline as is typical in cases of this size and complexity. The United States Trustee held a statutory meeting of Creditors pursuant to Bankruptcy Code section 341(a) (the "341 Meeting") on October 22, 2013. Among other things, the United States Trustee interviewed the Debtors' representative at the 341 Meeting concerning the Schedules.

### 6. Bar Date

On December 4, 2013, the Bankruptcy Court entered an order [Docket No. 364] setting (a) January 15, 2014 at 4:00 p.m. (prevailing Arizona time) as the deadline for all non-governmental units (as defined in Bankruptcy Code section 101(27)) to file Claims in the Chapter 11 Cases; (b) March 14, 2014 at 4:00 p.m. (prevailing Arizona time) as the deadline for all governmental units (as defined in Bankruptcy Code section 101(27) and with the exception of the DOE, which had an April 14, 2014 deadline to file any General Unsecured Claims of the type described in the Sale Orders (as defined below)); (c) procedures for filing proofs of claim; and (d) the form and manner of notice of the applicable bar dates (the "Bar Date Order"). The Debtors are currently reviewing Claims that have been filed in response to the Bar Date Order, and will file objections to filed and scheduled Claims with the Bankruptcy Court as necessary and appropriate in compliance with the Bankruptcy Code, Bankruptcy Rules and the terms of the Debtors' proposed Plan, if confirmed.

Because the resolution process for the Claims is currently ongoing with respect to both scheduled and filed Claims, the Claim amounts identified in this Disclosure Statement are estimates and, in particular, the recoveries for holders of Allowed General Unsecured Claims could be materially lower if such Claims are higher than current estimates.

**B.** **Sale of Substantially All of the Debtors' Assets**

**1.** **Auction and Sale Process**

Upon commencing their Chapter 11 Cases, the Debtors' primary goal was to effectuate a sale of substantially all of their assets. To that end, on September 17, 2013, the Debtors filed a motion [Docket No. 11] seeking, among other things, entry of an order (the "Bid Procedures Order") approving procedures for (a) submitting bids for the purchase of substantially all of their assets,[6] and (b) conducting an auction for substantially all of the their assets (the "Auction"). On September 19, 2013, the Bankruptcy Court entered the Bid Procedures Order [Docket No. 56].

Consistent with the requirements of the Bid Procedures Order, on October 8, 2013, the Debtors conducted the Auction and ultimately determined, in their business judgment and in consultation with Committee, that a combination of three separate bids submitted for each of the Debtors' three main business lines constituted the highest and best offer for their principal business assets (collectively, the "Successful Bids"). The Successful Bids represented total aggregate cash consideration of $4,335,000, composed of the following: (a) a bid from Intertek Testing Services NA, Inc. ("Intertek") of $750,000 for the eTec Labs business line; (b) a bid from Access Control Group, L.L.C. ("Access Control") of $250,000 for the Minit-Charger business line; and (c) a bid of $3,335,000 from Blink Acquisition for the Blink Network business line.[7]

The Debtors presented the Successful Bids to the Bankruptcy Court at a hearing held on October 9, 2013 (the "Sale Hearing"). At the Sale Hearing, the Bankruptcy Court approved the Successful Bids and indicated that it would enter separate orders approving the sales to Intertek, Access Control and Blink Acquisition. On October 11, 2013, the Bankruptcy Court entered orders [Docket Nos. 213, 214, and 215] (collectively, the "Sale Orders"), among other things, approving each of the three sales free and clear of all liens, claims, encumbrances, and interests (collectively, the "Sales"). The Sales to Intertek and Access Control closed on October 11, 2013, and the Sale to Blink Acquisition closed on October 16, 2013.

**2.** **Subsequent Transition Efforts**

After the Sales to Blink Acquisition, Intertek and Access Control successfully closed, the Debtors assisted the respective purchasers with the transition process. This included, among other things, shifting many of the Debtors' employees to the purchasers of the Debtors' assets, assuming and assigning various executory contracts and unexpired leases to the respective purchasers, speaking with vendors and other third parties to explain the transition process, and rejecting executory contracts and unexpired leases that were not assumed and assigned and were no longer of any material benefit to the Estates.

**3.** **Executory Contracts and Unexpired Leases**

Pursuant to procedures set forth in the various Sale Orders, the Debtors filed motions and the Bankruptcy Court entered orders assuming and assigning or rejecting over 850 executory contracts and unexpired leases.

---

[6]   Certain assets, including, among others, chapter 5 avoidance actions, were not sold through the sale process and, as set forth below, remain in the Estates for further administration by the Debtors and the Liquidating Trust, as applicable.

[7]   In addition to the cash consideration included in the Successful Bids, under the relevant sale and purchase agreements, each of Intertek, Access Control and Blink Acquisition agreed to pay all amounts necessary to cure monetary defaults under any agreement that each party, respectively, elected to have assumed and assigned to it in connection with the Sales.

C.    **Other Motions and Important Events**

1.    **Wind Down of Mexican Subsidiary**

On December 11, 2013, the Bankruptcy Court entered an order [Docket No. 386] authorizing the Debtors to use up to $90,000 of Estate resources to wind down Portable Energy, a non-Debtor subsidiary of the Debtors organized under the laws of Mexico, that was engaged in the manufacture and assembly of a type of battery used in certain supercomputers.  Pursuant to this authority, the Debtors have wound down the operations of Portable Energy.

2.    **Additional Asset Dispositions**

The Debtors also requested that the Bankruptcy Court approve certain procedures for the sale and/or abandonment of their remaining *de minimis* assets [Docket No. 265].  However, due to opposition from Blink Acquisition, the Bankruptcy Court only entered a limited, interim order [Docket No. 322] that authorized the Debtors to sell certain *de minimis* assets associated with their Fuel Cell Store business (the "Fuel Cell Assets").  Pursuant to this interim order and the authority granted therein, the Fuel Cell Assets were sold for $55,000 to Trygve Enterprises, LLC [Docket No. 325].

In addition to the disposition of the Fuel Cell Assets, the Debtors requested and received authority from the Bankruptcy Court to effectuate a trade of certain low-carbon fuel credits issued by the State of California (the "LCFS Credits") through a third-party broker.  Specifically, on November 7, 2013, the Bankruptcy Court entered an order [Docket No. 294] authorizing, but not directing, the Debtors to (i) dispose of the LCFS Credits, and (ii) perform all of their obligations in connection therewith, including payment of the fee owed to the third-party broker that completed the trade.  The sale of the LCFS Credits closed on or around February 28, 2014, and resulted in net proceeds to the Estates of $207,543.60.

3.    **Settlement of Nissan's Fees and Expenses Arising From the DIP Financing**

On or around April 28, 2014, the Debtors sought Bankruptcy Court approval of and authority to enter into that certain Settlement Agreement and Release, dated April 28, 2014, by and between Nissan, the Debtors and the Committee [Docket No. 540] (the "Nissan Settlement Agreement"), as a compromise of the disputed fees and expenses (the "Fee Dispute") of Nissan and its professionals and advisors owed by the Debtors to Nissan in connection with the DIP Financing, as discussed in Section VI.A.1(a).  Pursuant to the Nissan Settlement Agreement, Nissan agreed to pay the sum of $45,000 to the Debtors for the benefit of their estates in exchange for mutual releases of claims arising from the DIP Financing and the Fee Dispute.  The Nissan Settlement Agreement was intended to compromise and fully resolve all issues, disputes, liabilities and claims existing between Nissan, the Debtors and the Committee, arising from or related to the DIP Financing and the Fee Dispute.  On May 28, 2014, the Bankruptcy Court entered an order authorizing the Debtors to enter into the Nissan Settlement Agreement [Docket No. 581].

4.    **Remaining Assets**

In addition to cash on hand of approximately $1.27 million, the Debtors' assets consist primarily of, among others, Causes of Action (as set forth in Section 9.6 of the Plan), insurance policies, and certain other *de minimis* assets (collectively, the "Remaining Assets").  In addition, the Debtors believe that Blink Acquisition is responsible for certain wages related to employees that were considered for employment with Blink Acquisition, and the Debtors also have certain payment obligations to Blink Acquisition related to funds collected by the Debtors after the sales that are property of Blink Acquisition.  The Debtors and Blink are in the process of reconciling these amounts, and Debtors' cash on hand as of the Effective Date may increase or decrease as a result of such reconciliation.

The Debtors also estimate that the costs of administering the Chapter 11 Cases from the date hereof to the Effective Date could be as high as $375,000; provided, however, that such estimate is subject to significant change if, among other things, the Plan is contested.

5.      **Analysis of Alternative Plan Structures**

Since the closing of the various Sales in mid-October, the Debtors and their advisors have spent a substantial amount of time evaluating different plan structures to determine the best vehicle for maximizing creditor recoveries. Active discussions with the Committee and other parties in interest, including the Plan Contributor, led the Debtors and their professional advisors to engage in a comprehensive analysis of the Debtors' tax attributes, which analysis also required seeking outside tax specialists to evaluate the feasibility of a contemplated reorganization structure. After weighing the relative advantages and disadvantages of developing and soliciting votes on a plan of reorganization as compared to a plan of liquidation, the Debtors believe, including through consultation with the Committee, that the Plan will best maximize the value of the Debtors' estates for the benefit of creditors. This view is informed primarily by the commitments made by the Plan Contributor to make payments for the benefit of creditors in an amount equal to $200,000 plus the Additional Distributions, subject to the risks set forth herein.

## VII.     SUMMARY OF THE PLAN[8]

A copy of the Plan accompanies the Disclosure Statement as **Exhibit A**. The following summary of the material provisions of the Plan is qualified in its entirety by the specific provisions of the Plan, including the Plan's definitions of certain terms used below. The following is intended to provide a general description of the Plan. For more specific information, please refer to the attached Plan. Please note that the Debtors have attempted to minimize the use of defined terms in describing the Plan. However, any capitalized terms that are not defined in this section of the Disclosure Statement are defined in the Plan. It is recommended that one refer to those definitions when reading this document.

### A.      Brief Explanation of the Plan

The Debtors will be reorganized pursuant to the proposed Plan. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate in an orderly fashion its business for the benefit of itself and its creditors and equity holders. Confirmation of a plan is the principal objective of a chapter 11 case.

In general, a chapter 11 plan (1) divides claims into separate classes; (2) specifies the property that each class is to receive under the plan; and (3) contains other provisions necessary to the reorganization or liquidation of the debtor.

A chapter 11 plan may provide that certain classes of claims are either (1) to be paid in full upon the effective date of the plan; (2) reinstated; or (3) their legal, equitable and contractual rights are to remain unchanged by the reorganization or liquidation effectuated by the plan. These classes are referred to under the Bankruptcy Code as not impaired, and, because of such favorable treatment, are deemed to accept the plan. Accordingly, it is not necessary to solicit votes from the holders of claims in such not impaired classes. A chapter 11 plan may also provide that certain classes will not receive any distributions of property. Such classes are deemed to reject the plan.

All other classes of claims contain impaired claims. An impaired class is generally a class that will receive something less than their claims under a plan of reorganization or liquidation. Before a plan can be confirmed by a bankruptcy court, the Bankruptcy Code generally requires that each impaired class of claims votes to accept a plan. Acceptances must be received from the holders of claims in each impaired class of claims that have voted on the plan. However, even if an impaired class rejects (or is deemed to reject) the plan, a bankruptcy court may confirm the plan if certain minimum treatment standards are met with respect to such class or classes.

---

[8]      This section is intended only to provide a summary of the key terms, structure, classification, treatment and implementation of the Plan, and is qualified in its entirety by reference to the entire Plan and exhibits thereto. Although the statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to therein, this Disclosure Statement does not purport to be a precise or complete statement of all such terms and provisions, and should not be relied on for a comprehensive discussion of the Plan. Instead, reference is made to the Plan and all such documents for the full and complete statement of such terms and provisions. The Plan itself (including attachments) will control the treatment of Claims and Equity Interests under the Plan. To the extent there are any inconsistencies between this section and the Plan (including attachments), the latter shall govern.

The Bankruptcy Code does not require each holder of a claim to vote in favor of a plan in order for the bankruptcy court to confirm the plan. However, the bankruptcy court must find that the plan meets a number of tests (other than the voting requirements described in this section) before it may confirm or approve the plan of reorganization or liquidation. Many of these tests are designed to protect the interests of holders of claims who do not vote to accept the plan, but who will nonetheless be bound by the plan's provisions if it is confirmed by the bankruptcy court.

### B.     Treatment of Unclassified Claims

#### 1.     Administrative Claims.

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or the Liquidating Trustee, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each holder of an Allowed Administrative Claim will receive from the Debtors or the Liquidating Trustee, as applicable, in full and final satisfaction of its Allowed Administrative Claim, Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim either: (a) if such Allowed Administrative Claim is allowed as of the Effective Date, no later than forty-five (45) days after the Effective Date or as soon as reasonably practicable thereafter; (b) if the Claim is not Allowed as of the Effective Date, no later than forty-five (45) days after the date on which an order of the Bankruptcy Court allowing such Claim becomes a Final Order, or as soon thereafter as reasonably practicable thereafter; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Estates in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the holder of such Allowed Administrative Claim.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court (including the OCP Order) or as provided herein, unless previously filed, requests for payment of Allowed Administrative Claims must be filed and served on the Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order. Holders of Allowed Administrative Claims that are required to file and serve a request for payment of such Allowed Administrative Claims that do not file and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Claims against the Debtors or their property, and such Claims shall be deemed discharged as of the Effective Date. Objections to such requests must be filed and served on the requesting party by the Administrative Claims Objection Bar Date.

#### 2.     Compensation Claims.

Notwithstanding any other provision of the Plan concerning Administrative Claims, any Professional seeking an award by the Bankruptcy Court of an Allowed Administrative Claim on account of Compensation Claims (a) shall no later than sixty (60) days after the Effective Date, file a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through and including the Confirmation Date and (b) shall receive from the Debtors or the Liquidating Trustee, as applicable, as soon as reasonably practicable after such Claim is allowed, in full settlement, satisfaction, and release of, and in exchange for, such Allowed Administrative Claim, Cash in an amount equal to the unpaid amount of such Allowed Compensation Claim in accordance with any Final Order allowing such Allowed Compensation Claim.

##### (a)     Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Confirmation Date, the Debtors or the Liquidating Trustee, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable fees and expenses incurred by Professionals on or after the Confirmation Date. Upon the Confirmation Date, any requirement that Professionals comply with Bankruptcy Code sections 327 through 331 and 1103 or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Liquidating Trustee, as applicable, may pay any Professional in the ordinary course of business without any further notice, action, order or approval of the Bankruptcy Court.

3.    **Substantial Contribution Compensation and Expenses.**

Except as otherwise specifically provided in the Plan, any Person or Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to Bankruptcy Code sections 503(b)(3), (4) or (5) must file an application and serve such application on counsel for the Debtors or the Liquidating Trustee, as applicable, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code or the Bankruptcy Rules on or before the Administrative Claim Bar Date, or be forever barred from seeking such compensation or expense reimbursement. All rights of the Debtors, the Liquidating Trustee, the United States Trustee and all other parties in interest to object to such request are expressly reserved.

4.    **Priority Tax Claims.**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release and discharge of, and in exchange for, each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in Bankruptcy Code section 1129(a)(9)(C).

C.    **Classification and Treatment of Claims and Equity Interests**

Pursuant to Bankruptcy Code sections 1122 and 1123, the following designates the Classes of Claims and Equity Interests under the Plan. A Claim or Equity Interest is in a particular Class for purposes of voting on, and of receiving distributions pursuant to, the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and such Claim or Equity Interest has not been paid, released or otherwise settled prior to the Effective Date. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.

| | SUMMARY OF PLAN TREATMENT AND EXPECTED RECOVERIES | | |
|---|---|---|---|
| Class | Designation | Plan Treatment | Estimated Recovery Under the Plan |
| Class 1 | Secured Claims | Except to the extent that a holder of an Allowed Secured Claim agrees to a less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release and discharge of, and in exchange for, each Allowed Secured Claim, each such holder thereof shall receive, at the option of the Debtors or Liquidating Trustee, as applicable, either: (i) payment in full in Cash of such holder's Allowed Secured Claim; (ii) reinstatement of such holder's Allowed Secured Claim; (iii) return of any collateral subject to such holder's Allowed Secured Claim; or (iv) such other treatment rendering such holder's Allowed Secured Claim Unimpaired. | 100% |

Case 2:13-bk-16126-MCW    Doc 692    Filed 10/28/14    Entered 10/28/14 18:11:21    Desc
Main Document    Page 23 of 101

| | | SUMMARY OF PLAN TREATMENT AND EXPECTED RECOVERIES | |
|---|---|---|---|
| **Class** | **Designation** | **Plan Treatment** | **Estimated Recovery Under the Plan** |
| Class 2 | Priority Non-Tax Claims | Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment of its Allowed Priority Non-Tax Claim, in full and final satisfaction, settlement, release and discharge of, and in exchange for, each Allowed Priority Non-Tax Claim, each such holder thereof shall receive, at the option of the Liquidating Trustee, either: (i) payment in full in Cash of such holder's Allowed Priority Non-Tax Claim; or (ii) such other treatment rendering such Allowed Priority Non-Tax Claim Unimpaired. | 100% |
| Class 3 | General Unsecured Claims | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of its Allowed General Unsecured Claim, in full and final satisfaction, settlement, release and discharge of, and in exchange for, each Allowed General Unsecured Claim, each holder thereof shall receive (a) Cash in an amount equal to the pro rata share of the Unsecured Claims Fund and (b) to the extent a holder of an Allowed General Unsecured Claim constitutes a Qualified Creditor Stock Beneficiary, distributions under, and in accordance with, the Tax Sharing Agreement and the Stock Trust Agreement, as applicable. | Up to 9% (Subject to material change based on, among other things, claims objections as well as the realization of Causes of Action and other assets) |
| Class 4 | Intercompany Claims | All Class 4 Claims shall be, at the election of the Reorganized Debtors, remain Unimpaired, as may be agreed to by the Reorganized Debtors and the holder of such Intercompany Claim. For the avoidance of doubt, holders of Class 4 Intercompany Claims shall not be entitled to any distribution from the Unsecured Claims Fund or on account of the Trust Agreements and Tax Sharing Agreement, as applicable. | 100% |
| Class 5 | Section 510(b) Claims | All Class 5 Claims shall be discharged, cancelled, released and extinguished as of the Effective Date without any distribution on account of such Claims. | 0% |
| Class 6 | Equity Interests | All Equity Interests shall be discharged, cancelled, released and extinguished without any distribution on account of such Equity Interests. | 0% |

D.     **Means for Implementation of the Plan**

1.     **Reorganized ECOtality.**  The Plan provides that all existing stock in ECOtality, Inc. shall be cancelled effective as of the Effective Date.  The Plan furthermore provides that on the Effective Date of the Plan, new stock in the Reorganized ECOtality (the "Reorganized Stock") will be issued 50% to Blink UYA, LLC ("Blink") and 50% to Stock Trust, which stock shall be held by the Stock Trust for the benefit of the Qualified Creditor Stock Beneficiaries.  As a result of their beneficial interest in the Stock Trust, Qualified Creditor Stock Beneficiaries may receive distributions arising from distributions on account of the Qualified Creditor Stock or distributions pursuant to the Tax Sharing Agreement among the Reorganized Debtors and the Stock Trust.  The Plan also provides for Minimum Distributions to the Stock Trust for the benefit of Qualified Creditor Stock Beneficiaries

of no less than $725,000, to be paid in full or in part by the Plan Contributor in the event that the Qualified Creditor Stock Beneficiaries have not received at least $925,000 on or prior to the third anniversary of the Effective Date on account of their Qualified Creditor Stock or the Tax Sharing Agreement. Creditors should refer to the Plan for complete information in these regards.

      **2.**    **Liquidating Trust.**    Distributions to holders of Allowed Claims (including Compensation Claims) contemplated under the Plan shall be funded by the proceeds of Liquidating Trust Assets. After the payment or reservation for, as applicable, the expenses of administering the Liquidating Trust, including the winding down and closing of the Chapter 11 Cases (including with respect to any fees and expenses incurred by any Professionals after the Confirmation Date), the fees and expenses of the Liquidating Trustee and its retained professionals, all Allowed Administrative Claims, Allowed Compensation Claims, Allowed Priority Tax Claims, Allowed Secured Claims, Allowed Priority Non-Tax Claims and appropriate reserves, and any remaining assets shall be used to fund the Unsecured Claims Fund.

      (a)    Creation. On the Effective Date, the Liquidating Trust shall be created pursuant to the Liquidating Trust Agreement, the terms of which shall be incorporated herein by reference. As of the Effective Date, all of the Liquidating Trust Assets shall be transferred to the Liquidating Trust, pursuant to the terms of the Liquidating Trust Agreement. The Liquidating Trust shall be established for the sole purpose of liquidating and distributing the Liquidating Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d).

      (b)    Employment and Compensation of Professionals. In accordance with the Liquidating Trust Agreement, the Liquidating Trust may employ such counsel (which may include one or more of the same counsel employed by either the Debtors or the Committee), advisors and other professionals (which may include one or more of the same Professionals employed by either the Debtors or the Committee) selected by the Liquidating Trustee that the Liquidating Trustee reasonably requires to perform its responsibilities under the Plan without further order from the Bankruptcy Court. The Liquidating Trust's professionals shall be compensated at their respective standard hourly rates as agreed to by the Liquidating Trustee, without further motion, application, notice, or other order of the Bankruptcy Court. The fees and expenses of the Liquidating Trust's professionals shall be satisfied out of the Liquidating Trust Assets.

      **3.**    **Liquidating Trustee**

      (a)    Appointment. The Liquidating Trustee shall be deemed appointed on the Effective Date, without further motion, application, notice, hearing or other order of the Bankruptcy Court. The Debtors hereby recommend that the initial Liquidating Trustee shall be Carolyn Johnsen, which recommendation is acceptable to the Committee. Ms. Johnsen has served as counsel to the Committee and, as a result, is knowledgeable about the Debtors, the Chapter 11 Cases and the Liquidating Trust Assets. For further information regarding Ms. Johnsen's qualifications to serve as the Liquidating Trustee, please refer to **Exhibit B** hereto. In the event Ms. Johnsen does not serve as Liquidating Trustee for some reason, the Debtors reserve the right to select a Person or Entity to serve as the Liquidating Trustee, which selection shall be reasonably acceptable to the Committee.

      (b)    Duties. As more fully described in the Liquidating Trust Agreement, the Liquidating Trustee shall have the responsibility for administering the Liquidating Trust, maintaining applicable reserves, liquidating the Liquidating Trust Assets, and making distributions under the Plan.

      (c)    No Further Approvals Required/Transfer of Liquidating Trust Assets. In performance of its duties hereunder, the Liquidating Trustee shall have the rights and powers of a debtor in possession under Bankruptcy Code section 1107, and such other rights, powers, and duties necessary, appropriate, advisable or convenient to effectuate the provisions of the Plan. On and after the Effective Date, the Liquidating Trustee shall not be required to obtain any approvals from the Bankruptcy Court, any court or governmental body and/or provide any notices under any applicable laws to implement the terms of the Plan, including the transfer of any Liquidating Trust Assets retained by the Liquidating Trust, except as explicitly set forth in the Liquidating Trust Agreement. As further set forth in the Liquidating Trust Agreement, without limitation of the foregoing, the Liquidating Trustee shall be authorized pursuant to the Plan to transfer any or all of the Liquidating Trust Assets without necessity of any further notice or approval of the Bankruptcy Court and/or under any applicable state or federal law. This provision shall be subject in its entirety to the Liquidating Trust Agreement.

4.      **Stock Trust**.

(a)      Creation.  On the Effective Date, the Stock Trust shall be created pursuant to the Stock Trust Agreement, the terms of which shall be incorporated herein by reference.  As of the Effective Date, all of the Stock Trust Assets shall be transferred to the Stock Trust pursuant to the terms of the Stock Trust Agreement. The rights of the Qualified Creditor Stock Beneficiaries shall be set forth in the Stock Trust Agreement.  The Stock Trust shall be established for the sole purpose of liquidating and distributing the Stock Trust Assets while preserving the value of the Stock Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d).

(b)      Employment and Compensation of Professionals.  In accordance with the Stock Trust Agreement, the Stock Trust may employ such counsel, advisors and other professionals selected by the Stock Trustee that the Stock Trust reasonably requires to perform its responsibilities under the Plan without further order from the Bankruptcy Court.  The Stock Trust's professionals shall be compensated at their respective standard hourly rates as agreed to by the Stock Trustee, without further motion, application, notice, or other order of the Bankruptcy Court.

5.      **Stock Trustee**

(a)      Appointment.  The Stock Trustee shall be deemed appointed on the Effective Date, without further motion, application, notice, hearing or other order of the Bankruptcy Court.  The Debtors hereby recommend that the initial Stock Trustee shall be Carolyn Johnsen, which recommendation is acceptable to the Committee.  Ms. Johnsen has served as counsel to the Committee and, as a result, is knowledgeable about the Debtors, the Chapter 11 Cases and the Stock Trust Assets.  For further information regarding Ms. Johnsen's qualifications to serve as the Stock Trustee, please refer to **Exhibit B** hereto.  In the event Ms. Johnsen is not able to or determines not to serve as Stock Trustee for some reason as of the Effective Date, the Debtors reserve the right to select a Person or Entity to serve as the Stock Trustee, which selection shall be reasonably acceptable to the Committee.

(b)      Duties.  The Stock Trustee shall have the responsibility for administering the Stock Trust in accordance with the Stock Trust Agreement.

(c)      No Further Approvals Required/Transfer of Stock Trust Assets.  On and after the Effective Date, the Stock Trustee shall not be required to obtain any approvals from the Bankruptcy Court, any court or governmental body and/or provide any notices under any applicable laws to implement the terms of the Plan, including the transfer of any Stock Trust Assets retained by the Stock Trust, except as explicitly set forth in the Stock Trust Agreement.  As further set forth in the Stock Trust Agreement, without limitation of the foregoing, the Stock Trustee shall be authorized pursuant to the Plan to transfer any or all of the Stock Trust Assets without necessity of any further notice or approval of the Bankruptcy Court and/or under any applicable state or federal law. This provision shall be subject in its entirety to the Stock Trust Agreement.

6.      **New Board**.  Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, and except as may otherwise be disclosed in the Plan Supplement, on the Effective Date, the directors and  officers identified in the Plan Supplement, and who shall be reasonably acceptable to the Plan Contributor, the Debtors and the Committee, shall serve as the New Board of the Reorganized Debtors that are corporations.  Pursuant to section 1129(a)(5), the Debtors will disclose in the Plan  Supplement, on or prior to the Confirmation Date, the identity and affiliations of any Person proposed to serve on a Reorganized Debtor's New Board and, to the extent such Person is an Insider, the nature of any compensation  for such Person. After the Effective Date, the corporate governance and management of the Reorganized Debtors shall be determined by the applicable board of managers or board of directors in accordance with the laws of the applicable state or country of organization.

7.      **Cancellation of Notes, Instruments and Outstanding Equity Interests**.  On the Effective Date, except as otherwise provided for in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, all agreements, stock, instruments, certificates and other documents in respect of the Equity Interests shall be cancelled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released and discharged.

8.      **Cancellation of Liens**.  On the Effective Date, except as otherwise provided for in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, any Lien securing any Claim shall be deemed released, and the holder of such Claim shall be authorized and directed to release any collateral or other property of any Debtor held by such holder and to take such actions as may be requested by the Debtors or the Liquidating Trustee, as applicable, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Debtors or the Liquidating Trustee, as applicable.

9.      **Exemption from Certain Transfer Taxes and Recording Fees**.  To the fullest extent permitted by Bankruptcy Code section 1146(a), any transfer from a Debtor to the Liquidating Trustee or to any entity under, pursuant to, in contemplation of, or in connection with the Plan or through: (a) the issuance, distribution, transfer or exchange of any debt, securities or other interest in the Debtors; (b) the creation, modification, consolidation or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment or recording of any lease or sublease; or (d) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

10.      **No Further Approvals**.  The transactions contemplated by the Plan shall be approved and effective as of the Effective Date without the need for any further state or local regulatory approvals or approvals by any non-Debtor parties, and without any requirement for further action by the Debtors or the Liquidating Trustee, as applicable.

11.      **Dissolution of Committee**.  The Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in Bankruptcy Code section 1103 and shall perform such other duties as it may have been assigned by the Bankruptcy Court prior to the Effective Date. On the Effective Date, the Committee shall be dissolved and the Committee's members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Committee's Professionals shall terminate.

12.      **Pre-Effective Date Injunctions or Stays**.  All injunctions or stays, whether by operation of law or by order of the Bankruptcy Court, provided for in the Chapter 11 Cases pursuant to Bankruptcy Code sections 105 or 362 or otherwise that are in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

13.      **Restructuring and Other Corporate Actions and Transactions.**

(a)      Restructuring Transactions.  Upon the Effective Date, the following transactions shall be effectuated contemporaneously:

i.      All of the issued and outstanding capital stock of ECOtality, Inc. shall be cancelled and new shares of common stock, the Reorganized Stock, shall be issued as follows: 50% to the Stock Trustee for the *pro rata* benefit of the Qualified Creditor Stock Beneficiaries (the "Qualified Creditor Stock") and 50% to the Plan Stockholder (the "Plan Stock").

ii.      The Plan Stockholder, the Reorganized Debtors and the Stock Trustee shall execute the Tax Sharing Agreement.

iii.      The Qualified Creditor Stock Beneficiaries shall receive, on a *pro rata* basis, no less than $925,000 (the "Minimum Distribution") as follows:

a.      The Plan Contributor has deposited $200,000 in cash (the "Trust Deposit") with the Debtors, to be held in trust and to be distributed pursuant to Section 4.12(a)(iii)(2) of the Plan.

b.      In the event that the Qualified Creditor Stock Beneficiaries have not received at least $925,000 in cash on or prior to the third anniversary of the Effective Date on account of their Qualified Creditor Stock or the Tax Sharing Agreement, then, within thirty (30) days after the third anniversary of the Effective Date, the Plan Contributor shall pay to the Liquidating Trust, without setoff or reduction of any kind or for any purpose, $725,000 as follows: three equal installments, the first to be paid, in cash, no later than the thirtieth (30th) day after the third anniversary of the Effective Date (the "First Payment Date"), and on the same date yearly thereafter until the third and final payment is made.  Any such payment shall be reduced dollar for dollar to the extent a payment has previously been made by Reorganized ECOtality to the Stock Trust whether pursuant to the Tax Sharing Agreement on account of a tax benefit to Reorganized ECOtality or otherwise.  The Liquidating Trustee shall distribute to the Qualified Creditor Stock Beneficiaries their *pro rata* share of such $725,000 in addition to the Trust Deposit pursuant to the Liquidating Trust Agreement and the Stock Trust Agreement, as applicable.  The obligation of the Plan Contributor to pay the balance of the Minimum Distribution after payment of the Trust Deposit as contemplated in Section 4.12 of the Plan shall be secured by a physical pledge of such number of shares of common stock of Car Charging Group, Inc. that have the value, as of the Effective Date, of the Minimum Distribution (the "Pledged Shares") in favor of the Liquidating Trust pursuant to a stock pledge agreement (the "Stock Pledge Agreement").  A stock certificate or certificates representing the Pledged Shares shall be delivered in pledge to the Stock Trustee on the Effective Date.  The Stock Trustee may exercise any remedies, immediately and without interference by any party, under the Stock Pledge Agreement, including the right to foreclose on the Pledged Shares, in the event of a failure to make any payment due under the Stock Trust Agreement and the Tax Sharing Agreement by Reorganized ECOtality or the Plan Contributor, as applicable, to the Stock Trust.  Promptly after the end of each succeeding year following the Effective Date, to the extent the value of the Pledged Shares at such time no longer is equal to the amount of the Minimum Distribution that remains unpaid to the Stock Trust, no later than five (5) business days after receiving notice of such deficiency from the Stock Trustee, which notice shall include a calculation of the deficiency and may only be provided by the Stock Trustee to the Plan Contributor promptly after the end of each calendar year, the Plan Contributor shall pledge additional shares of common stock of Car Charging Group, Inc. as Pledged Shares such that the value of the Pledged Shares in the aggregate equals the amount of the Minimum Distribution that then remains unpaid to the Stock Trust (*i.e.* less any amounts paid pursuant to the Plan, including amounts paid at any time after the First Payment Date, pursuant to the Tax Sharing Agreement and the Stock Trust).  For purposes of the foregoing yearly review of the value of the Pledged Shares relative to the amount of the Minimum Distribution that remains unpaid, the value of such Pledged Shares shall be the average of the closing prices of the common stock of Car Charging Group, Inc. listed on the OTC Bulletin Board (or such other securities exchange or over-the-counter trading market or service on which such shares are then traded or quoted) for the ten (10) consecutive trading days ending five (5) days prior to the delivery of the notice referenced above in Section 4.12(a)(iii)(2) of the Plan.

c.      The Stock Trustee shall use commercially reasonable efforts, within thirty (30) days after the Effective Date, to provide the Liquidating Trustee with a list and contact information for all Qualified Creditor Stock Beneficiaries existing as of that date.

d.      The Stock Trustee shall use commercially reasonable efforts, within thirty (30) days prior to the third anniversary of the Effective Date, to provide the Liquidating Trustee with a list and contact information for all Qualified Creditor Stock Beneficiaries existing as of that date, as well as an accounting of all distributions made to the Qualified Creditor Stock Beneficiaries on account of the Plan Stock and the Tax Sharing Agreement.

(b)      Continued Operation of Reorganized ECOtality.  On and after the Effective Date, Reorganized ECOtality shall continue in business as a Business Enterprise.

i.      The New Corporate Governance Documents shall, as of the Effective Date, be adopted and shall go into effect in accordance with applicable state law.  Such documents shall conform to the terms of the Plan and any agreements ancillary to the Plan and shall otherwise be in form and substance reasonably acceptable to the Debtors, the Committee and the Plan Contributor.  For the avoidance of doubt, nothing

in New Corporate Governance Documents shall impair the rights of the Stock Trust or the obligations of the Plan Contributor as set forth in the Plan.

ii.     On the Effective Date, the Plan Stockholder shall transfer and assign its rights and obligations pursuant to the Service Contracts to Reorganized ECOtality, and Reorganized ECOtality shall accept such assignment.

iii.     Subject to the consent of the Debtors and the Committee, Reorganized ECOtality may, in its discretion as required for Reorganized ECOtality to maintain the Business Enterprise, pursuant to and under the terms of the loan documents included in the Plan Supplement, enter into a loan for borrowed money as needed to fund its operations under a revolving line of credit (the "Operating Line of Credit"). The Operating Line of Credit, subject to the consent of the Debtors and the Committee, shall be secured by interests in (i) all of the assets of Reorganized ECOtality acquired by the Reorganized ECOtality after the Effective Date (for clarity, and without limitation, expressly excluding the Liquidating Trust Assets), (ii) a pledge of the Plan Stock and/or (iii) the Qualified Creditor Stock, which pledge may only be exercised if an event of default (as defined in the loan documents pursuant to which the Operating Line of Credit is provided) has occurred and is continuing, following not less than five (5) business days' notice thereof to the Stock Trustee. An event of default under the Operating Line of Credit shall constitute an event of default under the Stock Pledge Agreement and the Stock Trustee shall be permitted to exercise all remedies under the Stock Pledge Agreement, including foreclosing on the Pledged Shares, immediately and without notice or interference from any party.

iv.     No later than five (5) business days after the exercise of remedies upon an event of default under the Operating Line of Credit, the Plan Contributor shall pay the Minimum Distribution (less any amounts previously paid to the Stock Trust for the benefit of the Qualified Creditor Stock Beneficiaries pursuant to the Tax Sharing Agreement and the Stock Trust Agreement, as applicable) to the Stock Trust, without setoff or reduction of any kind or for any purpose, which amounts shall be distributed for the benefit of Qualified Creditor Stock Beneficiaries pursuant to the Trust Agreements, as applicable.

v.     The Plan Stockholder may, in its discretion, pursuant to terms that may be agreed upon by Reorganized ECOtality and the Plan Stockholder, transfer assets, other than the Purchased Assets, to Reorganized ECOtality as may be required for Reorganized ECOtality to continue to maintain the Business Enterprise.

(c)     General Corporate Actions. Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) cancellation and reissuance of stock and all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or Reorganized ECOtality, and any corporate action required by the Debtors or Reorganized ECOtality in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stock holders, the managing members, directors or officers of Debtor ECOtality. On or (as applicable) prior to the Effective Date, the managing members, directors or officers of the Debtors shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of an on behalf of the Debtors and Reorganized ECOtality. Such authorizations and approvals shall be effective notwithstanding any requirements under non-bankruptcy law. In the event of any conflict between the provisions of the Plan and any actions, documents, agreements, or otherwise arising from Section 4.12 of the Plan, the provisions of the Plan shall govern.

**14.     Withholding and Reporting Requirements**. In connection with the Plan, the Trustees shall comply with all withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities and all distributions hereunder shall be subject to such withholding and reporting requirements. The Trustees shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. Notwithstanding the foregoing, each holder of an Allowed Claim that is to receive a distribution hereunder shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, including income, withholding and other tax obligations, on account of such distribution. The Trustees have the right, but not the obligation, not to make a distribution until such holder has made arrangements satisfactory to the Trustees for payment of any such tax obligations. The Trustees may require, as a condition to the receipt of a distribution, that the holder of an Allowed Claim complete

the appropriate Form W-8 or Form W-9, as applicable to each holder. If such holder fails to comply with such request within one year, such distribution shall be deemed an unclaimed distribution.

15. **Allocation of Distributions Between Principal and Interest**. To the extent that any Allowed Claim entitled to distribution under the Plan consists of indebtedness and accrued but unpaid interest thereon, such distributions shall, for all income tax purposes, be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

E. **Conditions Precedent to Effectiveness of the Plan**

1. **Conditions to the Effective Date**. Consummation of the Plan and the occurrence of the Effective Date are subject to satisfaction of the following conditions:

(a) The Bankruptcy Court shall have entered the Confirmation Order, and such Confirmation Order shall have become a Final Order;

(b) No request for revocation of the Confirmation Order under Bankruptcy Code section 1144 has been made, or, if made, remains pending; and

(c) All documents necessary to implement the transactions contemplated by the Plan are in form and substance acceptable to the Debtors.

2. **Waiver of Condition.**

The conditions set forth in Section 8.1 of the Plan, other than the condition requiring that the Confirmation Order shall have been entered by the Bankruptcy Court, may be waived in whole or in part by the Debtors.

3. **Notice of Effective Date.**

The Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Section 8.1 of the Plan have been satisfied or waived pursuant to Section 8.2 of the Plan, and the Effective Date has occurred.

4. **Order Denying Confirmation.**

If the Plan is not Consummated, then nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors; (c) prejudice in any manner any right, remedy or Claim of the Debtors; (d) be deemed an admission against interest by the Debtors; or (e) constitute a settlement, implicit or otherwise, of any kind whatsoever.

F. **Discharge, Release, Injunction and Related Provisions**

1. **Discharge of Claims and Termination of Equity Interests.**

(a) **Except with respect to Class 4 Creditors, to the extent their Claims are expressly not discharged, and as of the Effective Date, except as otherwise explicitly provided in the Plan or the Confirmation Order including with respect to Class 4 Claims, the rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims and satisfaction or termination of all Equity Interests. Except with respect to Class 4 Creditors, to the extent their Claims are expressly not discharged, and except as otherwise provided in the Plan or the Confirmation Order, Confirmation shall, as of the Effective Date: (i) discharge the Debtors from all Claims or other debts that arose before the Effective Date, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, and all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(i), in each case whether or not (w) a Proof of Claim is filed or deemed filed pursuant to Bankruptcy Code section 501, (x) a Claim based on such debt is Allowed pursuant to**

Bankruptcy Code section 502, (y) the holder of a Claim based on such debt has accepted the Plan or (z) such Claim is listed in the Schedules; and (ii) satisfy, terminate or cancel all Equity Interests and other rights of equity security holders in the Debtors.

(b)     As of the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, all Persons and Entities shall be precluded from asserting against the Debtors, or their respective successors or property, any other or further Claims, demands, debts, rights, causes of action, liabilities or equity interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all such Claims except with respect to Class 4 Creditors, to the extent their Claims are expressly not discharged, and other debts and liabilities against the Debtors and satisfaction, termination or cancellation of all Equity Interests and other rights of equity security holders in the Debtors, pursuant to Bankruptcy Code sections 524 and 1141, and such discharge will void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim.

2.     __Injunctions.__

(a)     Except as otherwise provided in the Plan, the Trust Agreements or the Confirmation Order, all Persons or Entities who have held, hold or may hold Claims, Equity Interests, Causes of Action or liabilities that: (i) are subject to compromise and settlement pursuant to the terms of the Plan; (ii) have been released pursuant to __Section 9.3__ of the Plan; (iii) are subject to exculpation pursuant to __Section 9.5__ of the Plan (but only to the extent of the exculpation provided in __Section 9.5__ of the Plan); or (iv) are otherwise stayed or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from commencing or continuing in any manner any action or other proceeding, including on account of any Claims, Equity Interests, Causes of Action or liabilities that have been compromised or settled against the Debtors or any Person or Entity so released or exculpated (or the property or estate of any Person or Entity, directly or indirectly, so released or exculpated) on account of or in connection with or with respect to any released, settled, compromised, or exculpated Claims, Equity Interests, Causes of Action or liabilities.

3.     __Releases.__

(a)     __Debtor Releases.__     Notwithstanding anything contained herein to the contrary, except as provided in __Section 9.4__ of the Plan, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable law, for good and valuable consideration provided by each of the Released Parties and Limited Released Parties, as applicable, the adequacy of which is hereby confirmed, the Released Parties and the Limited Released Parties (subject to __Section 9.4__ of the Plan) are deemed conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged by the Debtors and their Estates from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party or Limited Released Party, as applicable, the restructuring of Claims and Equity Interests prior to or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or any related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party or a Limited Released Party, as applicable, that constitutes actual fraud, willful misconduct or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

(b)     **Releases by Holders of Claims and Equity Interests.**  Except for any obligation, claim, cause of Action or liability arising expressly under the Plan, reserved by any Person or Entity pursuant to the Plan or as provided in **Section 9.4** of the Plan, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable law, holders of Claims and Equity Interests shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Released Parties and the Limited Released Parties, as applicable, from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party or Limited Released Party, as applicable, the restructuring of Claims and Equity Interests prior to or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or any related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party or Limited Released Party, as applicable, that constitutes actual fraud, willful misconduct or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 4.     Limitation on Releases.

Notwithstanding any other provision of **Article IX** of the Plan, nothing in **Article IX** of the Plan shall be deemed to release the Limited Released Parties from any claim related to the prepetition conduct with respect to the prepetition operations and affairs of the Debtors.  Such claims include, **without** **limitation**, claims for deepening insolvency; breach of fiduciary duties; misrepresentation, negligence, and other misconduct; aiding and abetting such misconduct; fraudulent conveyances and preference recoveries.

### 5.     Exculpation.

Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable law, none of the Exculpated Parties, shall have or incur any liability from the Petition Date to the Effective Date for any claim, cause of action, or other assertion of liability for any act taken or omitted in connection with, or arising out of, the Chapter 11 Cases or the negotiation, formulation, preparation, administration, consummation and/or implementation of the Plan, or any contract, instrument, document, or other agreement entered into pursuant thereto through the Effective Date; provided that the foregoing shall not affect the liability of any Person or Entity that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.  The Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan and administration thereof.

### 6.     Retention and Enforcement and Release of Causes of Action.

Except as otherwise provided in the Plan, or in any document, instrument, release or other agreement entered into in connection with the Plan, in accordance with Bankruptcy Code section 1123(b), the Debtors, their Estates, the Trust Agreements, and any other party, including any of the Buyers (only to the extent Causes of Action were transferred from the Debtors to the applicable Buyer under the respective APA), expressly reserve all rights to retain and prosecute any and all of the Causes of Action identified in **Exhibit A** to the Plan, as the case may be. Sole authority and responsibility for investigating, analyzing, commencing, prosecuting, litigating, compromising, collecting and otherwise administering (or decline to do any of the foregoing) any or all of the Causes of Action pursuant to the terms of the Plan, the Liquidating Trust Agreement, and any other applicable document shall be held by (A) the Debtors, prior to the Effective Date (except to the extent a Cause of Action was transferred from the Debtors to an applicable Buyer under the respective APA, in which case the applicable Buyer has such authority),

and (B) on or after the Effective Date, by (i) the Liquidating Trustee, with respect only to those Causes of Action that are Excluded Assets (the "Retained Causes of Action"), and (ii) with respect to any other Causes of Action, any other party that acquired rights to such Cause of Action, including any Buyer (only to the extent Causes of Action were transferred from the Debtors to the applicable Buyer under the respective APA). No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to any or all of the Causes of Action upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

## VIII.      RISK FACTORS

Holders of Claims entitled to vote on the Plan should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

### A.      Value of the Debtors' Assets and Distributions

Substantially all of the Debtors' assets have been sold at various Bankruptcy Court-approved Sales. The Debtors make no representation as to the net proceeds that may be realized upon the sale of the remainder of Debtors' assets, if any, or that there will be any proceeds at all to distribute to Creditors under the Plan. It is the Debtors' objective that an orderly liquidation of Liquidating Trust Assets by the Liquidating Trustee will provide more to Creditors than the alternative of a fire sale liquidation of the Debtors' properties would have under Chapter 7; however, under the circumstances, the net proceeds available for distribution may be lower than expected, thereby decreasing recoveries for holders of Allowed Claims.

### B.      Allowed Amount of Claims

#### 1.      The outcome of challenging Disputed Claims is uncertain.

The Debtors and/or the Liquidating Trustee may challenge, object to, and/or dispute certain filed and scheduled Claims. While disallowance of Claims will increase the amount of funds available for distribution to holders of other Allowed Claims, there is no assurance that the Debtors and/or the Liquidating Trustee will be successful in challenging such Claims; it will not be permitted to expend resources of the Estates to do so unless all holders of Allowed Claims have been paid in full in accordance with the Plan. Therefore, the pursuit of Disputed Claims by the Debtors or the Liquidating Trustee, as applicable, shall not take place if there are insufficient funds in the Estates to do so, or, there is otherwise no mutual agreement of the Creditors allowing the expense of such pursuit to be surcharged to collateral that relates to the challenged Claim.

Although Claims may be Disputed by the Debtors or Liquidating Trustee, as applicable, it will still be necessary to reserve funds for such Disputed Claims, and, in the event that the Bankruptcy Court determines that such Disputed Claims are valid Allowed Claims that must be paid, then the amount of funds available for distribution to the other holders of Allowed Claims will be reduced, i.e., the creditor pool will be increased and the amount available for distribution will be decreased resulting in a longer time (and fewer funds) to pay Allowed Claims in full.

#### 2.      Administrative Claims, Priority Tax Claims, Secured Claims and Priority Non-Tax Claims may be higher than currently estimated.

The Allowed amount of Administrative Claims, Priority Tax Claims, Secured Claims and Priority Non-Tax Claims may exceed the Debtors' estimates. For example, the Debtors' current estimates as to the amount owed on account of Claims asserted by applicable taxing authorities are based upon the amounts identified in the Debtors' Schedules and Proofs of Claim that were filed prior to the Bar Date. The Allowed amount of Administrative Claims and Priority Tax Claims may be higher or lower than anticipated to the extent the applicable taxing authorities (a) have not yet filed a Claim on account of prepetition tax liabilities but assert that such amounts should be Allowed notwithstanding the expiration of the Bar Date and/or (b) request payment of Administrative Claims prior to the Administrative Claims Bar Date on account of postpetition tax liabilities. Under the Bankruptcy Code, the Plan must provide for payment in full of such Claims unless the holders of such Claims agree to different treatment.

Because there is no source of additional funds for the payment of such Claims to the extent the Debtors' projections are exceeded, if the Bankruptcy Court determines that such Claims are valid Allowed Administrative Claims and Priority Tax Claims, then the amount of funds available for distribution to the holders of Allowed General Unsecured Claims may be negatively impacted.

### 3. <u>Disputes with Blink Acquisition regarding ownership of the Scottsdale House, and responsibility with regard to certain contractual obligations and employee wages are uncertain.</u>

Contrary to the contentions of Blink Acquisition, the Debtors believe that ownership of the Scottsdale House was not transferred to Blink Acquisition pursuant to the Sales. In addition, the Debtors believe, pursuant to the Sales, certain contractual obligations and employee wages are the responsibility of Blink Acquisition. If the Bankruptcy Court, however, determines that the Scottsdale House was transferred to Blink Acquisition through the Sales or that certain contractual obligations and employee wages are not the responsibility of Blink Acquisition, the amount of funds available for distribution to the holders of Allowed General Unsecured Claims may be negatively impacted.

### C. Reorganized Stock and Tax Sharing Agreement

The Plan provides that the Debtors will be dissolved and all existing stock in the Debtors shall be cancelled effective as of the Effective Date of the Plan. The Plan furthermore provides that on the Effective Date of the Plan, Reorganized Stock will be issued 50% to the Plan Stockholder and 50% to Qualified Creditors (to be allocated pro rata to Qualified Creditors based on the amount of their claims), which stock shall be held by the Stock Trust for the benefit of the Qualified Creditors. The Plan Stockholder will operate the Reorganized Debtors under a service agreement. As a result of their ownership of stock in the Reorganized Debtors, Qualified Creditors may receive distributions arising from distributions on account of the Reorganized Stock or distributions pursuant to the Tax Sharing Agreement among the Reorganized Debtors and the Stock Trust. The Plan also provides for a Minimum Distribution to the Qualified Creditors of no less than $925,000, to be paid in full or in part by the Plan Contributor by making Additional Distributions in the event that the Qualified Creditor Stock Beneficiaries have not received at least $925,000 on or prior to the third anniversary of the Effective Date on account of their Qualified Creditor Stock or the Tax Sharing Agreement. It is substantially uncertain whether a beneficiary in the Stock Trust (i.e., a holder of an Allowed General Unsecured Claim who is also a Qualified Creditor) will receive payments under the Tax Sharing Agreement or the Additional Distributions. Whether distributions will ever be made on the Reorganized Stock is also subject to substantial uncertainty.

The Tax Sharing Agreement provides that the Stock Trust receives a payment only if a reduction in tax is recognized by the Reorganized Debtors or their affiliates on account of the Debtors' tax attributes. As discussed further in Section XI hereof, "Certain Federal Income Tax Consequences of the Plan," the tax attributes may be subject to limitations on their availability to offset future income tax liability of Reorganized Debtors or their affiliates. Furthermore, Reorganized Debtors must have income to offset with the tax attributes before any of the tax attributes can be utilized by the Reorganized Debtors or their affiliates.

Even if amounts are due and owing to the Stock Trust under the Tax Sharing Agreement or the Additional Amounts are due and owing under the Plan, the Reorganized Debtors or the Plan Contributor may be unable or otherwise fail to remit such amounts. In the event the Reorganized Debtors or the Plan Contributor fails to fulfil its obligations under the Tax Sharing Agreement or the Plan, the Stock Trust may have limited recourse if this failure results from the insolvency or bankruptcy of the Reorganized Debtors or the Plan Contributor.

In light of the foregoing, it is uncertain whether the Qualified Creditor Stock Beneficiaries will receive the Additional Distributions.

### D. Certain Tax Implications of the Chapter 11 Cases

Holders of Claims should carefully review Section XI hereof, "Certain Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and certain Holders of Claims.

### E.      The DOE's Claim

Pursuant to the Sale Order approving the Sale to Blink Acquisition, which closed on October 16, 2013 [Docket No. 213], Blink Acquisition negotiated with the DOE to seek to achieve a novation of the Debtors' agreements with the United States government that were assigned in connection with the Sale to Blink Acquisition (the "Assigned Contracts").   The DOE subsequently declined to novate the Debtors' agreement with Blink Acquisition.  By the terms of that Sale Order, upon and after the transfer of the assets thereunder, the DOE will not assert any claims relating to the Assigned Contracts against the Debtors or their property.  In addition, the terms of the Sale Order provide that the DOE may assert, within 180 days of the closing of the Sale to Blink Acquisition, any unsecured claims that the DOE may have with regard to any issues arising from invoices submitted by the Debtors related to the Assigned Contracts.  On April 10, 2014, the DOE filed Proof of Claim No. 42, asserting an unsecured claim against Debtor Electric Transportation Engineering Corporation (d/b/a ECOtality North America) in the amount of $8,068,007.75.[9]

### F.      Liquidating Trustee Fees and Expenses

The fees and expenses of the Liquidating Trustee may be in excess as to what is anticipated.  Moreover, the Liquidating Trustee may not be successful in prosecuting certain Causes of Action.  As a result, the amounts available for distribution may be lower than expected, thereby decreasing recoveries for holders of Allowed Claims.

### G.      Non-Confirmation or Non-Consummation of the Plan

#### 1.      Parties in interest may object to the Plan's classification of Claims and Equity Interests.

Bankruptcy Code section 1122 provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of the Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.      The Debtors may fail to satisfy vote requirements.

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

#### 3.      The Debtors may not be able to secure Confirmation of the Plan.

Bankruptcy Code section 1129 sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A

---

[9]     The DOE also asserts that its claim is entitled to treatment as a Secured Claim under Bankruptcy Code section 506 to the extent it is subject to set off by a Claim of the Debtors against DOE or any other United States department, agency or instrumentality.  The Debtors reserve all rights with respect to this Claim and any other Claim(s) asserted by the DOE.

non-accepting holder of an Allowed Claim, or a holder of Claim or Equity Interest that is deemed to reject the Plan, might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures and voting results are appropriate, the Bankruptcy Court may still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met. If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims would receive with respect to their Allowed Claims.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class than the treatment currently provided in the Plan. This less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

**4.**      **The conditions precedent to the Effective Date may not occur.**

As more fully set forth in Article VIII of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not occur.

**5.**      **Nonconsensual Confirmation.**

In the event that any Impaired Class of Claims does not vote to accept the Plan, or if an Impaired Class of Claims or Equity Interests is deemed to reject the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtors' request if at least one Impaired Class has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired classes. The Debtors intend to seek Confirmation over the deemed rejection of the Plan by holders of Class 5 and 6 Claims. Although the Debtors believe that the Plan satisfies the nonconsensual Confirmation requirements of Bankruptcy Code section 1129(b), there can be no assurance that the Bankruptcy Court will reach the same conclusion. In addition, the pursuit of nonconsensual Confirmation or consummation of the Plan may result in, among other things, delay and increased expenses relating to Compensation Claims.

## IX.     SOLICITATION AND VOTING PROCEDURES

The following summarizes briefly the procedures to accept or reject the Plan (the "Solicitation Procedures"). Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

**A.**     **The Solicitation Package**. The following materials, as may be amended or supplemented from time to time, constitute the solicitation package (the "Solicitation Package"):

- A cover letter that, among other things, (i) describes the contents of the Solicitation Package; (ii) generally sets forth the solicitation process as approved by the Bankruptcy Court; and (iii) encourages holders in the voting Class to accept the Plan;

- An appropriate form of ballot, substantially in the form of Official Form 14, together with the applicable voting instructions;

- A notice setting forth (i) the deadline established for submitting Ballots, (ii) the time, date and place of the combined Confirmation Hearing and the hearing to consider final approval of the Disclosure Statement, and (iii) the deadline for filing objections to final approval of the Disclosure Statement and/or Confirmation of the Plan;

- The Disclosure Statement, as approved by the Bankruptcy Court, with all exhibits thereto (including the Plan, exhibits to the Plan, each as may be amended or supplemented);

- The order approving the Disclosure Statement on a conditional basis or otherwise; and

- Any such other materials as the Bankruptcy Court may direct.

The voting Class, Class 3, shall be served by first class mail with copies of this Disclosure Statement, the Plan and the appropriate ballot. The Solicitation Package will not be provided to other Classes because all other Classes are either (i) Impaired and deemed to reject the Plan or (ii) Unimpaired and deemed to accept the Plan, and therefore not entitled to vote. **Any party who desires additional copies of these documents may request them from the Claims and Noticing Agent either by telephone, (866) 967-1788, by emailing ECOInfo@kccllc.com, or by visiting www.kccllc.net/ECOtality**.

### B.      Voting Deadline

The period during which Ballots with respect to the Plan will be accepted by the Debtors will terminate on **December 8, 2014 at 5:00 p.m. (Arizona Time)**, unless the Debtors, in their sole discretion, extend the date until which Ballots will be accepted. Except to the extent the Debtors so determine or as permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Debtors in connection with the Debtors' request for Confirmation of the Plan (or any permitted modification thereof).

The Debtors may extend the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received. The Debtors will give notice of any extension in a manner deemed reasonable to the Debtors in their discretion.

### C.      Voting Instructions

Only the holders of General Unsecured Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning them to the Claims and Noticing Agent. It is important to follow the specific instructions provided on each Ballot. Each Ballot should be sent to the following address such that it is actually received on or before the Voting Deadline:

**ECOtality Ballot Processing Center**
**c/o Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue**
**El Segundo, California 90245**

The Debtors have engaged the Claims and Noticing Agent to assist in the balloting and tabulation process. The Claims and Noticing Agent will process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan, and the Debtors will file, or cause to be filed, the voting report (the "Voting Report") no later than three (3) business days prior to the Confirmation Hearing.

**The deadline by which the Claims and Noticing Agent must actually receive your Ballot is December 8, 2014 at 5:00 p.m. (Arizona Time). Any Ballot that is properly executed, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.**

## NOTE TO VOTING CLASS

By signing and returning a Ballot, each holder of an General Unsecured Claim will be certifying to the Bankruptcy Court and the Debtors that, among other things:

- the holder has been provided with a Solicitation Package and understands that the solicitation of votes for the Plan is subject to all of the terms and conditions set forth in the Disclosure Statement, the Plan and the remainder of the Solicitation Package;

- the holder has not relied on any statement made or other information received from any person or entity with respect to the Plan other than the information contained in the Disclosure Statement, Solicitation Package or other publicly available materials;

- the holder has cast the same vote with respect to all Claims in the particular Class;

- no other Ballots with respect to the same Claim have been cast, or, if any other Ballots have been cast with respect to such Claim, then any such Ballots are thereby revoked, in accordance with the procedures set forth herein;

- the Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or Equity Interest or an assertion or admission of a Claim or Equity Interest; and

- only holders of General Unsecured Claims shall be entitled to vote with regard to such Claims.

### D.     Voting Tabulation

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. Except as otherwise provided in the Solicitation Procedures, a Ballot will be deemed delivered only when the Claims and Noticing Agent actually receives the executed Ballot as instructed in the voting instructions above. No Ballot should be sent to the Bankruptcy Court, the Debtors, the Debtors' agents (other than the Claims and Noticing Agent) or the Debtors' financial or legal advisors. The Debtors expressly reserve the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of Bankruptcy Code section 1127 and the terms of the Plan regarding modifications).

To the extent a holder holds multiple Claims within a particular Class, the Claims and Noticing Agent may, in its discretion, and to the extent possible, aggregate the Claims of any particular holder within such Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party in interest under Bankruptcy Code section 1126(e), the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

No later than three (3) business days before the Confirmation Hearing, the Debtors shall cause to be filed the Voting Report setting forth the results of the voting by Class. The Voting Report shall include: (i) a list of all Creditors who have filed acceptances or rejections of the Plan; (ii) a tally, by Class, of the number of acceptances and rejections and the dollar amount in Claims and the amount of Allowed interests represented by the acceptances and rejections; and (iii) identification of any Ballots received after the Voting Deadline set by the Bankruptcy Court and shall state whether such Ballots are included in the tally. The Voting Report also shall delineate every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity (each a "Defective Ballot"), including, but not limited to, those Ballots that: (i) are received after the Voting Deadline unless the Debtors have granted an extension of the Voting Deadline with respect to such Ballot; (ii) are (in whole or in material part) illegible or unidentifiable; (iii) lack signatures; (iv) lack necessary information; (v) are damaged; (vi) are cast by a Person or Entity that does not hold a Claim in a Class entitled to vote on the Plan as of the Voting Record Date; (vii) does not indicate an acceptance or a rejection or that indicates both an acceptance and a rejection; (viii) are sent to the Bankruptcy Court, the Debtors, the Debtors' agents, advisors or representatives (other than the Claims and Noticing Agent); or (ix) partially accept and partially reject the Plan. The Voting Report shall also state whether any objections to Confirmation were filed and whether the Debtors intend to proceed with confirmation under Bankruptcy Code section 1129(a) or (b).

The Claims and Noticing Agent will attempt to reconcile the amount of any Claim reported on a Ballot with the Debtors' records, but in the event such amount cannot be timely reconciled without undue effort on the part of the Claims and Noticing Agent, the amount shown in the Debtors' records shall govern.

## X.     CONFIRMATION OF THE PLAN

### A.     Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to Bankruptcy Code section 1129 are: (i) the Plan is in the "best interests" of holders of Claims; (ii) the Plan is feasible and (iii) the Plan is accepted by all

Impaired Classes of Claims, or if rejected by an Impaired Class or if an Impaired Class is deemed to reject, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the Class.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of Bankruptcy Code section 1129. The Debtors believe that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (ii) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11; and (iii) the Plan has been proposed in good faith.

## B.      Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, Bankruptcy Code section 1129(a)(7) requires that a bankruptcy court find as a condition to Confirmation, that a chapter 11 plan provides, with respect to each impaired[10] class of claims and interests, that each holder of an impaired claim or interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that the holder would receive or retain if the debtors liquidated under chapter 7.

The Debtors believe that the Plan satisfies the best interests test because, among other things, the recoveries expected to be available to holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation, and distributions under the Plan will commence at an earlier point in time than they would if a chapter 7 trustee were put in place.

In a typical Chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of the properties securing their liens. If any assets are remaining in the Estates after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to receive payment. Unsecured creditors are paid from any remaining sales proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, equity interest holders receive the balance that remains, if any, after all creditors are paid.

Substantially all of the Debtors' assets have already been liquidated during the Chapter 11 Cases, and the Debtors only have one remaining employee who is in the process of seeking employment elsewhere. The Debtors have diligently proceeded with monetizing or attempting to monetize all assets of their Estates. Although the Plan effects a liquidation of the Estates' remaining assets and a chapter 7 liquidation would have the same goal, the Debtors believe that the Plan provides the best source of recovery for holders of Allowed General Unsecured Claims because the Debtors have secured commitments from the Plan Contributor to make payments for the benefit of creditors in an amount equal to $200,000 plus the Additional Distributions, subject to the risks set forth herein. These additional amounts would not be paid by the Plan Contributor in a chapter 7 liquidation.

In addition, liquidating the Debtors' assets under chapter 7 would require the appointment of a chapter 7 trustee. Such an appointment would delay distributions to holders of Claims and would likely provide a smaller distribution to holders of Allowed Claims because of the additional fees and expenses which would be incurred during a chapter 7 liquidation, including potential added time, fees and expenses incurred by a chapter 7 trustee and any of its retained professionals who would need to familiarize themselves with the Chapter 11 Cases. Given the proposed Liquidating Trustee's familiarity with the Debtors' Chapter 11 Cases and assurances that no additional fees, beyond the fees she is entitled to receive for her legal services, will be charged for the proposed Liquidating Trustee's services, the Debtors, accordingly, believe that the Plan is in the best interests of creditors. In the event Ms. Johnsen does not serve as Liquidating Trustee for some reason, the Debtors will recommend another Person or Entity that is familiar with the Debtors and the Chapter 11 Cases, such recommendation shall be reasonably acceptable to the Committee, to ensure that the Plan remains in the best interest of creditors.

---

[10]     A class of claims is "impaired" within the meaning of Bankruptcy Code section 1124 unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

C.      **Feasibility**

Bankruptcy Code section 1129(a)(11) requires that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).

The Debtors are reorganizing and will maintain business operations with little or no debt after the Effective Date, except for potentially the Operating Line of Credit. Accordingly, the Debtors believe that the Plan is feasible and meets the requirements of Bankruptcy Code section 1129(a)(11).

D.      **Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not impaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Bankruptcy Code section 1126(c) defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

E.      **Confirmation without Acceptance by All Impaired Classes**

Bankruptcy Code section 1129(b) allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided, however, that the plan has been accepted by at least one impaired class. Pursuant to Bankruptcy Code section 1129(b), notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

The Debtors intend to request Confirmation of the Plan, as it may be modified from time to time, under the "cramdown" provision Bankruptcy Code section 1129(b). The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Supplement document, including the right to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b).

1.      <u>**No Unfair Discrimination**</u>

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. Under the Plan, all Classes are provided treatment that is substantially equivalent to as the treatment that is provided to other Classes that have equal rank.

2.      <u>**Fair and Equitable Test**</u>

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in the class. As to the dissenting (or deemed rejecting) class, the test sets different standards depending upon the type of claims or equity interests in the class. A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the

allowed amount of such claim; or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

The Debtors submit that Confirmation of the Plan pursuant to the "cramdown" provisions of Bankruptcy Code section 1129(b) is proper, as the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XI. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. Introduction

The following discussion is a summary of the Debtors' analysis of certain U.S. federal income tax consequences of the Consummation of the Plan to the Debtors and certain holders of Claims. This summary is based on the title 26 of the Tax Code, the Treasury Regulations, judicial authorities, published administrative positions of the IRS and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. The Debtors have not requested, nor do they intend to request, a private letter ruling from the IRS or an opinion of counsel with respect to any of the aspects of the Plan. The discussion below is not binding upon the IRS or any court and does not reflect any independent analysis by the Debtors. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not apply to holders of Claims that are not "U.S. persons" (as such phrase is defined in the Tax Code) and does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to such holders in light of their individual circumstances. This discussion does not address tax issues with respect to such holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies and regulated investment companies). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. The following discussion assumes that each holder of a Claim holds its Claim as a "capital asset" within the meaning of section 1221 of the Tax Code.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.**

### B. U.S. Federal Income Tax Consequences to Debtors

The Debtors may incur federal income tax liability as a result of the transactions contemplated by the Plan, based in part on the value of the assets transferred to the Liquidating Trust, the amount of the Debtors' net operating losses ("NOLs") and the application of the federal tax rules regarding the alternative minimum tax. Such tax liability, if any, shall be treated in accordance with the terms and provisions of the Plan.

Pursuant to the Plan, the Debtors' assets will be transferred to the Liquidating Trust, which will be created solely for the purposes of liquidating and monetizing the Liquidating Trust Assets and making distributions to certain holders of Allowed Claims in an orderly liquidation during the term of the Liquidating Trust. The transfer of Liquidating Trust Assets to the Liquidating Trust may result in the recognition of taxable gain or loss to the Debtors, based on the difference between the fair market value of such assets and the Debtors' tax basis in such assets. Further, Debtors may recognize cancellation of debt ("COD") income upon transferring the Liquidating Trust Assets to the Liquidating Trust and the Stock Trust Assets to the Stock Trust. The Debtors may be required to pay federal income tax on some or all of any gains or COD income recognized. The Debtors, however, believe that they will generally have sufficient NOLs to offset any COD income or gain recognized. There could nonetheless be some liability for taxes in certain states and under the federal alternative minimum tax.

## 1.     Limitation of NOL Carryforwards and Other Tax Attributes

The Debtors have approximately $[  ] million of NOLs as of December 31, 2013. Following consummation of the Plan, the Debtors anticipate that any remaining NOLs and other tax attributes may be subject to limitation under section 382 of the Tax Code by reason of the transactions pursuant to the Plan.

Under section 382 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its NOLs (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally is subject to an annual limitation.  As discussed in greater detail herein, the Debtors anticipate that the issuance of the Reorganized Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.  This limitation is independent of, and in addition to, the reduction of tax attributes resulting from the exclusion of COD income.

## 2.     General Section 382 Annual Limitation

This discussion refers to the limitation determined under section 382 of the Tax Code in the case of an "ownership change" as the "Section 382 Limitation."  In general, a corporation's Section 382 Limitation on the use of its Pre-Change Losses in any "post-change year" is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted Federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs,  currently 3.05%).  The Section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.   Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the Tax Code were to occur after the Effective Date.  With respect to any ownership change after the Effective Date, NOLs and other tax attributes attributable to the period prior to the Effective Date are treated as Pre-Change Losses for the latter ownership change as well, with the result that such NOLs would be subject to the smaller of the earlier annual limitation and any later annual limitations.

## 3.     Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when a debtor company's existing shareholders and/or so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims or interests, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions attributable to "qualified creditors" claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the annual limitation on the debtor's Pre-Change Losses would be reduced to zero for any post-change year ending after the change date of the second ownership change.

If the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception").  When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined

before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

The Debtors currently expect to utilize the Section 382(l)(5) Exception. Nonetheless, it is possible that the Debtors either will not qualify for or elect not to utilize the 382(l)(5) Exception. In such case, the Debtors expect that their use of the Pre-Change Losses, if any, after the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception. Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses, if any, after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the Tax Code were to occur after the Effective Date.

Furthermore, pursuant to the Tax Sharing Agreement, the Reorganized Debtors are obligated to distribute to the Stock Trust 50% of the amount of any tax benefit recognized by Debtors or their Affiliates within the first five years following the Effective Date. Any such amounts distributed, however, reduce the Reorganized Debtors' future obligation to make the Additional Distributions.

### C. U.S. Federal Income Tax Consequences to Holders of General Unsecured Claims

General Unsecured Claims will be cancelled on the Effective Date and the holders of such Claims will be entitled to receive, on account of any Allowed General Unsecured Claims, *inter alia*, their *pro rata* share of the Unsecured Claims Fund, and if such holders are also Qualified Creditor Stock Beneficiaries, their *pro rata* share of the Stock Trust. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, pursuant to Treasury Regulation section 301.7701-4(d) and related regulations, the Liquidating Trustee intends to take a position on the Liquidating Trust's tax return that the Liquidating Trust should be treated as a grantor trust set up for the benefit of beneficiaries of the Liquidating Trust. The Stock Trustee intends to take the same position with respect to the Stock Trust. Holders of Allowed General Unsecured Claims that receive beneficial interests in the Liquidating Trust or the Stock Trust will be treated for U.S. federal income tax purposes as receiving their *pro rata* shares of the Liquidating Trust Assets and, as applicable, their *pro rata* share of the Stock Trust Assets from the applicable Debtors in a taxable exchange and then depositing them in the Liquidating Trust and, as applicable, the Stock Trust in exchange for beneficial interests in the Liquidating Trust and, as applicable, the Stock Trust.

Holders of Allowed General Unsecured Claims that receive interest in the Unsecured Claims Fund will be required to report on their U.S. federal income tax returns their share of the Liquidating Trust's items of income, gain, loss, deduction and credit in the year recognized by the Liquidating Trust. This requirement may result in such holders being subject to tax on their allocable share of the Liquidating Trust's taxable income prior to receiving any cash distributions from the Liquidating Trust. Similar rules apply with respect to the Stock Trust. Holders of Allowed General Unsecured Claims that receive beneficial interests in the Liquidating Trust and, as applicable, in the Stock Trust are urged to consult their tax advisors regarding the tax consequences of the right to receive and of the receipt (if any) of property from the Liquidating Trust.

Subject to contrary definitive guidance from the IRS or a court of competent jurisdiction (including the receipt by the Liquidating Trustee of an IRS private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee will (A) elect to treat the Disputed Claims Reserve and the reserves for Disputed General Unsecured Claims as "disputed ownership funds" governed by Treasury Regulation section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

Accordingly, the Disputed Claims Reserve and the reserves for Disputed General Unsecured Claims will be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidating Trust Assets in such reserves, and all distributions from such reserves (which distributions will be net of the related expenses of the reserve) will be treated as received by holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the Liquidating Trustee and the beneficiaries of the Liquidating Trust) will be required to report for tax purposes consistently with the foregoing.

Holders of Allowed General Unsecured Claims, other than in their capacity as Qualified Creditor Stock Beneficiaries if applicable, should recognize gain or loss equal to the difference between (a) the fair market value as of the Effective Date of their *pro rata* share of the interests in the Unsecured Claims Fund (to the extent such *pro rata* share is not allocable to accrued interest) and (b) the holder's tax basis in the Allowed General Unsecured Claims surrendered by the holder. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Claims were held for more than one year by the holder. To the extent that any portion of the interest in the Unsecured Claims Fund received in the exchange is allocable to accrued interest, the holder may recognize ordinary income (see discussion below). A holder's tax basis in the interest in the Unsecured Claims Fund received should equal its fair market value as of the Effective Date. A holder's holding period for the interest in the Unsecured Claims Fund should begin on the day following the Effective Date.

Pursuant to the Plan, the Debtors will cancel all existing stock and issue Reorganized Stock 50% to the Plan Stockholder and 50% to the Qualified Creditor Stock Beneficiaries, which stock shall be held by the Stock Trust. Whether a holder of an Allowed General Unsecured Claim who is a Qualified Creditor Stock Beneficiary recognizes gain or loss depends, in part, on whether the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the debt underlying the Allowed General Unsecured Claim surrendered is treated as a "security" for the reorganization provisions of the Tax Code.

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued. The Convertible Note had an initial term of approximately three years, but the convertibility factor may be of increased importance in determining whether the Convertible Note is a security.

A holder of a Allowed General Unsecured Claim who is a Qualified Creditor Stock Beneficiary will realize gain or loss in an amount equal to the difference between (a) the sum of the fair market values of (i) its share of Reorganized Stock, (ii) its interest in distributions under the Tax Sharing Agreement, (iii) its interest in the Additional Distributions, and (iv) any cash received, and (b) the holder's adjusted tax basis in its Allowed General Unsecured Claim surrendered in the exchange, determined immediately prior to the Effective Date.

If the Convertible Note is treated as a security, and the basis of such Claim is the Convertible Note, the exchange of such Allowed Unsecured Claims for Reorganized Stock and other consideration should be treated as a recapitalization, and therefore a reorganization, under section 368(a)(1)(E) of the Tax Code. A holder of a Allowed General Unsecured Claim who recognizes gain on the exchange of such Claims should be required to recognize the lesser of (a) the amount of gain realized on such exchange and (b) the sum of the fair market values of (i) its interest in distributions under the Tax Sharing Agreement, (ii) its interest in the Additional Distributions, and (iii) any cash received. A holder of such Allow General Unsecured Claim who realizes a loss on the exchange will not be permitted to recognize such loss, except to the extent of any loss attributable to accrued but untaxed interest (discussed below in Section XI.C.1). A holder's tax basis in its Reorganized Stock should be equal to such holder's tax basis in the Claim surrendered therefor, increased by the amount of gain recognized on the exchange, if any, and reduced by the sum of the fair market values of (i) its interest in distributions under the Tax Sharing Agreement, (ii) its interest in the Additional Distributions, and (iii) any cash received. A holder's holding period for its Reorganized Stock should include the holding period for the surrendered Allowed General Unsecured Claim. A holder's tax basis in the sum of the fair market values of (i) its interest in distributions under the Tax Sharing Agreement and (ii) its interest in the Additional Distributions will equal the fair market value of such interests. A holder's holding period for its interest in the interest in distributions under the Tax Sharing Agreement and (ii) the interest in the Additional Distributions received on the Effective Date should begin on the day following the Effective Date.

If the Convertible Note is not treated as a security for U.S. federal income tax purposes, or an Allowed General Unsecured Claim is not based on the Convertible Note, a holder of an Allowed General Unsecured Claim

who is a Qualified Creditor should be treated as exchanging such Claims in a fully taxable exchange. A holder who is subject to this treatment should recognize gain or loss equal to gain or loss realized. If recognized gain is capital in nature, it generally would be long-term capital gain if the holder held its First Lien Facility Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations discussed below in Section XI.C.3. A holder's tax basis in (i) its share of Reorganized Stock, (ii) its interest in distributions under the Tax Sharing Agreement, and (iii) its interest in the Additional Distributions will equal the fair market value of such interests. A holder's holding period for (i) its share of Reorganized Stock, (ii) its interest in distributions under the Tax Sharing Agreement, and (iii) its interest in the Additional Distributions received on the Effective Date should begin on the day following the Effective Date.

### 1. Accrued but Unpaid Interest

To the extent that any amount received by a holder of a Claim is attributable to accrued interest, such amount should be taxable to the holder as interest income. Conversely, a holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest on the Claims was previously included in the holder's gross income but was not paid in full by the Debtors or the Liquidating Trust. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a holder of a Claim will be attributable to accrued interest is unclear. Nevertheless, the Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, distributions in respect of Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for holders of Allowed Claims.

### 2. Market Discount

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of the gain realized by a holder of a Claim who exchanges the Claim for consideration (or the right to receive consideration) on the Effective Date may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market discount" on the Claim. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Gain, if any, recognized by a holder on the exchange of a Claim pursuant to the Plan that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claims were considered to be held by the holder (unless the holder elected to include market discount in income as it accrued).

### 3. Limitation on Use of Capital Losses

Holders of Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For noncorporate holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

D.       **Withholding and Reporting**

Certain payments, including payments in respect of Claims pursuant to the Plan, are generally subject to information reporting to the IRS.  Moreover, such reportable payments may be subject to backup withholding at a rate of 28% unless the holder (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax.  Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your U.S. federal income tax liability provided the required information is furnished to the IRS.

In addition, a beneficiary of the Liquidating Trust that is a not a U.S. person may be subject to up to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate.  A non-U.S. holder may also be subject to other adverse consequences in connection with the implementation of the Plan.  As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders of Claims.

Under the Foreign Account Tax Compliance Act ("FATCA"), which was enacted in 2010, foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends.  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

As currently proposed, FATCA withholding rules would apply to U.S.-source payments made after June 30, 2014, and to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends that occurs after December 31, 2016.  Although administrative guidance and Treasury Regulations have been issued, the exact scope and application of these rules remains unclear and potentially subject to material changes.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

**XII.       CONCLUSION AND RECOMMENDATION**

All holders of Claims entitled to vote are urged to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will actually be received by the Voting Deadline.

Dated:  October 28, 2014

ECOtality, Inc.
Electric Transportation Engineering Corporation
ECOtality Stores, Inc.
ETEC North, LLC
The Clarity Group, Inc.
G.H.V. Refrigeration, Inc.


By:   /s/
         Name:  Susie Herrmann
         Title:  Chief Financial Officer

**Exhibit A**

**Plan of Reorganization**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| ELECTRIC TRANSPORTATION ENGINEERING CORPORATION (d/b/a ECOTALITY NORTH AMERICA), *et al.*[1] | Case No. 2:13-BK-16126 (MCW) |
| Debtors. | Jointly Administered |

This filing applies to:

■ All Debtors
   Specified Debtors

## DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION

AKIN GUMP STRAUSS HAUER & FELD LLP
Charles R. Gibbs (admitted *pro hac vice*)
1700 Pacific Avenue
Dallas, Texas 75201
Telephone:    (214) 969-2800
Facsimile:    (214) 969-4343

-and-

David P. Simonds (admitted *pro hac vice*)
Arun Kurichety (admitted *pro hac vice*)
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone:    (310) 229-1000
Facsimile:    (310) 229-1001

PARKER SCHWARTZ, PLLC
Jared G. Parker
7310 N. 16th St., Suite 330
Phoenix, Arizona 85020
Telephone:    (602) 282-0476
Facsimile:    (602) 282-0478

*Co-Counsel to the Debtors and Debtors in Possession*

Dated:  October 28, 2014

---

[1] The Debtors in these jointly administered chapter 11 cases and the last four digits of their respective Employer Identification Numbers are:  (i) ECOtality, Inc. (5422); (ii) Electric Transportation Engineering Corporation (4755); (iii) ECOtality Stores, Inc. (2643); (iv) ETEC North, LLC (n/a); (v) The Clarity Group, Inc. (8832); and (vi) G.H.V. Refrigeration, Inc. (4512).  The Debtors' service address is ECOtality, Inc., P.O. Box 20336, Phoenix, AZ 85036-0336.

Case 2:13-bk-16126-MCW    Doc 692    Filed 10/28/14    Entered 10/28/14 18:11:21    Desc
Main Document        Page 49 of 101

**Nothing contained herein shall constitute an offer, acceptance, or a legally binding obligation of the Debtors or any other party in interest and this Plan is subject to approval by the Bankruptcy Court and other customary conditions. This Plan is not an offer with respect to any securities.**

**YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

# TABLE OF CONTENTS

Page

ARTICLE I. – DEFINITIONS AND RULES OF INTERPRETATION ...................................... 1

    A.      Rules of Interpretation and Governing Law. ......................................................... 1
    B.      Definitions..................................................................................................................... 2

ARTICLE II. – CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.... 11

    A.      Unclassified Claims ................................................................................................... 11
         2.1      Administrative Claims ................................................................................ 11
         2.2      Compensation Claims ................................................................................ 11
         2.3      Substantial Contribution Compensation and Expenses ........................... 12
         2.4      Priority Tax Claims..................................................................................... 12

    B.      General Rules............................................................................................................. 12
         2.5      Classification............................................................................................... 12

    C.      Summary of Classification of Claims and Equity Interests................................. 13

    D.      Classified Claims and Equity Interests ................................................................. 13
         2.6      Class 1 – Secured Claims........................................................................... 13
         2.7      Class 2 – Priority Non-Tax Claims .......................................................... 13
         2.8      Class 3 – General Unsecured Claims........................................................ 14
         2.9      Class 4 – Intercompany Claims ................................................................ 14
         2.10      Class 5 – Section 510(b) Claims .............................................................. 14
         2.11      Class 6 – Equity Interests.......................................................................... 14

    E.      Additional Provisions Regarding Unimpaired Claims and
         Subordinated Claims ............................................................................................... 15
         2.12      Special Provision Regarding Unimpaired Claims .................................. 15
         2.13      Subordinated Claims .................................................................................. 15

ARTICLE III. – ACCEPTANCE ............................................................................................. 15

         3.1      Elimination of Vacant Classes ................................................................. 15
         3.2      Cramdown.................................................................................................... 15

ARTICLE IV. – MEANS FOR IMPLEMENTATION OF PLAN ......................................... 15

         4.1      Liquidating Trust ....................................................................................... 15
         4.2      Liquidating Trustee ................................................................................... 16
         4.3      Stock Trust................................................................................................... 17
         4.4      Stock Trustee ............................................................................................. 17
         4.5      New Board. .................................................................................................. 18
         4.6      Cancellation of Notes, Instruments, and Outstanding Equity Interests. ... 18
         4.7      Cancellation of Liens ................................................................................. 18

4.8     Exemption from Certain Transfer Taxes and Recording Fees.................. 18

4.9     No Further Approvals ...................................................................... 19

4.10   Dissolution of Committee ................................................................. 19

4.11   Pre-Effective Date Injunctions or Stays ............................................ 19

4.12   Restructuring and Other Corporate Actions and Transactions ................. 19

ARTICLE V. – EXECUTORY CONTRACTS AND UNEXPIRED LEASES .......................... 22

5.1     Rejection and Repudiation of Executory Contracts and Unexpired
Leases ............................................................................................ 22

5.2     Claims Based on Rejection or Repudiation of Executory Contracts and
Unexpired Leases ............................................................................. 22

5.3     Termination of All Employee, Retiree and Workers' Compensation
Benefits .......................................................................................... 23

5.4     Survival of Certain Indemnification Obligations ..................................... 23

ARTICLE VI. – PROCEDURES FOR RESOLVING AND TREATING DISPUTED
CLAIMS ......................................................................................... 23

6.1     Prosecution of Objections to Claims on and after the Effective Date ...... 23

6.2     Estimation of Claims ........................................................................ 24

6.3     No Distributions Pending Allowance ................................................... 24

6.4     Distributions after Allowance ............................................................ 24

6.5     Disallowed Claims ............................................................................ 24

ARTICLE VII. – DISTRIBUTIONS ................................................................................. 25

7.1     Manner of Payment and Distributions under the Plan ............................. 25

7.2     Interest and Penalties on Claims ....................................................... 25

7.3     Record Date for Distributions ............................................................ 25

7.4     Withholding and Reporting Requirements ............................................ 25

7.5     Setoffs ............................................................................................ 26

7.6     Allocation of Plan Distributions Between Principal and Interest ............. 26

7.7     Undeliverable or Returned Distributions .............................................. 26

7.8     Fractional Distributions .................................................................... 26

7.9     Miscellaneous Distribution Provisions ................................................ 26

ARTICLE VIII. – CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN ........ 27

8.1     Conditions to the Effective Date ........................................................ 27

8.2     Waiver of Condition ........................................................................ 27

8.3     Notice of Effective Date .................................................................. 27

8.4     Order Denying Confirmation ............................................................. 28

ARTICLE IX. – EFFECT OF THE PLAN ON CLAIMS AND EQUITY INTERESTS ........... 28

9.1     Discharge of Claims and Termination of Equity Interests ....................... 28

9.2     Injunctions ...................................................................................... 28

9.3     Releases...................................................................................................... 29
9.4     Limitation on Releases................................................................................ 30
9.5     Exculpation ................................................................................................. 30
9.6     Retention and Enforcement and Release of Causes of Action ................. 30

ARTICLE X. – MISCELLANEOUS PROVISIONS .................................................................. 31

10.1    Retention of Jurisdiction ............................................................................ 31
10.2    Terms Binding ............................................................................................ 32
10.3    Severability ................................................................................................ 32
10.4    Computation of Time.................................................................................. 32
10.5    Confirmation Order and Plan Control........................................................ 32
10.6    Incorporation by Reference......................................................................... 33
10.7    Modifications to the Plan ........................................................................... 33
10.8    Revocation, Withdrawal or Non-Consummation ....................................... 33
10.9    Courts of Competent Jurisdiction .............................................................. 33
10.10   Payment of Statutory Fees ......................................................................... 33
10.11   Notice ......................................................................................................... 33
10.12   Reservation of Rights................................................................................. 35
10.13   No Waiver................................................................................................... 35

v

# INDEX OF EXHIBITS

**Exhibit A**              Non-Exclusive List of Retained Causes of Action

                **Exhibit 1**     Non-Exclusive List of Accounts Receivables of Electric Transportation Engineering Corporation (d/b/a ECOtality North America)

## INTRODUCTION

The above-captioned debtors and debtors in possession (collectively, the "Debtors") propose this joint plan of reorganization (the "Plan") for the resolution of outstanding claims against and interests in the Debtors pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.B. hereof. Holders of Claims and Equity Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, historical financial information and developments during the Chapter 11 Cases, as well as a summary and description of the Plan and certain related matters. The Debtors are proponents of the Plan within the meaning of Bankruptcy Code section 1129.

This Plan is advanced jointly by the Debtors as a plan of reorganization and for the liquidation of certain remaining assets for the benefit of creditors. The remaining assets of all of the Debtors will be pooled together and liquidated pursuant to the Liquidating Trust. The proceeds from the remaining assets will then be paid ratably within classes to all of the creditors of the Debtors in accordance with the applicable provisions of the Bankruptcy Code and this Plan. Upon Confirmation, this objective will be accomplished through the Liquidating Trust and the Stock Trust, all as more thoroughly set forth herein.

## ARTICLE I.
## DEFINITIONS AND RULES OF INTERPRETATION

**A.** **Rules of Interpretation and Governing Law.** For purposes of this document: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words ''herein,'' ''hereof'' and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in Bankruptcy Code section 102 shall apply; and (h) any term used in capitalized form herein that is not otherwise defined, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the state of Arizona, without giving effect to the principles of conflict of laws thereof.

1

**B.**     **Definitions.**     The following terms (which appear in the Plan as capitalized terms) shall have the meanings set forth below.  A term used in the Plan and not defined in the Plan but that is defined in the Bankruptcy Code shall have the meaning set forth in the Bankruptcy Code.

1.1     "Administrative Claim" means a Claim for costs and expenses of administration of the Chapter 11 Cases that is Allowed under Bankruptcy Code sections 503(b), 507(a) or 1114(e)(2), including, without limitation, (a) any actual and necessary expenses of preserving the Estates; (b) any actual and necessary expenses of operating the Debtors' business; (c) any actual indebtedness or obligations incurred or assumed by the Debtors during the pendency of the Chapter 11 Cases in connection with the conduct of their businesses; (d) any actual expenses necessary or appropriate to facilitate or effectuate the Plan; (e) any amount required to be paid under Bankruptcy Code section 365(b)(1) in connection with the assumption of executory contacts or unexpired leases; (f) all allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under Bankruptcy Code sections 328, 330(a), 331 or 503(b)(2), (3), (4) or (5); (g) Claims arising under Bankruptcy Code section 503(b)(9); and (h) all fees and charges payable pursuant to section 1930 of title 28 of the United States Code.

1.2     "Allowed" shall mean, with reference to any Claim or Equity Interest, or any portion thereof, in any Class or category specified, against or of a Debtor, (a) a Claim or Equity Interest that has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary Proof of Claim has been filed and as to which no objection to allowance or priority or request for estimation has been filed prior to the Claims Objection Bar Date; (b) a Claim or Equity Interest for which a Proof of Claim has been timely filed in a liquidated amount and not contingent and as to which no objection to allowance, to alter priority, or request for estimation has been timely interposed and not withdrawn within the applicable period of limitation fixed by the Plan or applicable law; (c) a Claim or Equity Interest as to which any objection has been settled, waived, withdrawn or denied by a Final Order to the extent such Final Order provides for the allowance of all or a portion of such Claim or Equity Interest; or (d) a Claim or Equity Interest that is expressly allowed (i) pursuant to a Final Order, (ii) pursuant to an agreement between the holder of such Claim or Equity Interest and the Debtors and the Liquidating Trustee, as applicable or (iii) pursuant to the terms of the Plan.  Unless otherwise specified in the Plan or in an order of the Bankruptcy Court allowing such Claim or Equity Interest, "Allowed" in reference to a Claim shall not include (a) any interest on the amount of such Claim accruing from and after the Petition Date; (b) any punitive or exemplary damages; or (c) any fine, penalty or forfeiture.  Any Claim listed in the Schedules as disputed, contingent, or unliquidated, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order, or approval of the Bankruptcy Court.

1.3     "Allowed Claim" means a Claim or any portion thereof, without duplication, that has been Allowed.

1.4     "Administrative Claims Bar Date" means the deadline for filing requests for payment of Allowed Administrative Claims (other than Compensation Claims), which shall

be the first Business Day that is forty-five (45) days following the Effective Date, except as specifically set forth in the Plan or a Final Order.

1.5    "<u>Administrative Claims Objection Bar Date</u>" means the deadline for filing objections to requests for payment of Allowed Administrative Claims (other than requests for payment of Compensation Claims), which shall be the first Business Day that is one hundred eighty (180) days following the Effective Date; <u>provided</u>, <u>that</u>, the Administrative Claims Objection Bar Date may be extended by order of the Bankruptcy Court.

1.6    "<u>APA</u>" means, either individually or collectively as the case may be, those certain Asset Purchase Agreements among the various Buyers and the Debtors which have been approved by the Bankruptcy Court in these Chapter 11 Cases.

1.7    "<u>Avoidance Actions</u>" means (a) any and all actions that are filed or that may be filed pursuant to Bankruptcy Code sections 544, 545, 547, 548, 550 or 551, or applicable non-bankruptcy law that may be incorporated or brought under the foregoing Bankruptcy Code sections, or (b) any other similar actions or proceedings filed to recover property for or on behalf of the Estates.

1.8    "<u>Bankruptcy Code</u>" means Title 11 of the United States Code, § 101 *et. seq.*, as applicable, as of the Petition Date.

1.9    "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Arizona, Phoenix Division.

1.10    "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms and the Local Bankruptcy Rules of the Bankruptcy Court, each as amended from time to time, applicable to the Chapter 11 Cases.

1.11    "<u>Bar Date</u>" means the date established by the Bankruptcy Court by which Proofs of Claim must have been filed with respect to such Claims, pursuant to that certain Final Order [Docket No. 364], and if not specified therein, a Final Order or the Plan.

1.12    "<u>Business Day</u>" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

1.13    "<u>Business Enterprise</u>" means such capital, credit, contracts, leases, licenses and any other assets required to enable Reorganized ECOtality to function as a viable historic substantial business pursuant to section 368 of the Tax Code.

1.14    "<u>Buyers</u>" means Blink Acquisition, LLC, Access Control Group, LLC and Intertek Testing Services NA, Inc., who purchased assets of the Debtors pursuant to the APAs.

1.15    "<u>Cash</u>" means cash and cash equivalents, in legal tender of the United States of America.

1.16    "<u>Causes of Action</u>" means any and all present or future claims, rights, legal and equitable defenses, offsets, recoupments, actions in law or equity or otherwise, choses

3

in action, obligation, guaranty, controversy, demand, action suits, damages, judgments, third-party claims, counter-claims, cross-claims against any Person or Entity, whether known or unknown, liquidated or unliquidated, foreseen or unforeseen, existing or hereafter arising, whether based on legal or equitable relief, whether arising under the Bankruptcy Code or federal, state, common, or other law or equity, whether or not the subject of a pending litigation or proceedings on the Effective Date or thereafter, including without limitation, all other actions described in the Plan, including <u>Section 9.6</u>.

      1.17   "<u>Chapter 11 Cases</u>" means the respective bankruptcy cases of (a) ECOtality, Inc.; (b) Electric Transportation Engineering Corporation; (c) ECOtality Stores, Inc.; (d) ETEC North, LLC; (e) The Clarity Group, Inc.; and (f) G.H.V. Refrigeration, Inc. in the Bankruptcy Court and jointly administered under Case No. 2:13-BK-16126 (MCW).

      1.18   "<u>Claim</u>" means the same as set forth in Bankruptcy Code section 101(5) and includes all rights to payment from the Debtors.

      1.19   "<u>Claims and Noticing Agent</u>" means Kurtzman Carson Consultants LLC, employed by the Debtors as the official claims, noticing and balloting agent in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court.

      1.20   "<u>Claims Objection Bar Date</u>" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) one hundred eighty (180) days after the Effective Date and (b) such later period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

      1.21   "<u>Committee</u>" means the committee of unsecured creditors appointed by the United States Trustee in the Chapter 11 Cases under Bankruptcy Code section 1102.

      1.22   "<u>Compensation Claims</u>" means Claims on account of fees for professional services rendered and expenses incurred in connection with such services by Professionals on and after the Petition Date and prior to and including the Confirmation Date.

      1.23   "<u>Confirmation</u>" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

      1.24   "<u>Confirmation Date</u>" means the date upon which the Confirmation Order is entered by the Bankruptcy Court confirming the Plan, which order becomes final and non-appealable after the Confirmation Hearing.

      1.25   "<u>Confirmation Objection Deadline</u>" means the day that is fourteen (14) days prior to the Confirmation Hearing or such other date set by the Court.

      1.26   "<u>Confirmation Hearing</u>" means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to Bankruptcy Code section 1128.

      1.27   "<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code section 1129.

1.28 "<u>Consummation</u>" means "substantial consummation" as defined in Bankruptcy Code section 1101(2).

1.29 "<u>Creditor</u>" means a Person, firm, partnership, corporation or an Entity who has filed, or deemed to have filed, a lawful Claim against the Debtors, as provided by the Bankruptcy Code and orders of the Bankruptcy Court, and which Claim has been allowed by the Bankruptcy Court, or is deemed allowed by applicable provisions of law.

1.30 "<u>Debtors</u>" mean: (a) ECOtality, Inc.; (b) Electric Transportation Engineering Corporation; (c) ECOtality Stores, Inc.; (d) ETEC North, LLC; (e) The Clarity Group, Inc.; and (f) G.H.V. Refrigeration, Inc.

1.31 "<u>Disclosure Statement</u>" means that Disclosure Statement filed with and approved by the Bankruptcy Court at or prior to the Confirmation Hearing.

1.32 "<u>Disputed</u>" means, with respect to any Claim or Equity Interest, any (a) Claim that is listed on the Schedules as unliquidated, disputed or contingent; (b) Claim or Equity Interest as to which the Debtors or any other party in interest have interposed a timely objection or request for estimation in accordance with this Plan, the Bankruptcy Code, the Bankruptcy Rules and any orders of the Bankruptcy Court or which is otherwise disputed by the Debtors in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order; (c) any Claim evidenced by a Proof of Claim which amends a Claim scheduled by the Debtors as contingent, unliquidated, or disputed; or (d) any Claim or Equity Interest that is not an Allowed Claim or Allowed Equity Interest.

1.33 "<u>Disputed Claims Reserve</u>" means a fund held by the Liquidating Trust (which need not be held in a segregated bank account) for the payment of Disputed Claims that become Allowed Claims after the Effective Date, which fund shall be maintained by the Liquidating Trustee for the benefit of the Holders of Disputed Claims.

1.34 "<u>Distribution Date</u>" means date upon which the Liquidating Trustee will make distributions to holders of Allowed Claims entitled to receive distributions under the Plan on account of such Allowed Claims, which date shall be as soon as reasonably practicable.

1.35 "<u>Distribution Record Date</u>" means the record date for the purpose of determining holders of Allowed Claims entitled to receive distributions under the Plan on account of such Allowed Claims, which date shall be the Confirmation Date.

1.36 "<u>DOE</u>" means the United States Department of Energy.

1.37 "<u>Effective Date</u>" means the date upon which the Plan's conditions to effectiveness are satisfied or waived in accordance with <u>Article VIII</u> hereof, which shall be the day Consummation occurs.

1.38 "<u>Entity</u>" means an "entity" as defined in Bankruptcy Code section 101(15).

5

1.39    "Estate" means the bankruptcy estate of any Debtor by virtue of Bankruptcy Code section 541 upon the commencement of the Chapter 11 Cases.

1.40    "Equity Interest" means, with respect to a Debtor, as of the Petition Date, any capital stock or other ownership interest in such Debtor, whether or not transferable, any option, call, warrant, or right to purchase, sell, or subscribe for an ownership interest or other equity security in such Debtor, or any redemption, conversion, exchange, voting, participation, dividend rights and liquidation preferences relating to such capital stock or other ownership interest.

1.41    "Excluded Assets" means the assets which were specifically identified on the relevant schedules to the APAs as being excluded from the sales to the Buyers.

1.42    "Exculpated Parties" means (a) the Debtors, (b) each director, officer, financial advisor, restructuring advisor, attorney or any other advisor employed by or serving the Debtors as of or after the Petition Date, (c) the Committee, (d) counsel for the Committee, (e) each member of the Committee solely in its capacity as a member of the Committee, (f) the Plan Contributor, (g) each director, officer, financial advisor, restructuring advisor, attorney or any other advisor employed by or serving the Plan Contributor as of or after the Petition Date, (h) Blink Acquisition LLC, (i) each director, officer, financial advisor, restructuring advisor, attorney or any other advisor employed by or serving Blink Acquisition LLC as of or after the Petition Date, and (j) the respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, parents, principals, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, crisis managers, accountants, investment bankers and consultants of each of the Entities in (a)-(i).

1.43    "Final Order" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, that, the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order; provided, further, that the Debtors reserve the right to waive any appeal period.

1.44    "General Unsecured Claim" means a Claim against the Debtors, which is not an Administrative Claim, Compensation Claim, Priority Tax Claim, Secured Claim, Priority Non-Tax Claim, Intercompany Claim or Section 510(b) Claim.

1.45    "Impaired" means, with respect to a Claim, or class of Claims, "impaired" within the meaning of the Bankruptcy Code section 1124.

1.46   "Intercompany Claims" means any amounts due or obligation among or between the Debtors, including without limitation intercompany receivables, intercompany investments, intercompany guarantees, contribution due to intercompany liabilities, or ownership interests of one Debtor by another Debtor as identified in the Plan Supplement.

1.47   "Interim Compensation Order" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 337], entered on November 25, 2013, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Professional or otherwise.

1.48   "Lien" means any charge against or interest in property to secure payment of a debt or performance of an obligation and includes, without limitation, any judicial lien, security interest, mortgage, deed of trust or statutory lien as defined in Bankruptcy Code section 101.

1.49   "Limited Released Parties" means the Debtors' current and former officers and directors, shareholders, affiliates, subsidiaries, principals, employees, agents, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers and consultants.

1.50   "Liquidating Trust" means the trust described in Section 4.1 to be established under laws of the state of Arizona that will effectuate the Liquidating Trust Agreement.

1.51   "Liquidating Trust Agreement" means the Liquidating Trust Agreement, the form of which will be included in the Plan Supplement, to be dated on or prior to the Effective Date, between the Debtors and the Liquidating Trustee, governing, among other things, the disposition of the Liquidating Trust Assets and distribution of the proceeds thereof in accordance with the Plan, and setting forth the duties and obligations of the Liquidating Trustee.

1.52   "Liquidating Trust Assets" means (a) the Excluded Assets, including Avoidance Actions, all Cash that is property of Debtors, including the Trust Deposit and the balance of the Minimum Distribution; (b) any Causes of Action (except to the extent a Cause of Action was transferred from the Debtors to an applicable Buyer under the respective APA); (c) all rights, claims and/or assets under any and all contracts, leases and agreements which have been rejected by the Debtors, including all rights and/or assets; and (d) any proceeds of the foregoing.

1.53   "Liquidating Trustee" means that Person or Entity under the Liquidating Trust Agreement responsible, as trustee of the Liquidating Trust, for implementing and carrying out the terms of the Liquidating Trust Agreement and the Plan, as selected by the Debtors and the Committee and identified in the Plan.

1.54   "Minimum Distribution" has the meaning ascribed in Section 4.12(a)(iii).

1.55   "New Board" means, collectively, the initial board of directors or members, as the case may be, of each of the Reorganized Debtors.

7

1.56    "New Corporate Governance Documents" means the form of the amended and restated articles of incorporation and bylaws, or other similar organizational and constituent documents, for each of the Reorganized Debtors, and which forms shall be included in the Plan Supplement.

1.57    "OCP Order" means the Final Order Authorizing the Employment and Compensation of Professionals Utilized in the Ordinary Course of Business [Docket No. 231].

1.58    "Person" means a "person" as defined in Bankruptcy Code section 101(41).

1.59    "Petition Date" means September 16, 2013, the date each Debtor filed its petition commencing the Chapter 11 Cases.

1.60    "Plan Contributor" means Blink UYA, LLC, who shall be deemed, only after the occurrence of the Effective Date, a Plan co-proponent as contemplated by section 1129 of the Bankruptcy Code; provided, however, that such Plan co-proponent status shall only afford the Plan Contributor the right, subject to applicable law, to seek amendments of the Plan after the Effective Date, as necessary, to enforce the terms of the Plan, subject to the prior written consent of the Liquidating Trustee and the Stock Trustee and upon reasonable notice regarding any such amendment; provided, further, and for the avoidance of doubt, that such Plan co-proponent status shall not afford the Plan Contributor the right to object, oppose or interfere in any manner with any action taken by the Debtors to seek additional extensions of the exclusive filing period under Bankruptcy Code section 1121(c)(3).

1.61    "Plan Stock" has the meaning ascribed in Section 4.12(a)(i).

1.62    "Plan Stockholder" means the Plan Contributor.

1.63    "Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, in the discretion of the Debtors, including the Liquidating Trust Agreement, the Stock Trust Agreement, the Tax Sharing Agreement, the Stock Pledge Agreement, the Service Contracts, the list of Intercompany Claims and the New Corporate Governance Documents, which shall be in form and substance reasonably acceptable to the Debtors, the Committee and the Plan Contributor, which the Debtors shall respectively use reasonable efforts to cause to be filed seven (7) days prior to (but in no event later than) by the Confirmation Objection Deadline, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, as may be amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules.

1.64    "Priority Non-Tax Claim" means a Claim to the extent that it is of the kind described in, and entitled to priority under, Bankruptcy Code section 507(a)(3), (4), (5) or (6), but other than any Priority Tax Claim.

1.65    "Priority Tax Claim" means a Claim to the extent that it is of the kind described in, and entitled to priority under, Bankruptcy Code section 507(a)(8).

8

1.66 "Professional" means a Person or Entity employed by the Debtors or the Committee pursuant to a Final Order in accordance with the Bankruptcy Code sections 327, 328 or 1103.

1.67 "Proof of Claim" means a proof of claim filed by a holder of a Claim against any Debtor (as may be amended and supplemented from time to time pursuant to the Bankruptcy Code or Bankruptcy Rules) on or before the applicable Bar Date, or such other time as may be permitted by the Bankruptcy Court or agreed to by the Debtors or the Liquidating Trustee, as applicable.

1.68 "Purchased Assets" means the assets purchased by Blink Acquisition, LLC pursuant to the APA between the Debtors and such entity.

1.69 "Qualified Creditor Stock" has the meaning ascribed in Section 4.12(a)(i).

1.70 "Qualified Creditor Stock Beneficiary" means a Creditor with an Allowed General Unsecured Claim against Debtors which Allowed General Unsecured Claim is qualified under section 382(l)(5)(E) of the Tax Code.

1.71 "Released Parties" means, collectively: (a) the Debtors; (b) the Plan Contributor; (c) the Committee; (d) counsel for the Committee; and (e) Blink Acquisition, LLC.

1.72 "Reorganized Debtors" mean the Debtors upon and after the Effective Date.

1.73 "Reorganized ECOtality" means Debtor ECOtality, Inc. upon and after the Effective Date.

1.74 "Reorganized Stock" shall mean, collectively, the Qualified Creditor Stock and the Plan Stock.

1.75 "Schedules" means the schedules of assets and liabilities and the statements of financial affairs filed by each of the Debtors pursuant to the Bankruptcy Code section 521, Bankruptcy Rule 1007, and the Official Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended from time to time through the Confirmation Date in accordance with Bankruptcy Rule 1009.

1.76 "Section 510(b) Claims" means any Claim against any Debtor arising from rescission of a purchase or sale of a security of any Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under Bankruptcy Code section 502 on account of such a Claim.

1.77 "Secured" means when referring to a Claim: (a) secured by a Lien on property in which an Estate has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to Bankruptcy Code section 553, to the extent of the value of the Creditor's interest in an Estate's interest in such property or to the extent of the amount subject to setoff, as applicable,

as determined pursuant to Bankruptcy Code section 506(a) or (b) Allowed as such pursuant to the Plan.

1.78    "Service Contract" means any contract(s) and agreement(s) to be identified in the Plan Supplement and any future contracts or leases among Reorganized ECOtality and the Plan Stockholder or affiliate that may be required for Reorganized ECOtality to maintain the Business Enterprise.

1.79    "Stock Pledge Agreement" has the meaning ascribed in Section 4.12(a)(iii)(2).

1.80    "Stock Trust" means the trust established by the Stock Trust Agreement pursuant to the Stock Trust Agreement.

1.81    "Stock Trust Agreement" means that certain Qualified Creditor Stock Trust Agreement, the form of which shall be included in the Plan Supplement.

1.82    "Stock Trust Assets" means the Qualified Creditor Stock, the right to payments under the Tax Sharing Agreement, and the right to receive the Minimum Distribution, and any amounts received in respect of or proceeds from the foregoing.

1.83    "Stock Trustee" means the trustee appointed under the Stock Trust, who shall, among other things, collectively, hold the right to exercise any and all rights and duties provided for under the Stock Trust Agreement.

1.84    "Tax Code" means the Internal Revenue Code of 1986, as amended.

1.85    "Tax Sharing Agreement" means that certain Tax Sharing Agreement which governs the relationship between the Stock Trust, Reorganized ECOtality and the Plan Stockholder with respect to the sharing of certain anticipated tax benefits, the form of which shall be included in the Plan Supplement.

1.86    "Treasury Regulations" means the regulations promulgated pursuant to the Tax Code.

1.87    "Trust Agreements" mean the Liquidating Trust Agreement and/or the Stock Trust Agreement.

1.88    "Trust Deposit" has the meaning ascribed in Section 4.12(a)(iii)(1).

1.89    "Trusts" mean the Stock Trust and the Liquidating Trust.

1.90    "United States Trustee" means the United States Trustee for Region 14.

1.91    "Unimpaired" means, with respect to a class of Claims, a class of Claims that is not Impaired.

1.92  "Unsecured Claims Fund" means the Liquidating Trust Assets available for distribution after such assets have been monetized, to the extent applicable, to holders of Allowed Class 3 General Unsecured Claims by the Liquidating Trustee pursuant to the terms of the Liquidating Trust Agreement.

## ARTICLE II.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A.  Unclassified Claims.

2.1  **Administrative Claims**.  Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or the Liquidating Trustee, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each holder of an Allowed Administrative Claim will receive from the Debtors or the Liquidating Trustee, as applicable, in full and final satisfaction of its Allowed Administrative Claim, Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim either:  (a) if such Allowed Administrative Claim is allowed as of the Effective Date, no later than forty-five (45) days after the Effective Date or as soon as reasonably practicable thereafter; (b) if the Claim is not Allowed as of the Effective Date, no later than forty-five (45) days after the date on which an order of the Bankruptcy Court allowing such Claim becomes a Final Order, or as soon thereafter as reasonably practicable thereafter; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Estates in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the holder of such Allowed Administrative Claim.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court (including the OCP Order) or as provided herein, unless previously filed, requests for payment of Allowed Administrative Claims must be filed and served on the Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.  Holders of Allowed Administrative Claims that are required to file and serve a request for payment of such Allowed Administrative Claims that do not file and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Claims against the Debtors or their property, and such Claims shall be deemed discharged as of the Effective Date. Objections to such requests must be filed and served on the requesting party by the Administrative Claims Objection Bar Date.

2.2  **Compensation Claims**.  Notwithstanding any other provision of the Plan concerning Administrative Claims, any Professional seeking an award by the Bankruptcy Court of an Allowed Administrative Claim on account of Compensation Claims (a) shall no later than sixty (60) days after the Effective Date, file a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through and including the Confirmation Date and (b) shall receive from the Debtors or the Liquidating Trustee, as applicable, as soon as reasonably practicable after such Claim is allowed, in full settlement, satisfaction, and release of, and in exchange for, such Allowed Administrative Claim, Cash in an

11

amount equal to the unpaid amount of such Allowed Compensation Claim in accordance with any Final Order allowing such Allowed Compensation Claim.

(a)      <u>Post-Confirmation Date Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, on and after the Confirmation Date, the Debtors or the Liquidating Trustee, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable fees and expenses incurred by Professionals on or after the Confirmation Date. Upon the Confirmation Date, any requirement that Professionals comply with Bankruptcy Code sections 327 through 331 and 1103 or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Liquidating Trustee, as applicable, may pay any Professional in the ordinary course of business without any further notice, action, order or approval of the Bankruptcy Court.

2.3 **Substantial Contribution Compensation and Expenses**. Except as otherwise specifically provided in the Plan, any Person or Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to Bankruptcy Code sections 503(b)(3), (4) or (5) must file an application and serve such application on counsel for the Debtors or the Liquidating Trustee, as applicable, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code or the Bankruptcy Rules on or before the Administrative Claim Bar Date, or be forever barred from seeking such compensation or expense reimbursement. All rights of the Debtors, the Liquidating Trustee, the United States Trustee and all other parties in interest to object to such request are expressly reserved.

2.4 **Priority Tax Claims**. Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release and discharge of, and in exchange for, each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in Bankruptcy Code section 1129(a)(9)(C).

**B.**      **General Rules**.

2.5 **Classification**. Pursuant to Bankruptcy Code sections 1122 and 1123, the following designates the Classes of Claims and Equity Interests under the Plan. A Claim or Equity Interest is in a particular Class for purposes of voting on, and of receiving distributions pursuant to, the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and such Claim or Equity Interest has not been paid, released or otherwise settled prior to the Effective Date. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.

C.    **Summary of Classification of Claims and Equity Interests**.

| Class | Designation | Impairment | Entitled to Vote |
|:-----:|:-----------:|:----------:|:----------------:|
| 1 | Allowed Secured Claims | Unimpaired | No (deemed to accept) |
| 2 | Allowed Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| 3 | Allowed General Unsecured Claims | Impaired | Yes |
| 4 | Intercompany Claims | Unimpaired | No (deemed to accept) |
| 5 | Section 510(b) Claims | Impaired | No (deemed to reject) |
| 6 | Equity Interests | Impaired | No (deemed to reject) |

D.    **Classified Claims and Equity Interests**

2.6    **Class 1 – Secured Claims**.

(a)    Classification.    Class 1 consists of all Allowed Secured Claims against the Debtors.

(b)    Treatment.    Except to the extent that a holder of an Allowed Secured Claim agrees to a less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release and discharge of, and in exchange for, each Allowed Secured Claim, each such holder thereof shall receive, at the option of the Debtors or Liquidating Trustee, as applicable, either: (i) payment in full in Cash of such holder's Allowed Secured Claim; (ii) reinstatement of such holder's Allowed Secured Claim; (iii) return of any collateral subject to such holder's Allowed Secured Claim; or (iv) such other treatment rendering such holder's Allowed Secured Claim Unimpaired.

(c)    Impairment and Voting.    Class 1 Claims are Unimpaired and the holders thereof are not entitled to vote on the Plan.

2.7    **Class 2 – Priority Non-Tax Claims**.

(a)    Classification.    Class 2 consists of all Allowed Priority Non-Tax Claims against the Debtors.

(b)    Treatment.    Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment of its Allowed Priority Non-Tax Claim, in full and final satisfaction, settlement, release and discharge of, and in exchange for, each Allowed Priority Non-Tax Claim, each such holder thereof shall receive, at the option of the Liquidating Trustee, either:  (i) payment in full in Cash of such holder's Allowed Priority Non-Tax Claim; or (ii) such other treatment rendering such Allowed Priority Non-Tax Claim Unimpaired.

13

(c)　　Impairment and Voting.　Class 2 Claims are Unimpaired and the holders thereof are not entitled to vote on the Plan.

2.8　　**Class 3 – General Unsecured Claims**.

(a)　　Classification.　Class 3 consists of all Allowed General Unsecured Claims against the Debtors.

(b)　　Treatment.　Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of its Allowed General Unsecured Claim, in full and final satisfaction, settlement, release and discharge of, and in exchange for, each Allowed General Unsecured Claim, each holder thereof shall receive (a) Cash in an amount equal to the pro rata share of the Unsecured Claims Fund and (b) to the extent a holder of an Allowed General Unsecured Claim constitutes a Qualified Creditor Stock Beneficiary, distributions under, and in accordance with, the Tax Sharing Agreement and the Stock Trust Agreement, as applicable.

(c)　　Impairment and Voting.　Class 3 Claims are Impaired and the holders thereof are entitled to vote on the Plan.

2.9　　**Class 4 – Intercompany Claims**.

(a)　　Classification.　Class 4 consists of all Intercompany Claims.

(b)　　Treatment.　All Class 4 Claims shall be, at the election of the Reorganized Debtors, remain Unimpaired, as may be agreed to by the Reorganized Debtors and the holder of such Intercompany Claim.　For the avoidance of doubt, holders of Class 4 Intercompany Claims shall not be entitled to any distribution from the Unsecured Claims Fund or on account of the Trust Agreements and Tax Sharing Agreement, as applicable.

(c)　　Impairment and Voting.　Class 4 Claims are Unimpaired and holders thereof are deemed to accept the Plan.

2.10　　**Class 5 – Section 510(b) Claims**.

(a)　　Classification.　Class 5 consists of all Section 510(b) Claims.

(b)　　Treatment.　All Class 5 Claims shall be discharged, cancelled, released and extinguished as of the Effective Date without any distribution on account of such Claims.

(c)　　Impairment and Voting.　Class 5 Claims are Impaired and holders thereof are deemed to reject the Plan.

2.11　　**Class 6 – Equity Interests**.

(a)　　Classification.　Class 6 consists of all Equity Interests.

(b)   <u>Treatment</u>.  All Equity Interests shall be discharged, cancelled, released and extinguished without any distribution on account of such Equity Interests.

(c)   <u>Impairment and Voting</u>.  Class 6 Equity Interests are Impaired and holders thereof are deemed to reject the Plan.

**E.    <u>Additional Provisions Regarding Unimpaired Claims and Subordinated Claims</u>.**

2.12  **<u>Special Provision Regarding Unimpaired Claims</u>**.  Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' or the Liquidating Trustee's rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments asserted against Unimpaired Claims.

2.13  **<u>Subordinated Claims</u>**.  The allowance, classification and treatment of all Allowed Claims and Allowed Equity Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, Bankruptcy Code section 510(b), or otherwise.  Pursuant to Bankruptcy Code section 510, the Debtors, subject to the reasonable consent of the Plan Contributor, reserve the right to re-classify any Allowed Claim or Allowed Equity Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**ARTICLE III.**
**ACCEPTANCE**

3.1  **<u>Elimination of Vacant Classes</u>**.  Any Class of Claims that does not have a holder of an Allowed Claim or a Claim temporarily allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to Bankruptcy Code section 1129(a)(8).

3.2  **<u>Cramdown</u>**.  The Debtors shall request confirmation of the Plan, as it may be modified from time to time, under Bankruptcy Code section 1129(b).  The Debtors reserve the right to modify the Plan to the extent, if any, that confirmation pursuant to Bankruptcy Code section 1129(b) requires modification to the Plan.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF PLAN**

4.1  **<u>Liquidating Trust</u>**.  Distributions to holders of Allowed Claims (including Compensation Claims) contemplated under the Plan shall be funded by the proceeds of Liquidating Trust Assets.  After the payment or reservation for, as applicable, the expenses of administering the Liquidating Trust, including the winding down and closing of the Chapter 11 Cases (including with respect to any fees and expenses incurred by any Professionals after the Confirmation Date), the fees and expenses of the Liquidating Trustee and its retained

15

professionals, all Allowed Administrative Claims, Allowed Compensation Claims, Allowed Priority Tax Claims, Allowed Secured Claims, Allowed Priority Non-Tax Claims and appropriate reserves, and any remaining assets shall be used to fund the Unsecured Claims Fund.

(a)     Creation.   On the Effective Date, the Liquidating Trust shall be created pursuant to the Liquidating Trust Agreement, the terms of which shall be incorporated herein by reference.   As of the Effective Date, all of the Liquidating Trust Assets shall be transferred to the Liquidating Trust, pursuant to the terms of the Liquidating Trust Agreement. The Liquidating Trust shall be established for the sole purpose of liquidating and distributing the Liquidating Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d).

(b)     Employment and Compensation of Professionals.   In accordance with the Liquidating Trust Agreement, the Liquidating Trust may employ such counsel (which may include one or more of the same counsel employed by either the Debtors or the Committee), advisors and other professionals (which may include one or more of the same Professionals employed by either the Debtors or the Committee) selected by the Liquidating Trustee that the Liquidating Trustee reasonably requires to perform its responsibilities under the Plan without further order from the Bankruptcy Court.   The Liquidating Trust's professionals shall be compensated at their respective standard hourly rates as agreed to by the Liquidating Trustee, without further motion, application, notice, or other order of the Bankruptcy Court.   The fees and expenses of the Liquidating Trust's professionals shall be satisfied out of the Liquidating Trust Assets.

## 4.2     **Liquidating Trustee**.

(a)     Appointment.   The Liquidating Trustee shall be deemed appointed on the Effective Date, without further motion, application, notice, hearing or other order of the Bankruptcy Court.   The Debtors hereby recommend that the initial Liquidating Trustee shall be Carolyn Johnsen, which recommendation is acceptable to the Committee.   Ms. Johnsen has served as counsel to the Committee and, as a result, is knowledgeable about the Debtors, the Chapter 11 Cases and the Liquidating Trust Assets.   For further information regarding Ms. Johnsen's qualifications to serve as the Liquidating Trustee, please refer to **Exhibit B** of the Disclosure Statement.   In the event Ms. Johnsen does not serve as Liquidating Trustee for some reason, the Debtors reserve the right to select a Person or Entity to serve as the Liquidating Trustee, which selection shall be reasonably acceptable to the Committee.

(b)     Duties.   As more fully described in the Liquidating Trust Agreement, the Liquidating Trustee shall have the responsibility for administering the Liquidating Trust, maintaining applicable reserves, liquidating the Liquidating Trust Assets, and making distributions under the Plan.

(c)     No Further Approvals Required/Transfer of Liquidating Trust Assets.   In performance of its duties hereunder, the Liquidating Trustee shall have the rights and powers of a debtor in possession under Bankruptcy Code section 1107, and such other rights, powers, and duties necessary, appropriate, advisable or convenient to effectuate the provisions of the Plan.   On and after the Effective Date, the Liquidating Trustee shall not be required to obtain any approvals from the Bankruptcy Court, any court or governmental body and/or provide any

notices under any applicable laws to implement the terms of the Plan, including the transfer of any Liquidating Trust Assets retained by the Liquidating Trust, except as explicitly set forth in the Liquidating Trust Agreement. As further set forth in the Liquidating Trust Agreement, without limitation of the foregoing, the Liquidating Trustee shall be authorized pursuant to this Plan to transfer any or all of the Liquidating Trust Assets without necessity of any further notice or approval of the Bankruptcy Court and/or under any applicable state or federal law. This provision shall be subject in its entirety to the Liquidating Trust Agreement.

4.3    **Stock Trust**.

(a)    Creation. On the Effective Date, the Stock Trust shall be created pursuant to the Stock Trust Agreement, the terms of which shall be incorporated herein by reference. As of the Effective Date, all of the Stock Trust Assets shall be transferred to the Stock Trust pursuant to the terms of the Stock Trust Agreement. The rights of the Qualified Creditor Stock Beneficiaries shall be set forth in the Stock Trust Agreement. The Stock Trust shall be established for the sole purpose of liquidating and distributing the Stock Trust Assets while preserving the value of the Stock Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d).

(b)    Employment and Compensation of Professionals. In accordance with the Stock Trust Agreement, the Stock Trust may employ such counsel, advisors and other professionals selected by the Stock Trustee that the Stock Trust reasonably requires to perform its responsibilities under the Plan without further order from the Bankruptcy Court. The Stock Trust's professionals shall be compensated at their respective standard hourly rates as agreed to by the Stock Trustee, without further motion, application, notice, or other order of the Bankruptcy Court.

4.4    **Stock Trustee**.

(a)    Appointment. The Stock Trustee shall be deemed appointed on the Effective Date, without further motion, application, notice, hearing or other order of the Bankruptcy Court. The Debtors hereby recommend that the initial Stock Trustee shall be Carolyn Johnsen, which recommendation is acceptable to the Committee. Ms. Johnsen has served as counsel to the Committee and, as a result, is knowledgeable about the Debtors, the Chapter 11 Cases and the Stock Trust Assets. For further information regarding Ms. Johnsen's qualifications to serve as the Stock Trustee, please refer to **Exhibit B** of the Disclosure Statement. In the event Ms. Johnsen is not able or determines not to serve as Stock Trustee for some reason as of the Effective Date, the Debtors reserve the right to select a Person or Entity to serve as the Stock Trustee, which selection shall be reasonably acceptable to the Committee.

(b)    Duties. The Stock Trustee shall have the responsibility for administering the Stock Trust in accordance with the Stock Trust Agreement.

(c)    No Further Approvals Required/Transfer of Stock Trust Assets. On and after the Effective Date, the Stock Trustee shall not be required to obtain any approvals from the Bankruptcy Court, any court or governmental body and/or provide any notices under any applicable laws to implement the terms of the Plan, including the transfer of any Stock Trust

17

Assets retained by the Stock Trust, except as explicitly set forth in the Stock Trust Agreement. As further set forth in the Stock Trust Agreement, without limitation of the foregoing, the Stock Trustee shall be authorized pursuant to this Plan to transfer any or all of the Stock Trust Assets without necessity of any further notice or approval of the Bankruptcy Court and/or under any applicable state or federal law. This provision shall be subject in its entirety to the Stock Trust Agreement.

    4.5  **New Board**. Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, and except as may otherwise be disclosed in the Plan Supplement, on the Effective Date, the directors and officers identified in the Plan Supplement, and who shall be reasonably acceptable to the Plan Contributor, the Debtors and the Committee, shall serve as the New Board of the Reorganized Debtors that are corporations. Pursuant to section 1129(a)(5), the Debtors will disclose in the Plan Supplement, on or prior to the Confirmation Date, the identity and affiliations of any Person proposed to serve on a Reorganized Debtor's New Board and, to the extent such Person is an Insider, the nature of any compensation for such Person. After the Effective Date, the corporate governance and management of the Reorganized Debtors shall be determined by the applicable board of managers or board of directors in accordance with the laws of the applicable state or country of organization.

    4.6  **Cancellation of Notes, Instruments, and Outstanding Equity Interests**. On the Effective Date, except as otherwise provided for in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, all agreements, stock, instruments, certificates and other documents in respect of the Equity Interests shall be cancelled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released and discharged.

    4.7  **Cancellation of Liens**. On the Effective Date, except as otherwise provided for in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, any Lien securing any Claim shall be deemed released, and the holder of such Claim shall be authorized and directed to release any collateral or other property of any Debtor held by such holder and to take such actions as may be requested by the Debtors or the Liquidating Trustee, as applicable, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Debtors or the Liquidating Trustee, as applicable.

    4.8  **Exemption from Certain Transfer Taxes and Recording Fees**. To the fullest extent permitted by Bankruptcy Code section 1146(a), any transfer from a Debtor to the Liquidating Trustee or to any entity under, pursuant to, in contemplation of, or in connection with the Plan or through: (a) the issuance, distribution, transfer or exchange of any debt, securities or other interest in the Debtors; (b) the creation, modification, consolidation or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment or recording of any lease or sublease; or (d) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document

18

Case 2:13-bk-16126-MCW Doc 692 Filed 10/28/14 Entered 10/28/14 18:11:21 Desc
Main Document Page 72 of 101

recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

        4.9    **No Further Approvals**.  The transactions contemplated by the Plan shall be approved and effective as of the Effective Date without the need for any further state or local regulatory approvals or approvals by any non-Debtor parties, and without any requirement for further action by the Debtors or the Liquidating Trustee, as applicable.

        4.10    **Dissolution of Committee**.  The Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in Bankruptcy Code section 1103 and shall perform such other duties as it may have been assigned by the Bankruptcy Court prior to the Effective Date.  On the Effective Date, the Committee shall be dissolved and the Committee's members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Committee's Professionals shall terminate.

        4.11    **Pre-Effective Date Injunctions or Stays**.  All injunctions or stays, whether by operation of law or by order of the Bankruptcy Court, provided for in the Chapter 11 Cases pursuant to Bankruptcy Code sections 105 or 362 or otherwise that are in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

        4.12    **Restructuring and Other Corporate Actions and Transactions**.

        (a)    <u>Restructuring Transactions</u>.  Upon the Effective Date, the following transactions shall be effectuated contemporaneously:

        (i)    All of the issued and outstanding capital stock of ECOtality, Inc. shall be cancelled and new shares of common stock, the Reorganized Stock, shall be issued as follows: 50% to the Stock Trustee for the *pro rata* benefit of the Qualified Creditor Stock Beneficiaries (the "<u>Qualified Creditor Stock</u>") and 50% to the Plan Stockholder (the "<u>Plan Stock</u>").

        (ii)    The Plan Stockholder, the Reorganized Debtors and the Stock Trustee shall execute the Tax Sharing Agreement.

        (iii)    The Qualified Creditor Stock Beneficiaries shall receive, on a *pro rata* basis, no less than $925,000 (the "<u>Minimum Distribution</u>") as follows:

        (1)    The Plan Contributor has deposited $200,000 in cash (the "<u>Trust Deposit</u>") with the Debtors, to be held in trust and to be distributed pursuant to <u>Section 4.12(a)(iii)(2)</u>.

19

(2)     In the event that the Qualified Creditor Stock Beneficiaries have not received at least $925,000 in cash on or prior to the third anniversary of the Effective Date on account of their Qualified Creditor Stock or the Tax Sharing Agreement, then, within thirty (30) days after the third anniversary of the Effective Date, the Plan Contributor shall pay to the Liquidating Trust, without setoff or reduction of any kind or for any purpose, $725,000 as follows: three equal installments, the first to be paid, in cash, no later than the thirtieth (30th) day after the third anniversary of the Effective Date (the "First Payment Date"), and on the same date yearly thereafter until the third and final payment is made.  Any such payment shall be reduced dollar for dollar to the extent a payment has previously been made by Reorganized ECOtality to the Stock Trust whether pursuant to the Tax Sharing Agreement on account of a tax benefit to Reorganized ECOtality or otherwise.  The Liquidating Trustee shall distribute to the Qualified Creditor Stock Beneficiaries their *pro rata* share of such $725,000 in addition to the Trust Deposit pursuant to the Liquidating Trust Agreement and the Stock Trust Agreement, as applicable.  The obligation of the Plan Contributor to pay the balance of the Minimum Distribution after payment of the Trust Deposit as contemplated in Section 4.12 shall be secured by a physical pledge of such number of shares of common stock of Car Charging Group, Inc. that have the value, as of the Effective Date, of the Minimum Distribution (the "Pledged Shares") in favor of the Liquidating Trust pursuant to a stock pledge agreement (the "Stock Pledge Agreement").  A stock certificate or certificates representing the Pledged Shares shall be delivered in pledge to the Stock Trustee on the Effective Date.  The Stock Trustee may exercise any remedies, immediately and without interference by any party, under the Stock Pledge Agreement, including the right to foreclose on the Pledged Shares, in the event of a failure to make any payment due under the Stock Trust Agreement and the Tax Sharing Agreement by Reorganized ECOtality or the Plan Contributor, as applicable, to the Stock Trust. Promptly after the end of each succeeding year following the Effective Date, to the extent the value of the Pledged Shares at such time no longer is equal to the amount of the Minimum Distribution that remains unpaid to the Stock Trust, no later than five (5) business days after receiving notice of such deficiency from the Stock Trustee, which notice shall include a calculation of the deficiency and may only be provided by the Stock Trustee to the Plan Contributor promptly after the end of each calendar year, the Plan Contributor shall pledge additional shares of common stock of Car Charging Group, Inc. as Pledged Shares such that the value of the Pledged Shares in the aggregate equals the amount of the Minimum Distribution that then remains unpaid to the Stock Trust (*i.e.* less any amounts paid pursuant to this Plan, including amounts paid at any time after the First Payment Date, pursuant to the Tax Sharing Agreement and the Stock Trust).  For purposes of the foregoing yearly review of the value of the Pledged Shares relative to the amount of the Minimum Distribution that remains unpaid, the value of such Pledged Shares shall be the average of the closing prices of the common stock of Car Charging Group, Inc. listed on the OTC Bulletin Board (or such other securities exchange or over-the-counter trading market or service on which such shares are then traded or quoted) for the ten (10) consecutive trading days ending five (5) days prior to the delivery of the notice referenced above in this Section 4.12(a)(iii)(2).

(3)     The Stock Trustee shall use commercially reasonable efforts, within thirty (30) days after the Effective Date, to provide the Liquidating Trustee with a list and contact information for all Qualified Creditor Stock Beneficiaries existing as of that date.

(4)     The Stock Trustee shall use commercially reasonable efforts, within thirty (30) days prior to the third anniversary of the Effective Date, to provide the Liquidating Trustee with a list and contact information for all Qualified Creditor Stock Beneficiaries existing as of that date, as well as an accounting of all distributions made to the Qualified Creditor Stock Beneficiaries on account of the Plan Stock and the Tax Sharing Agreement.

(b)     <u>Continued Operation of Reorganized ECOtality</u>.  On and after the Effective Date, Reorganized ECOtality shall continue in business as a Business Enterprise.

(i)     The New Corporate Governance Documents shall, as of the Effective Date, be adopted and shall go into effect in accordance with applicable state law.  Such documents shall conform to the terms of this Plan and any agreements ancillary to this Plan and shall otherwise be in form and substance reasonably acceptable to the Debtors, the Committee and the Plan Contributor.  For the avoidance of doubt, nothing in New Corporate Governance Documents shall impair the rights of the Stock Trust or the obligations of the Plan Contributor as set forth in this Plan.

(ii)     On the Effective Date, the Plan Stockholder shall transfer and assign its rights and obligations pursuant to the Service Contracts to Reorganized ECOtality, and Reorganized ECOtality shall accept such assignment.

(iii)     Subject to the consent of the Debtors and the Committee, Reorganized ECOtality may, in its discretion as required for Reorganized ECOtality to maintain the Business Enterprise, pursuant to and under the terms of the loan documents included in the Plan Supplement, enter into a loan for borrowed money as needed to fund its operations under a revolving line of credit (the "<u>Operating Line of Credit</u>").  The Operating Line of Credit, subject to the consent of the Debtors and the Committee, shall be secured by interests in (i) all of the assets of Reorganized ECOtality acquired by the Reorganized ECOtality after the Effective Date (for clarity, and without limitation, expressly excluding the Liquidating Trust Assets), (ii) a pledge of the Plan Stock and/or (iii) the Qualified Creditor Stock, which pledge may only be exercised if an event of default (as defined in the loan documents pursuant to which the Operating Line of Credit is provided) has occurred and is continuing, following not less than five (5) business days' notice thereof to the Stock Trustee.  An event of default under the Operating Line of Credit shall constitute an event of default under the Stock Pledge Agreement and the Stock Trustee shall be permitted to exercise all remedies under the Stock Pledge Agreement, including foreclosing on the Pledged Shares, immediately and without notice or interference from any party.

(iv)     No later than five (5) business days after the exercise of remedies upon an event of default under the Operating Line of Credit, the Plan Contributor shall pay the Minimum Distribution (less any amounts previously paid to the Stock Trust for the benefit of the Qualified Creditor Stock Beneficiaries pursuant to the Tax Sharing Agreement and the Stock Trust Agreement, as applicable) to the Stock Trust, without setoff or reduction of any kind or for any purpose, which amounts shall be distributed for the benefit of Qualified Creditor Stock Beneficiaries pursuant to the Trust Agreements, as applicable.

21

(v)     The Plan Stockholder may, in its discretion, pursuant to terms that may be agreed upon by Reorganized ECOtality and the Plan Stockholder, transfer assets, other than the Purchased Assets, to Reorganized ECOtality as may be required for Reorganized ECOtality to continue to maintain the Business Enterprise.

(c)     General Corporate Actions.  Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) cancellation and reissuance of stock and all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or Reorganized ECOtality, and any corporate action required by the Debtors or Reorganized ECOtality in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stock holders, the managing members, directors or officers of Debtor ECOtality.  On or (as applicable) prior to the Effective Date, the managing members, directors or officers of the Debtors shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of an on behalf of the Debtors and Reorganized ECOtality.  Such authorizations and approvals shall be effective notwithstanding any requirements under non-bankruptcy law.  In the event of any conflict between the provisions of this Plan and any actions, documents, agreements, or otherwise arising from this Section 4.12, the provisions of this Plan shall govern.

## ARTICLE V.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

5.1     Rejection and Repudiation of Executory Contracts and Unexpired Leases. On the Effective Date, all executory contracts and unexpired leases shall be deemed rejected or repudiated pursuant to Bankruptcy Code section 365 other than those executory contracts or unexpired leases that: (a) previously were assumed or rejected by the Debtors; (b) are otherwise addressed in the Confirmation Order; (c) are otherwise addressed in the Plan; or (d) are the subject of a motion to reject such executory contracts or unexpired leases, as applicable, that is pending on the Effective Date, regardless of whether the requested effective date of such rejection is on or after the Effective Date.

5.2     Claims Based on Rejection or Repudiation of Executory Contracts and Unexpired Leases.  If the rejection or repudiation of an executory contract or unexpired lease pursuant to the Plan results in a Claim, then such Claim shall be forever barred and shall not be enforceable against the Debtors or their properties, or any of their interests in properties as agent, successor or assign, unless a Proof of Claim is filed with the Claims and Noticing Agent and served upon counsel to the Liquidating Trustee within thirty (30) days after the earlier of (i) entry of the Confirmation Order and (ii) the effective date of rejection or repudiation of the executory contract or unexpired lease.  The Debtors shall give notice of the bar date established by this Section 5.2 to the non-Debtor counterparties to the executory contracts and unexpired leases by service of the Plan, the Confirmation Order, or otherwise.  Unless otherwise provided herein, the Liquidating Trustee shall object to such Claims on or before the Claims Objection Bar Date.

5.3     Termination of All Employee, Retiree and Workers' Compensation Benefits.  All existing employee benefits (including, without limitation, workers' compensation benefits, health care plans, disability plans, severance benefit plans, incentive plans, and life insurance plans) and retiree benefits (as such term is defined under Bankruptcy Code section 1114(a)) not previously terminated by the Debtors shall be terminated on or before the Effective Date, except as otherwise expressly provided in the Confirmation Order.

5.4     Survival of Certain Indemnification Obligations.  Any obligations of the Debtors pursuant to their corporate charters and bylaws or agreements, including amendments, entered into any time prior to the Effective Date, to indemnify, reimburse, or limit the liability of any Person or Entity pursuant to the Debtors' certificates of incorporation, bylaws, policy of providing employee indemnification, applicable state law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against such Person or Entity based upon any act or omission related to such Person or Entity's service with, for, or on behalf of the Debtors prior to the Effective Date with respect to all past, present and future actions, suits, and proceedings relating to the Debtors shall continue as obligations of the Liquidating Trust only in accordance with this Section 5.4, and shall survive confirmation of the Plan, irrespective of whether any such defense, indemnification, reimbursement, or limitation of liability accrued or is owed in connection with an occurrence before or after the Petition Date; provided, however, that all monetary obligations under this Section 5.4 shall be limited solely to available insurance coverage and neither the Liquidating Trust, the Liquidating Trust Assets, the Liquidating Trustee, the Plan Contributor, the Plan Stockholder, Blink Acquisition LLC, the Stock Trust, the Stock Trust Assets, the Stock Trustee nor any of the Reorganized Debtors shall be liable for any such obligations under any circumstance.  Any Claim based on the Debtors' obligations set forth in this Section 5.4 shall not be subject to any objection by reason of Bankruptcy Code section 502(e)(1)(B).  Notwithstanding anything to the contrary herein, there also shall be no obligation of any kind on the part of the Debtors, the Liquidating Trust, the Liquidating Trustee, the Plan Contributor, the Plan Stockholder, Blink Acquisition LLC, the Stock Trust, the Stock Trustee or any of the Reorganized Debtors with respect to any Claims, suits or actions against a Person or Entity that result in a final order determining that such Person or Entity is liable for fraud, willful misconduct, gross negligence, bad faith, self-dealing or breach of the duty of loyalty.

## ARTICLE VI.
## PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

6.1     **Prosecution of Objections to Claims on and after the Effective Date**.

(a)     On and after the Effective Date, objections to, and requests for estimation of, any Claims, including any Claims scheduled by the Debtors in the Schedules, may be interposed and prosecuted only by the Liquidating Trustee and the Liquidating Trust.  Such objections and requests for estimation shall be served on the respective holder of such Claim and filed with the Bankruptcy Court on or before the later of (i) Claims Objection Bar Date and (ii) such other date as may be fixed by the Bankruptcy Court upon a motion filed by the Liquidating Trustee and served only upon the United States Trustee and any party that has filed a notice of appearance and request for service of notices and papers on or after the Effective Date.

(b)      On the Effective Date, all pending objections to and requests for estimation of any Claims will vest in the Liquidating Trust.

(c)      On and after the Effective Date, the Liquidating Trustee shall be authorized to resolve all respective Disputed Claims by withdrawing or settling objections thereto, or by litigating to judgment in the Bankruptcy Court, or such other court having competent jurisdiction, the validity, nature and/or amount thereof.  If the Liquidating Trustee agrees with the holder of a Disputed Claim to compromise, settle and/or resolve a Disputed Claim by granting such holder an Allowed Claim, then the Liquidating Trustee may compromise, settle and/or resolve such Disputed Claim without Bankruptcy Court approval.

6.2      **Estimation of Claims**.  The Liquidating Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Bankruptcy Code section 502(c) regardless of whether the Debtors or the Liquidating Trustee, as applicable, scheduled such Claim in the Schedules, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Liquidating Trustee may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

6.3      **No Distributions Pending Allowance**.  Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such disputed portion; provided, however, that the Liquidating Trustee may, at its discretion and in accordance with the Trust Agreements, pay any undisputed portion of a Disputed Claim in accordance with the terms of the Plan or the Trust Agreements, as applicable.  To the extent that all or a portion of a Disputed Claim is disallowed, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed and any distribution withheld pending the resolution of such Claim shall be reallocated *pro rata* to the holders of Allowed Claims in the same Class.

6.4      **Distributions after Allowance**.  To the extent that a Disputed Claim becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan, the Trust Agreements, and the Confirmation Order.  As soon as practicable after the date that an order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Trustees shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan.

6.5      **Disallowed Claims**.  Any Claim held by a Person or Entity against whom any Debtor or the Liquidating Trust has commenced a proceeding asserting a Cause of Action under Bankruptcy Code section 542, 543, 544, 545, 547, 548, 549, 550, 551 and/or 553, shall be

deemed disallowed pursuant to Bankruptcy Code section 502(d) and the holder of such Claim shall not be entitled to vote to accept or reject the Plan. Claims that are deemed disallowed pursuant to this <u>Section 6.5</u> shall continue to be disallowed for all purposes until such Cause of Action has been settled or resolved by Final Order and any sums due to the Debtors or the Liquidating Trust, as applicable, from such party have been paid.

**ARTICLE VII.**
**DISTRIBUTIONS**

7.1 **Manner of Payment and Distributions under the Plan**. All distributions under the Plan shall be made by the Liquidating Trustee pursuant to the terms of the Trust Agreements, the Plan and the Confirmation Order.

(a) <u>Distributions to Holders of Allowed Claims</u>. Subject to the conditions set forth in the Trust Agreements, the Liquidating Trustees will make distributions on account of Allowed Claims as of the Distribution Date or otherwise in accordance with the provisions of <u>Article II</u> hereof or otherwise in the Plan or the Confirmation Order. The Trustees will make subsequent distributions to a holder of such Allowed Claim within a reasonable period of time after such Claim becomes Allowed. Payments of Cash by the Liquidating Trustee pursuant to the Plan and the Trust Agreements may be by check drawn on a domestic bank and shall be made to the address of the holder of such Claim as most recently indicated on or prior to the Effective Date in the Debtors' books and records. At the option of the Liquidating Trustee, payments may be made by wire transfer from a bank.

7.2 **Interest and Penalties on Claims**. Unless otherwise specifically provided for in the Plan, the Trust Agreements, the Confirmation Order, required by applicable bankruptcy law or necessary to render a Claim Unimpaired, postpetition interest and penalties shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of the Plan.

7.3 **Record Date for Distributions**. None of the Debtors or the Trustees will have any obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and make distributions only to those holders of Allowed Claims that are holders of such Claims as of the close of business on the Distribution Record Date. The Debtors and the Trustees shall be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date.

7.4 **Withholding and Reporting Requirements**. In connection with the Plan, the Trustees shall comply with all withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities and all distributions hereunder shall be subject to such withholding and reporting requirements. The Trustees shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. Notwithstanding the foregoing, each holder of an Allowed Claim that is to receive a distribution hereunder shall have the sole and exclusive responsibility for the

25

satisfaction and payment of any tax obligations imposed by any government unit, including income, withholding and other tax obligations, on account of such distribution. The Trustees have the right, but not the obligation, not to make a distribution until such holder has made arrangements satisfactory to the Trustees for payment of any such tax obligations. The Trustees may require, as a condition to the receipt of a distribution, that the holder of an Allowed Claim complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If such holder fails to comply with such request within one year, such distribution shall be deemed an unclaimed distribution.

        7.5   **Setoffs**. Except as provided under the Plan, the Debtors and/or the Trustees may, but shall not be required to, set off against any Claim and the payments to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever that the Debtors may have against the holder of a Claim, but neither the Debtors' or Liquidating Trustee's failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the of any such claim the Debtors or the Liquidating Trustee, as applicable, may have against such holder of a Claim.

        7.6   **Allocation of Plan Distributions Between Principal and Interest**. To the extent that any Allowed Claim entitled to distribution under the Plan consists of indebtedness and accrued but unpaid interest thereon, such distributions shall, for all income tax purposes, be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

        7.7   **Undeliverable or Returned Distributions**. If any Allowed Claim distribution is returned to the Trustees as undeliverable, the Trustees shall use reasonable efforts to determine the correct address of the holder of such Claim. If such reasonable efforts are unsuccessful, no further distributions shall be made to the holder of such Claim unless and until the Trustees are notified in writing of such holder's then current address. Upon receipt by the Trustees, returned Cash shall not earn any interest or be entitled to any dividends or other accruals of any kind. Any holder of an Allowed Claim that does not assert a Claim pursuant to this Section 7.7 for a returned distribution within one (1) year after the Effective Date shall be forever barred from asserting any such Claim against the Debtors or their property or other property transferred pursuant to the Plan and Trust Agreements.

        7.8   **Fractional Distributions**. No fractional dollars or shares shall be distributed. Where fractional dollars would otherwise be called for, the actual issuance shall reflect a rounding down of such fraction to the nearest whole dollar.

        7.9   **Miscellaneous Distribution Provisions**.

        (a)   Foreign Currency Exchange Rate. Except as specifically provided for in the Plan or an order of the Bankruptcy Court, as of the Effective Date, any Claim asserted in currency other than U.S. dollars automatically shall be deemed converted to the equivalent U.S. dollar value using Bank of America's noon spot rate as of the Petition Date for all purposes under the Plan, including voting, allowance and distribution.

(b)     <u>Distributions on Non-Business Days</u>.  Any payment or distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

(c)     <u>Partial Distributions on Disputed Claims</u>.  The Debtors or the Trustees, as applicable, may, but are not required to, make partial distributions to holders of Disputed Claims for the amount of the undisputed portion of such holder's Disputed Claim.

(d)     <u>Disputed Payments</u>.  If any dispute arises as to the identity of the holder of an Allowed Claim entitled to receive any distribution under the Plan, the Trustees may retain such distribution until its disposition is determined by a Final Order or written agreement among the interested parties to such dispute.

(e)     <u>Post-Consummation Effect of Evidence of Claims or Equity Interests</u>.  Except as otherwise provided herein, notes, stock certificates, membership certificates, unit certificates and other evidence of Claims against, or Equity Interests in, the Debtors shall, effective on the Effective Date, represent only the right to participate in the distributions contemplated by the Plan and shall not be valid or effective for any other purpose.

(f)     <u>Disgorgement</u>.  To the extent that any property, including Cash, is distributed to a Person or Entity on account of a Claim that is not an Allowed Claim, such property shall be held in trust for and shall promptly be returned to the Liquidating Trustee.

## ARTICLE VIII.
## <u>CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN</u>

8.1     **Conditions to the Effective Date**.  Consummation of the Plan and the occurrence of the Effective Date are subject to satisfaction of the following conditions:

(a)     The Bankruptcy Court shall have entered the Confirmation Order, and such Confirmation Order shall have become a Final Order;

(b)     No request for revocation of the Confirmation Order under Bankruptcy Code section 1144 has been made, or, if made, remains pending; and

(c)     All documents necessary to implement the transactions contemplated by this Plan are in form and substance acceptable to the Debtors.

8.2     **Waiver of Condition**.  The conditions set forth in <u>Section 8.1</u>, other than the condition requiring that the Confirmation Order shall have been entered by the Bankruptcy Court, may be waived in whole or in part by the Debtors.

8.3     **Notice of Effective Date**.  The Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in <u>Section 8.1</u> of the Plan have been satisfied or waived pursuant to <u>Section 8.2</u>, and the Effective Date has occurred.

27

8.4  **Order Denying Confirmation**.  If the Plan is not Consummated, then nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors; (c) prejudice in any manner any right, remedy or Claim of the Debtors; (d) be deemed an admission against interest by the Debtors; or (e) constitute a settlement, implicit or otherwise, of any kind whatsoever.

## ARTICLE IX.
## EFFECT OF THE PLAN ON CLAIMS AND EQUITY INTERESTS

9.1  **Discharge of Claims and Termination of Equity Interests**.

(a)  Except with respect to Class 4 Creditors, to the extent their Claims are expressly not discharged, and as of the Effective Date, except as otherwise explicitly provided in the Plan or the Confirmation Order including with respect to Class 4 Claims, the rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims and satisfaction or termination of all Equity Interests.  Except with respect to Class 4 Creditors, to the extent their Claims are expressly not discharged, and except as otherwise provided in the Plan or the Confirmation Order, Confirmation shall, as of the Effective Date:  (i) discharge the Debtors from all Claims or other debts that arose before the Effective Date, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, and all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(i), in each case whether or not (w) a Proof of Claim is filed or deemed filed pursuant to Bankruptcy Code section 501, (x) a Claim based on such debt is Allowed pursuant to Bankruptcy Code section 502, (y) the holder of a Claim based on such debt has accepted the Plan or (z) such Claim is listed in the Schedules; and (ii) satisfy, terminate or cancel all Equity Interests and other rights of equity security holders in the Debtors.

(b)  As of the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, all Persons and Entities shall be precluded from asserting against the Debtors, or their respective successors or property, any other or further Claims, demands, debts, rights, causes of action, liabilities or equity interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all such Claims except with respect to Class 4 Creditors, to the extent their Claims are expressly not discharged, and other debts and liabilities against the Debtors and satisfaction, termination or cancellation of all Equity Interests and other rights of equity security holders in the Debtors, pursuant to Bankruptcy Code sections 524 and 1141, and such discharge will void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim.

9.2  **Injunctions**.

(a)  Except as otherwise provided in the Plan, the Trust Agreements or the Confirmation Order, all Persons or Entities who have held, hold or may hold Claims, Equity Interests, Causes of Action or liabilities that:  (i) are subject to compromise and settlement pursuant to the terms of the Plan; (ii) have been released pursuant to <u>Section 9.3</u>; (iii) are subject

to exculpation pursuant to Section 9.5 (but only to the extent of the exculpation provided in Section 9.5); or (iv) are otherwise stayed or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from commencing or continuing in any manner any action or other proceeding, including on account of any Claims, Equity Interests, Causes of Action or liabilities that have been compromised or settled against the Debtors or any Person or Entity so released or exculpated (or the property or estate of any Person or Entity, directly or indirectly, so released or exculpated) on account of or in connection with or with respect to any released, settled, compromised, or exculpated Claims, Equity Interests, Causes of Action or liabilities.

9.3     **Releases**.

(a)     Debtor Releases.  Notwithstanding anything contained herein to the contrary, except as provided in Section 9.4, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable law, for good and valuable consideration provided by each of the Released Parties and Limited Released Parties, as applicable, the adequacy of which is hereby confirmed, the Released Parties and the Limited Released Parties (subject to Section 9.4 herein) are deemed conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged by the Debtors and their Estates from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party or Limited Released Party, as applicable, the restructuring of Claims and Equity Interests prior to or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or any related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party or a Limited Released Party, as applicable, that constitutes actual fraud, willful misconduct or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

(b)     Releases by Holders of Claims and Equity Interests.  Except for any obligation, claim, cause of Action or liability arising expressly under the Plan, reserved by any Person or Entity pursuant to the Plan or as provided in Section 9.4, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable law, holders of Claims and Equity Interests shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Released Parties and the Limited Released Parties, as applicable, from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in

29

law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party or Limited Released Party, as applicable, the restructuring of Claims and Equity Interests prior to or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or any related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party or Limited Released Party, as applicable, that constitutes actual fraud, willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

9.4     **Limitation on Releases**.   Notwithstanding any other provision of this Article IX, nothing in this Article IX shall be deemed to release the Limited Released Parties from any claim related to the prepetition conduct with respect to the prepetition operations and affairs of the Debtors. Such claims include, without limitation, claims for deepening insolvency; breach of fiduciary duties; misrepresentation, negligence, and other misconduct; aiding and abetting such misconduct; fraudulent conveyances and preference recoveries.

9.5     **Exculpation**.   Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable law, none of the Exculpated Parties, shall have or incur any liability from the Petition Date to the Effective Date for any claim, cause of action, or other assertion of liability for any act taken or omitted in connection with, or arising out of, the Chapter 11 Cases or the negotiation, formulation, preparation, administration, consummation and/or implementation of the Plan, or any contract, instrument, document, or other agreement entered into pursuant thereto through the Effective Date; provided that the foregoing shall not affect the liability of any Person or Entity that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence. The Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan and administration thereof.

9.6     **Retention and Enforcement and Release of Causes of Action**.   Except as otherwise provided in the Plan, or in any document, instrument, release or other agreement entered into in connection with the Plan, in accordance with Bankruptcy Code section 1123(b), the Debtors, their Estates, the Trust Agreements, and any other party, including any of the Buyers (only to the extent Causes of Action were transferred from the Debtors to the applicable Buyer under the respective APA), expressly reserve all rights to retain and prosecute any and all of the Causes of Action identified in **Exhibit A** to the Plan, as the case may be. Sole authority and responsibility for investigating, analyzing, commencing, prosecuting, litigating, compromising, collecting and otherwise administering (or decline to do any of the foregoing) any or all of the Causes of Action pursuant to the terms of the Plan, the Liquidating Trust

Case 2:13-bk-16126-MCW    Doc 692    Filed 10/28/14    Entered 10/28/14 18:11:21    Desc
Main Document    Page 84 of 101

Agreement, and any other applicable document shall be held by (A) the Debtors, prior to the Effective Date (except to the extent a Cause of Action was transferred from the Debtors to an applicable Buyer under the respective APA, in which case the applicable Buyer has such authority), and (B) on or after the Effective Date, by (i) the Liquidating Trustee, with respect only to those Causes of Action that are Excluded Assets (the "Retained Causes of Action"), and (ii) with respect to any other Causes of Action, any other party that acquired rights to such Cause of Action, including any Buyer (only to the extent Causes of Action were transferred from the Debtors to the applicable Buyer under the respective APA). No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to any or all of the Causes of Action upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

### ARTICLE X.
### MISCELLANEOUS PROVISIONS

10.1 **Retention of Jurisdiction**. Following the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising from or relating to the Chapter 11 Cases to the fullest extent of applicable law, including, without limitation:

(a) To determine the validity under any applicable law, allowability, classification and priority of Claims and Equity Interests upon objection, or to estimate, pursuant to Bankruptcy Code section 502(c), the amount of any Claim that is, or is anticipated to be, contingent or unliquidated as of the Effective Date;

(b) To construe and to take any action authorized by the Bankruptcy Code and requested by the Trustees or any other party in interest to enforce the Plan and the documents and agreements filed and/or executed in connection with the Plan, including the Trust Agreements, issue such orders as may be necessary for the implementation, execution and consummation of the Plan, and to ensure conformity with the terms and conditions of the Plan, such documents and agreements and other orders of the Bankruptcy Court, notwithstanding any otherwise applicable non-bankruptcy law;

(c) To determine any and all applications for allowance of Compensation Claims, and to determine any other request for payment of Administrative Claims;

(d) To determine all matters that may be pending before the Bankruptcy Court on or before the Effective Date;

(e) To resolve any dispute regarding the implementation or interpretation of the Plan, the Trust Agreements or any related agreement or document that arises at any time before the Chapter 11 Cases are closed (or if the Chapter 11 Cases are reopened), including the determination, to the extent a dispute arises, of the entities entitled to a distribution within any particular Class of Claims;

(f) To determine all applications, adversary proceedings, contested matters and other litigated matters, that were brought or that could have been brought in the

31

Bankruptcy Court on or before the Effective Date over which this Bankruptcy Court otherwise has jurisdiction;

(g)     To determine matters concerning local, state and federal taxes in accordance with Bankruptcy Code sections 346, 505 and 1146, and to determine any tax claims that may arise against the Trustees as a result of the transactions contemplated by the Plan;

(h)     To modify the Plan pursuant to Bankruptcy Code section 1127 or to remedy any apparent nonmaterial defect or omission in the Plan, or to reconcile any nonmaterial inconsistency in the Plan so as to carry out its intent and purposes; and

(i)     To hear any other matter not inconsistent with the Bankruptcy Code.

10.2    **Terms Binding**.  Upon the occurrence of the Effective Date, all provisions of the Plan, including all agreements, instruments and other documents filed in connection with the Plan and executed by the Debtors or the Liquidating Trustee, as applicable, in connection with the Plan, shall be binding upon the Debtors, the Liquidating Trustee, all holders of Claims and Equity Interests and all other Persons and Entities that are affected in any manner by the Plan.  All agreements, instruments and other documents filed in connection with the Plan shall have full force and effect, and shall bind all parties thereto, subject to the occurrence of the Effective Date, upon the entry of the Confirmation Order, whether or not such exhibits actually shall be executed by parties other than the Debtors or the Liquidating Trustee, or shall be issued, delivered or recorded on the Effective Date or thereafter.  The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.

10.3    **Severability**.  If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the Liquidating Trustee, and the Plan Contributor, which consent shall not be unreasonably withheld; and (c) non-severable and mutually dependent.

10.4    **Computation of Time**.  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006 will apply.

10.5    **Confirmation Order and Plan Control**.  Except as otherwise provided in the Plan, in the event of any inconsistency between the Plan and the Disclosure Statement, any exhibit to the Plan or any other instrument or document created or executed pursuant to the Plan,

the Plan shall control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

10.6    **Incorporation by Reference**.    The Plan Supplement is incorporated herein by reference.

10.7    **Modifications to the Plan**.    Subject to the reasonable consent of the Committee and the Plan Contributor, the Debtors may amend or modify the Plan, the Plan Supplement, and any schedule or supplement hereto, at any time prior to the Effective Date in accordance with the Bankruptcy Code, Bankruptcy Rules or any applicable court order. Subject to certain restrictions and requirements set forth in Bankruptcy Code section 1127 and Bankruptcy Rule 3019, the Debtors, subject to the reasonable consent of the Committee and the Plan Contributor, expressly reserve their rights to alter, amend or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. A holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or supplemented, if the proposed alteration, amendment, modification or supplement does not materially and adversely change the treatment of the Claim or Equity Interest of such holder.

10.8    **Revocation, Withdrawal or Non-Consummation**.    The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date. If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), and any document or agreement executed pursuant to the Plan, shall be null and void; provided, however, that all orders of the Bankruptcy Court and all documents executed pursuant thereto, except the Confirmation Order, shall remain in full force and effect. In such event, nothing contained herein, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims by or against any of the Debtors or any other Person or Entity, to prejudice in any manner the rights of any of the Debtors or any Person or Entity in any further proceedings or to constitute an admission of any sort by any of the Debtors or any other Person or Entity.

10.9    **Courts of Competent Jurisdiction**.    If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan or in the Chapter 11 Cases, such abstention, refusal or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

10.10    **Payment of Statutory Fees**.    All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date, and as appropriate, thereafter.

10.11    **Notice**.    All notices, requests and demands to or upon the parties listed below, to be effective, shall be in writing and, unless otherwise expressly provided herein, shall

be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

TO THE DEBTORS:

ECOtality, Inc.
P.O. Box 20336
Phoenix, AZ 85036-0336
Attention:     Susie Herrmann

With a copy to:

Akin Gump Strauss Hauer & Feld LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone:     (310) 229-1000
Facsimile:      (310) 229-1001
Attention:      David P. Simonds
                      Arun Kurichety

- and -

Parker Schwartz, PLLC
7310 N. 16th Street, Suite 330
Phoenix, Arizona 85020
Telephone:     (602) 282-0476
Facsimile:      (602) 282-0478
Attention:      Jared Parker


TO THE LIQUIDATING TRUST:

[insert address]

With a copy to:

Dickinson Wright PLLC
1850 North Central Avenue, Suite 1400
Phoenix, Arizona 85004
Telephone:     (602) 285-5040
Attention:      Carolyn J. Johnsen

TO THE PLAN CONTRIBUTOR:

Car Charging Group, Inc.
1691 Michigan Ave., Ste. 601
Miami Beach, Florida 33139
Telephone:     (305) 521-0200
<u>Attention</u>:      Amy K. Maliza

With a copy to:

Schafer and Weiner, PLLC
40950 Woodward Ave., Ste. 100
Bloomfield Hills, Michigan  48304
Telephone:     (248) 540-3340
<u>Attention</u>:      Michael E. Baum

10.12  **Reservation of Rights**.  The filing of the Plan, the Disclosure Statement, any statement or provision contained in the Plan, or the taking of any action by the Debtors or the Liquidating Trustee, as applicable, with respect to the Plan, shall not be deemed to be an admission or waiver of any rights of the Debtors or the Liquidating Trustee, as applicable, with respect to any holders of Claims against or Equity Interests in the Debtors.

10.13  **No Waiver**.  Neither the failure of a Debtor to list a Claim or Equity Interest in the Debtors' Schedules, the failure of a Debtor to object to any Claim, Administrative Claim or Equity Interest for purposes of voting, the failure of the Debtors to object to a Claim, Administrative Claim or Equity Interest prior to the Confirmation Date or the Effective Date, nor the failure of the Debtors, the Liquidating Trustee or the Plan Contributor, as applicable, to assert a Retained Cause of Action prior to the Confirmation Date or the Effective Date shall, in the absence of a legally-effective express waiver or release executed by the Debtors, the Liquidating Trustee or the Plan Contributor, as applicable, with the approval of the Bankruptcy Court, if required, and with any other consents or approvals required under the Plan, be deemed a waiver or release of the right of the Debtors, the Liquidating Trustee or the Plan Contributor, as applicable, or their respective successors, either before or after solicitation of votes on the Plan, the Confirmation Date or the Effective Date, to (a) object to or examine such Claim, Administrative Claim or Equity Interest, in whole or in part, or (b) retain or either assign or exclusively assert, pursue, prosecute, utilize, or otherwise act or enforce any Retained Cause of Action against the holder of such Claim, Administrative Claim or Equity Interest.

Dated:  October 28, 2014

                                    ECOtality, Inc.
                                    Electric Transportation Engineering Corporation
                                    ECOtality Stores, Inc.
                                    ETEC North, LLC
                                    The Clarity Group, Inc.
                                    G.H.V. Refrigeration, Inc.

By:  _/s/_____
                Name:  Susie Herrmann
                Title:  Chief Financial Officer

**Exhibit A**

**Non-Exclusive List of Causes of Action**

# NON-EXCLUSIVE LIST OF CAUSES OF ACTION

The Plan preserves all causes of action, whether or not such Causes of Action were Excluded Assets, and whether or not any Cause of Action was otherwise waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order.[1] The below is a non-exclusive list of (i) Causes of Action and (ii) Retained Causes of Action, to which the Debtors and their Estates expressly reserve all rights to retain and prosecute, as the case may be, in accordance with Bankruptcy Code section 1123(b). The Debtors shall have, prior to the Effective Date, and the Liquidating Trustee shall have, or, with respect to Causes of Action that are not Retained Causes of Action, such party that obtained rights to such Cause of Action under an APA, on or after the Effective Date, sole authority and responsibility for investigating, analyzing, commencing, prosecuting, litigating, compromising, collecting and otherwise administering (or decline to do any of the foregoing) any or all of the Retained Causes of Action of Causes of Action, as the case may be, pursuant to the terms of the Plan, the Liquidating Trust Agreement, or such other applicable document.

For the avoidance of doubt, unless expressly released pursuant to the Plan or a Final Order, Causes of Action not listed on the attached list are not released, and the Estates, the Liquidating Trustee, or Buyer (only to the extent Causes of Action were transferred from the Debtors to the applicable Buyer under the respective APA), as applicable, expressly retain all Causes of Action of any kind whatsoever against all Persons and Entities as listed in the Debtors' Schedules, including, without limitation, the categories of Causes of Action set forth below. Failure to attribute any specific Cause of Action to a particular Person or Entity on the Debtors' Schedules shall not under any circumstance be interpreted to mean that such cause of action is not retained against such entity. All possible Causes of Action, including those not listed below, are retained against all Persons and Entities not expressly released pursuant to the Plan or a Final Order. In the event of any apparent inconsistency between the releases of Persons or Entities in their capacities as such pursuant to the Plan or a Bankruptcy Court order and the attached list, such releases granted pursuant to the Plan or a Final Order shall govern.

No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to any or all of the Retained Causes of Action upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

Section 1.16 of the Plan further defines Causes of Action to mean:

> "any and all present or future claims, rights, legal and equitable
> defenses, offsets, recoupments, actions in law or equity or otherwise,
> choses in action, obligation, guaranty, controversy, demand, action
> suits, damages, judgments, third-party claims, counter-claims, cross-
> claims against any Person or Entity, whether known or unknown,
> liquidated or unliquidated, foreseen or unforeseen, existing or
> hereafter arising, whether based on legal or equitable relief, whether
> arising under the Bankruptcy Code or federal, state, common, or other
> law or equity, whether or not the subject of a pending litigation or

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the *Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code*, dated as of May 20, 2014 (the "Plan").

proceedings on the Effective Date or thereafter, including without limitation, all other actions described in the Plan, including Section 9.6 of the Plan.

Notwithstanding and without limiting the generality of Section 9.6 of the Plan, the Debtors have identified below certain specific Causes of Action, including, without limitation, the following:

      a.     Claims disclosed in the APAs

      b.     Claims related to contracts and leases;

      c.     Claims related to pending and possible litigation;

      d.     Claims related to accounts receivable and accounts payable;

      e.     Claims related to warranty/manufacturing defects of chargers which overheated;

      f.     Claims related to the DOE;

      g.     Claims related to any Avoidance Actions;

      h.     Litigation relating to objections of any Creditor claims;

      i.     Objections, disputes or claims arising from any pending tax or other audits; and

      j.     Claims against any landlord, insurance company or any other entity holding a deposit or advance payment that has not been returned.

### A.     Claims Disclosed in the APAs

Causes of Action transferred from the Debtors to the applicable Buyer under their respective APAs.

### B.     Claims Related to Contracts and Leases

Unless otherwise released by the Plan, all Causes of Action are hereby reserved, which such Causes of Action are based in whole, or in part, upon any and all contracts and leases to which any Debtor is a party, or pursuant to which any Debtor has any rights whatsoever, regardless of whether such contract or lease is specifically identified herein. The claims and Causes of Action reserved include those against vendors, suppliers of goods and services, financial institutions or any other parties for: (i) for overpayments, duplicate payments, improper holdbacks, deductions owing or improper deductions taken, deposits, warranties, guarantees, indemnities, recoupment or setoff; (ii) for breach of contract, wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (iii) for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors; (iv) for payments, back charges, deposits, holdbacks, reserves or other amounts owed by any creditor, utility, supplier,

ii

vendor, insurer, surety, factor, lender, service provider, lessor or other party; (v) for any liens, including mechanic's, artisan's, materialmen's, possessory or statutory liens held by any one or more of the Debtors; (vi) arising out of environmental or contaminant exposure matters against owners, landlords, lessors, lessees, environmental consultants or contractors, environmental or other governmental agencies or suppliers of environmental services or goods, including any solid or hazardous waste haulers, transporters or arrangers; (vii) counterclaims and defenses related to any contractual obligations; (viii) any turnover actions arising under Bankruptcy Code sections 542 or 543; (ix) for unfair competition, interference with contract or potential business advantage, infringement of intellectual property  or any tort claims; and (x) for any claims against the Debtors' insurance carriers, including for payments or other amounts owed by such insurance carrier.

C.     **Claims, Defenses, Cross-Claims and Counter-Claims Related to Litigation and Possible Litigation**

The Debtors are party to, or believe they may become party to litigation, arbitration or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial.  Unless otherwise released by the Plan, all Causes of Action against or related to all Persons or Entities that are party to or that may in the future become party to litigation, arbitration or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial, are hereby reserved.

D.     **Claims Related to Accounts Receivable and Accounts Payable**

Unless otherwise released by the Plan, all Causes of Action against or related to all Persons and Entities that owe or that may in the future owe money to the Debtors, regardless of whether such entity is explicitly identified herein, the Debtors' Schedules, including Schedule B-16 for each Debtor, or any Plan Supplement, and any amendments thereto, are hereby reserved.  Furthermore, the Debtors expressly reserve all Causes of Action and defenses or counterclaims against or related to all Persons and Entities that assert or may assert that the Debtors owe money to them.  Certain claims against Persons or Estates arising from accounts receivables of Electric Transportation Engineering Corporation (d/b/a ECOtality North America), as identified on **Exhibit 1** attached hereto, as may be amended or supplemented, are hereby reserved.

E.     **Claim Against United States of America and the DOE**

Unless otherwise released by the Plan, all Causes of Action against the United States of America and the DOE are hereby reserved.

F.     **Claims Related to Avoidance Actions**

Unless otherwise released by the Plan, all Causes of Action against any Person or Entity arising under or related to any and all actions that are filed or that may be filed pursuant to Bankruptcy Code sections 544, 545, 547, 548, 550 or 551, or applicable non-bankruptcy law that may be incorporated or brought under the foregoing Bankruptcy Code sections, or (b) any other similar actions or proceedings filed to recover property for or on behalf of the Estates, in each case, which may have or will be brought in the Debtors' bankruptcy proceedings, regardless of

whether such Person or Entity is explicitly identified herein, the Plan, the Debtors' Schedules, including Statement of Financial Affairs 3(b), or any Plan Supplement, and any amendments thereto, are hereby reserved.

### G. Litigation Relating to Objections of Creditor Claims

Unless otherwise released by the Plan, all Causes of Action against any Person or Entity arising out of or related to claims in the Chapter 11 Cases, whether scheduled by the Debtors, even if not listed as disputed, unliquidated or contingent, or arising under a Proof of Claim filed in Chapter 11 Cases, as well as the continuing right to object to any such claim, including specifically any claims of Cloud Utility Pty, Ltd, Brisbane Queensland, Australia, are hereby reserved.

### H. Objections, Disputes or Claims Arising From Any Pending Tax or Other Audits

Unless otherwise released by the Plan, all Causes of Action against any Person or Entity arising out of or related to claims that result from any pending or disputed imposition of taxes, penalties or other charge, as well as the right to object or dispute such a charge under available administrative procedures or to seek relief from such charges as may be appropriate under Bankruptcy Code section 505, including specifically the sales tax audit conducted by the State of California and personal property tax claims under consideration in several jurisdictions, are hereby reserved.

### I. Claims Against Landlords, Insurance Companies or Any Other Person or Entity Holding a Deposit or Advance Payment That Has Not Been Returned

Unless otherwise released by the Plan, all Causes of Action against any Person or Entity arising out of or related to funds paid to a landlord, insurance company or to any other Person or Entity as a deposit or advance payment, which has not been returned to the Debtors, are hereby reserved.

### J. Claims Against the Debtors' Current and Former Officers and/or Directors

The releases contained in the Plan shall in no way release or discharge the current and former officers and directors, shareholders, affiliates, subsidiaries, principals, employees, agents, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers and consultants from any claim related to their prepetition conduct with respect to the prepetition operations and affairs of the Debtors. Such claims include, without limitation, claims for deepening insolvency; breach of fiduciary duties; misrepresentation, negligence, and other misconduct; aiding and abetting such misconduct; and fraudulent conveyances and preference recoveries.

## Exhibit 1

**Non-Exclusive List of Accounts Receivable of
Electric Transportation Engineering Corporation (d/b/a ECOtality North America)**

**Non-Exclusive List of Accounts Receivable of**
**Electric Transportation Engineering Corporation (d/b/a ECOtality North America)**

**[TO BE VERIFIED]**

BUFFALO MATERIALS HANDLING
CARLTON-BATES COMPANY
EXIDE TECHNOLOGIES - JERSEY
GNB INDUSTRIAL POWER
GNB INDUSTRIAL POWER
FACTORY DIRECT
HOME DEPOT - ATLANTA
INDUSTRIAL POWER SOURCE
INTERSTATE POWERCARE
J.H. RYDER - MISSISSAUGA
J.H. RYDER - VILLE ST LAURENT
LITE SOLAR CORP
LUNDY INDUSTRIAL SALES LTD
PRONERGI SOLUCIONES, SA DE CV
SPECIALTY EQUIPMENT LLC
SPECIALTY VEHICLES
STANGCO INDUSTRIAL EQUIPMENT INC.
RYDER TLC - INDIANAPOLIS
WATTS EQUIPMENT COMPANY INC.
YALE CAROLINAS INC.

i

## Exhibit B

**Biography of Carolyn Johnsen**

# Carolyn J. Johnsen

Member, Phoenix

T: 602-285-5040
C: 602-684-4766
F: 602-285-5100
cjjohnsen@dickinsonwright.com

## Areas of Practice

- Bankruptcy & Restructuring
- Commercial Transactions
- Corporate
- Mergers & Acquisitions

## Education

Texas A&M University, B.S., Wildlife and Fisheries Science, 1977

Texas Tech University School of Law, J.D., 1980

Norwich University, M.A., Military History, 2011

## Acknowledgements

- AV Preeminent Peer Review Rated
- Listed in *The Best Lawyers in America* (2008-2014)
- Listed in *Southwest Super Lawyers* (2007-2014)
- AB Top Lawyer, Bankruptcy, *Arizona Business Magazine* (2008-2010)
- Top five finalist for Arizona Woman Magazine's 2009 Arizona Woman of the Year Award
- Top 50 Lawyers in Arizona, *Southwest Super Lawyers* (2007, 2009)
- Finalist for *Arizona Woman Magazine's* 2008 Golden Heart of Business Award
- Fellow, Litigation Counsel of America
- Distinguished Achievement Award, Sandra Day O'Connor College of Law (2007)
- Top 10 Leading Lawyers, *The Phoenix Business Journal* (2006)
- Best of the Bar, *The Business Journal* (2003-2005)
- Pioneer of the Year Award, National Association of Women Business Owners (1997-1998)
- Top Ten Women in Arizona Business (1997-1998)
- Honorary Squadron Commander, Luke Air Force Base

## Overview

Ms. Johnsen's experience includes creating complex plans of reorganization for multi-million dollar companies in a wide-range of industries, including mortgage lending, real estate, manufacturing, retail, refining, hospitality, aviation and energy-related.

Ms. Johnsen has advised private and public corporations in formulating and implementing managerial, personnel and operational structures. She has also guided numerous boards and senior managers in developing strategies and solutions for revising operations and restructuring debt to effectuate the emergence of a stronger business through bankruptcy, or to take advantage of acquisition and sale opportunities, including the application of bankruptcy procedures favorable to corporate securities regulation compliance. In addition, Ms. Johnsen has negotiated multiple multi-million dollar transactions with lenders, investment bankers and brokers, asset purchasers and sellers, and governmental agencies

## Prominent Assignments

Served as lead counsel for debtor company with a $1 billion commercial loan portfolio, 2400 investors, and multiple borrowers; hired after Chapter 11 had been filed to reorder company in lieu of assumption of control by court-ordered trustee including: locating and installing new management; revamping board and structuring transfer of control to new management without impeding company operations; minimizing and controlling defensive litigation by defaulting borrowers against the company; resolving compliance issues with State Banking Department, SEC and State Attorney General to prevent shutdown of the company and assessment of penalties; protecting company's position against borrowers and competing lenders in six simultaneous multi-million dollar bankruptcies filed by company borrowers; stabilizing the company to permit a court and creditor approved plan of reorganization with a structured framework for investor recovery

Ongoing representation of Arizona's largest utility company in bankruptcy matters; have guided Board of Directors and General Counsel in formulating and implementing policies and procedures for dealing with consumer and commercial bankruptcies and state receiverships; have guided General Counsel and formulated measures designed to protect the company if a transacting party files bankruptcy; have negotiated and finalized multi-million dollar power agreements and plant sales in numerous bankruptcy and receivership cases

Served as lead counsel to owner of national sports franchise in a Chapter 11 bankruptcy by the franchise; negotiated with national league, creditors and municipal stadium owner regarding competitive sale of franchise, player contracts, team assets, and assumption of stadium rights and contracts

Represented international, NASDAQ-traded software company in commercial bankruptcy matters; guided General Counsel and formulated policies and procedures designed to protect the company if a customer files bankruptcy; represented interest in multiple bankruptcies filed throughout the country

Represented committee of creditors appointed by the bankruptcy court in the case of a publicly-held food manufacturing company with nationwide and international manufacturing facilities; negotiated creditors' interests in sale of multiple assets and a significant capital raise from international commercial sources; addressed SEC issues involving investigation of previous corporate management; met continuously with corporate management and financial consultants to restructure operations; prevented possible liquidation and negotiated plan of reorganization allowing company to expand and provide full and quick payment to creditors and an eventual return to shareholders

Represented committee of creditors in successful sale of publicly-held company engaged in the international manufacturing of assets of automobile chargers and

DICKINSON WRIGHT

# Carolyn J. Johnsen

Member, Phoenix

T: 602-285-5040
C: 602-684-4766
F: 602-285-5100
cjjohnsen@dickinsonwright.com

## Areas of Practice

- Bankruptcy & Restructuring
- Commercial Transactions
- Corporate
- Mergers & Acquisitions

related products

Represented committee of creditors in successful reorganization of pet care companies operating in four states

## Professional Involvement

- Arizona Bankruptcy Inn of Court, Founding Master, One of 15 lawyers selected state-wide, Board of Directors, 2012-2013
- Arizona's CARE Program, Founder and Committee Chair, 2006-2011
- Arizona Business Leadership Forum, Member, 2013
- Arizona Campaign for Women Lawyers Tribute to Sandra Day O'Connor, Co-Chair, 2006-2009
- Ninth Circuit Judicial Conference, Court-appointed Lawyer Representative, 2003-2005
- Litigation Counsel, Founding Advisory Board Member, 2006-present
- Committee of 100, ASU Law School, Member, Executive Committee
- DirectWomen Board Institute, Member, 2011
- American Academy of Trial Counsel, Founding Advisory Board Member, 2006-present
- Bankruptcy Court, Mediator, 2005-present
- Committee on Bankruptcy Self-Help Assistance, Court Appointed Member, 2005-2006
- Turnaround Management Association, Director, 1999; Member, 1998-2013
- Bankruptcy Appellate Panel Rules Committee, Court-appointed member, 2001
- American Bankruptcy Institute, Member, 1992-present
- Bankruptcy Appellate Panel Rules Committee, Court Appointed Member, 2001

## Publications/Presentations

- Presenter, "The Ins and Outs of Bankruptcy from Both the Debtor and Creditor Perspectives," Association of Corporate Counsel, Arizona Chapter (March 2013)
- Presenter/ Co-Author, "Managing the Franchise Relationship through Franchisee Receivership and Bankruptcy," ABA National Forum on Franchising (August 2012)
- Co-author, "Managing the Franchise Relationship Through Franchisee Receivership and Bankruptcy," ABA National Forum on Franchising (August 2012)
- Presenter/ Co-Author, "Chapter 11 for Mom and Pop," State Bar of Arizona CLE by the Sea (July 2012)
- Panelist, "Hot Topics in Bankruptcy," State Bar Convention (June 2012)
- Author, "The Basic Ins and Outs of the Bankruptcy Arena for District Energy System Operators," District Energy Magazine, International District Energy Association (August 2010)
- Panel Moderator "Bankruptcy Mediation: Why It Works and When to Use It," State Bar of Arizona Bankruptcy Section (May 2008)
- Author, "Bankruptcy As The New Beginning," The Phoenix Business Journal: State Bar Special Bankruptcy Section (October 2009)
- Author, "Mortgages Ltd.: Bankruptcy's Perfect Storm," Bankruptcy Litigation Reporter (September 2009)
- Author, "The Next Chapter? In Tough Times, Filing for Chapter 11 Can be a Viable Solution" Arizona Business Magazine (June 2009)
- Moderator "Arizona Real Estate 2008: A Perfect Storm of Financial Disaster - Finding Your Life Vest or Raft and Learning to Ride the Waves," Turnaround Management Association, Arizona Chapter Meeting (November 2007)
- Author, "Why You Absolutely Need to Know Something About Bankruptcy: A Guide

DICKINSON WRIGHT

# Carolyn J. Johnsen

Member, Phoenix

T: 602-285-5040
C: 602-684-4766
F: 602-285-5100
cjjohnsen@dickinsonwright.com

### Areas of Practice

- Bankruptcy & Restructuring
- Commercial Transactions
- Corporate
- Mergers & Acquisitions

to the Bankruptcy Practice," Reference Guide (2003, revised 2007)
- Author, "The 'B' Word is Not So Bad! Using Bankruptcy as a Business Tool," Arizona Journal of Real Estate & Business (June 2006)
- Presenter, "The War of the Worlds, Bankruptcy Versus . . .," American Bar Association Forum on Franchising (October 2005)
- Presenter, "Bankruptcy Abuse and Consumer Protection Act," State Bar Seminar (September 2005)
- Presenter, "The 'B' Word is Still Not So Bad!" Golf & Resort Development (August 2004 and 2005)
- Author, "Restructuring, Sales, Financing, Acquisitions," Gold Mountain Resort Development (August 2005)
- Presenter, "Bankruptcy Ethics," State Bar Convention (annual presentation June 2002-2006)
- Author, "When is Receiving a 'Preference' a Bad Thing?" High Profile Arizona (February 2005)
- Presenter, "Bankruptcy," Federal District Court Conference (annual 2002-2005)
- Presenter, "Trustees," Conference of Chief Bankruptcy Judges (December 2004)
- Presenter/Co-Author, "Bankrupt Franchisors and Franchisees," American Bar Association Forum on Franchising (October 2002)
- Co-author, "The War of the Worlds, Bankruptcy Versus…," ABA National Forum on Franchising (October 2002)
- Presenter, "Bankruptcy Litigation & Practice," PESI Continuing Education (annual 1992-2006)

**DICKINSON**WRIGHT